BYRNE GOLDENBERG & HAMILTON, PLLC
John J. Byrne, Jr.
Thomas J. Hamilton
Lloyd Goldenberg
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus
David Smitham
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MUSEUM OF MODERN ART, et al., | ) ) ) |
| Plaintiffs, | ) ) ) ) |
| v. | ) ) ) |
| JULIUS H. SCHOEPS, | ) ) ) |
| Defendant. | ) ) ) ) ) |

07 Civ. 11074 (JSR)

**NOTICE OF
MOTION TO DISMISS
COMPLAINT FOR
DECLARATORY RELIEF**

Pursuant to Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 57, the Declaratory Judgment Act, 28

Facsimile: (202) 857-9799

David H. Pikus (DP-7846)
Kenneth M. Moltner (KM-7778)
David Smitham (DS-7778)
BRESSLER AMERY & ROSS, P.C.
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

3

U.S.C. § 2201, the New York Estates, Powers, and Trusts Law (EPTL) § 11-3.2, the accompanying

Declaration of John J. Byrne, Jr. and Memorandum of Points and Authorities, defendant Julius

H. Schoeps (Schoeps) moves to dismiss the December 7, 2007 Complaint for Declaratory Relief,

filed by plaintiffs the Museum of Modern Art (MoMA) and the Solomon R. Guggenheim

Foundation (Guggenheim), on the grounds that plaintiffs have misused the declaratory judgment

remedy to wrongfully position themselves as plaintiffs in an action that they should be defending,

and that under a recently decided New York case, Schoeps v. The Andrew Lloyd Webber Art

Foundation, Slip Op. 52183(U), 2007 WL 4098215 (N.Y. Sup., November 17, 2007), defendant

Schoeps lacks both standing and the legal capacity to litigate the claims at issue, namely the

ownership rights to artworks lost by his ancestor, Paul von Mendelssohn-Bartholdy, in Nazi

Germany.

On January 4, 2008, this Court orally ordered that this motion to dismiss be served and

filed on or before February 11, 2008; that plaintiffs' opposition papers be served and filed on or

before February 25, 2008; and that reply papers be served and filed on or before February 29,

2008; and that oral argument to be held on March 5, 2008.

Dated:  New York, New York
        February 11, 2008

Respectfully submitted,

John J. Byrne, Jr. (JB 6687)
BYRNE GOLDENBERG & HAMILTON, PLLC
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036

Telephone: (202) 857-9775

2

BYRNE GOLDENBERG & HAMILTON, PLLC
John J. Byrne, Jr.
Thomas J. Hamilton
Lloyd Goldenberg
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus
David Smitham (DS-7778)
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE MUSEUM OF MODERN ART, et al., | ) ) ) | |
| Plaintiffs, | ) ) | 07 Civ. 11074 (JSR) |
| v. | ) ) | **DECLARATION OF JOHN J. BYRNE, JR. IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR DECLARATORY RELIEF** |
| JULIUS H. SCHOEPS, | ) ) | |
| Defendant. | ) ) | |
| | ) ) ) | |

JOHN J. BYRNE, JR., under penalty of perjury, declares:

   1.  I am a member of the firm of Byrne Goldenberg & Hamilton, PLLC, attorneys for

defendant Julius H. Schoeps (Schoeps) in this action. I am a member in good standing of the bar of the State of New York and the bar of the United States District Court for the Southern District of New York. I submit this Declaration in support of Schoeps' Motion to Dismiss the Complaint for Declaratory Relief. I hereby declare that all of the statements contained in this Declaration are made and based upon personal knowledge and belief, or upon having confirmed the authenticity of the various exhibits annexed to this Declaration.

2. This matter concerns a dispute as to the ownership of two paintings by Pablo Picasso: *Boy Leading a Horse*, which is at plaintiff Museum of Modern Art (MoMA); and *Le Moulin de la Galette*, which is at the Guggenheim Museum (*Boy Leading a Horse* and *Le Moulin de la Galette* will be referred to collectively as the "Paintings"). Upon information and belief, the Guggenheim Museum is owned and operated by plaintiff The Solomon R. Guggenheim Foundation (the Guggenheim Museum and the Solomon R. Guggenheim Foundation will be referred to collectively as the "Guggenheim").

3. Through a comprehensive investigation, we have discovered many documents -- as well as eyewitness testimony -- that confirm that Schoeps' great-uncle, Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy), lost the Paintings in Nazi Germany as a proximate consequence of encompassing Nazi persecution that devastated him financially, professionally and personally.

4. Mendelssohn-Bartholdy was a wealthy banker of Jewish descent. In 1795, family members founded Mendelssohn & Co. bank. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become

one of the largest private banks in Germany.  Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co.  Through Mendelssohn-Bartholdy's inheritance and success as a private banker, he owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

5.  I am a former federal prosecutor.  I have overseen the three year investigation of this matter, and I am familiar with all aspects of it.  Our investigation has been extensive.  Three German attorneys have conducted archival research concerning the fate of Mendelssohn-Bartholdy in Nazi Germany, and also have researched and analyzed relevant German law.  Other researchers have investigated and collected documents from archives and other sources in Russia, Denmark, Switzerland and the U.S.  We have had many documents translated from German into English. We have obtained personal records from several members of the extended Mendelssohn family. My law partners, Thomas Hamilton and Lloyd Goldenberg, and I have researched extensively the legal issues surrounding this claim.

6.  I traveled to Germany on three occasions in connection with this matter. During these trips I met with investigators, conducted additional research personally, and interviewed an elderly relative of Mendelssohn-Bartholdy who witnessed firsthand how Nazi persecution affected him. I also have interviewed many additional respected authorities concerning issues relevant to the persecution of Mendelssohn-Bartholdy.

**Intensive and Unrelenting Nazi Persecution From January 1933 Until May 1935 Savaged Mendelssohn-Bartholdy**

7.  Our investigation has confirmed that from the time that Hitler came to power in

January 1933 until Mendelssohn-Bartholdy died of a heart attack in May 1935, Nazi authorities persecuted Mendelssohn-Bartholdy in an encompassing manner, and wreaked havoc not only upon his business and his estate, but also upon his social and personal life.  Among other things, we have found that during this period:

a) Mendelssohn-Bartholdy sustained significant banking losses from the operation of Mendelssohn & Co., including the Nazi takeover and Aryanization of Akzeptbank, a successful and influential bank in which Mendelssohn & Co. was a shareholder;

b) The Nazi government bullied, coerced, and intimidated Jewish-owned private banks like Mendelssohn & Co.  Nazi authorities investigated a Jewish manager of Mendelssohn & Co.  Beginning in 1934, the Nazis spoke openly about extinguishing Jewish-owned private banks.  In early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (In 1938 the Nazi government "Aryanized" Mendelssohn & Co. and transferred ownership to Deutsche Bank.)

c) The personal fortune of Mendelssohn-Bartholdy plummeted after the Nazis assumed power.  In fact, Mendelssohn-Bartholdy declined to petition for an entitled reduction of his alimony obligations to his first wife, Charlotte, based upon changed financial circumstances because a public disclosure of his diminished financial status would have eroded even further the competitive viability of Mendelssohn & Co. Moreover,

4

Mendelssohn-Bartholdy's dwindling estate induced him to remove certain planned bequests from his final Contract for the Disposition of his Property.

d)  Nazi anti-Semitic policies caused Mendelssohn-Bartholdy to lose prestigious positions in business and professional organizations, and, upon information and belief, resulted in him resigning from at least one social organization;

e)  Direct Nazi Party pressure induced Mendelssohn-Bartholdy's "Aryan" chauffeur to resign because the Nazis did not approve of him working for a Jew;

f)  Nazi intimidation forced Mendelssohn-Bartholdy and his wife, Elsa, to flee Alsenstrasse near the Reichstag building -- the site of militant anti-Semitic protests -- for a modest "garden house" further away;

g)  Mendelssohn-Bartholdy relinquished a large parcel of land at his country estate, Boernicke, under apparent pressure from the Nazi Kulturamt (Cultural Office);

h)  Mendelssohn-Bartholdy placed financial encumbrances ("Grundschulden") on both his residences at Alsenstrasse and Boernicke in an apparent attempt to protect them from Nazi confiscation; and

i)  Mendelssohn-Bartholdy -- for the first time ever -- began selling many prized paintings from his extraordinary private collection, and into a depressed art market increasingly saturated with artworks surrendered by other Jewish private collectors reeling from Nazi persecution.

**Mendelssohn-Bartholdy Sold the Painting as a Proximate Consequence of Nazi Persecution**

8.  As noted, before the Nazis came to power in January 1933, Mendelssohn-Bartholdy

5

enjoyed one of the premier private art collections in Europe. We have found no evidence that Mendelssohn-Bartholdy sold -- or contemplated selling -- any artwork before the Nazis came to power in 1933.

9.  After the Nazis took power and due to the intense Nazi persecution described above, however, Mendelssohn-Bartholdy began relinquishing many of the gems of his collection into a market brimming with artworks that other victims of Nazi persecution were liquidating. In or around October 1934, Mendelssohn-Bartholdy placed the Painting and four other Picasso artworks on consignment for sale with Berlin art dealer Justin K. Thannhauser. The five Picasso works were: *Boy Leading a Horse* (1906); *Le Moulin de la Galette* (1900); *The Absinthe Drinker (Angel Fernandez de Soto)* (1903); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903).

Based upon the foregoing -- and the corresponding bleak future that Mendelssohn-Bartholdy all but certainly envisioned for himself in Nazi Germany -- it is clear that Mendelssohn-Bartholdy sold the Painting under duress and as a proximate consequence of Nazi persecution. Also, we concluded, based on our investigation, that Mendelssohn-Bartholdy concluded the sale of the paintings without advising any family member of his actions.

### The Museums ignored the Nazi-era provenance of the Paintings when the Paintings were donated to the Museums.

#### MoMA was aware of the suspicious Nazi-era provenance of *Boy Leading a Horse* even before it accepted the donation of the painting, and recently has acknowledged this provenance

10.  I attach hereto as Exhibit 1 a copy of MoMA's Provenance Research Project (PRP) internet webpage, explaining that MoMA's PRP "List of Paintings" was compiled, among other

6

things, in accordance with the American Association of Museums April 2001 *Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era*.

11. I attach as Exhibit 2, a copy of MoMA's provenance history of *Boy Leading a Horse*, which is part of its Provenance Research Project. The provenance lists Paul von Mendelssohn-Bartholdy followed immediately by Justin K. Thannhauser. Further, although the "sale" date is listed as August 31, 1935, the Museums in their Complaint have clarified their position that the sale from Mendelssohn-Bartholdy to Thannhauser occurred "by" August 31, 1935. (See Complaint for Declaratory Relief, ¶ 33).

12. On June 25, 2007, I was granted access to review certain files at MoMA relating to the provenance of *Boy Leading a Horse*. After reviewing the files, a MoMA representative made copies of documents I requested, including a September 18, 2001 letter from the Art Loss Register, Inc. to MoMA about *Boy Leading a Horse*. (See copy of this letter, attached as Exhibit 3). The Art Loss Register reports that "the name [Thannhauser in the provenance] generally does not mean good things," further affirming the notorious reputation of Thannhauser regarding Nazi confiscated art, and the need for MoMA to conduct further investigation. Further, the ALR identifies "Albert Skira" -- who worked with Thannhauser to sell *Boy Leading a Horse* to William S. Paley in Switzerland -- as a "red flag" list name, due to his notorious reputation for trafficking in Nazi looted art. Finally, the ALR goes on to note that Mendelssohn-Bartholdy "might have been related to Francesco Mendelssohn, whose collection underwent a forced sale."

13. In addition, MoMA knew the extremely suspicious circumstances of the August 1936 sale of *Boy Leading a Horse* from Thannhauser to William S. Paley, the developer of the

Columbia Broadcasting System (CBS), discussed below. Paley's knowledge of the suspicious provenance of the painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990. Paley transferred Boy Leading a Horse to MoMA in 1964, but retained a life estate. MoMA acquired full ownership of the painting in 1990, upon Paley's death.

14. Thannhauser's sale to Paley of *Boy Leading a Horse* was typical of sales made by dealers selling property relinquished by Jews in Nazi Germany. For this sale, Thannhauser worked in Switzerland with Albert Skira. Our investigation has revealed that the U.S. government considered Skira a trafficker in Nazi looted art. Further, by 1936, Switzerland had become a notorious haven for traffickers in art lost by Nazi victims. Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the marketplace lost by Jews due to Nazi persecution. In addition, Paley was a sophisticated art collector.

15. Paley recounted the details of this sale in some detail in his autobiography. (See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107. In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Id. at 107. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Id. Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. Id.

8

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the painting into the lobby for Paley.  Id.

Paley liked the painting.  Paley asked Skira the price, and found that it was -- in Paley's words -- *"quite modest."*  Paley immediately told Skira: "That's fine.  I'll buy it."  Paley described the painting as "priceless."  Id.

Paley asked Skira who owned *Boy Leading a Horse*, and **Skira refused to tell him**.  Skira stated: "That's the one thing I can't tell you.  I'm sworn to secrecy."  Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art.  Clearly, Paley -- and through him MoMA -- was put on notice that they were in all likelihood dealing with property that was stolen or lost to Nazi persecution.

> The Guggenheim disregarded *Le Moulin de la Galette's* suspicious Nazi-
> era-provenance when it accepted Thannhauser's donation of the painting.

16.  In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum.  At that time, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to the Guggenheim, including *Le Moulin de la Galette*.  Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim.  This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum:  Justin K.*

9

*Thannhauser Collection*, by Vivian Endicott Barnett.

17.  On June 25, 2007, I was granted access to review certain files at Guggenheim relating to the provenance of *Le Moulin de la Galette*.  After reviewing the files, a Guggenheim representative made copies of some of the documents I requested, including a document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 4, and a document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 5.  I have also included with both of these exhibits a document that was provided to me for ascertaining the writer of notes, which contains handwriting samples of Thannhauser and others.  The paragraphs which follow immediately below are based on these documents.

18.  In or around 1972, Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information that they had developed regarding the artworks he had bequeathed to the museum.  Thannhauser ***himself*** reviewed these documents, and  --  where appropriate  --  made corrections and additions in his own hand on the documents.  Among these documents, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*.  Thannhauser wrote on this document in his own hand that he had purchased the painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935."  (See document entitled "JKT Notes, Dec. 1972," Exhibit 4 hereto).

19.  In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and

other artworks.  During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations.  The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser."  This document appears clearly to be based in part on Thannhauser's 1972 notes.  (See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5 hereto).

20.  Rich recorded that Thannhauser told him that the painting was on consignment in Buenos Aires in 1934.  Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

"[C]onsignment; sent to B-Aires in 1934."

(See copy of "DCR Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5).

21.  Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich show that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition but before Mendelssohn-Bartholdy's death in May 1935.

22.  Vivian Endicott Barnett, in *The Guggenheim Museum:  Justin K. Thannhauser Collection* (1978), confirmed that Thannhauser purchased the *Le Moulin de la Galette* from Mendelssohn-Bartholdy in or around 1935:

11

"[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**." (Emphasis added).

23.    The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks well into the Nazi era. Therefore, the Guggenheim's acceptance of the painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title to the painting or that the true owner would not come forward to claim it.

> The Guggenheim has ignored the Nazi-era provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on actual or constructive notice of reports of Thannhauser's trafficking in Nazi-confiscated art

24.    On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson. (See copy of this article, retrieved February 11, 2008 from the internet at www.dhl-3.de/biblio/news/1997/1109a, attached as Exhibit  6). The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article noted that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article stated that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black

Guggenheim on actual or constructive notice of Thannhauser's reported trafficking in Nazi-looted art. Nonetheless, upon information and belief, the Guggenheim failed to perform any additional research regarding the possibility that Mendelssohn-Bartholdy lost *Le Moulin de la Galette* in Nazi Germany. In fact, unlike MoMA, the Guggenheim concealed the Nazi-era provenance of its painting from potential claimants by failing to place any provenance information regarding *Le Moulin de la Galette* on its website or on the Nazi-Era Provenance Internet Portal (NEPIP). NEPIP, according to its website, "provides a searchable registry of objects in U.S. museum collections that **changed hands in Continental Europe during the Nazi era (1933-1945)** . . By providing a searchable online registry of objects, the Portal helps U.S. museums fulfill their responsibility to make information about objects in their collections centrally accessible." (Emphasis added). Although the Guggenheim does not appear to dispute that *Le Moulin de la Galette* "changed hands" in Nazi Germany in the mid-1930s, it has nonetheless failed to place the painting on NEPIP.

**The Museums responded to the Mendelssohn-Bartholdy heirs' demand letter by filing this lawsuit before even refusing the claim**

26. On November 1, 2007, I sent a letter to the Museum of Modern Art (MoMA), on behalf of the Mendelssohn-Bartholdy heirs demanding that MoMA return *Boy Leading a Horse* to the heirs by November 12. (See copy of the November 1, 2007 demand letter to MoMA, a copy of

27.  On November 1, 2007, I sent a letter to the Guggenheim on behalf of the Mendelssohn-Bartholdy heirs, demanding that the museum return *Le Moulin de la Galette* to the heirs by November 12, 2007.  (See copy of the November 1, 2007 demand letter to the Guggenheim, a copy of which is attached as Exhibit 8).

28.  The Museums answered by stating that they could not respond by November 12, but that they hoped to provide a response by December 14, 2007.  Then, on December 7, 2007, the Museums filed this Complaint for Declaratory Relief.  Also, on December 7, 2007, the Museums sent a letter to us refusing our demand for the return of the Paintings.  (See December 7, 2007 letter from Evan A. Davis to John J. Byrne, Jr., a copy of which is attached as Exhibit 9).

I declare under penalty of perjury that the foregoing is true and correct.

February __11__ , 2008.

John J. Byrne, Jr.

# EXHIBIT 1

# Provenance Research Project



## >>> Introduction

The Museum of Modern Art owns approximately 600 paintings created before 1946 and acquired after 1932, that were or could have been in Continental Europe during the Nazi era. Researchers at the Museum have closely examined, and are continuing to research, the ownership, or provenance, records for works that fall within this category. The majority of these works were acquired directly from the artists or have provenance records that are sufficiently complete to eliminate the likelihood of Nazi misappropriation. Provenance research on these works, however, remains an ongoing project, and a priority, at the Museum.

In April 2000, The Museum of Modern Art's director, Glenn D. Lowry, joined other American museum directors to present testimony before The Presidential Advisory Commission on Holocaust Assets, reaffirming the museum community's commitment both to assist in the discovery of objects unlawfully appropriated during the Holocaust period and to make information on collection provenance more widely available. We publish this List of Works to further this effort (and in accordance with the American Association of Museums (AAM)'s April 2001 *Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era*).

In September 2003, the AAM launched a Nazi-Era Provenance Internet Portal (www.nepip.org), thus providing a general searchable registry of objects in U.S. museum collections that were or could have been in Continental Europe during the Nazi era (1933–1945). Works on this MoMA Web site can be cross-referenced from the AAM portal.

The Museum is currently transferring detailed provenance information on the listed works from the Museum's archival records to the electronic format of this website. Ongoing provenance research on the listed works is posted periodically, in installments, and the Museum welcomes any further information on the provenance of these collection works that users of this site may be able to provide. (Please note that the Museum's archival records for all collection works are open, as they always have been, to serious researchers.) For any information or queries on works on this list, please see Contact Information.

© 2002 The Museum of Modern Art



# Provenance Research Project





Pablo Picasso (Spanish, 1881–1973. To France 1904.)

*Boy Leading a Horse.* (early 1906)

Oil on canvas, 7' 2 3/4" x 51 1/2" (220.3 x 130.6 cm)
The Museum of Modern Art, New York. Gift of William S. Paley

Collection work meeting criteria specified in Introduction.

575.64

Other works by this artist

Provenance:

Ambroise Vollard, Paris
Gertrude and Leo Stein, Paris. By 1907 - before 1913
[Galerie Simon, Paris?]
Paul von Mendelssohn-Bartholdy, Berlin. Acquired ? [by 1934] – 1935
Justin K. Thannhauser, Berlin. Purchased from Mendelssohn-Bartholdy, August 31,1935 – Sold through Siegfried Rosengart, Lucerne (partner of Thannhauser), to Skira/Paley, August 28,1936
Albert Skira, Geneva. Purchased for Paley, August 28, 1936
William S. Paley, New York. Purchased from Albert Skira, 1936 - 1964
The Museum of Modern Art, New York. Gift of William S. Paley, 1964

Alternate titles:

*Le meneur de cheval*
*Le jeune chevalier*
*Jeune garçon au cheval*
*Boy and Horse*
*The Horse Driver*

Printing instructions

© 2002 The Museum of Modern Art

# EXHIBIT 3



# THE ART LOSS REGISTER, INC.

20 East 46th Street, Suite 1402
New York, NY 10017

Telephone: 212-297-0941
Facsimile: 212-972-5091
Email: info@ALR.ny.com

September 18, 2001

Christel Hollevoet-Force
Research Assistant, Provenance
The Museum of Modern Art
11 West 53rd Street
New York, NY 10019

Invoice: MOMA210-5

Dear Ms. Hollevoet-Force:

Thank you for your search request.  We have completed the Art Loss Register database search on the
following items:

| | |
|---|---|
| **Artist:** | Pablo Picasso |
| **Title:** | *Boy Leading a Horse* |
| **Date:** | early 1906 |
| **Medium:** | Oil on canvas |
| **Dimensions:** | 7' 2 ¾" x 51 ½" (220.3 x 130.6 cm) |
| **Provenance:** | Ambroise Vollard, Paris; Gertrude and Leo Stein, Paris, by 1907 – before 1913; Paul von Mendelssohn-Bartholdy, Berlin; Justin Thannhauser, Munich; Siegfried Rosengart, Lucerne; Albert Skira, Geneva; William S. Paley, New York, 1936; The Museum of Modern Art, New York. Gift of William S. Paley, 1964. |

Color image Provided.

ALR NOTE: Paul von Mendelssohn – Bartholdy, Berlin might have been related to
Francesco Mendelssohn , whose collection underwent a forced sale.  The Thannhauser
archives are in Geneva now, and the name generally does not mean good things.  Sigfried
Rosengart records are now in Lucerne, Switerland.  It might be worth checking with
them to get a date of sale, as Albert Skira is a red flag list name, althoug it might be
alright as the painting went to New York so early on.

**REDACTED**

 **THE ART LOSS REGISTER, INC.**

REDACTED

 # THE ART LOSS REGISTER, INC.

**REDACTED**

As of September 18, 2001, these items have not been registered as stolen or missing on the Art Loss Register database. Nor are they listed in the published sources of WWII losses that are known to the Art Loss Register. As stated in the Terms and Conditions, the database does not include items that may have been illegally exported. Also, not every theft is necessarily reported to us.

Should you have any further questions or inquiries, please do not hesitate to contact us by telephone or fax. Thank you for using the Art Loss Register.

Sincerely,

Lucy Haverland

4

# EXHIBIT 4

**The Solomon R. Guggenheim Museum Archive**
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

*152.205*

*JKTACKR*
*Dec 1940*

Museum Number 16

Pablo Picasso

Le Moulin de la Galette, Paris, 1900 *(autumn)*

Oil on canvas,  35½ x 46 (frm. stretcher rev.)

Signed b. r. "P. R. Picasso - "

Provenance:  From the artist; Paul von Mendelssohn-Bartoldy (ca. 1910;
*from* Thannhauser Gallery, Berlin (ca. 190?) - bought back by
Justin Thannhauser *ca. 1935.*

Exhibitions: Picasso, Forty Years of his Art, Museum of Modern Art,
New York, (1939), #5, p. 24 (ill.).
*? Chicago, art institute 1939 or 1940?*
Picasso: Fifty Years of his Art, Museum of Modern Art,
New York, 1946, p. 18 (ill.).

Picasso: 75th Anniversary Exhibition, Museum of Modern Art,
New York, 1957, p. 15 (ill.).

Picasso, Philadelphia Museum of Art, 1958, #4 (ill.).

Picasso, Arts Council of Great Britain, *London Tate gallery* 1960, #4, (ill. pl. 1b).

Literature:  Zervos, Christian, Pablo Picasso, I, # 4.

Cirici-Pellicer, Alexandre, Picasso Avant Picasso, trans. from
the Spanish edition of 1946 by Marguerite de Floris and
Ventura Gasol, Geneva, 1950, pp. 65-69.

Barr, Alfred H. Jr., Picasso: Fifty Years of his Art, New York,
1946, pp. 19-20.

Boeck, Wilhelm and Sabartès, Jaime, Picasso, New York, 1955, p. 147.

Asnar, Jose Camon, Picasso y el Cubismo, Madrid, 1956, #214 (ill.).

Penrose, Roland, Picasso: His Life and Work, New York, 1959,
pp. 63-64, ill. #8, pl. I.

Champris, Pierre de, Picasso, Ombre et Soleil, Paris, 1960, #3 (ill.),
p. 15.

Blunt, Anthony and Pool, Phoebe, Picasso, the Formative Years,
London, 1962, "First Visit to Paris 1900," pp. 12-14.

*Also elsewhere often reproduced.*
*Helen F. Mackenzie   Understanding   Picasso "sponsored by the*
*Art Institute of Chic." Volume at that Price 1940. Plate 1.*

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be protected by copyright.
This copy is for personal use only; do not reproduce.

**Guggenheim** MUSEUM
*Collections Research*

## Solomon R. Guggenheim Museum Archives
*Materials relating to Justin K. Thannhauser*

Handwriting Key:

- spiky handwriting = Justin K. Thannhauser

*In the 1920ᵗʰ vice-versa = a large show of American Contemporary artists, - with an illustrated Catalog, - the Exhibition was sponsored by prominent Americans, — sorry, I forgot all the names!*

- bubbly handwriting = Vivian Barnett (SRGM Curator)

*yes — for all works in Australia. Doesn't know how long*

- small handwriting = Daniel Catton Rich (SRGM Trustee), largely in conversation with Thannhauser

*Kunsthaus Zürich
Pablo Picano
Sept 11 - Oct 30, 1932
(Kleiner Katalog) only to 227*

# EXHIBIT 5

JKT

Provenances for PICASSO

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

34

## The End of the Road

Private collection, Barcelona   *By 1957 JKT.*

### Au Café, Woman and Child, Man with Pack        *All in Zürich 1932*

All Santiago Laporta, Barcelona


## Le Moulin de la Galette

From the artist; Thannhauser Gallery, Munich (c. 1909);
Paul von Mendelssohn-Bartoldy (c. 1910-1935);
Justin K. Thannhauser   *B-Aires.   sent to B-aires 1934*
*consigned*


## The Fourteenth of July

From whom was it purchased in Paris about 1937?   *1936-37   36-37*
*Picasso, — Pierre Loeb NY.*   *→ 1937*


## Woman Ironing      *Berlin, Strasbourg — Holland, another gallery to*

Did you sell it to Karl Adler about 1916 and
buy it back in the late 1930's?

Who owned it before?   *Kahnweiler (didn't deal in Picasso then)*
Acc. Zervos, A. Vollard.

## Head of a Woman   (pastel)

When did it belong to Paul von Mendelssohn-Bartoldy,
Berlin?

*loan to Leprin.   1935-36*
*Consignment*   It belonged to Justin K. Thannhauser at the time of
the 1934 Buenos Aires exhibition, didn't it? *no*


## Vase and Flowers   (drawing)

Gallery in Paris


## Two Harlequins    *August 1939*

Who was Mlle. A. Nachmann? *South of too*

When and from whom did you acquire it? *— middleman   Sent to — Cannes.*

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

**Guggenheim** MUSEUM
*Collections Research*

Solomon R. Guggenheim Museum Archives
*Materials relating to Justin K. Thannhauser*

Handwriting Key:

- spiky handwriting = Justin K. Thannhauser

*In the 1920ᵗʰ vice-versa = a large show of American Contempo-
rary artists, - with an illustrated Catalog, - the exhibition was sponsored
by prominent Americans, — sorry, I forgot all the names!*

- bubbly handwriting = Vivian Barnett (SRGM Curator)

*yes—for all work in
Australia.
Doesn't know how long*

- small handwriting = Daniel Catton Rich (SRGM
  Trustee), largely in conversation with Thannhauser

*Kunsthaus Zürich
Pablo Picano
Sept 11 - Oct 30, 1932
(Kleiner Katalog) only to 227*

# EXHIBIT 6

## Nation | World

**RELATED STORIES**
A network of profiteers
Art histories at The Fogg and The MFA

# Murky histories cloud some local art

**By Maureen Goggin and Walter V. Robinson, Globe Staff, 11/09/97**

**F**rench art dealer Cesar Mange de Hauke died in 1965. But he comes alive in declassified documents in the US National Archives: collaborating with the leader of the notorious Nazi effort to plunder artworks systematically from Jews, and driving a German staff car in occupied Paris.

Yet in 1949, just as the State Department was denying him an immigration visa because of his Nazi complicity, de Hauke sold a magnificent pastel by Edgar Degas to New York financier Maurice Wertheim, whose collection passed to the Fogg Art Museum at Harvard, his alma mater, after his death in 1950.

At the Fogg, correspondence on file shows that Wertheim was skeptical about de Hauke's right to sell Degas's "Singer with a Glove." But he bought it anyway. National Archives documents only add to those suspicions: State Department records, evidence that the art was owned by a French family whose collection was targeted by the Nazis in 1941, and information that before it fell into de Hauke's hands it belonged to a Swiss doctor who purchased at least one other looted painting.

At both the Fogg and the Museum of Fine Arts in Boston, records suggest that other European artworks acquired during and after World War II arrived with pedigrees that should have aroused curiosity, if not suspicion. Now, a half-century later, once-secret government documents have provoked a fresh accounting of what happened to the war's spoils, and have provided new evidence that some unsuspecting collectors donated artworks that may have been plundered from Jews and other European collections to major museums.

The Degas is unusual for the amount of documentation that suggests it might have passed illegally through Nazi hands and, ultimately, onto a

second-floor wall in the Fogg's most celebrated gallery, the Wertheim Collection. But the two museums have other works with suspect characteristics: unexplained wartime ownership gaps, the involvement of dealers who collaborated with Nazi art looters, and, often, a failure by the collectors or museums to make inquiries before acquiring them.

For example, a wartime FBI report suggests that the Museum of Fine Arts was nonchalant about the origin of its acquisitions during the war. The MFA's curator of prints, Henry Preston Rossiter, admitted to FBI agents in 1941 he knew that one dealer, Richard Zinser, whose works he bought routinely had been imprisoned in Germany for smuggling.

Rossiter bought prints from Zinser, including valuable works by Albrecht Durer, even though, the FBI report noted, Rossiter said Zinser "never reveals where he obtains his works."

After the FBI's visit, the MFA ceased buying Zinser's works.

Even so, in an interview on Oct. 24, MFA director Malcolm Rogers asserted the museum has always insisted that its curators carefully check the history of any acquisition. As evidence of that longstanding commitment, he cited the MFA's written "Collection Policy" that contains that requirement.

Last Thursday, a museum spokeswoman, Dawn Griffin, acknowledged that the MFA's Collection Policy had been approved by the museum's trustees on Oct. 23, the day before the Globe interview. She said, however, that it had been in preparation for more than a year. But it was not until Oct. 23 that the museum began requiring all dealers to sign bills of sale affirming their right to sell the artwork.

Griffin refused the Globe's request to release a copy of the full 12-page written policy, saying it was an internal museum document.

An open market

Mark Masurovsky, one of the first historians to find evidence about unscrupulous dealers in the National Archives, said disinterest by museums in the origin of artworks "sent a clear signal during and after the war that there was an open and unquestioning market for looted artworks in the United States." With that encouragement, de Hauke and other unscrupulous emigre dealers had a clear financial incentive to prey on Jews, said Masurovsky, who is working for the Holocaust Art Restitution Project, an effort spearheaded by the National Jewish Museum to document and locate works looted from Jews.

Jonathan Petropoulos, a historian at Loyola College in Baltimore who has written extensively about wartime plundering, said there is no evidence that American collectors and museums knew they were acquiring looted art. But the combination of seemingly legitimate

middlemen, the zeal that museums brought to building their collections and their unwillingness to ask probing questions of dealers or donors had a predictable result.

"The evidence, and it is growing, suggests that there may be hundreds of paintings in American museums that were stolen from Jews or looted from other European collections," Petropoulos said. "If you count drawings and lithographs, the number of artworks that have problematic ownership histories is probably in the thousands."

At the MFA and the Fogg, Rogers and other officials are left defending acquisitions that, in many cases, were made before they were born. They note that many artworks have gaps in their ownership, simply, and most often innocently, because owners cherish their anonymity, and sometimes forget where they bought paintings. The archival evidence pointing to other motives has only become available in the last two decades. And as public institutions, their collections are published for any claimant who wishes to come forward.

Moreover, the museum officials noted, there is no conclusive evidence that any of the paintings that the Globe asked about were stolen. And with no claimants for the artworks, much of the documentation is circumstantial.

Art specialists interviewed by the Globe said the Fogg and MFA are hardly unique among museums for acquiring art without applying any of the customary standards of due diligence that are required by law when real estate and even used cars change hands. Nowadays, most museums follow a standard practice, requiring donors and art dealers to sign documents declaring they have clear title to the artwork.

But experts in art law say such documents are legally meaningless, and amount to nothing more than a fig leaf for what the law now requires: a full title search that can identify problem artworks and provide a real defense if a claim is made.

Questionable provenance

The Globe decided to examine a small portion of the thousands of European paintings at the MFA and Fogg - modern paintings acquired during or after the war - after reporting earlier this year about war-related claims being pressed against other museums.

The Metropolitan Museum of Art in New York and the Philadelphia Museum of Art are facing allegations that they acquired looted artworks after the war. In another case, curators at the Art Institute of Chicago helped a major benefactor, Daniel Searle, acquire a Degas monotype looted from a Dutch victim of the Holocaust.

Officials at both the Fogg and the MFA cooperated, opening their

archives for inspection, and doing original - and, some critics say, long overdue - research to fill gaps in provenance, or ownership of some paintings. The results, in some instances, are embarrassing to the museums, especially the Fogg, where four paintings have questionable provenances.

At the Museum of Fine Arts, the issue is often how little it knows about some of its artworks. For example, the MFA bought a Monet painting from Brandeis University in 1974. Records at the MFA and Brandeis suggest that neither institution knew anything about the ownership of "Woodgatherers at the Edge of the Forest" during most of the century after Monet painted it in 1864. The painting was purchased in 1961 from New York dealer Alexander Ball by Harold Kaplan, who donated it to Brandeis in 1968.

Ball, according to National Archives records, had frequent dealings with Nazi art looters - and a business relationship with Hans Wendland, who funneled numerous stolen paintings into a wartime black market that included emigre dealers in New York.

At the MFA, some valuable paintings have no ownership history, except the name of the donors: The museum, for instance, knows nothing about the history of five paintings left to the museum in 1948 by one of its benefactors.

The museum has also been unable to identify who owned one of its Picassos, "Standing Figure," during the 37 years before the MFA bought the work from Swiss dealer Fritz Nathan in 1958. In a letter to the Globe suggesting that suspicions about the provenance of MFA paintings are unwarranted, George T. M. Shackelford, the curator of European paintings, said Nathan's gallery "for more than half a century was generally regarded as one of the most distinguished art galleries in Europe."

Yet Nathan was the wartime art adviser and purchasing agent for Emil G. Buhrle, a Swiss collector who knowingly bought many paintings that had been looted from Jews, according to extensive Allied interrogation reports in the National Archives. What's more, a 1921 auction catalog shows that the painting had been sold to a "Winberg."

Rogers, speaking from hindsight, said knowledge about Ball's wartime activities makes it "very unlikely" the MFA would have purchased the "Woodgathers at the Edge of the Forest" without conducting a thorough investigation. "Clearly," he said, "that would ring alarm bells."

But Rogers noted that much of the information surfaced only recently. "Inherent in the trading of any goods, as I'm sure you know since you must have bought second-hand goods yourself or from antique shops, is a matter of professional confidence," he said. As for most gaps, he added, "Human nature and memory are much more fragile than you

think, and our knowledge is often incomplete.... Incompleteness is no grounds for suspicion."

Still, he said, recent disclosures, some of them in the Globe, have led to a "new awareness [of a problem] that nobody guessed the size of, and we're all trying to cope with that."

Rogers, confronting questions about artworks acquired a half century ago, wondered why they were not raised in the 1950s and 1960s by the many Jews who, he said, were art dealers, collectors and art historians.

"But it is fascinating why in the years following the war ... more wasn't said, people weren't more enraged ... particularly since so many of the people in the art world were Jewish at that time. So many of the scholars were people who had fled. You know, most of the great giants in the art historical world were Jewish in that period ... The collectors were as well. Very strange," Rogers said.

Selling off paintings to survive

Unlike the much larger MFA, the Fogg has virtually no staff or money to undertake the sort of provenance research the Globe conducted: Its annual budget for out-of-town research is just $2,000.

The Fogg collections, built on the philanthropy of Harvard's most successful graduates, also contain their share of paintings with incomplete, and sometimes suspicious ownership records.

Across the room from the Degas in the Wertheim Collection is a haunting 1887 still life by Vincent van Gogh, "Three Pairs of Shoes," with its subliminal message about the misery of Europe's working poor. Wertheim bought it in late 1943 from the best-known of the emigre dealers, Georges Wildenstein. Wildenstein, like de Hauke, had a business relationship with Karl Haberstock, Hitler's principal art looter.

But where did Wildenstein obtain the van Gogh? According to the Fogg's records, it came from Marcel Kapferer, a French Jew. His granddaughter, Francine Legrand-Kapferer, said in a recent interview that Kapferer hid his family from the Nazis in Cannes during the war, selling off paintings one at a time to survive. Legrand-Kapferer said that her grandfather frequently reminded his family that but for those sales, they would have died.

All such sales under duress in Nazi-occupied Europe were declared invalid under a 1943 Allied declaration. If the van Gogh was among the works sold during the war - and Legrand-Kapferer said she did not know whether it was - then the artwork would enter a legal limbo.

Even more suspicious is a Monet, "La Mere Paul," listed at the Fogg as owned before the war by Paul Wittgenstein in Vienna and bought by

the Wertheim Fund for the Fogg in 1955.

At the Globe's request, Austrian journalist Hubertus Czernin searched out Nazi records in Austrian archives. They show that the Nazis confiscated a substantial art collection from a renowned Vienna concert pianist of the same name, Paul Wittgenstein, though the records are incomplete.

Wittgenstein's daughter, Joan Ripley of Charlottesville, Va., said her father, who was of Jewish ancestry, fled to New York in 1938 and as far as she knows never returned to Vienna, or recovered the bulk of his property after the war. Another relative, though, recalls a "a painting of an old woman, a Monet" that once hung in Wittgenstein's home.

The record shows that the Monet next surfaced in a gallery in Stuttgart, Germany, in 1954, where it was bought by Jacques Seligmann, another emigre dealer and associate of de Hauke who has been implicated in wartime art collaboration. Seligmann sold it to the Wertheim Fund.

The $38,500 Degas

But it is the Degas pastel that Wertheim bought the year before he died that has the most troubling history.

Maurice Wertheim was a tournament chess player, a founder of the New York Theatre Guild, for a time the owner of The Nation magazine, and the father of Barbara W. Tuchman, the Pulitzer Prize-winning historian. During the war, he was also chairman of the American Jewish Committee.

Wertheim was fearful that de Hauke did not have the right to sell the Degas, though the correspondence at the Fogg does not suggest why. To allay his fears, Wertheim had his lawyer call Justin Thannhauser, an associate of de Hauke, while de Hauke was en route to a meeting with Wertheim. Thannhauser told the lawyer that de Hauke did not own the pastel, but was selling it for a Dr. Heer of Zurich.

Yet when de Hauke arrived, he told Wertheim that his corporation owned the Degas, but refused to sign a statement saying he had authority to sell it. Wertheim nonetheless handed over a check for $38,500 for the artwork.

"Mr. Wertheim made the remark that he is aware of the fact that he took a chance with regard to the title of this picture, but that in view of the information obtained from Thannhauser, the risk involved is rather remote," the Wertheim lawyer, Hermann E. Simon, wrote at the time.

Three weeks later, Simon received a letter, apparently from de Hauke's lawyer, asserting that de Hauke bought the picture from Thannhauser - another apparent contradiction.

Ivan Gaskell, the Fogg's curator of paintings, sculpture and decorative arts, said that when he first saw the correspondence three or four years ago, he interpreted it to mean that both dealers had an interest in the work. "In and of itself, it did not suggest any suspicion," Gaskell said.

But the US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

The original listed owner of the pastel was Camille Groult. Declassified US documents show that Haberstock, the Nazi art looter with ties to de Hauke, hired another art collaborator to "expertise" the Groult collection, a common step before a confiscation or forced sale. The Groults were apparently not Jewish, and efforts to determine what happened to their collection, or whether the Degas was part of it at the time, were unavailing.

The next owner in the chain was Dr. Fritz Heer, identified in National Archives documents as a Swiss collector who purchased at least one looted painting.

Several documents that historian Mazurovsky discovered in the National Archives contain intelligence information and post-war State Department correspondence that build a case against de Hauke for his ties to Haberstock and his role in art looting, even suggesting he may have been involved in obtaining paintings for Adolf Hitler, Hermann Goering and Heinrich Himmler. Two months before Wertheim bought the Degas, a handwritten note by a State Department official concluded de Hauke "knowingly handled looted art in his deals with the Germans" and that he should be denied a visa to remain in the United States.

Gaskell, the Fogg curator, said he is eager to track down more information about the paintings, especially the Degas. In light of the archival records, he said of the one artwork,"There are clearly red lights all along the way."

Previous coverage and related links are available on Globe Online at www.boston.com. The keyword is paintings.

This story ran on page A01 of the Boston Globe on 11/09/97.
© Copyright 1997 Globe Newspaper Company.



CLICK HERE

Nobody Walks Away From This Sale.

We Pedal The Best. For Less. Click here!



© Copyright 1998 Globe
Newspaper Company



Extending our newspaper services
to the web

Return to the home page
of The Globe Online