# EXHIBIT 8

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMCAST.NET

November 1, 2007

## BY FEDERAL EXPRESS & FACSIMILE

Sarah G. Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128-0173

Re:  Demand for return of Pablo Picasso's *Le Moulin de la Galette* (1900),
(Thannhauser Collection, 78.2514.34)

Dear Ms. Austrian:

Thank you for your letter of July 13, 2007.  As you know, we represent the heirs of Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy).  By this letter, we hereby demand the return of Pablo Picasso's *Le Moulin de la Galette* (Painting), oil on canvas, approximately 88.2 x 115.5 cms., completed approximately 1900, currently at the Guggenheim Museum (Museum), Thannhauser Collection, to the heirs of Mendelssohn-Bartholdy by November 12, 2007.  If you do not return the Painting by this deadline -- or agree to do so -- we will consider this a refusal of our demand and take whatever actions we deem appropriate to protect the rights of our clients.  We believe our clients are entitled to the recovery under, among other bases, New York law regarding conversion, replevin, restitution and constructive trust.[1]

---

[1] We have set forth below the essential facts and law we believe entitle the Mendelssohn-Bartholdy heirs to the return of the Painting.  Notwithstanding the statement in your letter of July 13, we make no representation to you that we are submitting "all factual information and legal authority" in support of our claim, and we specifically reserve the right to assert additional facts and legal support for our position at any time.  You have stated that you have copies of filings in the case of Schoeps v. Webber, Index No. 116768/06, and various other relevant documents.  Further, the key documents relating to provenance regarding *Le Moulin de la Galette* are in your internal files.  Moreover, many of the historical references contained in this letter are readily accessible on the Internet, books, or other texts.  In light of the foregoing, we believe it is unnecessary to attach additional documents to this demand letter.

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

## I. **INTRODUCTION**

Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting.

Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in Berlin in 1935, and a Certificate of Inheritance was issued at that time. Our law firm represents all of the living heirs of Paul von Mendelssohn-Bartholdy.

## II. **FACTS SUPPORTING OUR DEMAND FOR THE RETURN OF THE PAINTING**

### A.  Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke). Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

Paul von Mendelssohn-Bartholdy never sold *any* art before the Nazis came to power in 1933.

2

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Painting and four other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Boy Leading a Horse* (1906); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.

As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

3

After Paul von Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, Thannhauser brought it to New York in or around 1940, where it has remained for the most part since that time.

## B. Ideological Foundations of Nazi Persecution of Jews

In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany.

## C. Nazi Persecution of Jews Became Official State Policy in 1933

The Nazis pursued their agenda to banish Jews from the economic life of Germany when Hitler became Chancellor in January 1933. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages:

1.  The first stage occurred during the years 1933-1938 when  --  precluded from an expanding list of jobs, professions, and economic activities -- Jews sold their property often at discount prices merely to survive; and

2.  The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany which, in turn, triggered the forfeiture to the Reich of all remaining Jewish-owned property.

The Nazis' campaign against the Jews began almost immediately after they took power and was inexorable.  In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions.  In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for

4

November 1, 2007                                          Byrne Goldenberg & Hamilton, PLLC

plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99.  In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state.  The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax.  When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax.  Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency.  The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.

### D.  During the Years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis, as noted, blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

The Nazis pressured private Jewish banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks  -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

### E.  Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market

A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications.  And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York. International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

### F. Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting

The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank -- one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

1. sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

2. endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized"   Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank);

3. withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

4. suffered a precipitous collapse of his personal net worth;

5. declined to petition for an entitled reduction of his alimony obligations to his first wife based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

6. surrendered under pressure extensive land from his country estate (Boernicke) to the

Nazi Kulturamt (Cultural Office);

7. placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

8. had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

9. lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance institution;

10. was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

11. as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

12. finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser. Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

Thannhauser took advantage until approximately 1938 of the depressed prices of the Berlin art market. He sold to clients internationally, including New York and Switzerland, artworks that he had obtained at discounted prices from persecuted Jewish collectors. Both during this period and after the War, Thannhauser partnered with art dealers such as Cesar Mange de Haucke and Albert Skira whom the U.S. State Department identified as trafficking in Nazi-looted art.

The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune. For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan"

Deutsche Bank. Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed. Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

### III. THE U.S. AND STATE OF NEW YORK HAVE CONSISTENTLY PURSUED POLICIES AND ENACTED LAWS TO INVALIDATE "FORCED SALES" AND OTHER COERCIVE TRANSFERS OF PROPERTY IN NAZI GERMANY -- SUCH AS MENDELSSOHN-BARTHOLDY'S SALE OF THE PAINTING TO THANNHAUSER -- AND TO RESTITUTE SUCH PROPERTY TO NAZI VICTIMS AND THEIR HEIRS. THESE U.S. RESTITUTION PRINCIPLES HAVE ACHIEVED INTERNATIONAL ACCEPTANCE, AND WILL APPLY IN THIS MATTER.

#### A. Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners

Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

### B. Military Government Law No. 59 (MGL No. 59) Was the Centerpiece of Post-War U.S. Restitution Policy

U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1). MGL No. 59 applied in the American Occupation Zone, and was the first Holocaust restitution law enacted for application in post-war Germany.

MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. See § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required even persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

### C. The U.S. actively and successfully promoted the adoption of MGL No. 59's restitution principles to the British and French in their respective "Occupation Zones" and in Berlin. Ultimately, even the Germans themselves enacted laws incorporating the principles of MGL No. 59 for application in all of Germany

The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S. National Security Council (NSC) drafted the "*Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC. In its directive to the U.S. High Commissioner for Germany, the NSC pronounced that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . . To carry out this policy, you should **seek agreement from your British and French colleagues** to **persuade the German Government** to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70. (Emphasis added). Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself. For example:

1. **The Berlin Restitution Law of 1949.**

   MGL No. 59 was the controlling law for the U.S. "Occupation Zone" in Germany after 1947, but did not apply to Berlin. Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law. No. 59. The provisions regarding the "presumption of confiscation" and potential rebuttal thereof are virtually identical.

2. **Britain and France passed restitution laws in their "Occupation Zones" similar to MGL No. 59.**

   Britain and France passed laws in their individual German "Occupation Zones" that were similar to MGL No. 59 and the Berlin Restitution Law. (See British Military Law 59, and currently applicable provisions of French law (article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No-1344 dated September 30, 1949).

### 3. **German restitution laws are patterned after MGL No. 59.**

(a) After the Allies left the Federal Republic of Germany (West Germany), the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59 and the Berlin Restitution Law of 1949. (See "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

(b) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 — which are, of course, the same as MGL No. 59.

The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution).

Accordingly, under the restitution principles pioneered by the United States and accepted by the Allies, Germany and others, the Mendelssohn-Bartholdy heirs are entitled to recover the Painting as a result of Mendelssohn-Bartholdy's duress sale of the Painting to Thannhauser in Nazi Germany.

## IV. **IN RECENT YEARS, THE U.S. STATE DEPARTMENT, U.S. CONGRESS, AND STATE OF NEW YORK HAVE REAFFRIMED AND REINVIGORATED THEIR POLICIES AND EFFORTS IN FAVOR OF HOLOCAUST ART RESTITUTION**

### A. **The U.S. Department of State Has Always been Strongly Committed to Holocaust Art Restitution. In the 1990s, the State Department Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations**

The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is clearly expressed in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's

11

opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Advisor, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in the United States District Court for the Southern District of New York, which identifies MGL No. 59 as exemplifying U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See also Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit amended mandate and followed expression of Executive Policy in April 13, 1949 Jack B. Tate letter quoted above, as to a jurisdictional issue).

In the 1990's, the U.S. Department of State created a special office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy. The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries.

The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

### B. Against the Backdrop of Executive Branch Holocaust Restitution Policy, the U.S. Congress -- in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies

In 1998, the U.S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years

November 1, 2007                                          Byrne Goldenberg & Hamilton, PLLC

1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567. These statutes confirm U.S. policy to facilitate the return of confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

In summary:

1.  The Redress Act seeks to assist Holocaust victims in their efforts to recover artworks and other assets lost in Nazi Germany. (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by  international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective."

2.  The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U.S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No. 59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

3.  The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U.S. government. Among its accomplishments, the Presidential Commission negotiated an agreement with the American Association of Museums (AAM) for the creation of a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). To comply with this agreement, the AAM created the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org) in 2003, with hyperlinked museum websites where detailed provenance information is provided.  NEPIP and the hyperlinked museum websites will sometimes be referred to herein as the "NEPIP system." As discussed infra, the investigation of this case began in 2005 when Mendelssohn-Bartholdy heir Julius Schoeps (Schoeps), through his agents, discovered on NEPIP and the hyperlinked Museum

13

of Modern Art's "Provenance Research Project" (located at www.moma.org) that Paul von Mendelssohn-Bartholdy sold Pablo Picasso's *Boy Leading a Horse* in Nazi Germany to Berlin art dealer Justin K. Thannhauser.

### C.  Since 1997, New York State Has Proclaimed a Signal Public Policy to Help Victims Of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945

On June 25, 1997, then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

Governor Pataki repeatedly has underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution.  In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of history's darkest times."

The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution.  The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales.  See, e.g., HCPO Press Releases dated, respectively, June 17, 2003, November 17, 2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks lost as a consequence of forced sales.

### V. <u>THE MENDELSSOHN-BARTHOLDY HEIRS HAVE NOT UNREASONABLY DELAYED MAKING THIS DEMAND, SINCE THEY WERE NOT AWARE OF THEIR RIGHTS TO THE PAINTING UNTIL THE EFFORTS OF THE U.S. GOVERNMENT AND STATE OF NEW YORK MADE NECESSARY INFORMATION AVAILABLE TO THEM</u>

#### A. Until 2005, no heir of Paul von Mendelssohn-Bartholdy knew he had sold any art in Nazi Germany

Until 2005, no Mendelssohn-Bartholdy heir knew that their ancestor, Paul von Mendelssohn-Bartholdy, sold any artworks in Nazi Germany.  In 2005, Mendelssohn-Bartholdy heir Julius Schoeps, through his attorneys, first discovered the sale in Nazi Germany by Mendelssohn-Bartholdy to Thannhauser of Picasso's *Boy Leading a Horse* on the NEPIP system. As discussed infra, the NEPIP system was created as part of a massive undertaking by the State of New York and the U.S. government -- from the late 1990's through today -- to make documents and information available to Holocaust claimants so that they can identify,

investigate, and make claims to recover artworks that may have been lost as a result of Nazi persecution. NEPIP provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). It was created by the American Association of Museums (AAM) pursuant to an agreement with the Presidential Commission created by the Commission Act (1998). New York's HCPO also was active in NEPIP's development.

But for the efforts of the State of New York and the U.S. government to make information available to Holocaust victims and their heirs, the Mendelssohn-Bartholdy heirs might never have discovered -- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold these paintings under duress in Nazi Germany.

Once Schoeps was made aware of the NEPIP entry, he acted diligently throughout 2005-2007 to investigate, among other things, the relationship between Mendelssohn-Bartholdy and Thannhauser, the art collection of Mendelssohn-Bartholdy, additional sales Mendelssohn-Bartholdy made under duress, Nazi persecution of Mendelssohn-Bartholdy, the location of the other Mendelssohn-Bartholdy heirs, and other matters which enabled him to make this demand in 2007.

**B. The "Wall of Silence" which denied Holocaust claimants access to information that would allow them to investigate and reclaim lost property**

Until recently, Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available. This historical deficiency has been widely recognized. For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**wall of silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

**C. The U.S. Congress, U.S. Department of State, and State of New York began intensive efforts in the late 1990s to tear down the "Wall of Silence," that is, to make information and documents available to Holocaust claimants so that they could develop and prosecute claims for the recovery of property lost during the Nazi era**

In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example:

1.  In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations.  The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945.  The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

2.  In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections.  In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

3.  In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants.  As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

4.  In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended. Upon meeting some initial resistance to acceptance of the AAMD guidelines, State Department representatives re-drafted the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

5.  The Presidential Commission, created by the Commission Act of 1998,

negotiated an agreement with the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. This agreement led to the creation of the Nazi-Era Provenance Internet Portal (NEPIP), www.nepip.org in September 2003, which was in part federally funded. NEPIP lists art that has a Nazi-Era provenance, that is, art that changed ownership in Europe between 1933-1945. NEPIP is connected by hyperlink to individual museum Websites where detailed provenance information can be accessed. The New York Holocaust Claims Processing Office (HCPO) actively participated in the AAM task force established to create NEPIP;

6.  In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively — and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

7.  In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs Provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art — all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission — it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

**D. The efforts of the U.S. Government and State of New York to help victims of Nazi persecution and their heirs to recover confiscated artworks are on-going, and more relevant information continues to become available**

The U.S. Government and the State of New York began a process in the late 1990s that, among other things, has given Holocaust claimants increased access to documents and information worldwide. However, progress has been slow in some areas and the release of additional archives, documents and information is continuing.

For example, in 2006, the Claims Conference published a survey it conducted of U.S. museums' participation in NEPIP. The survey reports that NEPIP "lists approximately 18,000 items, or slightly higher than **12 percent** of the total number" of objects (over 140,000) that

November 1, 2007                                                      Byrne Goldenberg & Hamilton, PLLC

museums have determined are within the NEPIP criteria. Further, of "the museums that do clearly state that they are conducting provenance research, **52 percent have completed research on less than half of the relevant items** in their collection and a further 33 percent did not provide information on the extent to which they had completed the work." See "Nazi-Era Stolen Art and U.S. Museums: A Survey And Joint Project of the Claims Conference and the World Jewish Restitution Organization (WJRO)"(2006) (questionnaire sent on February 10, 2006 to 332 U.S. art museums to ascertain museums' progress in adhering to recognized principles concerning Nazi-era looted art).

New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing. (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

**E. This claim Was Made Possible <u>Only</u> by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990s -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

This claim was made possible by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. For example, in 2005, Schoeps first discovered that his Jewish ancestor, Paul von Mendelssohn-Bartholdy, sold a Picasso painting to art dealer Justin K. Thannhauser in Nazi Germany from information published on NEPIP and the hyperlinked Museum of Modern Art (MoMA), Provenance Research Project (PRP).

Based on the information discovered on NEPIP and MoMA's PRP in 2005, Schoeps -- and later the other Mendelssohn-Bartholdy heirs -- through their agents, investigated Mendelssohn-Bartholdy's relationship with Justin K. Thannhauser and his sale of Picasso artworks to Thannhauser. Ultimately, the heirs discovered that Mendelssohn-Bartholdy had sold five Picasso artworks to Thannhauser under duress in Nazi Germany, including, of course, *Le Moulin de la Galette*.

18

Byrne Goldenberg & Hamilton, PLLC

As noted, NEPIP and the museums' related websites were developed by the AAM as a result of the AAM's agreement with the Presidential Commission. The Presidential Commission was created by the Commission Act of 1998. In addition, the NEPIP project has received some federal funding. Also, the State of New York played an important role in the development of NEPIP, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since this claim to recover the Painting grew out of information discovered on NEPIP and a related museum website, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and information to enable them to develop claims.

### F. The Mendelssohn-Bartholdy heirs, Through Their Agents, Have Acted Diligently Throughout 2005-2007 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany

Once Schoeps became aware of Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he and other Mendelssohn-Bartholdy heirs have acted diligently in 2005-2007 to complete this investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, the circumstances of his sale of art under Nazi duress, and other matters which enabled us to make this demand. The Mendelssohn-Bartholdy, through their agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

### VI. THE MUSEUM DISREGARDED THE PAINTING'S SUSPICIOUS NAZI-ERA PROVENANCE WHEN IT ACCEPTED THE PAINTING INTO ITS COLLECTION, AND CONTINUED TO IGNORE PROVENANCE PROBLEMS EVEN AS THEY BECAME MORE APPARENT. AS A RESULT, THE MUSEUM NEVER OBTAINED A COMMERCIALLY REASONABLE BELIEF THAT IT HAD ACQUIRED GOOD TITLE TO THE PAINTING, OR THAT THE TRUE OWNER WOULD NOT COME FORWARD TO CLAIM IT.

The Museum failed in its obligation "to inquire about the validity of title before completing the transaction." U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004). Moreover, as additional facts became known over time which cast further doubt on the "validity of title," the Museum ignored them. The Museum's actions with regard to the acquisition and continued possession of the Painting without inquiring into its background is more egregious in light of the U.S. government's circular letters warning museums and others against acquiring Nazi-confiscated art, and New York courts' condemnation of the lax practices of the art world in art trading, as discussed below.

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

### A. Following the War, the U.S. Government Repeatedly Cautioned Museums and the International Art Market About Acquiring Nazi-Confiscated Art

The formal policies of economic coercion and duress that Nazi Germany employed against its Jewish citizens during the years 1933-45, and its subsequent seizure and plunder of artworks in occupied countries, resulted in enormous displacement of art which the U.S. government and its Allies attempted to rectify after the War.

In 1946, the U.S. Department of State (State Department) issued a circular letter to U.S. museums, auction houses and dealers advising that the legal restrictions on the importation of artworks from Nazi-occupied countries had been lifted and urging precautions against acquiring contraband materials.

In 1951, the State Department issued a second circular letter to the U.S. art industry reiterating this warning. In light of the State Department warnings, the Museum clearly would have been aware of the dangers of acquiring Nazi-confiscated art in approximately the early 1970s when Thannhauser advised the Guggenheim Museum that he was bequeathing the Painting and other artworks.

### B. For More Than 35 Years, New York Courts Have  Condemned How Casually Art is Acquired on the International Market, and Have Announced a Policy to Protect Victims of Art Theft in Order to Safeguard the Commercial Integrity of the New York City Art Market

Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned such individuals to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"; Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of... title...it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art... and diminishes the integrity of the apathetic merchant."

In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

### C. The Museum Disregarded the Painting's Suspicious Nazi-Era Provenance When It Accepted the Painting Into Its Collection

In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum. At that time, the Museum began investigating the provenance and history of artworks Thannhauser had bequeathed to the Museum, including *Le Moulin de la Galette*. Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Museum.[2]

Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information they had developed regarding the artworks he had bequeathed to the Museum. Thannhauser *himself* reviewed these documents, and -- where appropriate -- made corrections and additions in his own hand on the documents.

In 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*. Thannhauser wrote on this document in his own hand that he had purchased the Painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935." (See document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive).

In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document clearly was based in part on Thannhauser's 1972 notes.

Rich recorded that Thannhauser told him that the Painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

"[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive).

Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich establish that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser

---

[2] This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum: Justin K. Thannhauser Collection*, by Vivian Endicott Barnett.

November 1, 2007                                                              Byrne Goldenberg & Hamilton, PLLC

purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition but before Mendelssohn-Bartholdy's death in May 1935.

Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser Collection* (1978), confirmed that Thannhauser purchased the Painting from Mendelssohn-Bartholdy in or around 1935:

> "[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935.**" (Emphasis added; <u>see</u> Attachment 5).

Therefore, by 1975, the Guggenheim was aware that:

(a) Paul von Mendelssohn-Bartholdy was Jewish based, among other reasons, upon the fact that "Mendelssohn" is a common name of Jewish origin and Mendelssohn-Bartholdy was descended from a famous German Jewish family;

(b) Mendelssohn-Bartholdy was from Berlin (<u>see</u> document entitled "JKT Notes" regarding another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under duress to Thannhauser, and that Thannhauser bequeathed to the Museum, where Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, ***Berlin***" [emphasis added]);

(c) Nazi persecution of Jews began immediately after the Nazis took power in 1933, and increased in intensity throughout 1933-1935;

(d) Mendelssohn-Bartholdy sold the Painting and another artwork that Thannhauser was donating to the Museum, *Head of a Woman,* between the time they were on consignment in Buenos Aires in October 1934 and Mendelssohn-Bartholdy's death in May 1935;

(e) In addition, minimal additional research would have revealed:

> (1) the Mendelssohn family suffered tremendous persecution during the Nazi era; and

> (2) the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo Picasso artworks on consignment in Buenos Aires in October 1934, further evidence that Mendelssohn-Bartholdy was selling his art under duress; and

(f) U.S. State Department "circular letters" warned museums that Nazi confiscated artworks were entering the U.S. marketplace, and urged them to take precautions against acquiring such works.

The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks. Therefore, the Museum's acceptance of the Painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title or that the true owner would not come forward to claim the Painting.

### D. The Museum has ignored the Nazi-era provenance of the Painting from 1972 up to the present time, despite being placed on notice of Thannhauser's trafficking in Nazi-confiscated art

On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art,*" by Maureen Goggin and Walter V. Robinson. The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article notes that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article states that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war."

The front-page Boston Globe article placed the Guggenheim Museum on further notice of Thannhauser's dealings in Nazi-era art, and the need to investigate the provenance of the artworks in the so-called "Thannhauser Collection" at the Museum to ascertain whether they were Nazi-confiscated.

Despite the Museum's increasing knowledge of Thannhauser, no additional research was performed regarding the possibility that Mendelssohn-Bartholdy lost the Painting in Nazi Germany.

## VII. CONCLUSION AND DEMAND FOR RETURN OF THE PAINTING

In light of the foregoing, the Mendelssohn-Bartholdy heirs demand return of the Painting by November 12, 2007.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

23



**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial (212) 225-2850
E-Mail edavis@cgsh.com

ROGER W THOMAS
MARK A. WALKER
LESLIE B SAMUELS
ALLAN G SPERLING
MAX GITTER
EVAN A DAVIS
LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
ROBERT L TORTORIELLO
A RICHARD SUSKO
LEE C BUCHHEIT
JAMES M PEASLEE
ALAN L BELLER
THOMAS J MOLONEY
JONATHAN I BLACKMAN
WILLIAM F GORIN
MICHAEL L RYAN
ROBERT P DAVIS
YARON Z REICH
RICHARD S LINCER
JAIME A EL KOURY
STEVEN G HOROWITZ
ANDREA G PODOLSKY
STEVEN M LOEB
DANIEL S STERNBERG
DONALD A STERN
CRAIG B BROOD
SHELDON H ALSTER
WANDA J OLSON
MITCHELL A LOWENTHAL
DEBORAH M BUELL
EDWARD J ROSEN
LAWRENCE B FRIEDMAN
NICOLAS GRABAR

CHRISTOPHER E AUSTIN
SETH GROSSHANDLER
WILLIAM A GROLL
JANET L FISHER
DAVID L BUDERMAN
HOWARD S ZELBO
DAVID E BRODSKY
ARTHUR H KOHN
ANA DEMEL
RAYMOND B CHECK
RICHARD J COOPER
JEFFREY S LEWIS
PAUL J SHIM
YVETTE P TEOFAN
STEVEN L WILNER
ERIKA M NIJENHUIS
LINDSEE P GRANFIELD
DAVID C LOPEZ
CARMEN A CORRALES
JAMES L BROMLEY
PAUL E GLOTZER
MICHAEL A GERSTENZANG
LEWIS J LIMAN
NEIL Q WHORISKEY
JORGE U JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND
JEFFREY A ROSENTHAL
ETHAN A KLINGSBERG
MICHAEL D DAYAN
CARMINE D BOCCUZZI JR
JEFFREY D KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
DAVID I GOTTLIEB

LEONARD C JACOBY
SANDRA L FLOW
FRANCISCO L CESTERO
DANA G FLESCHMAN
FRANCESCA LAVIN
SANG JIN HAN
WILLIAM L MCRAE
JASON FACTOR
MARGARET S STOWERS
LISA M SCHWEITZER
KRISTOFER W HESS
JUAN G GIRALDEZ
DUANE MCLAUGHLIN
BREON S PEACE
RESIDENT PARTNERS

SANDRA M ROCKS
ELLEN M CREEDE
S DOUGLAS BORISKY
JUDITH KASSEL
DAVID E WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S MORAG
MARY E ALCOCK
GABRIEL J MESA
DAVID H HERRINGTON
MARK A ADAMS
HEIDE H ILGENFRITZ
DAVID S BERG
KATHLEEN M EMBERGER
NANCY I RUBION
WALLACE L LARSON JR
RESIDENT COUNSEL

December 7, 2007

<u>BY FEDERAL EXPRESS AND E-MAIL</u>

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

Re:   *Boy Leading a Horse* and *Le Moulin de la Galette*

Dear Mr. Byrne:

On behalf of The Museum of Modern Art ("MoMA") and The Solomon R. Guggenheim Foundation (the "Guggenheim") (collectively, the "Museums"), I write to respond to the letters you sent to each museum dated November 1, 2007, declaring that you represent the heirs of Paul von Mendelssohn-Bartholdy ("von Mendelssohn-Bartholdy"), setting forth your clients' claims of title to two paintings by Pablo Picasso, *Boy Leading a Horse*, which MoMA acquired as a gift from William S. Paley in 1964, and *Le Moulin de la Galette* (collectively, the "Paintings"), which the Guggenheim acquired as a gift from Justin K. Thannhauser ("Thannhauser") in 1963, and demanding that the Museums return, or agree to return, the Paintings to your clients within 11 days of the date of the letters.

In keeping with their ethical standards and obligation to honor legitimate claims, the Museums have scrupulously reviewed your clients' claim that the sale of the Paintings, which were once in von Mendelssohn-Bartholdy's collection, to Thannhauser in or around 1935 was made under "duress." The Museums have carefully researched and investigated the provenance of the Paintings, including the factual circumstances surrounding their sale, and have concluded that your clients' claims are without merit. Accordingly, the Museums hereby refuse your demand to return the Paintings to your clients.

John J. Byrne, Jr., Esq., p. 2

       In response to your stated intention to "take whatever actions we deem appropriate to protect the rights of our clients," the Museums are filing a complaint today in the United States District Court for the Southern District of New York against your clients seeking an order from the Court declaring your clients' claims to be invalid.

       I enclose herewith a courtesy copy of the complaint, and ask that you agree to accept service on your clients' behalf.

Sincerely,

Evan A. Davis

Enclosure