UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE MUSEUM OF MODERN ART, et al.,

        Plaintiffs,

   v.

JULIUS H. SCHOEPS,

        Defendant.

07 Civ. 11074 (JSR)

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT JULIUS H. SCHOEPS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

---

BYRNE GOLDENBERG & HAMILTON, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

BRESSLER, AMERY & ROSS
A Professional Corporation
17 State Street
New York, New York 10004

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................i

I.      INTRODUCTION .....................................................................................1

II.     STATEMENT OF FACTS ........................................................................4

     A.    Paul von Mendelssohn-Bartholdy lost the Paintings
          as a result of Nazi persecution. ...............................................4

     B.    The Museums ignored the Nazi-era provenance of the
          Paintings when the Paintings were donated to the Museums. ...............6

          1.    MoMA was aware of the suspicious Nazi-era
          provenance of *Boy Leading a Horse* even before it accepted
          the donation of the painting, and recently has
          acknowledged this provenance .............................................6

          2.    The Guggenheim disregarded *Le Moulin de la Galette's*
          suspicious Nazi-era-provenance when it accepted Thannhauser's
          donation of the painting .......................................................8

             a.   The Guggenheim has ignored the Nazi-era provenance
          of *Le Moulin de la Galette* from 1972 up to the present time,
          despite being placed on either on actual or constructive
          notice of Thannhauser's trafficking in Nazi-confiscated art................11

     C.    The Museums responded to the Mendelssohn-Bartholdy
          heirs' demand letter by filing this lawsuit before even
          refusing the claim...................................................................12

III.    ARGUMENT ..........................................................................................12

     A.    The Museums' Complaint should be dismissed because
          defendant Schoeps -- in his personal capacity -- lacks
          both standing and the legal capacity to litigate an
          ownership dispute regarding art that Mendelssohn-
          Bartholdy lost due to Nazi persecution.  Under the recent
          ruling of the New York Supreme Court in Schoeps v.
          Webber, the Surrogate's Court first must appoint Schoeps
          the "personal representative" of the estate of Mendelssohn-
          Bartholdy before he can litigate such claims ........................................12

B.    The Court should dismiss the Museums' Complaint on the separate prudential ground that the Museums wrongfully filed this suit surreptitiously to gain an improper procedural advantage  --  a misuse of the Declaratory Judgment Act ....................... 15

CONCLUSION ........................................................................................................... 18

# TABLE OF AUTHORITIES

## Federal Cases

Capitol Records, Inc. v. Optical Recording Corporation, 810 F. Supp. 1350, 1354 (S.D.N.Y. 1992) .................................................................................................................. 16, 17

Great American Insurance Company v. Houston General Insurance Company, 735 F. Supp. 581 (S.D.N.Y. 1990) ........................................................................................................ 16, 17

Wilton v. Seven Falls Co, 515 U.S. 277 (1995) .................................................................. 15, 16

## State Cases

Elghanayan v. Elghanayan, 190 A.D.2d 449 (1st Dept. 1993) ..................................................... 13

Schoeps v. The Andrew Looyd Webber Art Foundation, Slip Op. 52183 (U), 2007 WL 4098215 (Supreme Court, New York Co., November 17, 2007 (Acosta, J.).........2,3, 12,13, 15

Solomon R. Guggenheim Foundation v. Lubell, 153 A.D.2d 143, 147 (1st Dept. 1990) ...... 14, 16

## Federal Statutes

28 U.S.C. 2201 et seq.............................................................................................. 15

## Other Authorities

Barnett, Vivian Endicott, *The Guggenheim Museum: Justin K. Thannhauser Collection*........8

Paley, William S., *As It Happened, A Memoir by William S. Paley, Founder and Chairman CBS* p. 107 (Doubleday 1979)................................................................................7, 8, 9

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT JULIUS H. SCHOEPS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF**

## I. INTRODUCTION

Defendant Julius H. Schoeps (Schoeps) moves to dismiss the Complaint for Declaratory Relief (Complaint) filed against him by plaintiffs the Museum of Modern Art (MoMA) and the Solomon R. Guggenheim Foundation (Guggenheim) (MoMA and Guggenheim will be referred to jointly as "Museums") on or about December 7, 2007.

This case involves a dispute over the ownership of two paintings by Pablo Picasso: *Boy Leading a Horse*, which is at MoMA, and *Le Moulin de la Galette*, which is at the Guggenheim (the two paintings may be referred to jointly as the "Paintings").[1]  The paintings were surrendered by Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) in Nazi Germany as a proximate and intended consequence of unrelenting Nazi persecution.  (See, e.g., accompanying February 11, 2008 Declaration of John J. Byrne, Jr. (Declaration), ¶ 7).

On November 1, 2007, counsel for the heirs of Mendelssohn-Bartholdy sent letters to the Museums demanding the return of the Paintings to the Mendelssohn-Bartholdy heirs.  (See Declaration, Exhibits 8 and 9).  On December 7, 2007, the Museums responded by filing the Complaint, and then sent a letter to counsel for the Mendelssohn-Bartholdy heirs refusing the demand for the return of the Paintings and providing a copy of the Complaint that had already been filed.  (See Declaration, ¶ 28, Exhibit 9).

As noted above, the demand for the return of the Paintings was made on behalf of the Mendelssohn-Bartholdy heirs  --  not on Schoeps' personal behalf.[2]  Yet, the Museums have sued

---

[1] The two Paintings are identified in the Complaint as "Plaintiffs-in-rem."

[2] Schoeps is one of many Mendelssohn-Bartholdy heirs.

Schoeps alone in his individual capacity.  Accordingly, Schoeps feels compelled to move to

dismiss this action in light of the recent decision of the Supreme Court of New York in Schoeps

v. The Andrew Lloyd Webber Art Foundation, Slip Op. 52183(U), 2007 WL 4098215 (N.Y.

Sup., November 17, 2007) (Schoeps v. Webber).  In Schoeps v. Webber, the court dismissed an

action that Schoeps had brought against The Andrew Lloyd Webber Art Foundation (Webber

Foundation), on grounds that Schoeps in his personal capacity lacks both the legal capacity as

well as standing to sue to recover art that Mendelssohn lost as a result of Nazi persecution, even

though all the other heirs have assigned their rights to him.  The court ruled that the Surrogate's

Court first must appoint Schoeps as a duly qualified personal representative of the estate of

Mendelssohn-Bartholdy before he can file suit or represent the estate or the other heirs in

litigation involving artworks lost by Paul von Mendelssohn-Bartholdy.  Schoeps v. Webber, at 2.

 Accordingly, Schoeps moves to dismiss this case under Schoeps v. Webber because he

personally lacks both standing and the legal capacity to litigate ownership of the Paintings.[3]

The Court additionally should dismiss this action because the Museums have misused the

federal declaratory judgment remedy.  The Museums have wrongfully commenced this

proceeding as a preemptive strike to gain an improper procedural advantage by winning a "race

to the courthouse."  The Museums -- disingenuously --  are attempting to misrepresent

themselves as wronged parties both to this Court and the media, and thereby to conceal the

transparent truth that they long have possessed artworks that they had every reason to suspect

were surrendered by persecuted Jews in Nazi Germany as a direct and intended consequence of

systematic Nazi coercion.  In holding the subject Paintings under these circumstances, the

---

[3] Schoeps does not agree with the findings or ruling in Schoeps v. Webber, and has a pending Motion for Leave to Reargue before the Supreme Court, and has also filed a Notice of Appeal.  Nonetheless, at this juncture, Schoeps feels constrained to move to dismiss this suit in light of the findings in Schoeps v. Webber.

2

Museums are tangible beneficiaries of Nazi policies.  Moreover, the Museums' ploy perverts the purpose of the federal declaratory judgment remedy, and contravenes the public interest in promoting settlement discussions so that scarce judicial resources may be conserved.  Rather than encouraging settlement discussions, the Museums' misconduct instead creates contrary incentives for aggrieved parties  --  such as the Mendelsohn-Bartholdy heirs  --  to "sue first" and ask questions later to ensure that they will not improperly be made defendants in a Complaint.

In addition, the Museums' stratagem of intimidation and wrongful misuse of the federal declaratory remedy improperly deters Holocaust victims and their heirs from making legitimate claims for the recovery of Nazi-confiscated artworks in Museums' collections. As publicly supported, tax-exempt organizations the Museums as a matter of law are accountable to the clarion policies of both the federal government as well as New York State to return to rightful owners artworks lost as a consequence of Nazi persecution. The Museums' blitzkrieg tactics against Holocaust victims and their heirs not only chill legitimate claims, but also are calculated to deflect attention from the many serious breaches of fiduciary duty that the Museums -- as putative trustees for the public -- have committed both in accepting and retaining the Paintings in their collections.

The Court has broad discretion as to whether it will accept jurisdiction of a complaint for declaratory relief, and Schoeps requests that the Court refuse jurisdiction and dismiss this ill-conceived action on prudential and public policy grounds.  The "natural plaintiffs" in this case are the heirs of Mendelssohn-Bartholdy, and we will proceed on their behalf as soon as a personal representative is appointed by the New York Surrogate's Court to represent the Mendelssohn-Bartholdy estate, as required by Schoeps v. Webber, p. 3.

## II. STATEMENT OF FACTS

### A. Paul von Mendelssohn-Bartholdy lost the Paintings as a result of Nazi persecution.

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn[4], were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. (See Complaint, ¶ 20). Family members founded Mendelssohn & Co. bank in 1795. (Declaration, ¶ 4. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany. (Declaration, ¶ 4).

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Through Mendelssohn-Bartholdy's inheritance and success as a private banker, he owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others. (Declaration, ¶ 4).

Paul von Mendelssohn-Bartholdy never sold **any** art before the Nazis came to power in 1933. (Declaration, ¶ 8).

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in

---

[4] Schoeps is the founder and director of the Moses Mendelssohn Center for European Jewish Studies, located in

May 1935.  (Declaration, ¶ 7).

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy.  In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank, including the Aryanization of Akzeptbank, which Mendelssohn & Co. owned in part; suffered a precipitous decline in his personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations because of his Jewish background; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under direct Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation.  Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection. (Declaration, ¶ 7).

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser Picasso's *Boy Leading a Horse*, *Le Moulin de la Galette*, and three other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); (1900); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903).   Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.  The fact that Mendelssohn-Bartholdy made these sales -- the first sales of art in his life -- after suffering relentless pressure that had devastated him financially, professionally and socially, confirms that

---

Potsdam, Germany.

these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that

his heirs are the true owners of the paintings under New York and U.S. law.  (Declaration, ¶ 8-9).

**B.  The Museums ignored the Nazi-era provenance of the Paintings when the Paintings were donated to the Museums.**

**1.  MoMA was aware of the suspicious Nazi-era provenance of *Boy Leading a Horse* even before it accepted the donation of the painting, and recently has acknowledged this provenance**

MoMA placed *Boy Leading a Horse* on its online Provenance Research Project (PRP),

which it created to fulfill its obligations to make available to the public provenance information

for paintings with a Nazi-era provenance.  (See Declaration ¶ 10-11, Exhibit 2). The ownership

history, or provenance, lists Paul von Mendelssohn-Bartholdy as an owner followed immediately by

Justin K. Thannhauser.  Further, although the "sale" date from Mendelssohn-Bartholdy to

Thannhauser is listed as August 31, 1935, in their Complaint for Declaratory Relief, the Museums

acknowledge that this actually means "by" August 31, 1935.  (See Complaint for Declaratory

Relief, ¶ 33).

In addition, MoMA knew the extremely suspicious circumstances of the August 1936 sale

of *Boy Leading a Horse* from Thannhauser to William S. Paley, the developer of the Columbia

Broadcasting System (CBS), discussed below.  Paley's knowledge of the suspicious provenance

of the painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990.

(See Complaint, ¶ 1; Declaration, ¶ 13).[5]

Thannhauser's sale to Paley of *Boy Lead a Horse* was a prototype of dealers selling

property relinquished by Jews in Nazi Germany.  For this sale, Thannhauser worked in

---

[5] Paley transferred *Boy Leading a Horse* to MoMA in 1964, but retained a life estate.  MoMA acquired full ownership of the painting in 1990, upon Paley's death.  (Complaint, ¶ 1).

Switzerland with Albert Skira - - a Swiss art dealer known for trafficking in Nazi looted art.[6]  By

1936, Switzerland had become a notorious haven for traffickers in art lost by Nazi victims in

forced sales.  Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted

in Germany by the Nazis in September 1935, had increased the number of artworks in the

marketplace lost by Jews due to Nazi persecution.  In addition, Paley was a sophisticated art

collector.

In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the

Palace Hotel.  See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder*

*and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.  Skira told Paley: "I've

got a great painting here [Geneva].  You must come right down and see it."  Id.  Paley told Skira

he was too tired, but Skira "insisted."  When Paley still refused to travel to Geneva to look at the

painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a*

*Horse*, arriving in St. Moritz the next day in a truck to present the painting to Paley.  Skira used a

truck because *Boy Leading a Horse* was too large to fit into a car.  Id.

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and

brought the painting into the lobby for Paley.  Id.

Paley liked the painting.  Paley asked Skira the price, and found that it was  --  in Paley's

words -- ***"quite modest."***  Paley immediately told Skira: "That's fine.  I'll buy it."  Paley

described the painting as "priceless."  Id.

Paley asked Skira who owned *Boy Leading a Horse*, and ***Skira refused to tell him***.  Skira

stated: "That's the one thing I can't tell you.  I'm sworn to secrecy."  Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the

---

[6] For discussion of Thannhauser's trafficking in Nazi-looted art, see discussion infra.

painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley -- and through him MoMA -- was put on notice that they were in all likelihood dealing with property that was stolen or lost to Nazi persecution.

### 2. The Guggenheim disregarded *Le Moulin de la Galette's* suspicious Nazi-era-provenance when it accepted Thannhauser's donation of the painting.

In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum. At that time, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to the Guggenheim, including *Le Moulin de la Galette*. Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim.[7]

Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information that they had developed regarding the artworks he had bequeathed to the museum. Thannhauser *himself* reviewed these documents, and -- where appropriate -- made corrections and additions in his own hand on the documents.

In 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*. Thannhauser wrote on this document in his own hand that he had purchased the painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935." (See document entitled "JKT Notes, Dec. 1972," from the Solomon R.

---

[7] This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum: Justin K. Thannhauser Collection*, by Vivian Endicott Barnett.

Guggenheim Museum Archive, a copy of which is attached to the Declaration as Exhibit 4).

In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document clearly was based in part on Thannhauser's 1972 notes.

Rich recorded that Thannhauser told him that the painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

> "[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached to the Declaration as Exhibit 5).

Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich establish that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition but before Mendelssohn-Bartholdy's death in May 1935.

Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser Collection* (1978), confirmed that Thannhauser purchased the *Le Moulin de la Galette* from Mendelssohn-Bartholdy in or around 1935:

> "[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**."

(Emphasis added).

Therefore, by 1975, the Guggenheim was aware that:

(a) Paul von Mendelssohn-Bartholdy was Jewish based, among other reasons, upon the fact that "Mendelssohn" is a common name of Jewish origin and Mendelssohn-Bartholdy was descended from a famous German Jewish family;

(b) Mendelssohn-Bartholdy was from Berlin (see document entitled "JKT Notes" regarding another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under duress to Thannhauser, and that Thannhauser bequeathed to the museum, where Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, ***Berlin***" [emphasis added]);

(c) Nazi persecution of Jews began immediately after the Nazis took power in 1933, and increased in intensity throughout 1933-1935;

(d) Mendelssohn-Bartholdy sold the painting and another artwork that Thannhauser was donating to the museum, *Head of a Woman,* between the time they were on consignment in Buenos Aires in October 1934 and Mendelssohn-Bartholdy's death in May 1935;

(e) In addition, minimal additional research would have revealed:

(1) the Mendelssohn family suffered tremendous persecution during the Nazi era; and

(2) the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo Picasso artworks on consignment in Buenos Aires in October 1934, further evidence that Mendelssohn-Bartholdy was selling his art under duress; and

(f) U.S. State Department "circular letters" warned museums that Nazi confiscated artworks were entering the U.S. marketplace, and urged them to take precautions against acquiring such works.

The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks well into the Nazi era. Therefore, the Guggenheim's acceptance of the painting without performing additional research into Mendelssohn-Bartholdy's

sale to Thannhauser left it with no commercially reasonable expectation that it had good title to the painting or that the true owner would not come forward to claim it.

> **a.  The Guggenheim has ignored the Nazi-era provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on either on actual or constructive notice of Thannhauser's trafficking in Nazi-confiscated art**

On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson.  (See Declaration, Exhibit 6).  The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family.  In addition, the article noted that Thannhauser's business partner in this sale was Cesar Mange de Hauke  --  a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity.  The article stated that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide.  Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war."

The front-page Boston Globe article placed the Guggenheim on either actual or constructive notice of Thannhauser's reported dealings in Nazi-era art, and the need to investigate the provenance of the artworks in the so-called "Thannhauser Collection" at the Guggenheim to ascertain whether they were Nazi-confiscated.  Upon information and belief, no additional research was performed regarding the possibility that Mendelssohn-Bartholdy lost *Le Moulin de la Galette* in Nazi Germany.  In fact, unlike MoMA, the Guggenheim concealed the Nazi-era provenance of its painting from potential claimants by failing to place any provenance

information regarding *Le Moulin de la Galette* on the Nazi-Era Provenance Internet Portal (NEPIP, www.nepip.org) or its website.

### C. The Museums responded to the Mendelssohn-Bartholdy heirs' demand letter by filing this lawsuit before even refusing the claim

On November 1, 2007, counsel for the Mendelssohn-Bartholdy heirs sent separate letters: to MoMA demanding the return *Boy Leading a Horse* to the heirs; and to the Guggenheim demanding the return *Le Moulin de la Galette.* (See copy of the November 1, 2007 demand letter to MoMA, a copy of which is attached to the Declaration as Exhibit 7; see also copy of the November 1, 2007 demand letter to the Guggenheim, a copy of which is attached to the Declaration as Exhibit 8).

On December 7, 2007, the Museums filed this Complaint for Declaratory Relief. Also, on December 7, 2007, the Museums sent a letter to us refusing our demand for the return of the Paintings. (See December 7, 2007 letter from Evan A. Davis to John J. Byrne, Jr., a copy of which is attached to the Declaration as Exhibit 9).

## III. ARGUMENT

### A. The Museums' Complaint should be dismissed because defendant Schoeps -- in his personal capacity -- lacks both standing and the legal capacity to litigate an ownership dispute regarding art that Mendelssohn-Bartholdy lost due to Nazi persecution. Under the recent ruling of the New York Supreme Court in Schoeps v. Webber, the Surrogate's Court first must appoint Schoeps the "personal representative" of the estate of Mendelssohn-Bartholdy before he can litigate such claims.

As noted, the November 1, 2007 letters sent to the Museums demanded the return of the Paintings to the heirs of Paul von Mendelssohn-Bartholdy, not to Schoeps personally. Yet, in response to the November 1 demand letters, the Museums filed suit against Schoeps on December 7, 2007.

This action against Schoeps should be dismissed. In the recently decided case of Schoeps

12

v. The Andrew Lloyd Webber Art Foundation, Slip Copy, 2007 WL 4098215 (N.Y. Sup.,

November 19, 2007) (Schoeps v. Webber), the court held that Schoeps -- in his personal

capacity -- does not have standing or the legal capacity to litigate ownership rights to paintings

lost by Paul von Mendelssohn-Bartholdy in Nazi Germany. Id. The Schoeps v. Webber court

found that the Surrogate's Court must appoint Schoeps the "personal representative" of the estate

of Mendelssohn-Bartholdy before he can litigate such claims. Id.

In Schoeps v. Webber, Schoeps -- in his personal capacity -- filed a Complaint in the

Supreme Court of New York, County of New York, seeking the restitution of Pablo Picasso's

painting *The Absinthe Drinker (Angel Fernandez de Soto)*. Like the Paintings at issue in this

case, Paul von Mendelssohn-Bartholdy lost *The Absinthe Drinker (Angel Fernandez de Soto)* in

Nazi Germany through a duress sale to Justin Thannhauser. In fact, Mendelssohn-Bartholdy sold

*The Absinthe Drinker (Angel Fernandez de Soto)* at the same time as the Paintings at issue in this

case.

In Schoeps v. Webber, Schoeps argued that he could litigate ownership rights to paintings

lost by Mendelssohn-Bartholdy due to Nazi persecution in his personal capacity, since he was an

heir of Mendelssohn-Bartholdy and all other heirs had assigned to him their rights to *The*

*Absinthe Drinker (Angel Fernandez de Soto)* for purposes of the lawsuit. Further, since

Mendelssohn-Bartholdy clearly had no cause of action to recover the painting in Nazi Germany

before he died in 1935, Schoeps argued that the New York Estates, Powers and Trusts Law

(EPTL) provisions regarding the appointment of a "personal representative" for Mendelssohn-

Bartholdy's estate did not apply. See Elghanayan v. Elghanayan, 190 A.D.2d 449 (1st Dept.

1993) (where decedent had no "cause of action" to protect at the time of his death -- and the

cause of action sued for accrued after decedent's death -- then the EPTL provisions regarding

the appointment of a personal representative do not apply and heirs may sue in their personal capacity). Schoeps argued that since this action did not accrue until November 2006 -- when the Mendelssohn-Bartholdy heirs demanded the return of the painting and the Webber Foundation refused -- Schoeps could sue in his personal capacity. See Solomon R. Guggenheim Foundation v. Lubell, 153 A.D.2d 143, 147 (1st Dept. 1990) (possessor commits no conversion under New York law until a demand is made for the return of an artwork and the possessor refuses to return it).

The court in Schoeps v. Webber, however, rejected Schoeps' arguments and dismissed the case. While the court noted "the very significant issues raised by the litigation," it nonetheless felt "constrained" to dismiss the action because Schoeps lacks standing to bring it without first being appointed a personal representative of the estate. Id. at 2. The court agreed that Mendelssohn-Bartholdy had no cause of action in Nazi Germany, but found that the "wrong" occurred during his lifetime and that any rights to the painting therefore belonged to his estate:

> [A]lthough plaintiff is correct in asserting that any cause of action asserted by Paul von Mendelssohn-Bartholdy would have been fruitless and probably nonexistent during his lifetime given the Nazi regime, the wrong nonetheless occurred during his lifetime and thus any rights to the painting necessarily belonged to his estate at the time of his death.

Id. at 3. The court concluded that since any "rights to the painting" belonged to the estate of Mendelssohn-Bartholdy at the time of his death, EPTL § 11-3.2 applies and the Surrogate's Court must appoint a "personal representative" of the estate of Mendelssohn-Bartholdy to litigate ownership rights to the painting. Id.[8]

The court additionally reasoned that the "New York Legislature designated the Surrogate's Court as the gatekeeper for estate-related claims. The appointment of a personal

---

[8] Schoeps emphatically disagrees with the court's decision to dismiss this case. On December 28, 2007, Schoeps

14

representative protects all the parties from after-the-fact claims of persons who alleged not to have assigned their interest to plaintiff." Id. at 3.

The court ruled, accordingly, that "to pursue this matter, plaintiff will have to convince the Surrogate's Court that he qualifies to be appointed the personal representative of Paul von Mendelssohn-Bartholdy's United States estate consisting of the painting." Id. at 2.

As a result of the ruling in Schoeps v. Webber, Schoeps feels compelled to move to dismiss the Museums' complaint for declaratory relief. Under Schoeps v. Webber, Schoeps in this case does not have standing or the legal capacity to litigate ownership rights to paintings lost by Paul von Mendelssohn-Bartholdy until he is appointed the personal representative of Mendelssohn-Bartholdy's estate. Indeed, we have retained counsel in New York and hope to have Schoeps appointed expeditiously.

In light of the foregoing, Schoeps requests that the Court dismiss the Museums' Complaint for Declaratory Relief.

### B.  The Court should dismiss the Museums' Complaint on the separate prudential ground that the Museums wrongfully filed this suit surreptitiously to gain an improper procedural advantage  --  a misuse of the Declaratory Judgment Act

The Court enjoys equitable discretion to dismiss any action brought under the Declaratory Judgment Act, 28 U.S.C. §2201, et. seq. (1994 ed.).  Unlike many federal statutory remedies, a petitioner has no automatic right to declaratory relief.  Rather, as the Supreme Court emphasized in Wilton v. Seven Falls Co, 515 U.S. 277 (1995), federal courts possess broad discretion to adjudicate declaratory actions: "(w)e have repeatedly characterized the Declaratory Judgment Act as an 'enabling Act', which confers discretion on the courts rather than an absolute right upon the litigant." Id. at 288.  Accordingly, "(i)n the declaratory judgment context, the normal principle that

---

filed a motion for leave to reargue, under CPLR § 2221, which is still pending.  On December 3, 2007, Schoeps filed a Notice of Appeal of the court's dismissal.

federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Id.

Federal courts sitting in New York routinely have dismissed complaints for declaratory relief when it is apparent that plaintiffs have misused the Declaratory Judgment Act to gain some procedural advantage. See, e.g., Great American Insurance Company v. Houston General Insurance Company, 735 F. Supp. 581 (S.D.N.Y. 1990). In Great American, the court ruled that a declaratory action served no useful purpose when it was filed during settlement discussions and 4 days before a settlement deadline. Id. at 586. Citing a "classic example of a race to the courthouse," the court denounced "the misuse of the Declaratory Judgment Act to gain a procedural advantage," and declared that "(t)he Federal Declaratory Judgment was not designed to countenance such procedural manipulation of...actions". Id. at 586; see also Capitol Records, Inc. v. Optical Recording Corporation, 810 F. Supp. 1350, 1354 (S.D.N.Y. 1992) (instructing that potential plaintiffs should be encouraged to attempt settlement discussions in good faith and with dispatch before filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation against them).

In this case, there can be no doubt that the Museums acted improperly to gain a procedural advantage, and they clearly misused the Declaratory Judgment Act. As noted, the Mendelssohn-Bartholdy heirs demanded by letter dated November 1, 2007, that the Paintings be returned to them. The Museums responded by filing suit on December 7, 2007, and then sending Mendelssohn-Bartholdy heirs' counsel an email refusing to return the Paintings, with the filed complaint attached. Thus, the Museums filed suit before the Mendelssohn-Bartholdy heirs even had a cause of action to recover the Paintings. See, e.g., Solomon R. Guggenheim Foundation v. Lubell, 153 A.D.2d 143, 147 (1st Dept. 1990) (claimant has no cause of action for conversion or replevin until he has

16

made a demand for the return of an artwork, and the possessor refuses to return it).  Accordingly, by filing suit under these circumstances, the Museums crossed the finish line of their "race to the courthouse" before the Mendelssohn heirs even heard the starting gun.  The Museums' "race to the courthouse" to gain an illicit tactical advantage and to portray themselves to this Court and the media as "victims" of an unfair demand  --  rather than knowing possessors of art coerced from Jewish victims in Nazi Germany  --  is clearly a misuse of the federal declaratory remedy, and this action should be dismissed.  See Great American, 735 F. Supp. at 586.

In addition, by dismissing the Museums' Complaint, this Court will advance the policy of encouraging settlement discussions in good faith before lawsuits are filed so that scant judicial resources may be preserved.  Capitol Records, 810 F. Supp. at 1354.  The Museums, in this case, filed this suit before even informing the Mendelssohn-Bartholdy heirs of their refusal to return the Paintings  --  thereby denying the heirs the opportunity to hear a coherent statement of the Museums' position before they commenced litigation.  Much less did the Museums afford the Mendelssohn-Bartholdy heirs an opportunity to discuss a possible settlement of their claims. Accordingly, the Court should dismiss this case to deter misuse of the declaratory judgment remedy and to encourage good faith settlement discussions before lawsuits are filed.  Id.

## IV. **CONCLUSION**

For the foregoing reasons, defendant Julius Schoeps requests that the Museums'

Complaint for Declaratory Relief be dismissed in its entirety and with prejudice.

Respectfully submitted,

John J. Byrne, Jr. (JB-6687)
BYRNE GOLDENBERG & HAMILTON, PLLC
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036

Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus (DP-7846)
Kenneth M. Moltner (KM-7778)
David Smitham (DS-7778)
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps