BYRNE GOLDENBERG & HAMILTON, PLLC
John J. Byrne, Jr.
Thomas J. Hamilton
Lloyd Goldenberg
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus
David Smitham (DS-7778)
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MUSEUM OF MODERN ART, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JULIUS H. SCHOEPS, <br><br> Defendant. | 07 Civ. 11074 (JSR) <br><br> **DECLARATION OF JOHN J. BYRNE, JR. IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR DECLARATORY RELIEF** |

JOHN J. BYRNE, JR., under penalty of perjury, declares:

1. I am a member of the firm of Byrne Goldenberg & Hamilton, PLLC, attorneys for

defendant Julius H. Schoeps (Schoeps) in this action. I am a member in good standing of the bar of the State of New York and the bar of the United States District Court for the Southern District of New York. I submit this Declaration in support of Schoeps' Motion to Dismiss the Complaint for Declaratory Relief. I hereby declare that all of the statements contained in this Declaration are made and based upon personal knowledge and belief, or upon having confirmed the authenticity of the various exhibits annexed to this Declaration.

2. This matter concerns a dispute as to the ownership of two paintings by Pablo Picasso: *Boy Leading a Horse*, which is at plaintiff Museum of Modern Art (MoMA); and *Le Moulin de la Galette*, which is at the Guggenheim Museum (*Boy Leading a Horse* and *Le Moulin de la Galette* will be referred to collectively as the "Paintings"). Upon information and belief, the Guggenheim Museum is owned and operated by plaintiff The Solomon R. Guggenheim Foundation (the Guggenheim Museum and the Solomon R. Guggenheim Foundation will be referred to collectively as the "Guggenheim").

3. Through a comprehensive investigation, we have discovered many documents -- as well as eyewitness testimony -- that confirm that Schoeps' great-uncle, Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy), lost the Paintings in Nazi Germany as a proximate consequence of encompassing Nazi persecution that devastated him financially, professionally and personally.

4. Mendelssohn-Bartholdy was a wealthy banker of Jewish descent. In 1795, family members founded Mendelssohn & Co. bank. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become

one of the largest private banks in Germany. Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Through Mendelssohn-Bartholdy's inheritance and success as a private banker, he owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

5. I am a former federal prosecutor. I have overseen the three year investigation of this matter, and I am familiar with all aspects of it. Our investigation has been extensive. Three German attorneys have conducted archival research concerning the fate of Mendelssohn-Bartholdy in Nazi Germany, and also have researched and analyzed relevant German law. Other researchers have investigated and collected documents from archives and other sources in Russia, Denmark, Switzerland and the U.S. We have had many documents translated from German into English. We have obtained personal records from several members of the extended Mendelssohn family. My law partners, Thomas Hamilton and Lloyd Goldenberg, and I have researched extensively the legal issues surrounding this claim.

6. I traveled to Germany on three occasions in connection with this matter. During these trips I met with investigators, conducted additional research personally, and interviewed an elderly relative of Mendelssohn-Bartholdy who witnessed firsthand how Nazi persecution affected him. I also have interviewed many additional respected authorities concerning issues relevant to the persecution of Mendelssohn-Bartholdy.

### Intensive and Unrelenting Nazi Persecution From January 1933 Until May 1935 Savaged Mendelssohn-Bartholdy

7. Our investigation has confirmed that from the time that Hitler came to power in

3

January 1933 until Mendelssohn-Bartholdy died of a heart attack in May 1935, Nazi authorities persecuted Mendelssohn-Bartholdy in an encompassing manner, and wreaked havoc not only upon his business and his estate, but also upon his social and personal life.  Among other things, we have found that during this period:

a) Mendelssohn-Bartholdy sustained significant banking losses from the operation of Mendelssohn & Co., including the Nazi takeover and Aryanization of Akzeptbank, a successful and influential bank in which Mendelssohn & Co. was a shareholder;

b) The Nazi government bullied, coerced, and intimidated Jewish-owned private banks like Mendelssohn & Co.  Nazi authorities investigated a Jewish manager of Mendelssohn & Co.  Beginning in 1934, the Nazis spoke openly about extinguishing Jewish-owned private banks.  In early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (In 1938 the Nazi government "Aryanized" Mendelssohn & Co. and transferred ownership to Deutsche Bank.)

c) The personal fortune of Mendelssohn-Bartholdy plummeted after the Nazis assumed power.  In fact, Mendelssohn-Bartholdy declined to petition for an entitled reduction of his alimony obligations to his first wife, Charlotte, based upon changed financial circumstances because a public disclosure of his diminished financial status would have eroded even further the competitive viability of Mendelssohn & Co. Moreover,

Mendelssohn-Bartholdy's dwindling estate induced him to remove certain planned bequests from his final Contract for the Disposition of his Property.

d) Nazi anti-Semitic policies caused Mendelssohn-Bartholdy to lose prestigious positions in business and professional organizations, and, upon information and belief, resulted in him resigning from at least one social organization;

e) Direct Nazi Party pressure induced Mendelssohn-Bartholdy's "Aryan" chauffeur to resign because the Nazis did not approve of him working for a Jew;

f) Nazi intimidation forced Mendelssohn-Bartholdy and his wife, Elsa, to flee Alsenstrasse near the Reichstag building -- the site of militant anti-Semitic protests -- for a modest "garden house" further away;

g) Mendelssohn-Bartholdy relinquished a large parcel of land at his country estate, Boernicke, under apparent pressure from the Nazi Kulturamt (Cultural Office);

h) Mendelssohn-Bartholdy placed financial encumbrances ("Grundschulden") on both his residences at Alsenstrasse and Boernicke in an apparent attempt to protect them from Nazi confiscation; and

i) Mendelssohn-Bartholdy -- for the first time ever -- began selling many prized paintings from his extraordinary private collection, and into a depressed art market increasingly saturated with artworks surrendered by other Jewish private collectors reeling from Nazi persecution.

**Mendelssohn-Bartholdy Sold the Painting as a Proximate Consequence of Nazi Persecution**

8. As noted, before the Nazis came to power in January 1933, Mendelssohn-Bartholdy

5

enjoyed one of the premier private art collections in Europe. We have found no evidence that Mendelssohn-Bartholdy sold -- or contemplated selling -- any artwork before the Nazis came to power in 1933.

9. After the Nazis took power and due to the intense Nazi persecution described above, however, Mendelssohn-Bartholdy began relinquishing many of the gems of his collection into a market brimming with artworks that other victims of Nazi persecution were liquidating. In or around October 1934, Mendelssohn-Bartholdy placed the Painting and four other Picasso artworks on consignment for sale with Berlin art dealer Justin K. Thannhauser. The five Picasso works were: *Boy Leading a Horse* (1906); *Le Moulin de la Galette* (1900); *The Absinthe Drinker (Angel Fernandez de Soto)* (1903); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903).

Based upon the foregoing -- and the corresponding bleak future that Mendelssohn-Bartholdy all but certainly envisioned for himself in Nazi Germany -- it is clear that Mendelssohn-Bartholdy sold the Painting under duress and as a proximate consequence of Nazi persecution. Also, we concluded, based on our investigation, that Mendelssohn-Bartholdy concluded the sale of the paintings without advising any family member of his actions.

> **The Museums ignored the Nazi-era provenance of the Paintings when the Paintings were donated to the Museums.**
>
> > MoMA was aware of the suspicious Nazi-era provenance of *Boy Leading a Horse* even before it accepted the donation of the painting, and recently has acknowledged this provenance

10. I attach hereto as Exhibit 1 a copy of MoMA's Provenance Research Project (PRP) internet webpage, explaining that MoMA's PRP "List of Paintings" was compiled, among other

things, in accordance with the American Association of Museums April 2001 *Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era.*

11. I attach as Exhibit 2, a copy of MoMA's provenance history of *Boy Leading a Horse*, which is part of its Provenance Research Project. The provenance lists Paul von Mendelssohn-Bartholdy followed immediately by Justin K. Thannhauser. Further, although the "sale" date is listed as August 31, 1935, the Museums in their Complaint have clarified their position that the sale from Mendelssohn-Bartholdy to Thannhauser occurred "by" August 31, 1935. (See Complaint for Declaratory Relief, ¶ 33).

12. On June 25, 2007, I was granted access to review certain files at MoMA relating to the provenance of *Boy Leading a Horse*. After reviewing the files, a MoMA representative made copies of documents I requested, including a September 18, 2001 letter from the Art Loss Register, Inc. to MoMA about *Boy Leading a Horse*. (See copy of this letter, attached as Exhibit 3). The Art Loss Register reports that "the name [Thannhauser in the provenance] generally does not mean good things," further affirming the notorious reputation of Thannhauser regarding Nazi confiscated art, and the need for MoMA to conduct further investigation. Further, the ALR identifies "Albert Skira" -- who worked with Thannhauser to sell *Boy Leading a Horse* to William S. Paley in Switzerland -- as a "red flag" list name, due to his notorious reputation for trafficking in Nazi looted art. Finally, the ALR goes on to note that Mendelssohn-Bartholdy "might have been related to Francesco Mendelssohn, whose collection underwent a forced sale."

13. In addition, MoMA knew the extremely suspicious circumstances of the August 1936 sale of *Boy Leading a Horse* from Thannhauser to William S. Paley, the developer of the

Columbia Broadcasting System (CBS), discussed below. Paley's knowledge of the suspicious provenance of the painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990. Paley transferred Boy Leading a Horse to MoMA in 1964, but retained a life estate. MoMA acquired full ownership of the painting in 1990, upon Paley's death.

14. Thannhauser's sale to Paley of *Boy Leading a Horse* was typical of sales made by dealers selling property relinquished by Jews in Nazi Germany. For this sale, Thannhauser worked in Switzerland with Albert Skira. Our investigation has revealed that the U.S. government considered Skira a trafficker in Nazi looted art. Further, by 1936, Switzerland had become a notorious haven for traffickers in art lost by Nazi victims. Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the marketplace lost by Jews due to Nazi persecution. In addition, Paley was a sophisticated art collector.

15. Paley recounted the details of this sale in some detail in his autobiography. (See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107. In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Id. at 107. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Id. Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. Id.

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the painting into the lobby for Paley. Id.

Paley liked the painting. Paley asked Skira the price, and found that it was -- in Paley's words -- ***"quite modest."*** Paley immediately told Skira: "That's fine. I'll buy it." Paley described the painting as "priceless." Id.

Paley asked Skira who owned *Boy Leading a Horse*, and **Skira refused to tell him**. Skira stated: "That's the one thing I can't tell you. I'm sworn to secrecy." Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley -- and through him MoMA -- was put on notice that they were in all likelihood dealing with property that was stolen or lost to Nazi persecution.

> The Guggenheim disregarded *Le Moulin de la Galette's* suspicious Nazi-era-provenance when it accepted Thannhauser's donation of the painting.

16. In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum. At that time, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to the Guggenheim, including *Le Moulin de la Galette*. Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim. This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum: Justin K.*

*Thannhauser Collection*, by Vivian Endicott Barnett.

17. On June 25, 2007, I was granted access to review certain files at Guggenheim relating to the provenance of *Le Moulin de la Galette*. After reviewing the files, a Guggenheim representative made copies of some of the documents I requested, including a document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 4, and a document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 5. I have also included with both of these exhibits a document that was provided to me for ascertaining the writer of notes, which contains handwriting samples of Thannhauser and others. The paragraphs which follow immediately below are based on these documents.

18. In or around 1972, Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information that they had developed regarding the artworks he had bequeathed to the museum. Thannhauser ***himself*** reviewed these documents, and -- where appropriate -- made corrections and additions in his own hand on the documents. Among these documents, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*. Thannhauser wrote on this document in his own hand that he had purchased the painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935." (See document entitled "JKT Notes, Dec. 1972," Exhibit 4 hereto).

19. In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and

other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document appears clearly to be based in part on Thannhauser's 1972 notes. (See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5 hereto).

20. Rich recorded that Thannhauser told him that the painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

> "[C]onsignment; sent to B-Aires in 1934."

(See copy of "DCR Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5).

21. Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich show that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition but before Mendelssohn-Bartholdy's death in May 1935.

22. Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser Collection* (1978), confirmed that Thannhauser purchased the *Le Moulin de la Galette* from Mendelssohn-Bartholdy in or around 1935:

11

> "[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**." (Emphasis added).

23. The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks well into the Nazi era. Therefore, the Guggenheim's acceptance of the painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title to the painting or that the true owner would not come forward to claim it.

> The Guggenheim has ignored the Nazi-era provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on actual or constructive notice of reports of Thannhauser's trafficking in Nazi-confiscated art

24. On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson. (See copy of this article, retrieved February 11, 2008 from the internet at www.dhl-3.de/biblio/news/1997/1109a, attached as Exhibit 6). The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article noted that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article stated that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black

12

Guggenheim on actual or constructive notice of Thannhauser's reported trafficking in Nazi-looted art. Nonetheless, upon information and belief, the Guggenheim failed to perform any additional research regarding the possibility that Mendelssohn-Bartholdy lost *Le Moulin de la Galette* in Nazi Germany. In fact, unlike MoMA, the Guggenheim concealed the Nazi-era provenance of its painting from potential claimants by failing to place any provenance information regarding *Le Moulin de la Galette* on its website or on the Nazi-Era Provenance Internet Portal (NEPIP). NEPIP, according to its website, "provides a searchable registry of objects in U.S. museum collections that **changed hands in Continental Europe during the Nazi era (1933-1945)** . . By providing a searchable online registry of objects, the Portal helps U.S. museums fulfill their responsibility to make information about objects in their collections centrally accessible." (Emphasis added). Although the Guggenheim does not appear to dispute that *Le Moulin de la Galette* "changed hands" in Nazi Germany in the mid-1930s, it has nonetheless failed to place the painting on NEPIP.

**The Museums responded to the Mendelssohn-Bartholdy heirs' demand letter by filing this lawsuit before even refusing the claim**

26. On November 1, 2007, I sent a letter to the Museum of Modern Art (MoMA), on behalf of the Mendelssohn-Bartholdy heirs demanding that MoMA return *Boy Leading a Horse* to the heirs by November 12. (See copy of the November 1, 2007 demand letter to MoMA, a copy of

13

which is attached hereto as Exhibit 7).

27. On November 1, 2007, I sent a letter to the Guggenheim on behalf of the Mendelssohn-Bartholdy heirs, demanding that the museum return *Le Moulin de la Galette* to the heirs by November 12, 2007. (See copy of the November 1, 2007 demand letter to the Guggenheim, a copy of which is attached as Exhibit 8).

28. The Museums answered by stating that they could not respond by November 12, but that they hoped to provide a response by December 14, 2007. Then, on December 7, 2007, the Museums filed this Complaint for Declaratory Relief. Also, on December 7, 2007, the Museums sent a letter to us refusing our demand for the return of the Paintings. (See December 7, 2007 letter from Evan A. Davis to John J. Byrne, Jr., a copy of which is attached as Exhibit 9).

I declare under penalty of perjury that the foregoing is true and correct.

February 11, 2008.

John J. Byrne, Jr.