BYRNE GOLDENBERG & HAMILTON, PLLC
John J. Byrne, Jr.
Thomas J. Hamilton
Lloyd Goldenberg
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus
David Smitham (DS-7778)
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____
)
)
)
THE MUSEUM OF MODERN ART, et al.,      )
                                       )        07 Civ. 11074 (JSR)
                    Plaintiffs,        )
                                       )        **DECLARATION OF**
        v.                             )        **JOHN J. BYRNE, JR.**
                                       )        **IN SUPPORT OF**
JULIUS H. SCHOEPS,                     )        **MOTION TO DISMISS**
                                       )        **COMPLAINT FOR**
                    Defendant.         )        **DECLARATORY RELIEF**
                                       )
                                       )
_____)


JOHN J. BYRNE, JR., under penalty of perjury, declares:

1. I am a member of the firm of Byrne Goldenberg & Hamilton, PLLC, attorneys for

defendant Julius H. Schoeps (Schoeps) in this action. I am a member in good standing of the bar of the State of New York and the bar of the United States District Court for the Southern District of New York. I submit this Declaration in support of Schoeps' Motion to Dismiss the Complaint for Declaratory Relief. I hereby declare that all of the statements contained in this Declaration are made and based upon personal knowledge and belief, or upon having confirmed the authenticity of the various exhibits annexed to this Declaration.

2. This matter concerns a dispute as to the ownership of two paintings by Pablo Picasso: *Boy Leading a Horse*, which is at plaintiff Museum of Modern Art (MoMA); and *Le Moulin de la Galette*, which is at the Guggenheim Museum (*Boy Leading a Horse* and *Le Moulin de la Galette* will be referred to collectively as the "Paintings"). Upon information and belief, the Guggenheim Museum is owned and operated by plaintiff The Solomon R. Guggenheim Foundation (the Guggenheim Museum and the Solomon R. Guggenheim Foundation will be referred to collectively as the "Guggenheim").

3. Through a comprehensive investigation, we have discovered many documents -- as well as eyewitness testimony -- that confirm that Schoeps' great-uncle, Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy), lost the Paintings in Nazi Germany as a proximate consequence of encompassing Nazi persecution that devastated him financially, professionally and personally.

4. Mendelssohn-Bartholdy was a wealthy banker of Jewish descent. In 1795, family members founded Mendelssohn & Co. bank. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become

one of the largest private banks in Germany. Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Through Mendelssohn-Bartholdy's inheritance and success as a private banker, he owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

5. I am a former federal prosecutor. I have overseen the three year investigation of this matter, and I am familiar with all aspects of it. Our investigation has been extensive. Three German attorneys have conducted archival research concerning the fate of Mendelssohn-Bartholdy in Nazi Germany, and also have researched and analyzed relevant German law. Other researchers have investigated and collected documents from archives and other sources in Russia, Denmark, Switzerland and the U.S. We have had many documents translated from German into English. We have obtained personal records from several members of the extended Mendelssohn family. My law partners, Thomas Hamilton and Lloyd Goldenberg, and I have researched extensively the legal issues surrounding this claim.

6. I traveled to Germany on three occasions in connection with this matter. During these trips I met with investigators, conducted additional research personally, and interviewed an elderly relative of Mendelssohn-Bartholdy who witnessed firsthand how Nazi persecution affected him. I also have interviewed many additional respected authorities concerning issues relevant to the persecution of Mendelssohn-Bartholdy.

### Intensive and Unrelenting Nazi Persecution From January 1933 Until May 1935 Savaged Mendelssohn-Bartholdy

7. Our investigation has confirmed that from the time that Hitler came to power in

3

January 1933 until Mendelssohn-Bartholdy died of a heart attack in May 1935, Nazi authorities persecuted Mendelssohn-Bartholdy in an encompassing manner, and wreaked havoc not only upon his business and his estate, but also upon his social and personal life.  Among other things, we have found that during this period:

a) Mendelssohn-Bartholdy sustained significant banking losses from the operation of Mendelssohn & Co., including the Nazi takeover and Aryanization of Akzeptbank, a successful and influential bank in which Mendelssohn & Co. was a shareholder;

b) The Nazi government bullied, coerced, and intimidated Jewish-owned private banks like Mendelssohn & Co.  Nazi authorities investigated a Jewish manager of Mendelssohn & Co.  Beginning in 1934, the Nazis spoke openly about extinguishing Jewish-owned private banks.  In early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (In 1938 the Nazi government "Aryanized" Mendelssohn & Co. and transferred ownership to Deutsche Bank.)

c) The personal fortune of Mendelssohn-Bartholdy plummeted after the Nazis assumed power.  In fact, Mendelssohn-Bartholdy declined to petition for an entitled reduction of his alimony obligations to his first wife, Charlotte, based upon changed financial circumstances because a public disclosure of his diminished financial status would have eroded even further the competitive viability of Mendelssohn & Co. Moreover,

Mendelssohn-Bartholdy's dwindling estate induced him to remove certain planned bequests from his final Contract for the Disposition of his Property.

d)  Nazi anti-Semitic policies caused Mendelssohn-Bartholdy to lose prestigious positions in business and professional organizations, and, upon information and belief, resulted in him resigning from at least one social organization;

e)  Direct Nazi Party pressure induced Mendelssohn-Bartholdy's "Aryan" chauffeur to resign because the Nazis did not approve of him working for a Jew;

f)  Nazi intimidation forced Mendelssohn-Bartholdy and his wife, Elsa, to flee Alsenstrasse near the Reichstag building -- the site of militant anti-Semitic protests -- for a modest "garden house" further away;

g)  Mendelssohn-Bartholdy relinquished a large parcel of land at his country estate, Boernicke, under apparent pressure from the Nazi Kulturamt (Cultural Office);

h)  Mendelssohn-Bartholdy placed financial encumbrances ("Grundschulden") on both his residences at Alsenstrasse and Boernicke in an apparent attempt to protect them from Nazi confiscation; and

i)  Mendelssohn-Bartholdy -- for the first time ever -- began selling many prized paintings from his extraordinary private collection, and into a depressed art market increasingly saturated with artworks surrendered by other Jewish private collectors reeling from Nazi persecution.

**Mendelssohn-Bartholdy Sold the Painting as a Proximate Consequence of Nazi Persecution**

8.  As noted, before the Nazis came to power in January 1933, Mendelssohn-Bartholdy

5

enjoyed one of the premier private art collections in Europe. We have found no evidence that Mendelssohn-Bartholdy sold -- or contemplated selling -- any artwork before the Nazis came to power in 1933.

9. After the Nazis took power and due to the intense Nazi persecution described above, however, Mendelssohn-Bartholdy began relinquishing many of the gems of his collection into a market brimming with artworks that other victims of Nazi persecution were liquidating. In or around October 1934, Mendelssohn-Bartholdy placed the Painting and four other Picasso artworks on consignment for sale with Berlin art dealer Justin K. Thannhauser. The five Picasso works were: *Boy Leading a Horse* (1906); *Le Moulin de la Galette* (1900); *The Absinthe Drinker (Angel Fernandez de Soto)* (1903); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903).

Based upon the foregoing -- and the corresponding bleak future that Mendelssohn-Bartholdy all but certainly envisioned for himself in Nazi Germany -- it is clear that Mendelssohn-Bartholdy sold the Painting under duress and as a proximate consequence of Nazi persecution. Also, we concluded, based on our investigation, that Mendelssohn-Bartholdy concluded the sale of the paintings without advising any family member of his actions.

**The Museums ignored the Nazi-era provenance of the Paintings when the Paintings were donated to the Museums.**

> MoMA was aware of the suspicious Nazi-era provenance of *Boy Leading a Horse* even before it accepted the donation of the painting, and recently has acknowledged this provenance

10. I attach hereto as Exhibit 1 a copy of MoMA's Provenance Research Project (PRP) internet webpage, explaining that MoMA's PRP "List of Paintings" was compiled, among other

things, in accordance with the American Association of Museums April 2001 *Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era*.

11.  I attach as Exhibit 2, a copy of MoMA's provenance history of *Boy Leading a Horse*, which is part of its Provenance Research Project.  The provenance lists Paul von Mendelssohn-Bartholdy followed immediately by Justin K. Thannhauser.  Further, although the "sale" date is listed as August 31, 1935, the Museums in their Complaint have clarified their position that the sale from Mendelssohn-Bartholdy to Thannhauser occurred "by" August 31, 1935.  (See Complaint for Declaratory Relief, ¶ 33).

12.  On June 25, 2007, I was granted access to review certain files at MoMA relating to the provenance of *Boy Leading a Horse*.  After reviewing the files, a MoMA representative made copies of documents I requested, including a September 18, 2001 letter from the Art Loss Register, Inc. to MoMA about *Boy Leading a Horse*.  (See copy of this letter, attached as Exhibit 3).  The Art Loss Register reports that "the name [Thannhauser in the provenance] generally does not mean good things," further affirming the notorious reputation of Thannhauser regarding Nazi confiscated art, and the need for MoMA to conduct further investigation.  Further, the ALR identifies "Albert Skira" -- who worked with Thannhauser to sell *Boy Leading a Horse* to William S. Paley in Switzerland -- as a "red flag" list name, due to his notorious reputation for trafficking in Nazi looted art.  Finally, the ALR goes on to note that Mendelssohn-Bartholdy "might have been related to Francesco Mendelssohn, whose collection underwent a forced sale."

13.  In addition, MoMA knew the extremely suspicious circumstances of the August 1936 sale of *Boy Leading a Horse* from Thannhauser to William S. Paley, the developer of the

Columbia Broadcasting System (CBS), discussed below.  Paley's knowledge of the suspicious provenance of the painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990.  Paley transferred Boy Leading a Horse to MoMA in 1964, but retained a life estate. MoMA acquired full ownership of the painting in 1990, upon Paley's death.

14.    Thannhauser's sale to Paley of *Boy Leading a Horse* was typical of sales made by dealers selling property relinquished by Jews in Nazi Germany.  For this sale, Thannhauser worked in Switzerland with Albert Skira.  Our investigation has revealed that the U.S. government considered Skira a trafficker in Nazi looted art.  Further, by 1936, Switzerland had become a notorious haven for traffickers in art lost by Nazi victims.  Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the marketplace lost by Jews due to Nazi persecution.  In addition, Paley was a sophisticated art collector.

15.    Paley recounted the details of this sale in some detail in his autobiography.  (See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.  In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel.  Id. at 107.  Skira told Paley: "I've got a great painting here [Geneva].  You must come right down and see it."  Id.  Paley told Skira he was too tired, but Skira "insisted."  When Paley still refused to travel to Geneva to look at the painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the painting to Paley.  Skira used a truck because *Boy Leading a Horse* was too large to fit into a car.  Id.

8

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the painting into the lobby for Paley.  Id.

Paley liked the painting.  Paley asked Skira the price, and found that it was -- in Paley's words -- ***"quite modest."***  Paley immediately told Skira: "That's fine.  I'll buy it."  Paley described the painting as "priceless."  Id.

Paley asked Skira who owned *Boy Leading a Horse*, and ***Skira refused to tell him***.  Skira stated: "That's the one thing I can't tell you.  I'm sworn to secrecy."  Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art.  Clearly, Paley -- and through him MoMA -- was put on notice that they were in all likelihood dealing with property that was stolen or lost to Nazi persecution.

### The Guggenheim disregarded *Le Moulin de la Galette's* suspicious Nazi-era-provenance when it accepted Thannhauser's donation of the painting.

16.  In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum.  At that time, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to the Guggenheim, including *Le Moulin de la Galette*.  Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim.  This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum:  Justin K.*

*Thannhauser Collection*, by Vivian Endicott Barnett.

17.  On June 25, 2007, I was granted access to review certain files at Guggenheim relating to the provenance of *Le Moulin de la Galette*.  After reviewing the files, a Guggenheim representative made copies of some of the documents I requested, including a document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 4, and a document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive, a copy of which is attached as Exhibit 5.  I have also included with both of these exhibits a document that was provided to me for ascertaining the writer of notes, which contains handwriting samples of Thannhauser and others.  The paragraphs which follow immediately below are based on these documents.

18.  In or around 1972, Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information that they had developed regarding the artworks he had bequeathed to the museum.  Thannhauser *himself* reviewed these documents, and  --  where appropriate  --  made corrections and additions in his own hand on the documents.  Among these documents, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*.  Thannhauser wrote on this document in his own hand that he had purchased the painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935."  (See document entitled "JKT Notes, Dec. 1972," Exhibit 4 hereto).

19.  In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and

other artworks.  During this interview, Rich used typed documents, with information and

questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972

annotations.  The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-

Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser."  This document

appears clearly to be based in part on Thannhauser's 1972 notes.  (See document entitled "DCR

Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5 hereto).

      20.  Rich recorded that Thannhauser told him that the painting was on consignment in

Buenos Aires in 1934.  Rich, in his 1975 handwritten notes of his conversation with

Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and

added:

> "[C]onsignment; sent to B-Aires in 1934."

(See copy of "DCR Notes Mar. '75, JKT Provenances for Picasso," Exhibit 5).

      21.  Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich show

that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with

Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser

purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition

but before Mendelssohn-Bartholdy's death in May 1935.

      22.  Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser

Collection* (1978), confirmed that Thannhauser purchased the *Le Moulin de la Galette* from

Mendelssohn-Bartholdy in or around 1935:

"[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**." (Emphasis added).

23. The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks well into the Nazi era. Therefore, the Guggenheim's acceptance of the painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title to the painting or that the true owner would not come forward to claim it.

The Guggenheim has ignored the Nazi-era provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on actual or constructive notice of reports of Thannhauser's trafficking in Nazi-confiscated art

24. On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson. (See copy of this article, retrieved February 11, 2008 from the internet at www.dhl-3.de/biblio/news/1997/1109a, attached as Exhibit 6). The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article noted that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article stated that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black

Guggenheim on actual or constructive notice of Thannhauser's reported trafficking in Nazi-looted art.   Nonetheless, upon information and belief, the Guggenheim failed to perform any additional research regarding the possibility that Mendelssohn-Bartholdy lost *Le Moulin de la Galette* in Nazi Germany.   In fact, unlike MoMA, the Guggenheim concealed the Nazi-era provenance of its painting from potential claimants by failing to place any provenance information regarding *Le Moulin de la Galette* on its website or on the Nazi-Era Provenance Internet Portal (NEPIP).   NEPIP, according to its website, "provides a searchable registry of objects in U.S. museum collections that **changed hands in Continental Europe during the Nazi era (1933-1945)** . .   By providing a searchable online registry of objects, the Portal helps U.S. museums fulfill their responsibility to make information about objects in their collections centrally accessible."  (Emphasis added).   Although the Guggenheim does not appear to dispute that *Le Moulin de la Galette* "changed hands" in Nazi Germany in the mid-1930s, it has nonetheless failed to place the painting on NEPIP.

**The Museums responded to the Mendelssohn-Bartholdy heirs' demand letter by filing this lawsuit before even refusing the claim**

26.   On November 1, 2007, I sent a letter to the Museum of Modern Art (MoMA), on behalf of the Mendelssohn-Bartholdy heirs demanding that MoMA return *Boy Leading a Horse* to the heirs by November 12.  (See copy of the November 1, 2007 demand letter to MoMA, a copy of

27.  On November 1, 2007, I sent a letter to the Guggenheim on behalf of the Mendelssohn-Bartholdy heirs, demanding that the museum return *Le Moulin de la Galette* to the heirs by November 12, 2007.  (<u>See</u> copy of the November 1, 2007 demand letter to the Guggenheim, a copy of which is attached as Exhibit 8).

28.  The Museums answered by stating that they could not respond by November 12, but that they hoped to provide a response by December 14, 2007.  Then, on December 7, 2007, the Museums filed this Complaint for Declaratory Relief.  Also, on December 7, 2007, the Museums sent a letter to us refusing our demand for the return of the Paintings.  (<u>See</u> December 7, 2007 letter from Evan A. Davis to John J. Byrne, Jr., a copy of which is attached as Exhibit 9).

I declare under penalty of perjury that the foregoing is true and correct.

February  11 , 2008.

John J. Byrne, Jr.

# EXHIBIT 1

# Provenance Research Project



>> > **Introduction**

The Museum of Modern Art owns approximately 600 paintings created before 1946 and acquired after 1932, that were or could have been in Continental Europe during the Nazi era. Researchers at the Museum have closely examined, and are continuing to research, the ownership, or provenance, records for works that fall within this category. The majority of these works were acquired directly from the artists or have provenance records that are sufficiently complete to eliminate the likelihood of Nazi misappropriation. Provenance research on these works, however, remains an ongoing project, and a priority, at the Museum.

In April 2000, The Museum of Modern Art's director, Glenn D. Lowry, joined other American museum directors to present testimony before The Presidential Advisory Commission on Holocaust Assets, reaffirming the museum community's commitment both to assist in the discovery of objects unlawfully appropriated during the Holocaust period and to make information on collection provenance more widely available. We publish this List of Works to further this effort (and in accordance with the American Association of Museums (AAM)'s April 2001 *Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era*).

In September 2003, the AAM launched a Nazi-Era Provenance Internet Portal (www.nepip.org), thus providing a general searchable registry of objects in U.S. museum collections that were or could have been in Continental Europe during the Nazi era (1933–1945). Works on this MoMA Web site can be cross-referenced from the AAM portal.

The Museum is currently transferring detailed provenance information on the listed works from the Museum's archival records to the electronic format of this website. Ongoing provenance research on the listed works is posted periodically, in installments, and the Museum welcomes any further information on the provenance of these collection works that users of this site may be able to provide. (Please note that the Museum's archival records for all collection works are open, as they always have been, to serious researchers.) For any information or queries on works on this list, please see Contact Information.

© 2002 The Museum of Modern Art

# EXHIBIT 2

# Provenance Research Project



Pablo Picasso (Spanish, 1881–1973. To France 1904.)

*Boy Leading a Horse.* (early 1906)

Oil on canvas, 7' 2 3/4" x 51 1/2" (220.3 x 130.6 cm) The Museum of Modern Art, New York. Gift of William S. Paley

Collection work meeting criteria specified in Introduction.

575.64

Other works by this artist



Provenance:

Ambroise Vollard, Paris
Gertrude and Leo Stein, Paris. By 1907 - before 1913
[Galerie Simon, Paris?]
Paul von Mendelssohn-Bartholdy, Berlin. Acquired ? [by 1934] – 1935
Justin K. Thannhauser, Berlin. Purchased from Mendelssohn-Bartholdy, August 31,1935 – Sold through Siegfried Rosengart, Lucerne (partner of Thannhauser), to Skira/Paley, August 28,1936
Albert Skira, Geneva. Purchased for Paley, August 28, 1936
William S. Paley, New York. Purchased from Albert Skira, 1936 - 1964
The Museum of Modern Art, New York. Gift of William S. Paley, 1964

Alternate titles:

*Le meneur de cheval*
*Le jeune chevalier*
*Jeune garçon au cheval*
*Boy and Horse*
*The Horse Driver*

Printing instructions

© 2002 The Museum of Modern Art

# EXHIBIT 3



# THE ART LOSS REGISTER, INC.

20 East 46th Street, Suite 1402
New York, NY 10017

Telephone: 212-297-0941
Facsimile: 212-972-5091
Email: info@ALR.ny.com

September 18, 2001

Christel Hollevoet-Force
Research Assistant, Provenance
The Museum of Modern Art
11 West 53rd Street
New York, NY 10019

Invoice: MOMA210-5

Dear Ms. Hollevoet-Force:

Thank you for your search request. We have completed the Art Loss Register database search on the following items:

**Artist:** Pablo Picasso
**Title:** *Boy Leading a Horse*
**Date:** early 1906
**Medium:** Oil on canvas
**Dimensions:** 7' 2 ¾" x 51 ½" (220.3 x 130.6 cm)
**Provenance:** Ambroise Vollard, Paris; Gertrude and Leo Stein, Paris, by 1907 – before 1913; Paul von Mendelssohn-Bartholdy, Berlin; Justin Thannhauser, Munich; Siegfried Rosengart, Lucerne; Albert Skira, Geneva; William S. Paley, New York, 1936; The Museum of Modern Art, New York. Gift of William S. Paley, 1964.

Color image Provided.

ALR NOTE: Paul von Mendelssohn – Bartholdy, Berlin might have been related to Francesco Mendelssohn , whose collection underwent a forced sale. The Thannhauser archives are in Geneva now, and the name generally does not mean good things. Sigfried Rosengart records are now in Lucerne, Switerland. It might be worth checking with them to get a date of sale, as Albert Skira is a red flag list name, althoug it might be alright as the painting went to New York so early on.

**REDACTED**



THE ART LOSS ■ REGISTER, INC.

REDACTED

2

 **THE ART LOSS■REGISTER, INC.**

**REDACTED**

As of September 18, 2001, these items have not been registered as stolen or missing on the Art Loss Register database.  Nor are they listed in the published sources of WWII losses that are known to the Art Loss Register. As stated in the Terms and Conditions, the database does not include items that may have been illegally exported.  Also, not every theft is necessarily reported to us.

Should you have any further questions or inquiries, please do not hesitate to contact us by telephone or fax.  Thank you for using the Art Loss Register.

Sincerely,

Lucy Haverland

4

# EXHIBIT 4

**The Solomon R. Guggenheim Museum Archive**
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

Museum Number 16

Pablo Picasso

Le Moulin de la Galette, Paris, 1900 *(autumn)*

Oil on canvas, 35½ x 46 (frm. stretcher rev.)

Signed b. r. "P. R. Picasso – "

Provenance:  From the artist; Paul von Mendelssohn-Bartholdy (ca. 1910;
Thannhauser Gallery, Berlin (ca. 1900); bought back by
Justin Thannhauser *ca. 1935.*

Exhibitions: Picasso, Forty Years of his Art, Museum of Modern Art,
New York, (1939), #5, p. 24 (ill.).

*? Chicago, Art Institute     1939 or 1940?*

Picasso: Fifty Years of his Art, Museum of Modern Art,
New York, 1946, p. 18 (ill.).

Picasso: 75th Anniversary Exhibition, Museum of Modern Art,
New York, 1957, p. 15 (ill.).

Picasso, Philadelphia Museum of Art, 1958, #4 (ill.).

Picasso, Arts Council of Great Britain, 1960, #4, (ill. pl. 1b). *London Tate Gallery*

Literature:  Zervos, Christian, Pablo Picasso, I, # 4.

Cirici-Pellicer, Alexandre, Picasso Avant Picasso, trans. from
the Spanish edition of 1946 by Marguerite de Floris and
Ventura Gasol, Geneva, 1950, pp. 65-69.

Barr, Alfred H. Jr., Picasso: Fifty Years of his Art, New York,
1946, pp. 19-20.

Boeck, Wilhelm and Sabartès, Jaime, Picasso, New York, 1955, p. 117.

Asnar, Jose Camon, Picasso y el Cubismo, Madrid, 1956, #214 (ill.).

Penrose, Roland, Picasso: His Life and Work, New York, 1959,
pp. 63-64, ill. #8, pl. I.

Champris, Pierre de, Picasso, Ombre et Soleil, Paris, 1960, #3 (ill.),
p. 15.

Blunt, Anthony and Pool, Phoebe, Picasso, the Formative Years,
London, 1962, "First Visit to Paris 1900," pp. 12-14.

*Also elsewhere often reproduced*

*Helen F. Mackenzie     Understanding     Picasso "... etc ..."*

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

**Guggenheim**MUSEUM
*Collections Research*

## Solomon R. Guggenheim Museum Archives
*Materials relating to Justin K. Thannhauser*

Handwriting Key:
- spiky handwriting = Justin K. Thannhauser

*In the 1920ⁿ vice-versa = a large show of American Contemporary artists, – with an illustrated Catalog; – the exhibition was sponsored by prominent Americans, — sorry, I forgot all the names!*

- bubbly handwriting = Vivian Barnett (SRGM Curator)

*yes – for all work in Australia. Doesn't know how long*

- small handwriting = Daniel Catton Rich (SRGM Trustee), largely in conversation with Thannhauser

*Kunsthaus Zürich
Pablo Picasso
Sept 11 – Oct 30, 1932
(Kleiner Katalog) only to 227*

# EXHIBIT 5

JKT

DCE Nord Mar 75

34

Provenances for PICASSO

The Solomon R. Guggenheim Museum Archive

The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

<u>The End of the Road</u>

Private collection, Barcelona    *By 1957 JKT*

✗ <u>Au Café</u>, <u>Woman and Child</u>, <u>Man with Pack</u>    *All in Zürich 1932*

All Santiago Laporta, Barcelona


✗ <u>Le Moulin de la Galette</u>

From the artist; Thannhauser Gallery, Munich (c. 1909);
Paul von Mendelssohn-Bartoldy (c. 1910-193?);
Justin K. Thannhauser    *B-aires.*    *sent to B-aires in 1934*    *consigned*


<u>The Fourteenth of July</u>

From whom was it purchased in Paris about 1937?    *1436-39  36-57*

*Picasso, — Pierre Loeb NY.*    *→ 1938←*

<u>Woman Ironing</u>    *Berlin, Strasbourg — Holland another gallery to*

Did you sell it to Karl Adler about 1916 and
buy it back in the late 1930's?

Who owned it before?    *Kahnweiler (didn't deal in Picasso then)*    Acc. Zervos, A. Vollard.

<u>Head of a Woman</u>   (pastel)

When did it belong to Paul von Mendelssohn-Bartoldy,
Berlin?

*Consignment*    *loan to Legrain.*    *1935-36*

It belonged to Justin K. Thannhauser at the time of
the 1934 Buenos Aires exhibition, didn't it?    *no*


✗ <u>Vase and Flowers</u>   (drawing)

Gallery in Paris


<u>Two Harlequins</u>

*August 1939*

Who was Mlle. A. Nachmann?    *Southoffer  — middleman*

When and from whom did you acquire it?    *— sent to — Copin.*

The Solomon R. Guggenheim Museum Archive

The material reproduced in this copy may be protected by copyright.
This copy is for personal use only; do not reproduce.

**Guggenheim** MUSEUM
*Collections Research*

## Solomon R. Guggenheim Museum Archives
*Materials relating to Justin K. Thannhauser*

Handwriting Key:

- spiky handwriting = Justin K. Thannhauser

*In the 1920ᵗ vice-versa = a large show of American Contemporary artists, - with an illustrated Catalog, - the Exhibition was sponsored by prominent Americans, — sorry, I forgot all the names!*

- bubbly handwriting = Vivian Barnett (SRGM Curator)

*yes — for all works in Australia. Doesn't know how long*

- small handwriting = Daniel Catton Rich (SRGM Trustee), largely in conversation with Thannhauser

*Kunsthaus Zürich
Pablo Picasso
Sept 11 - Oct 30, 1932
(Kleiner Katalog) only to 227*

# EXHIBIT 6

## Nation | World

**RELATED STORIES**
A network of profiteers
Art histories at The Fogg and The MFA

# Murky histories cloud some local art

**By Maureen Goggin and Walter V. Robinson, Globe Staff, 11/09/97**

French art dealer Cesar Mange de Hauke died in 1965. But he comes alive in declassified documents in the US National Archives: collaborating with the leader of the notorious Nazi effort to plunder artworks systematically from Jews, and driving a German staff car in occupied Paris.

Yet in 1949, just as the State Department was denying him an immigration visa because of his Nazi complicity, de Hauke sold a magnificent pastel by Edgar Degas to New York financier Maurice Wertheim, whose collection passed to the Fogg Art Museum at Harvard, his alma mater, after his death in 1950.

At the Fogg, correspondence on file shows that Wertheim was skeptical about de Hauke's right to sell Degas's "Singer with a Glove." But he bought it anyway. National Archives documents only add to those suspicions: State Department records, evidence that the art was owned by a French family whose collection was targeted by the Nazis in 1941, and information that before it fell into de Hauke's hands it belonged to a Swiss doctor who purchased at least one other looted painting.

At both the Fogg and the Museum of Fine Arts in Boston, records suggest that other European artworks acquired during and after World War II arrived with pedigrees that should have aroused curiosity, if not suspicion. Now, a half-century later, once-secret government documents have provoked a fresh accounting of what happened to the war's spoils, and have provided new evidence that some unsuspecting collectors donated artworks that may have been plundered from Jews and other European collections to major museums.

The Degas is unusual for the amount of documentation that suggests it might have passed illegally through Nazi hands and, ultimately, onto a

second-floor wall in the Fogg's most celebrated gallery, the Wertheim Collection. But the two museums have other works with suspect characteristics: unexplained wartime ownership gaps, the involvement of dealers who collaborated with Nazi art looters, and, often, a failure by the collectors or museums to make inquiries before acquiring them.

For example, a wartime FBI report suggests that the Museum of Fine Arts was nonchalant about the origin of its acquisitions during the war. The MFA's curator of prints, Henry Preston Rossiter, admitted to FBI agents in 1941 he knew that one dealer, Richard Zinser, whose works he bought routinely had been imprisoned in Germany for smuggling.

Rossiter bought prints from Zinser, including valuable works by Albrecht Durer, even though, the FBI report noted, Rossiter said Zinser "never reveals where he obtains his works."

After the FBI's visit, the MFA ceased buying Zinser's works.

Even so, in an interview on Oct. 24, MFA director Malcolm Rogers asserted the museum has always insisted that its curators carefully check the history of any acquisition. As evidence of that longstanding commitment, he cited the MFA's written "Collection Policy" that contains that requirement.

Last Thursday, a museum spokeswoman, Dawn Griffin, acknowledged that the MFA's Collection Policy had been approved by the museum's trustees on Oct. 23, the day before the Globe interview. She said, however, that it had been in preparation for more than a year. But it was not until Oct. 23 that the museum began requiring all dealers to sign bills of sale affirming their right to sell the artwork.

Griffin refused the Globe's request to release a copy of the full 12-page written policy, saying it was an internal museum document.

An open market

Mark Masurovsky, one of the first historians to find evidence about unscrupulous dealers in the National Archives, said disinterest by museums in the origin of artworks "sent a clear signal during and after the war that there was an open and unquestioning market for looted artworks in the United States." With that encouragement, de Hauke and other unscrupulous emigre dealers had a clear financial incentive to prey on Jews, said Masurovsky, who is working for the Holocaust Art Restitution Project, an effort spearheaded by the National Jewish Museum to document and locate works looted from Jews.

Jonathan Petropoulos, a historian at Loyola College in Baltimore who has written extensively about wartime plundering, said there is no evidence that American collectors and museums knew they were acquiring looted art. But the combination of seemingly legitimate

middlemen, the zeal that museums brought to building their collections and their unwillingness to ask probing questions of dealers or donors had a predictable result.

"The evidence, and it is growing, suggests that there may be hundreds of paintings in American museums that were stolen from Jews or looted from other European collections," Petropoulos said. "If you count drawings and lithographs, the number of artworks that have problematic ownership histories is probably in the thousands."

At the MFA and the Fogg, Rogers and other officials are left defending acquisitions that, in many cases, were made before they were born. They note that many artworks have gaps in their ownership, simply, and most often innocently, because owners cherish their anonymity, and sometimes forget where they bought paintings. The archival evidence pointing to other motives has only become available in the last two decades. And as public institutions, their collections are published for any claimant who wishes to come forward.

Moreover, the museum officials noted, there is no conclusive evidence that any of the paintings that the Globe asked about were stolen. And with no claimants for the artworks, much of the documentation is circumstantial.

Art specialists interviewed by the Globe said the Fogg and MFA are hardly unique among museums for acquiring art without applying any of the customary standards of due diligence that are required by law when real estate and even used cars change hands. Nowadays, most museums follow a standard practice, requiring donors and art dealers to sign documents declaring they have clear title to the artwork.

But experts in art law say such documents are legally meaningless, and amount to nothing more than a fig leaf for what the law now requires: a full title search that can identify problem artworks and provide a real defense if a claim is made.

Questionable provenance

The Globe decided to examine a small portion of the thousands of European paintings at the MFA and Fogg - modern paintings acquired during or after the war - after reporting earlier this year about war-related claims being pressed against other museums.

The Metropolitan Museum of Art in New York and the Philadelphia Museum of Art are facing allegations that they acquired looted artworks after the war. In another case, curators at the Art Institute of Chicago helped a major benefactor, Daniel Searle, acquire a Degas monotype looted from a Dutch victim of the Holocaust.

Officials at both the Fogg and the MFA cooperated, opening their

archives for inspection, and doing original - and, some critics say, long overdue - research to fill gaps in provenance, or ownership of some paintings. The results, in some instances, are embarrassing to the museums, especially the Fogg, where four paintings have questionable provenances.

At the Museum of Fine Arts, the issue is often how little it knows about some of its artworks. For example, the MFA bought a Monet painting from Brandeis University in 1974. Records at the MFA and Brandeis suggest that neither institution knew anything about the ownership of "Woodgatherers at the Edge of the Forest" during most of the century after Monet painted it in 1864. The painting was purchased in 1961 from New York dealer Alexander Ball by Harold Kaplan, who donated it to Brandeis in 1968.

Ball, according to National Archives records, had frequent dealings with Nazi art looters - and a business relationship with Hans Wendland, who funneled numerous stolen paintings into a wartime black market that included emigre dealers in New York.

At the MFA, some valuable paintings have no ownership history, except the name of the donors: The museum, for instance, knows nothing about the history of five paintings left to the museum in 1948 by one of its benefactors.

The museum has also been unable to identify who owned one of its Picassos, "Standing Figure," during the 37 years before the MFA bought the work from Swiss dealer Fritz Nathan in 1958. In a letter to the Globe suggesting that suspicions about the provenance of MFA paintings are unwarranted, George T. M. Shackelford, the curator of European paintings, said Nathan's gallery "for more than half a century was generally regarded as one of the most distinguished art galleries in Europe."

Yet Nathan was the wartime art adviser and purchasing agent for Emil G. Buhrle, a Swiss collector who knowingly bought many paintings that had been looted from Jews, according to extensive Allied interrogation reports in the National Archives. What's more, a 1921 auction catalog shows that the painting had been sold to a "Winberg."

Rogers, speaking from hindsight, said knowledge about Ball's wartime activities makes it "very unlikely" the MFA would have purchased the "Woodgathers at the Edge of the Forest" without conducting a thorough investigation. "Clearly," he said, "that would ring alarm bells."

But Rogers noted that much of the information surfaced only recently. "Inherent in the trading of any goods, as I'm sure you know since you must have bought second-hand goods yourself or from antique shops, is a matter of professional confidence," he said. As for most gaps, he added, "Human nature and memory are much more fragile than you

think, and our knowledge is often incomplete.... Incompleteness is no grounds for suspicion."

Still, he said, recent disclosures, some of them in the Globe, have led to a "new awareness [of a problem] that nobody guessed the size of, and we're all trying to cope with that."

Rogers, confronting questions about artworks acquired a half century ago, wondered why they were not raised in the 1950s and 1960s by the many Jews who, he said, were art dealers, collectors and art historians.

"But it is fascinating why in the years following the war ... more wasn't said, people weren't more enraged ... particularly since so many of the people in the art world were Jewish at that time. So many of the scholars were people who had fled. You know, most of the great giants in the art historical world were Jewish in that period ... The collectors were as well. Very strange," Rogers said.

Selling off paintings to survive

Unlike the much larger MFA, the Fogg has virtually no staff or money to undertake the sort of provenance research the Globe conducted: Its annual budget for out-of-town research is just $2,000.

The Fogg collections, built on the philanthropy of Harvard's most successful graduates, also contain their share of paintings with incomplete, and sometimes suspicious ownership records.

Across the room from the Degas in the Wertheim Collection is a haunting 1887 still life by Vincent van Gogh, "Three Pairs of Shoes," with its subliminal message about the misery of Europe's working poor. Wertheim bought it in late 1943 from the best-known of the emigre dealers, Georges Wildenstein. Wildenstein, like de Hauke, had a business relationship with Karl Haberstock, Hitler's principal art looter.

But where did Wildenstein obtain the van Gogh? According to the Fogg's records, it came from Marcel Kapferer, a French Jew. His granddaughter, Francine Legrand-Kapferer, said in a recent interview that Kapferer hid his family from the Nazis in Cannes during the war, selling off paintings one at a time to survive. Legrand-Kapferer said that her grandfather frequently reminded his family that but for those sales, they would have died.

All such sales under duress in Nazi-occupied Europe were declared invalid under a 1943 Allied declaration. If the van Gogh was among the works sold during the war - and Legrand-Kapferer said she did not know whether it was - then the artwork would enter a legal limbo.

Even more suspicious is a Monet, "La Mere Paul," listed at the Fogg as owned before the war by Paul Wittgenstein in Vienna and bought by

the Wertheim Fund for the Fogg in 1955.

At the Globe's request, Austrian journalist Hubertus Czernin searched out Nazi records in Austrian archives. They show that the Nazis confiscated a substantial art collection from a renowned Vienna concert pianist of the same name, Paul Wittgenstein, though the records are incomplete.

Wittgenstein's daughter, Joan Ripley of Charlottesville, Va., said her father, who was of Jewish ancestry, fled to New York in 1938 and as far as she knows never returned to Vienna, or recovered the bulk of his property after the war. Another relative, though, recalls a "a painting of an old woman, a Monet" that once hung in Wittgenstein's home.

The record shows that the Monet next surfaced in a gallery in Stuttgart, Germany, in 1954, where it was bought by Jacques Seligmann, another emigre dealer and associate of de Hauke who has been implicated in wartime art collaboration. Seligmann sold it to the Wertheim Fund.

The $38,500 Degas

But it is the Degas pastel that Wertheim bought the year before he died that has the most troubling history.

Maurice Wertheim was a tournament chess player, a founder of the New York Theatre Guild, for a time the owner of The Nation magazine, and the father of Barbara W. Tuchman, the Pulitzer Prize-winning historian. During the war, he was also chairman of the American Jewish Committee.

Wertheim was fearful that de Hauke did not have the right to sell the Degas, though the correspondence at the Fogg does not suggest why. To allay his fears, Wertheim had his lawyer call Justin Thannhauser, an associate of de Hauke, while de Hauke was en route to a meeting with Wertheim. Thannhauser told the lawyer that de Hauke did not own the pastel, but was selling it for a Dr. Heer of Zurich.

Yet when de Hauke arrived, he told Wertheim that his corporation owned the Degas, but refused to sign a statement saying he had authority to sell it. Wertheim nonetheless handed over a check for $38,500 for the artwork.

"Mr. Wertheim made the remark that he is aware of the fact that he took a chance with regard to the title of this picture, but that in view of the information obtained from Thannhauser, the risk involved is rather remote," the Wertheim lawyer, Hermann E. Simon, wrote at the time.

Three weeks later, Simon received a letter, apparently from de Hauke's lawyer, asserting that de Hauke bought the picture from Thannhauser - another apparent contradiction.

Ivan Gaskell, the Fogg's curator of paintings, sculpture and decorative arts, said that when he first saw the correspondence three or four years ago, he interpreted it to mean that both dealers had an interest in the work. "In and of itself, it did not suggest any suspicion," Gaskell said.

But the US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

The original listed owner of the pastel was Camille Groult. Declassified US documents show that Haberstock, the Nazi art looter with ties to de Hauke, hired another art collaborator to "expertise" the Groult collection, a common step before a confiscation or forced sale. The Groults were apparently not Jewish, and efforts to determine what happened to their collection, or whether the Degas was part of it at the time, were unavailing.

The next owner in the chain was Dr. Fritz Heer, identified in National Archives documents as a Swiss collector who purchased at least one looted painting.

Several documents that historian Mazurovsky discovered in the National Archives contain intelligence information and post-war State Department correspondence that build a case against de Hauke for his ties to Haberstock and his role in art looting, even suggesting he may have been involved in obtaining paintings for Adolf Hitler, Hermann Goering and Heinrich Himmler. Two months before Wertheim bought the Degas, a handwritten note by a State Department official concluded de Hauke "knowingly handled looted art in his deals with the Germans" and that he should be denied a visa to remain in the United States.

Gaskell, the Fogg curator, said he is eager to track down more information about the paintings, especially the Degas. In light of the archival records, he said of the one artwork,"There are clearly red lights all along the way."

Previous coverage and related links are available on Globe Online at www.boston.com. The keyword is paintings.

This story ran on page A01 of the Boston Globe on 11/09/97.
© Copyright 1997 Globe Newspaper Company.



We Pedal The Best. For Less. Click here!



© Copyright 1998 Globe
Newspaper Company



Extending our newspaper services
to the web

Return to the home page
of The Globe Online

# EXHIBIT 7

# BYRNE GOLDENBERG & HAMILTON, PLLC

Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMCAST.NET

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

November 1, 2007

## BY FEDERAL EXPRESS & FACSIMILE

Stephen W. Clark, Esq.
Deputy General Counsel
The Museum of Modern Art
11 West 53rd Street
New York, New York 10019-5497

Re:  Demand for the Return of Pablo Picasso's *Boy Leading a Horse*

Dear Mr. Clark:

Thank you for your letter of July 16, 2007.  As you know, we represent the heirs of Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy).  By this letter, we hereby demand the return of Pablo Picasso's *Boy Leading a Horse* (Painting), oil on canvas, approximately 220 x 130.6 cms., completed approximately 1906, currently at the Museum of Modern Art (MoMA), to the heirs of Mendelssohn-Bartholdy by November 12, 2007.  If you do not return the Painting by this deadline -- or agree to do so -- we will consider this a refusal of our demand and take whatever actions we deem appropriate to protect the rights of our clients.  We believe our clients are entitled to the recovery under, among other bases, New York law regarding conversion, replevin, restitution and constructive trust.[1]

---

[1] We have set forth below the essential facts and law we believe entitle the Mendelssohn-Bartholdy heirs to the return of the Painting.  Notwithstanding the statement in your letter of July 16, we make no representation to you that we are submitting "all of the relevant facts in [our] knowledge" in support of our claim, and we specifically reserve the right to assert additional facts and legal support for our position at any time.  You have stated that you have copies of filings in the case of Schoeps v. Webber, Index No. 116768/06, and various other relevant documents.  Further, the key documents relating to provenance regarding *Boy Leading a Horse* are in your internal files.  Moreover, many of the historical references contained in this letter are readily accessible on the Internet, books, or other texts.  In light of the foregoing, we believe it is unnecessary to attach additional documents to this demand letter.

Byrne Goldenberg & Hamilton, PLLC

## I.  INTRODUCTION

Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting.

Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in Berlin in 1935, and a Certificate of Inheritance was issued at that time. Our law firm represents all of the living heirs of Paul von Mendelssohn-Bartholdy.

## II.  FACTS SUPPORTING OUR DEMAND FOR THE RETURN OF THE PAINTING

### A.  Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke). Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

Paul von Mendelssohn-Bartholdy never sold *any* art before the Nazis came to power in 1933.

2

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Painting and four other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Le Moulin de la Galette* (1900); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.

As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

3

After Paul von Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, Thannhauser sold it to William S. Paley in 1936 in Switzerland in a manner, as discussed infra, that was overtly suspicious and that that put Paley on clear notice of the likelihood that the Painting had been lost due to Nazi persecution. For example, Thannhauser had Albert Skira -- later identified as a notorious trafficker in Nazi-looted art -- make the sale to Paley in Switzerland (a country bordering Nazi Germany that was infamous for traffickers in Nazi-confiscated property) for an artificially low price. Skira even refused to reveal the identity of the "owner" to Paley.

Paley returned the Painting to New York after completing his purchase from Skira. In or around 1964, Paley executed papers donating the Painting to MoMA, but retained a life estate. Paley died in 1990, and MoMA then acquired purported full ownership of the Painting. MoMA accepted Paley's gift into its collection in apparent total disregard of the provenance of the Painting that strongly suggested that Mendelssohn-Bartholdy lost it in a duress sale due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable expectation that it had acquired good title to the Painting or that the true owner would not step forward to reclaim it.

**B. Ideological Foundations of Nazi Persecution of Jews**

In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany.

**C. Nazi Persecution of Jews Became Official State Policy in 1933**

The Nazis pursued their agenda to banish Jews from the economic life of Germany when Hitler became Chancellor in January 1933. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages:

1. The first stage occurred during the years 1933-1938 when -- precluded from an expanding list of jobs, professions, and economic activities -- Jews sold their property often at discount prices merely to survive; and

2. The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany which, in turn, triggered the forfeiture to the Reich of all remaining Jewish-owned property.

The Nazis' campaign against the Jews began almost immediately after they took power and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99. In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state. The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax. When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax. Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency. The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.

### D. During the Years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis, as noted, blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

The Nazis pressured private Jewish banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

5

### E. Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market

A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York. International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

### F. Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting

The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank — one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

1. sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

2. endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting

Byrne Goldenberg & Hamilton, PLLC

with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank);

3. withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

4. suffered a precipitous collapse of his personal net worth;

5. declined to petition for an entitled reduction of his alimony obligations to his first wife based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

6. surrendered under pressure extensive land from his country estate (Boernicke) to the Nazi Kulturamt (Cultural Office);

7. placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

8. had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

9. lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance institution;

10. was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

11. as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

12. finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution --

Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser. Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune. For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan" Deutsche Bank. Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed. Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

III. **THE U.S. AND STATE OF NEW YORK HAVE CONSISTENTLY PURSUED POLICIES AND ENACTED LAWS TO INVALIDATE "FORCED SALES" AND OTHER COERCIVE TRANSFERS OF PROPERTY IN NAZI GERMANY -- SUCH AS MENDELSSOHN-BARTHOLDY'S SALE OF THE PAINTING TO THANNHAUSER -- AND TO RESTITUTE SUCH PROPERTY TO NAZI VICTIMS AND THEIR HEIRS. THESE U.S. RESTITUTION PRINCIPLES HAVE ACHIEVED INTERNATIONAL ACCEPTANCE, AND WILL APPLY IN THIS MATTER.**

A. **Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners**

Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of

Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

### B. Military Government Law No. 59 (MGL No. 59) Was the Centerpiece of Post-War U.S. Restitution Policy

U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1). MGL No. 59 applied in the American Occupation Zone, and was the first Holocaust restitution law enacted for application in post-war Germany.

MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. See § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required even persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

### C. The U.S. Actively and Successfully Promoted the Adoption of MGL No. 59's Restitution Principles to the British and French in their Respective "Occupation Zones" and in Berlin.  Ultimately, Even the Germans Themselves Enacted Laws Incorporating the Principles of MGL No. 59 for Application in All of Germany

The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S. National Security Council (NSC) drafted the *"Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC.  In its directive to the U.S. High Commissioner for Germany, the NSC pronounced that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, *it is the policy of your Government* that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . . To carry out this policy, you should **seek agreement from your British and French colleagues** to **persuade the German Government** to enact without delay a Uniform Internal Restitution Law, *which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59.*

NSC Policy Report, p. 70.  (Emphasis added).  Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time."  (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain).  As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself.  For example:

### 1.  The Berlin Restitution Law of 1949.

> MGL No. 59 was the controlling law for the U.S. "Occupation Zone" in Germany after 1947, but did not apply to Berlin.  Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each

10

controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law. No. 59. The provisions regarding the "presumption of confiscation" and potential rebuttal thereof are virtually identical.

2. **Britain and France passed restitution laws in their "Occupation Zones" similar to MGL No. 59.**

Britain and France passed laws in their individual German "Occupation Zones" that were similar to MGL No. 59 and the Berlin Restitution Law. (See British Military Law 59, and currently applicable provisions of French law (article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No-1344 dated September 30, 1949).

3. **German restitution laws are patterned after MGL No. 59.**

(a) After the Allies left the Federal Republic of Germany (West Germany), the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59 and the Berlin Restitution Law of 1949. (See "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

(b) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 — which are, of course, the same as MGL No. 59.

The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution).

Accordingly, under the restitution principles pioneered by the United States and accepted by the Allies, Germany and others, the Mendelssohn-Bartholdy heirs are entitled to recover the Painting as a result of Mendelssohn-Bartholdy's duress sale of the Painting to Thannhauser in Nazi Germany.

November 1, 2007                                            Byrne Goldenberg & Hamilton, PLLC

## IV.  IN RECENT YEARS, THE U.S. STATE DEPARTMENT, U.S. CONGRESS, AND STATE OF NEW YORK HAVE REAFFRIMED AND REINVIGORATED THEIR POLICIES AND EFFORTS IN FAVOR OF HOLOCAUST ART RESTITUTION

### A. The U.S. Department of State Has Always been Strongly Committed to Holocaust Art Restitution. In the 1990's, the State Department Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations

The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is clearly expressed in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Adviser, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in the United States District Court for the Southern District of New York, which identifies MGL No. 59 as exemplifying U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See also Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit amended mandate and followed expression of Executive Policy in April 13, 1949 Jack B. Tate letter quoted above, as to a jurisdictional issue).

In the 1990's, the U.S. Department of State created a special office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy. The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries.

The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

## B. The U.S. Congress — in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies

In 1998, the U.S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years 1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567. These statutes confirm U.S. policy to facilitate the return of confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

In summary:

1. **The Redress Act:** The Redress Act seeks to assist Holocaust victims in their efforts to recover artworks and other assets lost in Nazi Germany. (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective."

2. **The Disclosure Act:** The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U.S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No. 59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed

13

without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

3. **The Commission Act**: The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U.S. government.  Among its accomplishments, the Presidential Commission negotiated an agreement with the American Association of Museums (AAM) for the creation of a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945).  To comply with this agreement, the AAM created the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org) in 2003, with hyperlinked museum websites where detailed provenance information is provided -- such as the Museum of Modern Art's "Provenance Research Project" ("PRP", located at www.moma.org; NEPIP and the hyperlinked museum websites will sometimes be referred to jointly herein as the "NEPIP system").  As discussed *infra*, the investigation of this case began in 2005 when Mendelssohn-Bartholdy heir Julius Schoeps (Schoeps), through his attorneys, discovered on the PRP that Paul von Mendelssohn-Bartholdy sold Pablo Picasso's *Boy Leading a Horse* in Nazi Germany to Berlin art dealer Justin K. Thannhauser.

C.  **Since 1997, New York State Has Proclaimed a Signal Public Policy to Help Victims Of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945**

On June 25, 1997, then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

Former Governor Pataki repeatedly underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution.  In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of history's darkest times."

The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution.  The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales.  See, e.g., HCPO Press Releases dated, respectively, June 17, 2003, November 17,

November 1, 2007                                                Byrne Goldenberg & Hamilton, PLLC

2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks lost as a consequence of forced sales.

## V.  THE MENDELSSOHN-BARTHOLDY HEIRS HAVE NOT UNREASONABLY DELAYED MAKING THIS DEMAND, SINCE THEY WERE NOT AWARE OF THEIR RIGHTS TO THE PAINTING UNTIL THE EFFORTS OF THE U.S. GOVERNMENT AND STATE OF NEW YORK MADE NECESSARY INFORMATION AVAILABLE TO THEM

### A.  Until 2005, no heir of Paul von Mendelssohn-Bartholdy knew he had sold any art in Nazi Germany

Until 2005, no Mendelssohn-Bartholdy heir knew that Paul von Mendelssohn-Bartholdy had sold any artworks in Nazi Germany.  In 2005, Mendelssohn-Bartholdy heir Julius Schoeps, through his attorneys, discovered that Mendelssohn-Bartholdy had sold *Boy Leading a Horse* in Nazi Germany to Thannhauser on MoMA's Provenance Research Project (PRP) located at www.moma.org, which is connected by hyperlink to the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org).  As discussed infra, NEPIP and related museum websites were created as part of a massive undertaking by the State of New York and the U.S. government -- from the late 1990's through today -- to make documents and information available to Holocaust claimants so that they can identify, investigate, and make claims to recover artworks that may have been lost as a result of Nazi persecution.  NEPIP provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945).  It was created by the American Association of Museums (AAM) pursuant to an agreement with the Presidential Commission.[2] New York's HCPO also was active in NEPIP's development.

But for the efforts of the State of New York and the U.S. government to make information available to Holocaust victims and their heirs through NEPIP and related museum websites such as MoMA's PRP, the Mendelssohn-Bartholdy heirs might never have discovered -- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold *Boy Leading a Horse* and other paintings under duress in Nazi Germany.

Once Schoeps was aware of Mendelssohn-Bartholdy's sale of the Painting, he acted diligently throughout 2005-2007 to investigate, among other things, the relationship between Mendelssohn-Bartholdy and Thannhauser, the art collection of Mendelssohn-Bartholdy, additional sales Mendelssohn-Bartholdy made under duress, Nazi persecution of Mendelssohn-Bartholdy, the location of the other Mendelssohn-Bartholdy heirs, and other matters which enabled this demand.

---

[2] As noted, the Presidential Commission was created by the Commission Act (1998), discussed supra.

**B. The "Wall of Silence" which denied Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- access to information that would allow them to investigate and reclaim lost property**

Until recently, Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available. This historical deficiency has been widely recognized. For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**Wall of Silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

**C. The U.S. Congress, U.S. Department of State, and State of New York began intensive efforts in the late 1990's to tear down the "Wall of Silence," that is, to make information and documents available to Holocaust claimants so that they could develop and prosecute claims for the recovery of property lost during the Nazi era**

In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example:

1. In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations. The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945. The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

2. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S.

museums to perform provenance (ownership history) research and
publish information relating to art that may have a Nazi-era
provenance ("AAMD guidelines");

3. In 1998, the U.S. Department of State organized international
meetings and conferences on Nazi-era art, met with foreign officials,
and lobbied them intensely to facilitate Holocaust art recovery in
their countries and accept the AAMD guidelines calling for
provenance research and the publication of information helpful to
Holocaust claimants. As a result, many European countries began
publishing art provenance information, releasing documents and
archival materials from the Nazi era, passing laws facilitating art
restitution, and searching for Nazi victims and their heirs when
looted art was located;

4. In 1998, the Department of State organized the Washington
Conference on Holocaust Era Assets (Washington Conference), for
the purpose, among other things, of promoting the release of Nazi-
era information and archives worldwide, and of gaining international
acceptance of the AAMD guidelines. Officials from 44 countries
attended. Upon meeting some initial resistance to acceptance of the
AAMD guidelines, State Department representatives re-drafted the
guidelines and eventually succeeded in having all 44 countries at the
Washington Conference accept the re-packaged AMD principles,
which became known as the "Washington Principles"; the
Washington Principles led to increased worldwide publication of
information relating to art lost during World War II, and the release
of records to assist Holocaust claimants to recover art;

5. The Presidential Commission, created by the Commission Act of
1998, negotiated an agreement with the American Association of
Museums (AAM) that committed member museums to research
extensively artworks in their collections to identify those that may
have been confiscated as a proximate consequence of Nazi
persecution and to publish the provenance of these artworks. This
agreement led to the creation of the Nazi-Era Provenance Internet
Portal (NEPIP), www.nepip.org in September 2003, which was in
part federally funded. NEPIP lists art that has a Nazi-Era
provenance, that is, art that changed ownership in Europe between
1933-1945. NEPIP is connected by hyperlink to individual museum
Websites where detailed provenance information can be accessed.
The New York Holocaust Claims Processing Office (HCPO) actively
participated in the AAM task force established to create NEPIP;

17

6. In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively — and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

7. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art — all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission — it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

### D. The efforts of the U.S. Government and State of New York to help victims of Nazi persecution and their heirs to recover confiscated artworks are on-going, and more relevant information continues to becomes available

The U.S. Government and the State of New York began a process in the late 1990s that, among other things, has given Holocaust claimants increased access to documents and information worldwide. However, progress has been slow in some areas and the release of additional archives, documents and information is continuing.

For example, in 2006, the Claims Conference published a survey it conducted of U.S. museums' participation in NEPIP. The survey reports that NEPIP "lists approximately 18,000 items, or slightly higher than **12 percent** of the total number" of objects (over 140,000) that museums have determined are within the NEPIP criteria. Further, of "the museums that do clearly state that they are conducting provenance research, **52 percent have completed research on less than half of the relevant items** in their collection and a further 33 percent did not provide information on the extent to which they had completed the work." See "Nazi-Era Stolen Art and U.S. Museums: A Survey And Joint Project of the Claims Conference and the World Jewish Restitution Organization (WJRO)"(2006) (questionnaire sent on February 10, 2006 to 332 U.S. art museums to ascertain museums' progress in adhering to recognized principles concerning Nazi-era looted art).

New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing. (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

E. **The Mendelssohn-Bartholdy's claim was made possible only by the concerted, public-policy driven initiatives of the U.S. Government and the State of New York -- beginning in the late 1990s -- to make relevant information and documents accessible to Holocaust claimants to enable them to develop and prosecute claims to recover property lost as a consequence of Nazi persecution**

As noted, this claim was made possible by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. In 2005, Schoeps, through his attorneys, discovered that Mendelssohn-Bartholdy sold *Boy Leading a Horse* to Thannhauser in Nazi Germany from the Museum of Modern Art (MoMA), Provenance Research Project (PRP), which is part of the NEPIP system, and is connected by hyperlink to NEPIP itself.

The PRP and the NEPIP system exist because of the efforts of the U.S. Congress and State of New York, among others. For example, in 1998, Congress passed the Commission Act which created the Presidential Commission. The Presidential Commission negotiated an agreement with the American Association of Museums (AAM) that committed member museums -- like MoMA -- to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. As a result of this agreement, the AAM created the NEPIP system. In addition, the NEPIP project received federal funding. Also, the State of New York played an important role in the development of the NEPIP system, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since this claim to recover the Painting is based on information discovered on the NEPIP system, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- with access to documents and information to enable them to develop claims.

19

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

### F. The Mendelssohn-Bartholdy heirs, through their agents, have acted diligently throughout 2005-2007 to complete the investigation of Mendelssohn-Bartholdy's loss of art in Nazi Germany

Once Schoeps became aware of Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he and other Mendelssohn-Bartholdy heirs have acted diligently in 2005-2007 to complete this investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, the circumstances of his sale of art under Nazi duress, and other matters which enabled us to make this demand in 2007. The Mendelssohn-Bartholdy heirs, through their agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

## VI. MOMA DISREGARDED THE PAINTING'S SUSPICIOUS NAZI-ERA PROVENANCE WHEN IT ACCEPTED THE PAINTING INTO ITS COLLECTION, AND CONTINUED TO IGNORE PROVENANCE PROBLEMS EVEN AS THEY BECAME MORE APPARENT. AS A RESULT, MOMA NEVER OBTAINED A COMMERCIALLY REASONABLE BELIEF THAT IT HAD ACQUIRED GOOD TITLE TO THE PAINTING, OR THAT THE TRUE OWNER WOULD NOT COME FORWARD TO CLAIM IT.

MoMA failed in its obligation "to inquire about the validity of title before completing the transaction." U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004). Moreover, as additional facts became known over time which cast further doubt on the "validity of title," MoMA ignored them. The Museum's actions with regard to the acquisition and continued possession of the Painting without inquiring into its background is more egregious in light of the U.S. government's circular letters warning museums and others against acquiring Nazi-confiscated art, and New York courts' condemnation of the lax practices of the art world in art trading, as discussed below.

### A. Following the War, the U.S. Government repeatedly cautioned museums and the international art market about acquiring Nazi-confiscated art

The formal policies of economic coercion and duress that Nazi Germany employed against its Jewish citizens during the years 1933-45, and its subsequent seizure and plunder of artworks in occupied countries, resulted in enormous displacement of art which the U.S. government and its Allies attempted to rectify after the War.

In 1946, the U.S. Department of State (State Department) issued a circular letter to U.S. museums, auction houses and dealers advising that the legal restrictions on the importation of artworks from Nazi-occupied countries had been lifted and urging precautions against acquiring contraband materials.

In 1951, the State Department issued a second circular letter to the U.S. art industry reiterating this warning. In light of the State Department warnings, the Museum clearly would have been aware of the dangers of acquiring Nazi-confiscated art in 1964 when Paley executed the documents donating the Painting to the Museum, and retained only a life estate for himself.

**B. For more than 35 years, New York courts have condemned how casually art is acquired on the international market, and have announced a policy to protect victims of art theft in order to safeguard the commercial integrity of the New York City art market**

Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned such individuals to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"; Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of... title...it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art... and diminishes the integrity of the apathetic merchant."

In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

**C. The Museum disregarded the Painting's suspicious Nazi-era provenance when it accepted the painting into its collection**

**1. In August 1936, Thannhauser sold *Boy Leading a Horse* to William S. Paley in a manner that strongly suggested that the Painting had been lost as a result of Nazi persecution.**

In August 1936, Thannhauser worked in Switzerland with Albert Skira - - a Swiss art dealer known for trafficking in Nazi looted art - - to sell *Boy Leading a Horse* to William S. Paley (Paley), the developer of the Columbia Broadcasting System (CBS). Paley was a sophisticated art collector, and later held positions as a trustee and president of MoMA. Paley was fully aware of events in Nazi Germany.

Switzerland was a known haven for traffickers in art lost by Nazi victims in forced sales in 1936. Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the marketplace lost by Jews due to Nazi persecution.

In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the Painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the Painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the Painting into the lobby for Paley. Id.

Paley liked the Painting. Paley asked Skira the price, and found that it was -- in Paley's words -- *"quite modest."* Paley immediately told Skira: "That's fine. I'll buy it." Paley described the Painting as "priceless." Id.

Paley asked Skira who owned *Boy Leading a Horse*, and *Skira refused to tell him*. Skira stated: "That's the one thing I can't tell you. I'm sworn to secrecy." Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the Painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley was put on notice that there was a good possibility that he was purchasing confiscated art, and yet Paley proceeded with the sale.

## 2. Paley's knowledge of the suspicious provenance of the Painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990

Paley had an extremely close relationship with MoMA from shortly after he purchased the Painting in 1936 until his death. Paley was a Trustee of MoMA from 1937 until his death in 1990. In addition, Paley was President from 1968-1972; Chair from 1972-1985; and Chair Emeritus from 1985 until his death in 1990. Indeed, Paley stated that as of September 1968, he became, in effect, the CEO of MoMA: "After due consideration, I accepted the invitation to become president of the museum [MoMA]. I was elected to that office and became, in effect, its chief executive officer in September 1968." Id. at 391.

In light of Paley's close relationship and powerful positions within MoMA from 1937-1990, Paley's knowledge can be imputed to MoMA of the suspicious circumstances and "red flags"

regarding his purchase of the Painting which strongly suggested that a Jew lost the Painting in Nazi Germany due to Nazi persecution.

> ### 3. When Paley donated the Painting to MoMA in 1964, MoMA disregarded the provenance of the Painting which strongly suggested that it had been lost due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable expectation that it had good title to *Boy Leading a Horse*

In 1964, Paley executed documents donating *Boy Leading a Horse* to MoMA, while retaining a life interest. MoMA disregarded the provenance of the Painting which strongly suggested that it had been lost due to Nazi persecution in Germany, and accepted the Painting without performing provenance research.

MoMA's acceptance of the Painting knowing the suspicious provenance is more egregious because by 1964 the State Department had warned museums repeatedly that Nazi confiscated art was coming into the U.S. market and urged precautions against acquiring such materials. In addition, by 1964 Albert Skira -- who acted as Thannhauser's agent in the sale to Paley -- had been identified by the U.S. government as a trafficker in Nazi looted art.

In light of the foregoing, MoMA never had a commercially reasonable expectation in 1964 that it had acquired good title to the Painting or that the true owner would not come forward to claim it.[3]

> ### 4. MoMA continued to ignore the Nazi-era Provenance of the Painting from 1964 up to its acquisition of purported full title in 1990 after Paley's death

In 1979, Paley wrote an autobiographical book entitled "*As It Happened, a Memoir by William S. Paley, Founder and Chairman, CBS,*" describing his purchase of *Boy Leading a Horse* from Skira in detail, as discussed supra. Paley also relates that he met Thannhauser at some unspecified date prior to December 26, 1976, the date of Thannhauser's death. At this meeting,

---

[3]  It is firmly established under New York law that an acquirer of stolen property does not have clear title, even where a purchase was made in good faith. U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004); Solomon R. Guggenheim Found. v. Lubell, 77 N .Y.2d 311, 317 (1991) ( "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value."); Newton v. Porter, 69 N.Y. 133 (1877) ("The purchaser from a thief, however honest and bona fide the purchase may have been, cannot hold the stolen chattel against the true proprietor, but the latter may follow and reclaim it wherever or in whosoever hands it may be found."). A good faith purchaser simply cannot obtain title to stolen property because a thief has no title to give. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004); Silsbury v. McCoon, 3 N.Y. 379, 383-84 (1850). It is therefore incumbent upon a good faith purchaser to inquire about the validity of title before completing the transaction. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004); A.F.T. Corp. v. Pathe Exch., 172 N.Y.S. 364, 365 (1 Dep't 1918) ("[A] purchaser of personal property is bound to satisfy himself as to the title of the vendor, and deals with stolen property at his peril....").

Thannhauser told Paley that he was the "owner" who sold *Boy Leading a Horse* to Paley. Thannhauser stated that he had "smuggled" the Painting out of Nazi Germany because he "needed that money so badly," and that he had observed the transaction between Skira and Paley by standing outside and looking through the window.

In 1990, Paley passed away, and MoMA published "*The William S. Paley Collection*," by William Rubin and Matthew Armstrong, describing the collection Paley had left to MoMA. See William Rubin and Matthew Armstrong, *The William S. Paley Collection* (Museum of Modern Art, New York 1992). The preface described the suspicious circumstances surrounding Paley's purchase of the Painting:

> Nineteen thirty-six was a remarkable year [for Paley], marked by the acquisition of... by far the best-known work in the Paley Collection, Picasso's *Boy Leading a Horse*. Only later did Mr. Paley realize how lucky he was to have gotten a crack at [*Boy Leading a Horse*]. It had been smuggled to Switzerland out of Nazi Germany by the dealer Justin Thannhauser, and was being hurriedly and secretly offered for sale through Skira. There was no time to wait for a Geneva visit from Paley, who was skiing in Saint-Moritz. Skira trucked the large canvas to the Palace Hotel and carried it into the lobby. Paley bought it on the spot.

William Rubin and Matthew Armstrong, *The William S. Paley Collection*,
Preface, p. x (Museum of Modern Art, New York 1992) (Emphasis added) (using Paley's "*As It Happened*" as a source).

In *The William S. Paley Collection*, Rubin and Armstrong also provide the provenance of the Painting, and identify Paul von Mendelssohn-Bartholdy as the owner, immediately followed by Justin K. Thannhauser. Accordingly, MoMA was fully informed by 1992 that a person from a famous Jewish family -- Mendelssohn-Bartholdy -- made the sale in Nazi Germany to Thannhauser before Thannhauser "smuggled" the Painting out of the country and "hurriedly and secretly" offered it for sale through a known trafficker in Nazi confiscated art [Skira] in a country known as a haven for looted art sales [Switzerland].

Thus, despite MoMA's increasing knowledge of prior owners -- including the Jewish Paul von Mendelssohn-Bartholdy as the owner immediately before Thannhauser in Nazi Germany -- and the "red flags" indicating that the Painting likely was lost due to Nazi persecution, MoMA conducted no further provenance research and accepted Paley's donation with "no questions asked."

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

5. **The background and provenance for *Boy Leading a Horse* is a paradigm for a prototypical "forced sale." Therefore, MoMA's acceptance of the Painting without performing any "due diligence" investigation left it with no commercially reasonable expectation that it had good title**

In light of the provenance of the Painting which indicated a strong likelihood of loss due to Nazi persecution, it was incumbent upon MoMA as a reasonably prudent Museum to investigate further the provenance of the Painting both (a) in 1964 when Paley executed the documents donating the Painting to the Museum, and retained only a life estate for himself; and (b) in 1990, when Paley died and MoMA obtained purported full ownership of the Painting. However, MoMA failed to conduct any "due diligence" investigation on either occasion, completely disregarded the conspicuous Nazi-era provenance of the Painting, and accepted the Painting into its collection. Accordingly, MoMA has never had a commercially reasonable expectation that it had good title to *Boy Leading a Horse*, or that the true owner would not come forward to claim the Painting.

6. **MoMA placed the Painting on NEPIP**

As noted, the Presidential Commission negotiated an agreement with the AAM to create NEPIP. MoMA belatedly placed the Painting on NEPIP and its PRP only after research was undertaken by MoMA to participate in NEPIP. After MoMA placed the Painting on NEPIP, the Mendelssohn-Bartholdy heirs discovered it, investigated the matter, and now make a timely demand for its return.

## VII. CONCLUSION AND DEMAND FOR RETURN OF THE PAINTING

In light of the foregoing, the Mendelssohn-Bartholdy heirs demand return of the Painting by November 12, 2007.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

25

February 15, 2007

**VIA FAX & OVERNIGHT MAIL**

Derek L. Sorrells
Senior Case Administrator
NASD Dispute Resolution - Western Division
300 South Grand Avenue, Suite 900
Los Angeles, CA  90071

      **Re:**    **Vincent W. Hsieh, Charlene Y. Hsieh, The Vincent W. Hsieh & Charlene Y.**
                    **Hsieh Revocable Trust dated 2/4/99, Alexander Hsieh, Eric Hsieh and Chin-**
                    **Hsiu Chen v. Credit Suisse Securities (USA) LLC**
                    **NASD Arb. No. 06-05256**

Dear Mr. Sorrells:

      Please accept this letter as the pre-hearing memorandum of Respondent Credit Suisse Securities (USA) LLC. Please distribute a copy to each of the members of the Panel. I am enclosing an original and three copies for this purpose.

      Claimants say they wanted "enhanced income" and "safety of principal." They invested in 2004 in the two bonds they now complain of. These were highly rated bonds, thus ensuring safety of principal if held to maturity, and matured in 7 years, thus obtaining enhanced income when compared with bonds of shorter term. But between 2004 and 2006 interest rates increased, causing the then current market values of the bonds to decline.[1] Instead of holding to maturity, or

---

[1]For example, during 2004 the prime rate fluctuated between 4% and 5%; in 2006 between 7.25% and 8.25%. Source: http://www.moneycafe.com/library/prime.htm#chart.

Derek L. Sorrells (NASD)
February 15, 2008
Page 2

even waiting to see if interest rates declined and current market values thus increased,[2] Claimants chose to sell the bonds in 2006, realizing a loss – wholly avoidable had they held to maturity.

Claimants seek to recover the loss from Credit Suisse, thus seeking to have Credit Suisse stand not only as insurer of the *principal* of the bonds, but of interest rates and the transient market value of the bonds at every point during the bonds' lifetimes. This wholly unreasonable request is accompanied by an equally unreasonable rationale which is contrary to fact and logic.

First, Vincent Hsieh, who managed these family accounts, suggests that he didn't understand what he was buying. Mr. Hsieh is a very experienced and successful businessman.[3] He understood that a 7-year bond was a 7-year bond, and that the fact that it *might* be called earlier didn't mean it *must* be called earlier. (In fact, of three bonds he bought in late 2004, one was called by 2006, a 33% call rate within two years). If he didn't understand that, he was not entitled, as a matter of law, to rely on an alleged statement by Sun that similar bonds were called often in the past as some kind of assurance that *these* bonds would be called in a short time. See In re Caere Corporate Sec. Litig., 837 F. Supp. 1054, 1058 (N.D. Cal.1993) ("statements regarding past events contain no implicit prediction that those events or conditions will continue in the future").

Second, Mr. Hsieh claims that Sun represented that the interest rates on the notes would be adjusted annually, when in fact they were adjusted quarterly. The written description of the notes provided to Mr. Hsieh are quite clear. Interest was to be paid quarterly, based on an adjustable interest rate which had three components – a fixed rate throughout the term of the note, a rate which was reset annually to a predetermined rate, and a rate which fluctuated quarterly. Mr. Hsieh can't claim that because one of the three components of the interest rate was reset annually this meant that the interest rate as a whole was reset annually. In any event, as a matter of law Mr. Hsieh can't claim he misunderstood or that Sun misrepresented, because the interest rate on the notes was a documented fact and he was free to read the documents he had and/or request additional ones. See Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993) ("An investor may not rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth"); Grumman Allied Industries, Inc. v. Rohr Industries, Inc., 748 F.2d 727, 737 (2d Cir. 1984) (when accurate information is available to buyer and seller makes no effort to prevent access to it, he can't claim that he relied on misrepresentations by seller).

---

[2]In fact, the prime rate decreased from 8.25% at the end of 2006 to 6% currently. Id. We have used the prime rate in this example only for convenience; Claimants' bonds were keyed to different interest rates, but which also followed the same general pattern.
[3]In his words, Mr. Hsieh "was the founder and CEO of a successful security software company that merged with Computer Associates in 1999" and who then "formed a new venture that has a focus on developing cutting edge technologies for leading enterprises in their defense of new Internet threats."

Derek L. Sorrells (NASD)
February 15, 2008
Page 3

## **<u>CONCLUSION</u>**

The bottom line is that, taking Claimants at face value, they wanted enhanced income and safety of principal. Enhanced income is a function of the term of the loan; Claimants selected a medium term which provided some enhanced income. Claimants' principal was completely safe, but they chose to sell and take a loss instead of holding to maturity and receiving back their principal. Credit Suisse is not responsible for their decision.

Very truly yours,

**Bressler, Amery & Ross, P.C.**

David G. Smitham

DGS/eaj

cc:    Cary Lapidus, Esq. – (Via facsimile & overnight mail)
        Eric Glassman, Esq. (Via facsimile & overnight mail)

Derek L. Sorrells (NASD)
February 15, 2008
Page 4


bcc:     Patricia A. Solfaro, Esq. – (Via regular mail)
         Brian Amery, Esq. – (Via inter-office)

# EXHIBIT 8

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMCAST.NET

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

November 1, 2007

## BY FEDERAL EXPRESS & FACSIMILE

Sarah G. Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128-0173

Re: Demand for return of Pablo Picasso's *Le Moulin de la Galette* (1900),
(Thannhauser Collection, 78.2514.34)

Dear Ms. Austrian:

Thank you for your letter of July 13, 2007. As you know, we represent the heirs of Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy). By this letter, we hereby demand the return of Pablo Picasso's *Le Moulin de la Galette* (Painting), oil on canvas, approximately 88.2 x 115.5 cms., completed approximately 1900, currently at the Guggenheim Museum (Museum), Thannhauser Collection, to the heirs of Mendelssohn-Bartholdy by November 12, 2007. If you do not return the Painting by this deadline -- or agree to do so -- we will consider this a refusal of our demand and take whatever actions we deem appropriate to protect the rights of our clients. We believe our clients are entitled to the recovery under, among other bases, New York law regarding conversion, replevin, restitution and constructive trust.[1]

---

[1] We have set forth below the essential facts and law we believe entitle the Mendelssohn-Bartholdy heirs to the return of the Painting. Notwithstanding the statement in your letter of July 13, we make no representation to you that we are submitting "all factual information and legal authority" in support of our claim, and we specifically reserve the right to assert additional facts and legal support for our position at any time. You have stated that you have copies of filings in the case of Schoeps v. Webber, Index No. 116768/06, and various other relevant documents. Further, the key documents relating to provenance regarding *Le Moulin de la Galette* are in your internal files. Moreover, many of the historical references contained in this letter are readily accessible on the Internet, books, or other texts. In light of the foregoing, we believe it is unnecessary to attach additional documents to this demand letter.

November 1, 2007                                         Byrne Goldenberg & Hamilton, PLLC

## I. INTRODUCTION

Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting.

Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in Berlin in 1935, and a Certificate of Inheritance was issued at that time. Our law firm represents all of the living heirs of Paul von Mendelssohn-Bartholdy.

## II. FACTS SUPPORTING OUR DEMAND FOR THE RETURN OF THE PAINTING

### A. Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke). Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

Paul von Mendelssohn-Bartholdy never sold *any* art before the Nazis came to power in 1933.

2

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Painting and four other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Boy Leading a Horse* (1906); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.

As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

3

After Paul von Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, Thannhauser brought it to New York in or around 1940, where it has remained for the most part since that time.

### B. Ideological Foundations of Nazi Persecution of Jews

In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany.

### C. Nazi Persecution of Jews Became Official State Policy in 1933

The Nazis pursued their agenda to banish Jews from the economic life of Germany when Hitler became Chancellor in January 1933. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages:

1.  The first stage occurred during the years 1933-1938 when  --  precluded from an expanding list of jobs, professions, and economic activities -- Jews sold their property often at discount prices merely to survive; and

2.  The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany which, in turn, triggered the forfeiture to the Reich of all remaining Jewish-owned property.

The Nazis' campaign against the Jews began almost immediately after they took power and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for

4

plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99. In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state. The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax. When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax. Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency. The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.

### D. During the Years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis, as noted, blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

The Nazis pressured private Jewish banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

### E. Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market

A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York. International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

### F. Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting

The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank -- one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

1. sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

2. endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank);

3. withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

4. suffered a precipitous collapse of his personal net worth;

5. declined to petition for an entitled reduction of his alimony obligations to his first wife based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

6. surrendered under pressure extensive land from his country estate (Boernicke) to the

Nazi Kulturamt (Cultural Office);

7. placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

8. had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

9. lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance institution;

10. was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

11. as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

12. finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser. Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

Thannhauser took advantage until approximately 1938 of the depressed prices of the Berlin art market. He sold to clients internationally, including New York and Switzerland, artworks that he had obtained at discounted prices from persecuted Jewish collectors. Both during this period and after the War, Thannhauser partnered with art dealers such as Cesar Mange de Haucke and Albert Skira whom the U.S. State Department identified as trafficking in Nazi-looted art.

The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune. For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan"

7

Deutsche Bank. Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed. Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

## III. THE U.S. AND STATE OF NEW YORK HAVE CONSISTENTLY PURSUED POLICIES AND ENACTED LAWS TO INVALIDATE "FORCED SALES" AND OTHER COERCIVE TRANSFERS OF PROPERTY IN NAZI GERMANY -- SUCH AS MENDELSSOHN-BARTHOLDY'S SALE OF THE PAINTING TO THANNHAUSER -- AND TO RESTITUTE SUCH PROPERTY TO NAZI VICTIMS AND THEIR HEIRS. THESE U.S. RESTITUTION PRINCIPLES HAVE ACHIEVED INTERNATIONAL ACCEPTANCE, AND WILL APPLY IN THIS MATTER.

### A. Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners

Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

8

### B. Military Government Law No. 59 (MGL No. 59) Was the Centerpiece of Post-War U.S. Restitution Policy

U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1). MGL No. 59 applied in the American Occupation Zone, and was the first Holocaust restitution law enacted for application in post-war Germany.

MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. See § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required even persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

### C. The U.S. actively and successfully promoted the adoption of MGL No. 59's restitution principles to the British and French in their respective "Occupation Zones" and in Berlin. Ultimately, even the Germans themselves enacted laws incorporating the principles of MGL No. 59 for application in all of Germany

The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S. National Security Council (NSC) drafted the "*Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC. In its directive to the U.S. High Commissioner for Germany, the NSC pronounced that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

9

> With respect to internal restitution, *it is the policy of your Government* that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . . To carry out this policy, you should **seek agreement from your British and French colleagues** to **persuade the German Government** to enact without delay a Uniform Internal Restitution Law, *which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59*.

NSC Policy Report, p. 70. (Emphasis added). Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself. For example:

1. **The Berlin Restitution Law of 1949.**

   MGL No. 59 was the controlling law for the U.S. "Occupation Zone" in Germany after 1947, but did not apply to Berlin. Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law. No. 59. The provisions regarding the "presumption of confiscation" and potential rebuttal thereof are virtually identical.

2. **Britain and France passed restitution laws in their "Occupation Zones" similar to MGL No. 59.**

   Britain and France passed laws in their individual German "Occupation Zones" that were similar to MGL No. 59 and the Berlin Restitution Law. (See British Military Law 59, and currently applicable provisions of French law (article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No-1344 dated September 30, 1949).

10

### 3. German restitution laws are patterned after MGL No. 59.

(a) After the Allies left the Federal Republic of Germany (West Germany), the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59 and the Berlin Restitution Law of 1949. (See "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

(b) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 — which are, of course, the same as MGL No. 59.

The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution).

Accordingly, under the restitution principles pioneered by the United States and accepted by the Allies, Germany and others, the Mendelssohn-Bartholdy heirs are entitled to recover the Painting as a result of Mendelssohn-Bartholdy's duress sale of the Painting to Thannhauser in Nazi Germany.

## IV. IN RECENT YEARS, THE U.S. STATE DEPARTMENT, U.S. CONGRESS, AND STATE OF NEW YORK HAVE REAFFRIMED AND REINVIGORATED THEIR POLICIES AND EFFORTS IN FAVOR OF HOLOCAUST ART RESTITUTION

### A. The U.S. Department of State Has Always been Strongly Committed to Holocaust Art Restitution. In the 1990s, the State Department Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations

The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is clearly expressed in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's

opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Advisor, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in the United States District Court for the Southern District of New York, which identifies MGL No. 59 as exemplifying U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See also Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit amended mandate and followed expression of Executive Policy in April 13, 1949 Jack B. Tate letter quoted above, as to a jurisdictional issue).

In the 1990's, the U.S. Department of State created a special office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy. The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries.

The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

**B. Against the Backdrop of Executive Branch Holocaust Restitution Policy, the U.S. Congress -- in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies**

In 1998, the U.S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years

12

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567. These statutes confirm U.S. policy to facilitate the return of confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

In summary:

1. The Redress Act seeks to assist Holocaust victims in their efforts to recover artworks and other assets lost in Nazi Germany. (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective."

2. The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U.S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No. 59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

3. The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U.S. government. Among its accomplishments, the Presidential Commission negotiated an agreement with the American Association of Museums (AAM) for the creation of a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). To comply with this agreement, the AAM created the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org) in 2003, with hyperlinked museum websites where detailed provenance information is provided. NEPIP and the hyperlinked museum websites will sometimes be referred to herein as the "NEPIP system." As discussed infra, the investigation of this case began in 2005 when Mendelssohn-Bartholdy heir Julius Schoeps (Schoeps), through his agents, discovered on NEPIP and the hyperlinked Museum

13

of Modern Art's "Provenance Research Project" (located at www.moma.org) that Paul von Mendelssohn-Bartholdy sold Pablo Picasso's *Boy Leading a Horse* in Nazi Germany to Berlin art dealer Justin K. Thannhauser.

**C.  Since 1997, New York State Has Proclaimed a Signal Public Policy to Help Victims Of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945**

On June 25, 1997, then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

Governor Pataki repeatedly has underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution. In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of history's darkest times."

The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution. The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales. See, e.g., HCPO Press Releases dated, respectively, June 17, 2003, November 17, 2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks lost as a consequence of forced sales.

**V.  THE MENDELSSOHN-BARTHOLDY HEIRS HAVE NOT UNREASONABLY DELAYED MAKING THIS DEMAND, SINCE THEY WERE NOT AWARE OF THEIR RIGHTS TO THE PAINTING UNTIL THE EFFORTS OF THE U.S. GOVERNMENT AND STATE OF NEW YORK MADE NECESSARY INFORMATION AVAILABLE TO THEM**

**A.  Until 2005, no heir of Paul von Mendelssohn-Bartholdy knew he had sold any art in Nazi Germany**

Until 2005, no Mendelssohn-Bartholdy heir knew that their ancestor, Paul von Mendelssohn-Bartholdy, sold any artworks in Nazi Germany. In 2005, Mendelssohn-Bartholdy heir Julius Schoeps, through his attorneys, first discovered the sale in Nazi Germany by Mendelssohn-Bartholdy to Thannhauser of Picasso's *Boy Leading a Horse* on the NEPIP system. As discussed infra, the NEPIP system was created as part of a massive undertaking by the State of New York and the U.S. government -- from the late 1990's through today -- to make documents and information available to Holocaust claimants so that they can identify,

14

November 1, 2007                                      Byrne Goldenberg & Hamilton, PLLC

investigate, and make claims to recover artworks that may have been lost as a result of Nazi persecution. NEPIP provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). It was created by the American Association of Museums (AAM) pursuant to an agreement with the Presidential Commission created by the Commission Act (1998). New York's HCPO also was active in NEPIP's development.

But for the efforts of the State of New York and the U.S. government to make information available to Holocaust victims and their heirs, the Mendelssohn-Bartholdy heirs might never have discovered -- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold these paintings under duress in Nazi Germany.

Once Schoeps was made aware of the NEPIP entry, he acted diligently throughout 2005-2007 to investigate, among other things, the relationship between Mendelssohn-Bartholdy and Thannhauser, the art collection of Mendelssohn-Bartholdy, additional sales Mendelssohn-Bartholdy made under duress, Nazi persecution of Mendelssohn-Bartholdy, the location of the other Mendelssohn-Bartholdy heirs, and other matters which enabled him to make this demand in 2007.

**B. The "Wall of Silence" which denied Holocaust claimants access to information that would allow them to investigate and reclaim lost property**

Until recently, Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available. This historical deficiency has been widely recognized. For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**wall of silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

**C. The U.S. Congress, U.S. Department of State, and State of New York began intensive efforts in the late 1990s to tear down the "Wall of Silence," that is, to make information and documents available to Holocaust claimants so that they could develop and prosecute claims for the recovery of property lost during the Nazi era**

In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and — as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example:

15

1. In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations. The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945. The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

2. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

3. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants. As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

4. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended. Upon meeting some initial resistance to acceptance of the AAMD guidelines, State Department representatives re-drafted the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

5. The Presidential Commission, created by the Commission Act of 1998,

negotiated an agreement with the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. This agreement led to the creation of the Nazi-Era Provenance Internet Portal (NEPIP), www.nepip.org in September 2003, which was in part federally funded. NEPIP lists art that has a Nazi-Era provenance, that is, art that changed ownership in Europe between 1933-1945. NEPIP is connected by hyperlink to individual museum Websites where detailed provenance information can be accessed. The New York Holocaust Claims Processing Office (HCPO) actively participated in the AAM task force established to create NEPIP;

6. In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively — and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

7. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs Provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art — all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission — it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

**D. The efforts of the U.S. Government and State of New York to help victims of Nazi persecution and their heirs to recover confiscated artworks are on-going, and more relevant information continues to become available**

The U.S. Government and the State of New York began a process in the late 1990s that, among other things, has given Holocaust claimants increased access to documents and information worldwide. However, progress has been slow in some areas and the release of additional archives, documents and information is continuing.

For example, in 2006, the Claims Conference published a survey it conducted of U.S. museums' participation in NEPIP. The survey reports that NEPIP "lists approximately 18,000 items, or slightly higher than **12 percent** of the total number" of objects (over 140,000) that

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

museums have determined are within the NEPIP criteria. Further, of "the museums that do clearly state that they are conducting provenance research, **52 percent have completed research on less than half of the relevant items** in their collection and a further 33 percent did not provide information on the extent to which they had completed the work." See "Nazi-Era Stolen Art and U.S. Museums: A Survey And Joint Project of the Claims Conference and the World Jewish Restitution Organization (WJRO)"(2006) (questionnaire sent on February 10, 2006 to 332 U.S. art museums to ascertain museums' progress in adhering to recognized principles concerning Nazi-era looted art).

New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing. (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

**E. This claim Was Made Possible <u>Only</u> by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990s -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

This claim was made possible by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. For example, in 2005, Schoeps first discovered that his Jewish ancestor, Paul von Mendelssohn-Bartholdy, sold a Picasso painting to art dealer Justin K. Thannhauser in Nazi Germany from information published on NEPIP and the hyperlinked Museum of Modern Art (MoMA), Provenance Research Project (PRP).

Based on the information discovered on NEPIP and MoMA's PRP in 2005, Schoeps -- and later the other Mendelssohn-Bartholdy heirs -- through their agents, investigated Mendelssohn-Bartholdy's relationship with Justin K. Thannhauser and his sale of Picasso artworks to Thannhauser. Ultimately, the heirs discovered that Mendelssohn-Bartholdy had sold five Picasso artworks to Thannhauser under duress in Nazi Germany, including, of course, *Le Moulin de la Galette*.

18

As noted, NEPIP and the museums' related websites were developed by the AAM as a result of the AAM's agreement with the Presidential Commission. The Presidential Commission was created by the Commission Act of 1998. In addition, the NEPIP project has received some federal funding. Also, the State of New York played an important role in the development of NEPIP, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since this claim to recover the Painting grew out of information discovered on NEPIP and a related museum website, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and information to enable them to develop claims.

### F. The Mendelssohn-Bartholdy heirs, Through Their Agents, Have Acted Diligently Throughout 2005-2007 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany

Once Schoeps became aware of Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he and other Mendelssohn-Bartholdy heirs have acted diligently in 2005-2007 to complete this investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, the circumstances of his sale of art under Nazi duress, and other matters which enabled us to make this demand. The Mendelssohn-Bartholdy, through their agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

## VI. THE MUSEUM DISREGARDED THE PAINTING'S SUSPICIOUS NAZI-ERA PROVENANCE WHEN IT ACCEPTED THE PAINTING INTO ITS COLLECTION, AND CONTINUED TO IGNORE PROVENANCE PROBLEMS EVEN AS THEY BECAME MORE APPARENT. AS A RESULT, THE MUSEUM NEVER OBTAINED A COMMERCIALLY REASONABLE BELIEF THAT IT HAD ACQUIRED GOOD TITLE TO THE PAINTING, OR THAT THE TRUE OWNER WOULD NOT COME FORWARD TO CLAIM IT.

The Museum failed in its obligation "to inquire about the validity of title before completing the transaction." U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004). Moreover, as additional facts became known over time which cast further doubt on the "validity of title," the Museum ignored them. The Museum's actions with regard to the acquisition and continued possession of the Painting without inquiring into its background is more egregious in light of the U.S. government's circular letters warning museums and others against acquiring Nazi-confiscated art, and New York courts' condemnation of the lax practices of the art world in art trading, as discussed below.

November 1, 2007                                            Byrne Goldenberg & Hamilton, PLLC

### A. Following the War, the U.S. Government Repeatedly Cautioned Museums and the International Art Market About Acquiring Nazi-Confiscated Art

The formal policies of economic coercion and duress that Nazi Germany employed against its Jewish citizens during the years 1933-45, and its subsequent seizure and plunder of artworks in occupied countries, resulted in enormous displacement of art which the U.S. government and its Allies attempted to rectify after the War.

In 1946, the U.S. Department of State (State Department) issued a circular letter to U.S. museums, auction houses and dealers advising that the legal restrictions on the importation of artworks from Nazi-occupied countries had been lifted and urging precautions against acquiring contraband materials.

In 1951, the State Department issued a second circular letter to the U.S. art industry reiterating this warning. In light of the State Department warnings, the Museum clearly would have been aware of the dangers of acquiring Nazi-confiscated art in approximately the early 1970s when Thannhauser advised the Guggenheim Museum that he was bequeathing the Painting and other artworks.

### B. For More Than 35 Years, New York Courts Have Condemned How Casually Art is Acquired on the International Market, and Have Announced a Policy to Protect Victims of Art Theft in Order to Safeguard the Commercial Integrity of the New York City Art Market

Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned such individuals to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"; Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of... title...it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art... and diminishes the integrity of the apathetic merchant."

In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

20

### C. The Museum Disregarded the Painting's Suspicious Nazi-Era Provenance When It Accepted the Painting Into Its Collection

In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum. At that time, the Museum began investigating the provenance and history of artworks Thannhauser had bequeathed to the Museum, including *Le Moulin de la Galette*. Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Museum.[2]

Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information they had developed regarding the artworks he had bequeathed to the Museum. Thannhauser *himself* reviewed these documents, and -- where appropriate -- made corrections and additions in his own hand on the documents.

In 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*. Thannhauser wrote on this document in his own hand that he had purchased the Painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935." (See document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive).

In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document clearly was based in part on Thannhauser's 1972 notes.

Rich recorded that Thannhauser told him that the Painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

"[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive).

Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich establish that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser

---

[2] This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum: Justin K. Thannhauser Collection*, by Vivian Endicott Barnett.

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires
exhibition but before Mendelssohn-Bartholdy's death in May 1935.

Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser Collection*
(1978), confirmed that Thannhauser purchased the Painting from Mendelssohn-Bartholdy in or
around 1935:

> "[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin,
> c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**."
> (Emphasis added; <u>see</u> Attachment 5).

Therefore, by 1975, the Guggenheim was aware that:

(a) Paul von Mendelssohn-Bartholdy was Jewish based, among other reasons, upon the fact
that "Mendelssohn" is a common name of Jewish origin and Mendelssohn-Bartholdy was
descended from a famous German Jewish family;

(b) Mendelssohn-Bartholdy was from Berlin (<u>see</u> document entitled "JKT Notes" regarding
another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under
duress to Thannhauser, and that Thannhauser bequeathed to the Museum, where
Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, ***Berlin***" [emphasis added]);

(c) Nazi persecution of Jews began immediately after the Nazis took power in 1933, and
increased in intensity throughout 1933-1935;

(d) Mendelssohn-Bartholdy sold the Painting and another artwork that Thannhauser was
donating to the Museum, *Head of a Woman*, between the time they were on consignment in
Buenos Aires in October 1934 and Mendelssohn-Bartholdy's death in May 1935;

(e) In addition, minimal additional research would have revealed:

> (1) the Mendelssohn family suffered tremendous persecution during
> the Nazi era; and

> (2) the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo
> Picasso artworks on consignment in Buenos Aires in October
> 1934, further evidence that Mendelssohn-Bartholdy was selling
> his art under duress; and

(f) U.S. State Department "circular letters" warned museums that Nazi confiscated artworks
were entering the U.S. marketplace, and urged them to take precautions against acquiring
such works.

22

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks. Therefore, the Museum's acceptance of the Painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title or that the true owner would not come forward to claim the Painting.

> **D. The Museum has ignored the Nazi-era provenance of the Painting from 1972 up to the present time, despite being placed on notice of Thannhauser's trafficking in Nazi-confiscated art**

On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson. The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article notes that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article states that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war."

The front-page Boston Globe article placed the Guggenheim Museum on further notice of Thannhauser's dealings in Nazi-era art, and the need to investigate the provenance of the artworks in the so-called "Thannhauser Collection" at the Museum to ascertain whether they were Nazi-confiscated.

Despite the Museum's increasing knowledge of Thannhauser, no additional research was performed regarding the possibility that Mendelssohn-Bartholdy lost the Painting in Nazi Germany.

## VII. CONCLUSION AND DEMAND FOR RETURN OF THE PAINTING

In light of the foregoing, the Mendelssohn-Bartholdy heirs demand return of the Painting by November 12, 2007.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

23



CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial (212) 225-2850
E-Mail edavis@cgsh.com

December 7, 2007

BY FEDERAL EXPRESS AND E-MAIL

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

Re: *Boy Leading a Horse and Le Moulin de la Galette*

Dear Mr. Byrne:

On behalf of The Museum of Modern Art ("MoMA") and The Solomon R. Guggenheim Foundation (the "Guggenheim") (collectively, the "Museums"), I write to respond to the letters you sent to each museum dated November 1, 2007, declaring that you represent the heirs of Paul von Mendelssohn-Bartholdy ("von Mendelssohn-Bartholdy"), setting forth your clients' claims of title to two paintings by Pablo Picasso, *Boy Leading a Horse*, which MoMA acquired as a gift from William S. Paley in 1964, and *Le Moulin de la Galette* (collectively, the "Paintings"), which the Guggenheim acquired as a gift from Justin K. Thannhauser ("Thannhauser") in 1963, and demanding that the Museums return, or agree to return, the Paintings to your clients within 11 days of the date of the letters.

In keeping with their ethical standards and obligation to honor legitimate claims, the Museums have scrupulously reviewed your clients' claim that the sale of the Paintings, which were once in von Mendelssohn-Bartholdy's collection, to Thannhauser in or around 1935 was made under "duress." The Museums have carefully researched and investigated the provenance of the Paintings, including the factual circumstances surrounding their sale, and have concluded that your clients' claims are without merit. Accordingly, the Museums hereby refuse your demand to return the Paintings to your clients.

John J. Byrne, Jr., Esq., p. 2

       In response to your stated intention to "take whatever actions we deem appropriate to protect the rights of our clients," the Museums are filing a complaint today in the United States District Court for the Southern District of New York against your clients seeking an order from the Court declaring your clients' claims to be invalid.

       I enclose herewith a courtesy copy of the complaint, and ask that you agree to accept service on your clients' behalf.

       Sincerely,

       Evan A. Davis

Enclosure