UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                       :

THE MUSEUM OF MODERN ART, and THE    :
SOLOMON R. GUGGENHEIM FOUNDATION,    :
                                         :

                Plaintiffs,          :

BOY LEADING A HORSE, and LE MOULIN DE    :    07 Civ. 11074 (JSR)
LA GALETTE, Two Paintings by Pablo Picasso,  :

            Plaintiffs-in-rem,    :    **DECLARATION
                                         :    OF EVAN A. DAVIS**

               - against -       :

JULIUS H. SCHOEPS,                   :

               Defendant.     :

------------------------------------------------------------------x

Evan A. Davis declares as follows:

1.        I am a Member of the Bars of the State of New York and of this Court and of the law firm of Cleary Gottlieb Steen & Hamilton LLP, attorneys for plaintiffs The Museum of Modern Art ("MoMA") and The Solomon R. Guggenheim Foundation (the "Guggenheim").  I make this declaration in support of plaintiffs' opposition to defendant's motion to dismiss.

2.        Attached as Exhibit 1 is a true and correct copy of the letter from John J. Byrne to MoMA, dated March 28, 2007.

3.        Attached as Exhibit 2 is a true and correct copy of the letter from John J. Byrne to the Guggenheim, dated March 28, 2007.

4.        Attached as Exhibit 3 is a true and correct copy of the letter from the Guggenheim to John J. Byrne, dated May 29, 2007.

5.        Attached as Exhibit 4 is a true and correct copy of the letter from MoMA to John J. Byrne, dated May 30, 2007.

6.     Attached as Exhibit 5 is a true and correct copy of the letter from John J. Byrne to the Guggenheim, dated June 8, 2007.

7.     Attached as Exhibit 6 is a true and correct copy of the letter from John J. Byrne to MoMA, dated June 8, 2007.

8.     Attached as Exhibit 7 is a true and correct copy of the letter from the Guggenheim to John J. Byrne, dated July 13, 2007.

9.     Attached as Exhibit 8 is a true and correct copy of the letter from MoMA to John J. Byrne, dated July 16, 2007.

10.     Attached as Exhibit 9 is a true and correct copy of the letter from John J. Byrne to the Guggenheim, dated August 16, 2007.

11.     Attached as Exhibit 10 is a true and correct copy of the letter from John J. Byrne to MoMA, dated August 16, 2007.

12.     Attached as Exhibit 11 is a true and correct copy of the letter from MoMA to John J. Byrne, dated August 28, 2007.

13.     Attached as Exhibit 12 is a true and correct copy of the letter from the Guggenheim to John J. Byrne, dated August 29, 2007.

14.     Attached as Exhibit 13 is a true and correct copy of the letter from John J. Byrne to the Guggenheim, dated November 1, 2007.

15.     Attached as Exhibit 14 is a true and correct copy of the letter from John J. Byrne to MoMA, dated November 1, 2007.

16.     Attached as Exhibit 15 is a true and correct copy of the letter from MoMA to John J. Byrne, dated November 5, 2007.

2

17.     Attached as Exhibit 16 is a true and correct copy of the letter from the Guggenheim to John J. Byrne, dated November 6, 2007.

18.     Attached as Exhibit 17 is a true and correct copy of the letter from John J. Byrne to the Guggenheim, dated November 12, 2007.  Upon information and belief, Mr. Byrne did not contact the Guggenheim with his position on the matter.

19.     Attached as Exhibit 18 is a true and correct copy of the letter from John J. Byrne to MoMA, dated November 12, 2007.  Upon information and belief, Mr. Byrne did not contact MoMA with his position on the matter.

20.     Attached as Exhibit 19 is a true and correct copy of the letter from Evan A. Davis of Cleary Gottlieb Steen & Hamilton LLP, on behalf of MoMA and the Guggenheim, to John J. Byrne, dated December 7, 2007.

21.     Attached as Exhibit 20 is a true and correct copy of the Third Amended Complaint filed in Schoeps v. The Andrew Lloyd Webber Art Foundation, Index No. 116768/06, dated May 2, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        February 25, 2008


/s/ Evan A. Davis
Evan A. Davis

# EXHIBIT 1

## BYRNE GOLDENBERG & HAMILTON, PLLC

### ATTORNEYS AT LAW

1025 CONNECTICUT AVENUE NW, SUITE 1012
WASHINGTON, DC 20036

APR 0 3 2007

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CALIFORNIA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

TELEPHONE
(202) 857-9775
FACSIMILE
(202) 857-9799

March 28, 2007

**CERTIFIED MAIL**

Patty Lipschutz, Esq.
General Counsel
Museum of Modern Art
11 West 53rd Street
6th Floor
New York, New York 10019

> Re:  Request for Provenance Information and
> Documents Regarding Pablo Picasso's *Boy
> Leading a Horse*, Museum of Modern Art
> Identification Number 575.64

Dear Ms. Lipschutz:

Our law firm represents Professor Julius H. Schoeps of
Berlin, Germany, and other heirs of Paul von Mendelssohn-
Bartholdy (Mendelssohn-Bartholdy). Mendelssohn-Bartholdy
was a Jewish banker in Berlin who suffered intense Nazi
persecution from 1933 until his death of a heart attack in
May 1935. As a proximate consequence of Nazi persecution,
Mr. Mendelssohn-Bartholdy began selling paintings from his
art collection, including Pablo Picasso's *Boy Leading a
Horse* (the Painting). We are investigating Mendelssohn-
Bartholdy's "duress sale" of the Painting to Berlin art
dealer Justin K. Thannhauser in Nazi Germany. The Painting
was donated to the Museum of Modern Art (MoMA) by William
S. Paley in or around 1964, and has MoMA Identification
Number 575.64.

On behalf of the heirs of Mendelssohn-Bartholdy, we
request that you permit us to examine and copy any and all
documents or information the Museum of Modern Art (MoMA)
has relating to the Painting, including but not limited to
provenance information. For your reference, please see the

relevant page from MoMA's Provenance Research Project relating to the Painting, and the Painting's entry on the Nazi-Era Provenance Internet Portal (NEPIP).  As you can see from your Provenance Research Project page, Mendelssohn-Bartholdy is identified as the owner of the Painting in Nazi Germany, followed by Justin K. Thannhauser in 1935.  We are particularly interested in any information or documents that you may have regarding the transfer of the Painting from Mendelssohn-Bartholdy to Thannhauser in Nazi Germany.  We are also seeking any documents or information concerning later transfers, such as Thannhauser's sale to William S. Paley in or around 1936, and Paley's donation to MoMA in or around 1964. Finally, we ask for any provenance information in your possession relating to other artworks Mendelssohn-Bartholdy sold to Thannhauser during the Nazi-era, including in particular the following works by Picasso: *Le Moulin de la Galette; Madame Soler; (Blue) Head of a Woman;* and *Portrait of Angel Fernandez de Soto.*

    We thank you in advance for your cooperation in providing us with this information.  I look forward to hearing from you at your early convenience.  Please feel free to call me if you have any questions.

Very truly yours,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

2

# EXHIBIT 2

# BYRNE GOLDENBERG & HAMILTON, PLLC

### ATTORNEYS AT LAW

### 1025 CONNECTICUT AVENUE NW, SUITE 1012
WASHINGTON, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CALIFORNIA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

TELEPHONE
(202) 857-9775
FACSIMILE
(202) 857-9799

March 28, 2007

**CERTIFIED MAIL**

Sarah Austrian, Esq.
General Counsel
Solomon R. Guggenheim Museum
345 Hudson Street
12th Floor
New York, New York 10014

> Re:  Request for Provenance Information and
>      Documents Regarding Pablo Picasso's
>      *Le Moulin de la Galette* (1900),
>      (Thannhauser Collection, 78.2514.34)

Dear Ms. Austrian:

Our law firm represents Professor Julius H. Schoeps of
Berlin, Germany, and other heirs of Paul von Mendelssohn-
Bartholdy (Mendelssohn-Bartholdy). Mendelssohn-Bartholdy
was a Berlin banker of Jewish descent who suffered intense
Nazi persecution from 1933 until his death of a heart
attack in May 1935. As a proximate consequence of Nazi
persecution, Mendelssohn-Bartholdy began selling paintings
from his art collection, including Pablo Picasso's *Le
Moulin de la Galette* (the Painting), autumn 1900, oil on
canvas, 34 3/4 x 45 1/2 inches, currently in the
Thannhauser Collection, 78.2514.34, at the Solomon R.
Guggenheim Museum (Guggenheim). We are investigating
Mendelssohn-Bartholdy's "duress sale" of the Painting to
Berlin art dealer Justin K. Thannhauser (Thannhauser) in
Nazi Germany. Upon information and belief, Thannhauser
bequeathed the Painting to the Guggenheim in 1976.

On behalf of the heirs of Mendelssohn-Bartholdy, we
request that you permit us to examine and copy any and all
documents or other information that the Guggenheim has

relating to the Painting, including but not limited to
provenance information.  For your reference, please see
Vivian Endicott Barnett, *The Guggenheim Museum Justin K.
Thannhauser Collection*, published by The Solomon R.
Guggenheim Foundation in 1978.  As you will see,
Thannhauser provided notes to the Guggenheim in December
1972 establishing that he purchased the Painting from
Mendelssohn-Bartholdy "c.[circa] 1935." (Id. at 111).

In addition, Thannhauser acknowledged in his notes
that he purchased a second Picasso artwork from
Mendelssohn-Bartholdy in the Nazi-era, a pastel entitled
*Head of a Woman*,[1] "by 1937." (Id. at 126).  Although the
Guggenheim no longer has possession of *Head of a Woman*, we
are investigating the pastel as another artwork
Mendelssohn-Bartholdy lost as a proximate consequence of
Nazi persecution.[2]  Thannhauser told Daniel Catton Rich of
the Guggenheim in March 1975 that Mendelssohn-Bartholdy had
placed *Head of a Woman* on consignment with him by the time
it was exhibited at the Galeria Müller in Buenos Aires,
Argentina, in October 1934.  (Id. at 127).  We believe that
Mendelssohn-Bartholdy had also placed *Le Moulin de la
Galette* on consignment with Thannhauser in October 1934.
Accordingly, the conversations between Thannhauser and Rich
are relevant to our investigation.

In light of the above, we are particularly interested
in examining and copying any and all documents that relate
in any way to: (a) the notes that Thannhauser provided to
the Guggenheim in December 1972 regarding the Painting and
his art dealings in general; and (b) Thannhauser's
conversations with Daniel Catton Rich in March 1975.[3]

---

[1] Upon information and belief, Thannhauser bequeathed *Head of a Woman* to
the Guggenheim, but the Guggenheim de-accessioned the pastel in or
around 1961.

[2] In addition to *Le Moulin de la Galette* and *Head of a Woman*, our
investigation has found that Mendelssohn-Bartholdy also sold the
following Picasso artworks to Thannhauser under duress as a result of
Nazi persecution: *Boy Leading a Horse*; *Portrait of Angel Fernandez de
Soto*; and *Portrait of Madame Soler*.  Accordingly, we would appreciate
the opportunity to examine and copy any provenance information that you
may have regarding these works.

[3] In the "Introduction and Acknowledgements" to *The Guggenheim Museum
Justin K. Thannhauser Collection*, Vivian Endicott Barnett describes
Thannhauser's notes and conversations: "Justin K. Thannhauser
possessed a keen memory and shared his recollections with Daniel Catton
Rich in notes (December 1972) and conversations (March 1975) which are

2

We thank you in advance for your cooperation in providing us with this information. I look forward to hearing from you at your early convenience. Please feel free to call me if you have any questions.

Very truly yours,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

---

frequently cited as the source of information in catalogue entries. The present volume would not exist without the information he graciously and tirelessly provided." Id. at 13. Accordingly, it is clear that Ms. Barnett had access to these records when she wrote her book on the Guggenheim's Thannhauser collection.

3

# EXHIBIT 3

## Guggenheim MUSEUM

1071 Fifth Avenue
New York NY 10128-0173
Telephone 212 423 3500
Telefax 212 423 455

May 29, 2007

BY EXPRESS MAIL

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue NW
Suite 1012
Washington, DC 20036

Re:  Provenance Inquiry of Le Moulin de la Galette

Dear Mr. Byrne:

  I write in response to your letter dated March 28, 2007, informing the Solomon R. Guggenheim Museum (the "Museum") that you represent heirs of Paul von Mendelssohn-Bartholdy and that you are investigating Mr. von Mendelssohn-Bartholdy's sale, which you characterize as a "duress sale," in or around 1935, of a painting by Pablo Picasso entitled "Le Moulin de la Galette", which is currently in the Museum's collection.  Your March 28th letter also requests permission to examine and copy any provenance information the Museum may have relating to the painting.

  I am aware of the letter you sent to the National Gallery of Art on May 31, 2006, on behalf of what appears to be the same von Mendelssohn-Bartholdy heirs demanding the immediate return of another painting by Pablo Picasso entitled "Head of a Woman," based on the allegation that Mr. von Mendelssohn-Bartholdy lost the painting through a "duress sale" in or around 1935  In addition, I am aware of your March 28th letter to the Museum of Modern Art on behalf of heirs of Mendelssohn-Bartholdy stating that you are investigating the "duress sale" by Mr von Mendelssohn-Bartholdy, in or around 1935, of another Pablo Picasso painting entitled "Boy Leading a Horse."  I am also aware of the lawsuit that you commenced on behalf of an heir of Mendelssohn-Bartholdy, first in the United States District Court for the Southern District of New York, and subsequently in the Supreme Court for the State of New York against the Andrew Lloyd Weber Art Foundation seeking the restitution of another Pablo Picasso painting entitled "The Absinthe Drinker (Angel Fernandez de Soto)," based on a similar allegation of a "duress sale" in or around 1935.  In light of the similarities in the claims and the factual circumstances alleged in your March 28th letter to those alleged in your letter to the National Gallery and the lawsuit you commenced, we are treating your March 28th letter as a communication effectively seeking the same relief

The Museum's policy in responding to provenance inquiries, even in these potential litigation situations, is to adopt the same policy that governs the Museum's response to information requests from bona fide researchers and scholars, pursuant to which the Museum grants those researchers and scholars access to review the Museum's files on the provenance of the paintings in its collection

Accordingly, the Museum will grant you access to the same factual information on the provenance of the Picasso painting entitled "Le Moulin de la Galette" that it would to bona fide researchers and scholars. I would, in return, expect that you would provide the Museum with any provenance information you may have that you would make available to scholars. We will not provide, and would not expect you to provide, materials covered by the attorney-client privilege or work product protection.

In due course, I will be making a presentation to our decision makers regarding your clients' claim. We take our obligation to carefully evaluate these claims very seriously and our position with respect to your clients' claim will be determined at the Board level. If you wish to supplement your explanation of the basis for your claim, that would be appreciated  Of course you need not repeat information already set forth in your letter to the National Gallery or in your court filings. Alternatively, if you would like me to provide you with a list of questions to which you could respond in writing, I would be happy to do so. In the meantime, we invite you to contact Susan Davidson, Curator, at 212-423-3822 to arrange to come to the Museum to review the Museum's provenance file on the painting.

Sincerely,

*Sarah G. Austrian*

Sarah G. Austrian
General Counsel

2

# EXHIBIT 4

**The Museum of Modern Art**

Stephen W. Clark
Deputy General Counsel

May 30, 2007

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue NW, Suite 1012
Washington, DC  20036

Dear Mr. Byrne:

The Museum of Modern Art ("MoMA") is aware of a letter dated May 29, 2007, from the Guggenheim Museum to you about the provenance of several works of art, including Pablo Picasso's *Boy Leading a Horse*. MoMA joins in the ideas expressed in that letter  Please consider this our response to your March 28 letter and to your May 18 telephone call on this subject  We invite you to contact Mattias Herold at (212) 333-1224 to arrange a mutually convenient time to review MoMA's file on this picture

Sincerely,

Stephen W. Clark

cc. Patty Lipshutz, Esq.

# EXHIBIT 5

# BYRNE GOLDENBERG & HAMILTON, PLLC

Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMAST.NET

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

June 8, 2007

**BY FACSIMILE (212) 423-3650 & FIRST-CLASS MAIL**

Sarah G. Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128

Re: Provenance Inquiry for Pablo Picasso's *Le Moulin de la Galette*

Dear Ms. Austrian:

Thank you for your letter of May 29, 2007. I will make the arrangements as you requested for reviewing the provenance information regarding Picasso's *Le Moulin de la Galette*. If you are available on the date I am in New York, I would like to introduce myself. As to your request for provenance information in our possession, we anticipate making a full presentation to you of our position after we have had the opportunity to review your documents and complete our investigation.

Feel free to call me if you have any questions.

Very truly yours,

BYRNE GOLDENBERG & HAMILTION, PLLC

John J. Byrne, Jr.

# EXHIBIT 6

# BYRNE GOLDENBERG & HAMILTON, PLLC

Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD F. GOLDENBERG
ADMITTED DC, CA

THOMAS J HAMILTON
ADMITTED DC, MD, VA

TELEPHONE: (202) 857-9775
FACSIMILE. (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMAST.NET

June 8, 2007

**BY FACSIMILE (212) 708-9856 & FIRST-CLASS MAIL**

Stephen W. Clark, Esq.
Deputy General Counsel
The Museum of Modern Art
11 West 53rd Street
New York, New York 10019-5497

Re: <u>Provenance Inquiry for Pablo Picasso's <i>Boy Leading a Horse</i></u>

Dear Mr. Clark:

Thank you for your letter of May 30, 2007. I will make the arrangements as you requested for reviewing MoMA's file regarding Picasso's *Boy Leading a Horse*. If you are available on the date I am in New York, I would like to introduce myself. As I mentioned to you in our telephone conversation a few weeks ago, I anticipate making a full presentation to you of our position after we have had the opportunity to review your documents and complete our investigation.

Feel free to call me if you have any questions.

Very truly yours,

BYRNE GOLDENBERG & HAMILTION, PLLC

John J. Byrne, Jr.

.

# EXHIBIT 7

**Guggenheim** MUSEUM

1071 Fifth Avenue
New York NY 10128-0173
Telephone 212-423-3500
Telefax 212-423-3650

July 13, 2007

BY EXPRESS MAIL

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

Re: *Le Moulin de la Galette*

Dear Mr. Byrne:

As I mentioned in the final paragraph of the letter I sent to you on May 29, 2007, I plan to make a presentation to the Board of Trustees of the Solomon R. Guggenheim Foundation to enable the Board to evaluate and determine how to respond to your client's claim.

In your letter to me dated June 8, 2007, you stated that you anticipated making a full presentation to us of your position after you reviewed the Foundation's documents and completed your investigation. As we move forward with the decision-making process, we would like to afford you with the opportunity to submit all factual information and legal authority that you believe that the Board of Trustees should take into account in deciding how to respond to your demand. To ensure that it will be considered when I meet with the Board, this material must be submitted no later than August 16, 2007. This offer to receive written material from you is made without waiving any applicable privileges, and without prejudice to our defenses.

Sincerely,

Sarah G. Austrian
General Counsel

# EXHIBIT 8

## The Museum of Modern Art

Stephen W. Clark
Deputy General Counsel

July 16, 2007

John J Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue NW, Suite 1012
Washington, DC 20036

Dear Mr Byrne:

I am writing further to our correspondence about Pablo Picasso's *Boy Leading a Horse*  In the spirit of open exchange of provenance information, and without prejudice to any defenses or privileges, we made the Museum's curatorial files on this painting available to you last month  To date, however, you have not provided us any information in support of your assertion that the work was inappropriately taken from a previous owner, Paul von Mendelssohn-Bertoldy

Please submit to us by August 16, 2007, whatever information you wish us to consider about the provenance of *Boy Leading a Horse*  You may provide documentary evidence or a narrative (or both), but I urge you to supply all of the relevant facts in your knowledge so that we may make a fully informed, appropriate response to your demand

Sincerely,

Stephen W Clark

# EXHIBIT 9

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE JR
ADMITTED DC, MD, NY

LLOYD P GOLDENBERG
ADMITTED DC, CA

THOMAS J HAMILTON
ADMITTED DC, MD, VA

TELEPHONE (202) 857-9775
FACSIMILE (202) 857-9799
E-MAIL JOHN J BYRNE@COMCAST NET

August 16, 2007

**BY FAX AND FIRST CLASS MAIL**

Sarah G Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128-0173

Re: <u>Pablo Picasso's *Le Moulin de la Galette*</u>

Dear Ms Austrian:

Thank you for your letter of July 13, 2007. We are moving expeditiously to complete our investigation of Pablo Picasso's *Le Moulin de la Galette*, which is currently located at the Guggenheim Museum. As you are aware, provenance and historical research is complicated and time-consuming. As I mentioned in my letter of June 8, 2007, we intend to make a presentation to you after we have completed our investigation. We have not yet finished our investigation but intend to do so in the near future.

Feel free to call me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

# EXHIBIT 10

# BYRNE GOLDENBERG & HAMILTON, PLLC

## Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE. JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

TELEPHONE. (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL JOHN J. BYRNE@COMCAST.NET

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

August 16, 2007

**BY FAX AND FIRST CLASS MAIL**

Stephen W. Clark, Esq.
Deputy General Counsel
The Museum of Modern Art
11 West 53rd Street
New York, New York 10019-5497

Re: Pablo Picasso's *Boy Leading a Horse*

Dear Mr. Clark:

Thank you for your letter of July 16, 2007. We are moving expeditiously to complete our investigation of Pablo Picasso's *Boy Leading a Horse*, which is currently located at the Museum of Modern Art. As you are aware, provenance and historical research is complicated and time-consuming. As I mentioned in my letter of June 8, 2007, we intend to make a presentation to you after we have completed our investigation. We have not yet finished our investigation but intend to do so in the near future.

Feel free to call me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

# EXHIBIT 11

The Museum of Modern Art

August 28, 2007

BY FEDERAL EXPRESS

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC  20036

Dear Mr  Byrne.

I am in receipt of your letter dated August 16, 2007 stating that you have not yet finished your investigation into your client's claim of an alleged forced sale of Pablo Picasso's *Boy Leading a Horse*, but that you hope to do so in the near future.  I am surprised that this is the case as you have already instituted litigation over a painting of similar relevant provenance.

As I stated in my letter to you dated July 16, 2007, I plan to make a presentation to the Board of Trustees of the Museum of Modern Art to enable the Board to evaluate and determine how to respond to your client's claim, and I had asked that you submit a written elaboration of your clients' claim to me no later than August 16, 2007.

In light of your stated need for additional time, I will extend the deadline for your submission to November 1, 2007.  Your letter refers to making a presentation and I want to be clear that we do not contemplate a meeting, but rather only a written submission.  I also wish to make clear that there will be no further extensions

This offer to receive written material from you, like the offer communicated in my July 16 letter, is made without waiver of any applicable privileges, and without prejudice to any of our defenses.

Sincerely,

Deputy General Counsel

# EXHIBIT 12

**Guggenheim** MUSEUM

1071 Fifth Avenue
New York NY 10128 0173
Telephone 212 423 3500
Telefax 212 423 3650

August 29, 2007

<u>BY EXPRESS MAIL</u>

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC  20036

Re:  *Le Moulin de la Galette*

Dear Mr. Byrne:

I am in receipt of your letter dated August 16, 2007 stating that you have not yet finished your investigation into your client's claim of an alleged forced sale of Pablo Picasso's *Le Moulin de la Galette*, but that you hope to do so in the near future. I am surprised that this is the case as you have already instituted litigation over a painting of similar relevant provenance.

As I stated in my letter to you dated July 13, 2007, I plan to make a presentation to the Board of Trustees of the Solomon R. Guggenheim Foundation to enable the Board to evaluate and determine how to respond to your client's claim, and I had asked that you submit a written elaboration of your clients' claim to me no later than August 16, 2007.

In light of your stated need for additional time, I will extend the deadline for your submission to November 1, 2007. Your letter refers to making a presentation and I want to be clear that we do not contemplate a meeting, but rather only a written submission. I also wish to make clear that there will be no further extensions.

This offer to receive written material from you, like the offer communicated in my July 13, 2007 letter, is made without waiver of any applicable privileges, and without prejudice to any of our defenses.

Sincerely,

Sarah G. Austrian

Sarah G. Austrian
General Counsel

# EXHIBIT 13

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

TELEPHONE (202) 857-9775
FACSIMILE (202) 857-9799
E-MAIL. JOHN J BYRNE@COMCAST NET

November 1, 2007

**BY FEDERAL EXPRESS & FACSIMILE**

Sarah G. Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128-0173

> Re   Demand for return of Pablo Picasso's *Le Moulin de la Galette* (1900),
> (Thannhauser Collection, 78.2514.34)

Dear Ms. Austrian.

Thank you for your letter of July 13, 2007. As you know, we represent the heirs of Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy). By this letter, we hereby demand the return of Pablo Picasso's *Le Moulin de la Galette* (Painting), oil on canvas, approximately 88.2 x 115.5 cms., completed approximately 1900, currently at the Guggenheim Museum (Museum), Thannhauser Collection, to the heirs of Mendelssohn-Bartholdy by November 12, 2007. If you do not return the Painting by this deadline -- or agree to do so -- we will consider this a refusal of our demand and take whatever actions we deem appropriate to protect the rights of our clients. We believe our clients are entitled to the recovery under, among other bases, New York law regarding conversion, replevin, restitution and constructive trust.[1]

---

[1] We have set forth below the essential facts and law we believe entitle the Mendelssohn-Bartholdy heirs to the return of the Painting  Notwithstanding the statement in your letter of July 13, we make no representation to you that we are submitting "all factual information and legal authority" in support of our claim, and we specifically reserve the right to assert additional facts and legal support for our position at any time. You have stated that you have copies of filings in the case of Schoeps v. Webber, Index No. 116768/06 and various other relevant documents  Further, the key documents relating to provenance regarding *Le Moulin de la Galette* are in your internal files  Moreover, many of the historical references contained in this letter are readily accessible on the Internet, books, or other texts  In light of the foregoing, we believe it is unnecessary to attach additional documents to this demand letter

## I. INTRODUCTION

Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting

Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of his death, and was also survived by four sisters. Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in Berlin in 1935, and a Certificate of Inheritance was issued at that time. Our law firm represents all of the living heirs of Paul von Mendelssohn-Bartholdy.

## II. FACTS SUPPORTING OUR DEMAND FOR THE RETURN OF THE PAINTING

### A. Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795 When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke). Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

Paul von Mendelssohn-Bartholdy never sold *any* art before the Nazis came to power in 1933.

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Painting and four other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Boy Leading a Horse* (1906); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.

As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

3

After Paul von Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, Thannhauser brought it to New York in or around 1940, where it has remained for the most part since that time

### B. Ideological Foundations of Nazi Persecution of Jews

In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany.

### C. Nazi Persecution of Jews Became Official State Policy in 1933

The Nazis pursued their agenda to banish Jews from the economic life of Germany when Hitler became Chancellor in January 1933. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages:

1. The first stage occurred during the years 1933-1938 when -- precluded from an expanding list of jobs, professions, and economic activities -- Jews sold their property often at discount prices merely to survive; and

2. The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany which, in turn, triggered the forfeiture to the Reich of all remaining Jewish-owned property.

The Nazis' campaign against the Jews began almost immediately after they took power and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for

4

plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99. In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state. The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax. When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax. Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency. The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.

### D. During the Years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis, as noted, blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

The Nazis pressured private Jewish banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36 28 percent between 1932 and June 1935.

### E. Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market

A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations "

From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

November 1, 2007                          Byrne Goldenberg & Hamilton, PLLC

### F. Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting

The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank -- one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

1. sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co owned in part;

2. endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank);

3. withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

4. suffered a precipitous collapse of his personal net worth;

5. declined to petition for an entitled reduction of his alimony obligations to his first wife based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

6. surrendered under pressure extensive land from his country estate (Boernicke) to the

6

Nazi Kulturamt (Cultural Office);

7. placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

8. had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

9. lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance institution;

10. was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

11. as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

12. finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser  Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

Thannhauser took advantage until approximately 1938 of the depressed prices of the Berlin art market. He sold to clients internationally, including New York and Switzerland, artworks that he had obtained at discounted prices from persecuted Jewish collectors. Both during this period and after the War, Thannhauser partnered with art dealers such as Cesar Mange de Haucke and Albert Skira whom the U.S. State Department identified as trafficking in Nazi-looted art.

The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune. For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan"

Deutsche Bank. Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed. Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

## III. THE U.S. AND STATE OF NEW YORK HAVE CONSISTENTLY PURSUED POLICIES AND ENACTED LAWS TO INVALIDATE "FORCED SALES" AND OTHER COERCIVE TRANSFERS OF PROPERTY IN NAZI GERMANY -- SUCH AS MENDELSSOHN-BARTHOLDY'S SALE OF THE PAINTING TO THANNHAUSER -- AND TO RESTITUTE SUCH PROPERTY TO NAZI VICTIMS AND THEIR HEIRS. THESE U.S. RESTITUTION PRINCIPLES HAVE ACHIEVED INTERNATIONAL ACCEPTANCE, AND WILL APPLY IN THIS MATTER.

### A. Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners

Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

### B. Military Government Law No. 59 (MGL No. 59) Was the Centerpiece of Post-War U.S. Restitution Policy

U.S policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property. to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1). MGL No. 59 applied in the American Occupation Zone, and was the first Holocaust restitution law enacted for application in post-war Germany.

MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. See § 376(a). MGL No 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required even persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II· "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

### C. The U.S. actively and successfully promoted the adoption of MGL No. 59's restitution principles to the British and French in their respective "Occupation Zones" and in Berlin. Ultimately, even the Germans themselves enacted laws incorporating the principles of MGL No. 59 for application in all of Germany

The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S National Security Council (NSC) drafted the "*Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC. In its directive to the U.S. High Commissioner for Germany, the NSC pronounced that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . . To carry out this policy, you should **seek agreement from your British and French colleagues** to **persuade the German Government** to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70. (Emphasis added). Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself. For example:

1. **The Berlin Restitution Law of 1949.**

   MGL No. 59 was the controlling law for the U.S. "Occupation Zone" in Germany after 1947, but did not apply to Berlin. Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law No. 59. The provisions regarding the "presumption of confiscation" and potential rebuttal thereof are virtually identical

2. **Britain and France passed restitution laws in their "Occupation Zones" similar to MGL No. 59.**

   Britain and France passed laws in their individual German "Occupation Zones" that were similar to MGL No. 59 and the Berlin Restitution Law. (See British Military Law 59, and currently applicable provisions of French law (article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No-1344 dated September 30, 1949).

3. **German restitution laws are patterned after MGL No. 59.**

    (a) After the Allies left the Federal Republic of Germany (West Germany), the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No 59 and the Berlin Restitution Law of 1949  (See "*Bundesruckerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

    (b) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited.  The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany.  The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 — which are, of course, the same as MGL No. 59.

       The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution).

       Accordingly, under the restitution principles pioneered by the United States and accepted by the Allies, Germany and others, the Mendelssohn-Bartholdy heirs are entitled to recover the Painting as a result of Mendelssohn-Bartholdy's duress sale of the Painting to Thannhauser in Nazi Germany.

IV. **IN RECENT YEARS, THE U.S. STATE DEPARTMENT, U.S. CONGRESS, AND STATE OF NEW YORK HAVE REAFFRIMED AND REINVIGORATED THEIR POLICIES AND EFFORTS IN FAVOR OF HOLOCAUST ART RESTITUTION**

    A. **The U.S. Department of State Has Always been Strongly Committed to Holocaust Art Restitution.  In the 1990s, the State Department Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations**

       The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is clearly expressed in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's

opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Advisor, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in the United States District Court for the Southern District of New York, which identifies MGL No. 59 as exemplifying U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See also Bernstein v N V Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir 1954) (Second Circuit amended mandate and followed expression of Executive Policy in April 13, 1949 Jack B. Tate letter quoted above, as to a jurisdictional issue)

In the 1990's, the U.S. Department of State created a special office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy. The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries

The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

**B. Against the Backdrop of Executive Branch Holocaust Restitution Policy, the U.S. Congress -- in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies**

In 1998, the U S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years

1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567. These statutes confirm U.S. policy to facilitate the return of confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

In summary:

1    The Redress Act seeks to assist Holocaust victims in their efforts to recover artworks and other assets lost in Nazi Germany (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective."

2.    The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No 59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

3.    The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U S government. Among its accomplishments, the Presidential Commission negotiated an agreement with the American Association of Museums (AAM) for the creation of a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). To comply with this agreement, the AAM created the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org) in 2003, with hyperlinked museum websites where detailed provenance information is provided. NEPIP and the hyperlinked museum websites will sometimes be referred to herein as the "NEPIP system." As discussed infra, the investigation of this case began in 2005 when Mendelssohn-Bartholdy heir Julius Schoeps (Schoeps), through his agents, discovered on NEPIP and the hyperlinked Museum

of Modern Art's "Provenance Research Project" (located at www.moma.org) that Paul von Mendelssohn-Bartholdy sold Pablo Picasso's *Boy Leading a Horse* in Nazi Germany to Berlin art dealer Justin K. Thannhauser.

### C. Since 1997, New York State Has Proclaimed a Signal Public Policy to Help Victims Of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945

On June 25, 1997, then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

Governor Pataki repeatedly has underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution. In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of history's darkest times."

The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution. The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales. <u>See</u>, <u>e.g.</u>, HCPO Press Releases dated, respectively, June 17, 2003, November 17, 2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks lost as a consequence of forced sales.

### V. THE MENDELSSOHN-BARTHOLDY HEIRS HAVE NOT UNREASONABLY DELAYED MAKING THIS DEMAND, SINCE THEY WERE NOT AWARE OF THEIR RIGHTS TO THE PAINTING UNTIL THE EFFORTS OF THE U.S. GOVERNMENT AND STATE OF NEW YORK MADE NECESSARY INFORMATION AVAILABLE TO THEM

#### A. Until 2005, no heir of Paul von Mendelssohn-Bartholdy knew he had sold any art in Nazi Germany

Until 2005, no Mendelssohn-Bartholdy heir knew that their ancestor, Paul von Mendelssohn-Bartholdy, sold any artworks in Nazi Germany. In 2005, Mendelssohn-Bartholdy heir Julius Schoeps, through his attorneys, first discovered the sale in Nazi Germany by Mendelssohn-Bartholdy to Thannhauser of Picasso's *Boy Leading a Horse* on the NEPIP system. As discussed <u>infra</u>, the NEPIP system was created as part of a massive undertaking by the State of New York and the U.S. government -- from the late 1990's through today -- to make documents and information available to Holocaust claimants so that they can identify,

investigate, and make claims to recover artworks that may have been lost as a result of Nazi persecution. NEPIP provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). It was created by the American Association of Museums (AAM) pursuant to an agreement with the Presidential Commission created by the Commission Act (1998). New York's HCPO also was active in NEPIP's development.

But for the efforts of the State of New York and the U.S. government to make information available to Holocaust victims and their heirs, the Mendelssohn-Bartholdy heirs might never have discovered -- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold these paintings under duress in Nazi Germany.

Once Schoeps was made aware of the NEPIP entry, he acted diligently throughout 2005-2007 to investigate, among other things, the relationship between Mendelssohn-Bartholdy and Thannhauser, the art collection of Mendelssohn-Bartholdy, additional sales Mendelssohn-Bartholdy made under duress, Nazi persecution of Mendelssohn-Bartholdy, the location of the other Mendelssohn-Bartholdy heirs, and other matters which enabled him to make this demand in 2007.

### B. The "Wall of Silence" which denied Holocaust claimants access to information that would allow them to investigate and reclaim lost property

Until recently, Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available. This historical deficiency has been widely recognized. For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**wall of silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony)

### C. The U.S. Congress, U.S. Department of State, and State of New York began intensive efforts in the late 1990s to tear down the "Wall of Silence," that is, to make information and documents available to Holocaust claimants so that they could develop and prosecute claims for the recovery of property lost during the Nazi era

In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and --- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example.

1. In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations  The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945. The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

2. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections.  In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

3. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants.  As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

4. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended  Upon meeting some initial resistance to acceptance of the AAMD guidelines, State Department representatives re-drafted the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

5  The Presidential Commission, created by the Commission Act of 1998,

negotiated an agreement with the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. This agreement led to the creation of the Nazi-Era Provenance Internet Portal (NEPIP), www.nepip.org in September 2003, which was in part federally funded. NEPIP lists art that has a Nazi-Era provenance, that is, art that changed ownership in Europe between 1933-1945. NEPIP is connected by hyperlink to individual museum Websites where detailed provenance information can be accessed. The New York Holocaust Claims Processing Office (HCPO) actively participated in the AAM task force established to create NEPIP,

6    In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively — and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

7.   In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs Provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art — all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission — it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located

**D. The efforts of the U.S. Government and State of New York to help victims of Nazi persecution and their heirs to recover confiscated artworks are on-going, and more relevant information continues to become available**

The U.S Government and the State of New York began a process in the late 1990s that, among other things, has given Holocaust claimants increased access to documents and information worldwide However, progress has been slow in some areas and the release of additional archives, documents and information is continuing.

For example, in 2006, the Claims Conference published a survey it conducted of U.S. museums' participation in NEPIP. The survey reports that NEPIP "lists approximately 18,000 items, or slightly higher than **12 percent** of the total number" of objects (over 140,000) that

museums have determined are within the NEPIP criteria. Further, of "the museums that do clearly state that they are conducting provenance research, **52 percent have completed research on less than half of the relevant items** in their collection and a further 33 percent did not provide information on the extent to which they had completed the work." See "Nazi-Era Stolen Art and U.S. Museums: A Survey And Joint Project of the Claims Conference and the World Jewish Restitution Organization (WJRO)"(2006) (questionnaire sent on February 10, 2006 to 332 U.S. art museums to ascertain museums' progress in adhering to recognized principles concerning Nazi-era looted art).

New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing  (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

> **E. This claim Was Made Possible Only by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990s -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

This claim was made possible by information disclosed as a result of the intensive efforts of the U.S government and State of New York to assist Holocaust claimants. For example, in 2005, Schoeps first discovered that his Jewish ancestor, Paul von Mendelssohn-Bartholdy, sold a Picasso painting to art dealer Justin K. Thannhauser in Nazi Germany from information published on NEPIP and the hyperlinked Museum of Modern Art (MoMA), Provenance Research Project (PRP).

Based on the information discovered on NEPIP and MoMA's PRP in 2005, Schoeps -- and later the other Mendelssohn-Bartholdy heirs -- through their agents, investigated Mendelssohn-Bartholdy's relationship with Justin K. Thannhauser and his sale of Picasso artworks to Thannhauser  Ultimately, the heirs discovered that Mendelssohn-Bartholdy had sold five Picasso artworks to Thannhauser under duress in Nazi Germany, including, of course, *Le Moulin de la Galette*

As noted, NEPIP and the museums' related websites were developed by the AAM as a result of the AAM's agreement with the Presidential Commission. The Presidential Commission was created by the Commission Act of 1998. In addition, the NEPIP project has received some federal funding. Also, the State of New York played an important role in the development of NEPIP, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since this claim to recover the Painting grew out of information discovered on NEPIP and a related museum website, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and information to enable them to develop claims

### F. The Mendelssohn-Bartholdy heirs, Through Their Agents, Have Acted Diligently Throughout 2005-2007 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany

Once Schoeps became aware of Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he and other Mendelssohn-Bartholdy heirs have acted diligently in 2005-2007 to complete this investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, the circumstances of his sale of art under Nazi duress, and other matters which enabled us to make this demand. The Mendelssohn-Bartholdy, through their agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

### VI. THE MUSEUM DISREGARDED THE PAINTING'S SUSPICIOUS NAZI-ERA PROVENANCE WHEN IT ACCEPTED THE PAINTING INTO ITS COLLECTION, AND CONTINUED TO IGNORE PROVENANCE PROBLEMS EVEN AS THEY BECAME MORE APPARENT. AS A RESULT, THE MUSEUM NEVER OBTAINED A COMMERCIALLY REASONABLE BELIEF THAT IT HAD ACQUIRED GOOD TITLE TO THE PAINTING, OR THAT THE TRUE OWNER WOULD NOT COME FORWARD TO CLAIM IT.

The Museum failed in its obligation "to inquire about the validity of title before completing the transaction." U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D N Y. 2004) Moreover, as additional facts became known over time which cast further doubt on the "validity of title," the Museum ignored them The Museum's actions with regard to the acquisition and continued possession of the Painting without inquiring into its background is more egregious in light of the U.S government's circular letters warning museums and others against acquiring Nazi-confiscated art, and New York courts' condemnation of the lax practices of the art world in art trading, as discussed below.

### A. Following the War, the U.S. Government Repeatedly Cautioned Museums and the International Art Market About Acquiring Nazi-Confiscated Art

The formal policies of economic coercion and duress that Nazi Germany employed against its Jewish citizens during the years 1933-45, and its subsequent seizure and plunder of artworks in occupied countries, resulted in enormous displacement of art which the U.S. government and its Allies attempted to rectify after the War.

In 1946, the U.S. Department of State (State Department) issued a circular letter to U.S. museums, auction houses and dealers advising that the legal restrictions on the importation of artworks from Nazi-occupied countries had been lifted and urging precautions against acquiring contraband materials.

In 1951, the State Department issued a second circular letter to the U.S. art industry reiterating this warning. In light of the State Department warnings, the Museum clearly would have been aware of the dangers of acquiring Nazi-confiscated art in approximately the early 1970s when Thannhauser advised the Guggenheim Museum that he was bequeathing the Painting and other artworks.

### B. For More Than 35 Years, New York Courts Have Condemned How Casually Art is Acquired on the International Market, and Have Announced a Policy to Protect Victims of Art Theft in Order to Safeguard the Commercial Integrity of the New York City Art Market

Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned such individuals to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title", Porter v Wertz, 416 N Y S.2d 254, 259 (N.Y. App Div 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of . title . it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art. . and diminishes the integrity of the apathetic merchant."

In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

### C. The Museum Disregarded the Painting's Suspicious Nazi-Era Provenance When It Accepted the Painting Into Its Collection

In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim Museum. At that time, the Museum began investigating the provenance and history of artworks Thannhauser had bequeathed to the Museum, including *Le Moulin de la Galette*. Upon information and belief, the research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Museum.[2]

Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information they had developed regarding the artworks he had bequeathed to the Museum. Thannhauser *himself* reviewed these documents, and -- where appropriate -- made corrections and additions in his own hand on the documents.

In 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*. Thannhauser wrote on this document in his own hand that he had purchased the Painting from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca 1935." (See document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive).

In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based in part on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document clearly was based in part on Thannhauser's 1972 notes.

Rich recorded that Thannhauser told him that the Painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

"[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive).

Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich establish that (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934, and (2) Thannhauser

---

[2] This book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was entitled *The Guggenheim Museum  Justin K  Thannhauser Collection*, by Vivian Endicott Barnett

November 1, 2007                                            Byrne Goldenberg & Hamilton. PLLC

purchased the painting from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition but before Mendelssohn-Bartholdy's death in May 1935.

Vivian Endicott Barnett, in *The Guggenheim Museum  Justin K  Thannhauser Collection* (1978), confirmed that Thannhauser purchased the Painting from Mendelssohn-Bartholdy in or around 1935·

> "[P]urchased from Moderne Galerie by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935** " (Emphasis added; see Attachment 5).

Therefore, by 1975, the Guggenheim was aware that:

(a)  Paul von Mendelssohn-Bartholdy was Jewish based, among other reasons, upon the fact that "Mendelssohn" is a common name of Jewish origin and Mendelssohn-Bartholdy was descended from a famous German Jewish family,

(b)  Mendelssohn-Bartholdy was from Berlin (see document entitled "JKT Notes" regarding another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under duress to Thannhauser, and that Thannhauser bequeathed to the Museum, where Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, *Berlin*" [emphasis added]),

(c)  Nazi persecution of Jews began immediately after the Nazis took power in 1933, and increased in intensity throughout 1933-1935;

(d)  Mendelssohn-Bartholdy sold the Painting and another artwork that Thannhauser was donating to the Museum, *Head of a Woman,* between the time they were on consignment in Buenos Aires in October 1934 and Mendelssohn-Bartholdy's death in May 1935,

(e)  In addition, minimal additional research would have revealed:

(1)  the Mendelssohn family suffered tremendous persecution during the Nazi era; and

(2)  the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo Picasso artworks on consignment in Buenos Aires in October 1934, further evidence that Mendelssohn-Bartholdy was selling his art under duress; and

(f)  U S. State Department "circular letters" warned museums that Nazi confiscated artworks were entering the U.S. marketplace, and urged them to take precautions against acquiring such works

22

The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale." Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of valuable artworks. Therefore, the Museum's acceptance of the Painting without performing additional research into Mendelssohn-Bartholdy's sale to Thannhauser left it with no commercially reasonable expectation that it had good title or that the true owner would not come forward to claim the Painting.

> **D. The Museum has ignored the Nazi-era provenance of the Painting from 1972 up to the present time, despite being placed on notice of Thannhauser's trafficking in Nazi-confiscated art**

On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art,*" by Maureen Goggin and Walter V. Robinson. The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article notes that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity  The article states that "US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war."

The front-page Boston Globe article placed the Guggenheim Museum on further notice of Thannhauser's dealings in Nazi-era art, and the need to investigate the provenance of the artworks in the so-called "Thannhauser Collection" at the Museum to ascertain whether they were Nazi-confiscated.

Despite the Museum's increasing knowledge of Thannhauser. no additional research was performed regarding the possibility that Mendelssohn-Bartholdy lost the Painting in Nazi Germany.

## VII. CONCLUSION AND DEMAND FOR RETURN OF THE PAINTING

In light of the foregoing, the Mendelssohn-Bartholdy heirs demand return of the Painting by November 12, 2007.

Feel free to contact me if you have any questions

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

23

# EXHIBIT 14

NOV 0 2 2007

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J HAMILTON
ADMITTED DC, MD, VA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL JOHN J BYRNE@COMCAST.NET

November 1, 2007

**BY FEDERAL EXPRESS & FACSIMILE**

Stephen W. Clark, Esq.
Deputy General Counsel
The Museum of Modern Art
11 West 53rd Street
New York, New York 10019-5497

Re:  Demand for the Return of Pablo Picasso's *Boy Leading a Horse*

Dear Mr. Clark:

Thank you for your letter of July 16, 2007.  As you know, we represent the heirs of Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy).  By this letter, we hereby demand the return of Pablo Picasso's *Boy Leading a Horse* (Painting), oil on canvas, approximately 220 x 130.6 cms., completed approximately 1906, currently at the Museum of Modern Art (MoMA), to the heirs of Mendelssohn-Bartholdy by November 12, 2007.  If you do not return the Painting by this deadline -- or agree to do so -- we will consider this a refusal of our demand and take whatever actions we deem appropriate to protect the rights of our clients.  We believe our clients are entitled to the recovery under, among other bases, New York law regarding conversion, replevin, restitution and constructive trust.[1]

---

[1] We have set forth below the essential facts and law we believe entitle the Mendelssohn-Bartholdy heirs to the return of the Painting.  Notwithstanding the statement in your letter of July 16, we make no representation to you that we are submitting "all of the relevant facts in [our] knowledge" in support of our claim, and we specifically reserve the right to assert additional facts and legal support for our position at any time.  You have stated that you have copies of filings in the case of Schoeps v. Webber, Index No 116768/06, and various other relevant documents  Further, the key documents relating to provenance regarding *Boy Leading a Horse* are in your internal files.  Moreover, many of the historical references contained in this letter are readily accessible on the Internet, books, or other texts.  In light of the foregoing, we believe it is unnecessary to attach additional documents to this demand letter.

# I. INTRODUCTION

Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting.

Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in Berlin in 1935, and a Certificate of Inheritance was issued at that time. Our law firm represents all of the living heirs of Paul von Mendelssohn-Bartholdy.

# II. FACTS SUPPORTING OUR DEMAND FOR THE RETURN OF THE PAINTING

### A. Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"

Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co. Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke). Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

Paul von Mendelssohn-Bartholdy never sold *any* art before the Nazis came to power in 1933.

November 1, 2007                                          Byrne Goldenberg & Hamilton, PLLC

When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Painting and four other Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Le Moulin de la Galette* (1900); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935.

As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

3

After Paul von Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, Thannhauser sold it to William S. Paley in 1936 in Switzerland in a manner, as discussed infra, that was overtly suspicious and that that put Paley on clear notice of the likelihood that the Painting had been lost due to Nazi persecution. For example, Thannhauser had Albert Skira -- later identified as a notorious trafficker in Nazi-looted art -- make the sale to Paley in Switzerland (a country bordering Nazi Germany that was infamous for traffickers in Nazi-confiscated property) for an artificially low price. Skira even refused to reveal the identity of the "owner" to Paley.

Paley returned the Painting to New York after completing his purchase from Skira. In or around 1964, Paley executed papers donating the Painting to MoMA, but retained a life estate. Paley died in 1990, and MoMA then acquired purported full ownership of the Painting. MoMA accepted Paley's gift into its collection in apparent total disregard of the provenance of the Painting that strongly suggested that Mendelssohn-Bartholdy lost it in a duress sale due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable expectation that it had acquired good title to the Painting or that the true owner would not step forward to reclaim it.

### B. Ideological Foundations of Nazi Persecution of Jews

In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany.

### C. Nazi Persecution of Jews Became Official State Policy in 1933

The Nazis pursued their agenda to banish Jews from the economic life of Germany when Hitler became Chancellor in January 1933. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages:

1. The first stage occurred during the years 1933-1938 when -- precluded from an expanding list of jobs, professions, and economic activities -- Jews sold their property often at discount prices merely to survive; and

2. The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany which, in turn, triggered the forfeiture to the Reich of all remaining Jewish-owned property.

The Nazis' campaign against the Jews began almost immediately after they took power and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99. In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state. The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax. When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax. Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency. The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.

### D. During the Years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis, as noted, blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

The Nazis pressured private Jewish banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

November 1, 2007              .                    Byrne Goldenberg & Hamilton, PLLC

### E. Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market

A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York. International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

### F. Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting

The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank — one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

1. sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

2. endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting

with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank);

3.  withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

4.  suffered a precipitous collapse of his personal net worth;

5.  declined to petition for an entitled reduction of his alimony obligations to his first wife based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

6.  surrendered under pressure extensive land from his country estate (Boernicke) to the Nazi Kulturamt (Cultural Office);

7.  placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

8.  had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

9.  lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt für Angestellte," a primary German annuity insurance institution;

10. was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

11. as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

12. finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution --

November 1, 2007                                          Byrne Goldenberg & Hamilton, PLLC

Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser. Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune. For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan" Deutsche Bank. Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed. Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

III. **THE U.S. AND STATE OF NEW YORK HAVE CONSISTENTLY PURSUED POLICIES AND ENACTED LAWS TO INVALIDATE "FORCED SALES" AND OTHER COERCIVE TRANSFERS OF PROPERTY IN NAZI GERMANY -- SUCH AS MENDELSSOHN-BARTHOLDY'S SALE OF THE PAINTING TO THANNHAUSER -- AND TO RESTITUTE SUCH PROPERTY TO NAZI VICTIMS AND THEIR HEIRS. THESE U.S. RESTITUTION PRINCIPLES HAVE ACHIEVED INTERNATIONAL ACCEPTANCE, AND WILL APPLY IN THIS MATTER.**

A. **Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners**

Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of

8

Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

### B. Military Government Law No. 59 (MGL No. 59) Was the Centerpiece of Post-War U.S. Restitution Policy

U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1). MGL No. 59 applied in the American Occupation Zone, and was the first Holocaust restitution law enacted for application in post-war Germany.

MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. See § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required even persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

**C. The U.S. Actively and Successfully Promoted the Adoption of MGL No. 59's Restitution Principles to the British and French in their Respective "Occupation Zones" and in Berlin. Ultimately, Even the Germans Themselves Enacted Laws Incorporating the Principles of MGL No. 59 for Application in All of Germany**

The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S. National Security Council (NSC) drafted the "*Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC. In its directive to the U.S. High Commissioner for Germany, the NSC pronounced that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . . To carry out this policy, you should **seek agreement from your British and French colleagues** to **persuade the German Government** to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70. (Emphasis added). Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself. For example:

1. **The Berlin Restitution Law of 1949.**

> MGL No. 59 was the controlling law for the U.S. "Occupation Zone" in Germany after 1947, but did not apply to Berlin. Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each

controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law. No. 59. The provisions regarding the "presumption of confiscation" and potential rebuttal thereof are virtually identical.

2. **Britain and France passed restitution laws in their "Occupation Zones" similar to MGL No. 59.**

   Britain and France passed laws in their individual German "Occupation Zones" that were similar to MGL No. 59 and the Berlin Restitution Law. (See British Military Law 59, and currently applicable provisions of French law (article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No-1344 dated September 30, 1949).

3. **German restitution laws are patterned after MGL No. 59.**

   (a) After the Allies left the Federal Republic of Germany (West Germany), the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59 and the Berlin Restitution Law of 1949. (See "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

   (b) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 — which are, of course, the same as MGL No. 59.

The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution).

Accordingly, under the restitution principles pioneered by the United States and accepted by the Allies, Germany and others, the Mendelssohn-Bartholdy heirs are entitled to recover the Painting as a result of Mendelssohn-Bartholdy's duress sale of the Painting to Thannhauser in Nazi Germany.

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

## IV.  IN RECENT YEARS, THE U.S. STATE DEPARTMENT, U.S. CONGRESS, AND STATE OF NEW YORK HAVE REAFFRIMED AND REINVIGORATED THEIR POLICIES AND EFFORTS IN FAVOR OF HOLOCAUST ART RESTITUTION

### A.  The U.S. Department of State Has Always been Strongly Committed to Holocaust Art Restitution.  In the 1990's, the State Department Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations

The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is clearly expressed in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Adviser, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in the United States District Court for the Southern District of New York, which identifies MGL No. 59 as exemplifying U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No.  59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism.  Article 1 (1).  It should be noted that this policy applies generally despite the existence of purchasers in good faith.  Article 1 (2).

See also Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit amended mandate and followed expression of Executive Policy in April 13, 1949 Jack B. Tate letter quoted above, as to a jurisdictional issue).

In the 1990's, the U.S. Department of State created a special office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy.  The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

12

Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries.

The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

### B. The U.S. Congress -- in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies

In 1998, the U.S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years 1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567. These statutes confirm U.S. policy to facilitate the return of confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

In summary:

1. **The Redress Act:** The Redress Act seeks to assist Holocaust victims in their efforts to recover artworks and other assets lost in Nazi Germany. (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective."

2. **The Disclosure Act:** The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U.S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No. 59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed

13

without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

3. **The Commission Act:** The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U.S. government. Among its accomplishments, the Presidential Commission negotiated an agreement with the American Association of Museums (AAM) for the creation of a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). To comply with this agreement, the AAM created the Nazi-Era Provenance Internet Portal (hereinafter "NEPIP," located at www.nepip.org) in 2003, with hyperlinked museum websites where detailed provenance information is provided -- such as the Museum of Modern Art's "Provenance Research Project" ("PRP", located at www.moma.org; NEPIP and the hyperlinked museum websites will sometimes be referred to jointly herein as the "NEPIP system"). As discussed infra, the investigation of this case began in 2005 when Mendelssohn-Bartholdy heir Julius Schoeps (Schoeps), through his attorneys, discovered on the PRP that Paul von Mendelssohn-Bartholdy sold Pablo Picasso's *Boy Leading a Horse* in Nazi Germany to Berlin art dealer Justin K. Thannhauser.

C. **Since 1997, New York State Has Proclaimed a Signal Public Policy to Help Victims Of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945**

On June 25, 1997, then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

Former Governor Pataki repeatedly underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution. In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of history's darkest times."

The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution. The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales. See, e.g., HCPO Press Releases dated, respectively, June 17, 2003, November 17,

November 1, 2007                                      Byrne Goldenberg & Hamilton, PLLC

2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks
lost as a consequence of forced sales.

## V. THE MENDELSSOHN-BARTHOLDY HEIRS HAVE NOT UNREASONABLY DELAYED MAKING THIS DEMAND, SINCE THEY WERE NOT AWARE OF THEIR RIGHTS TO THE PAINTING UNTIL THE EFFORTS OF THE U.S. GOVERNMENT AND STATE OF NEW YORK MADE NECESSARY INFORMATION AVAILABLE TO THEM

### A. Until 2005, no heir of Paul von Mendelssohn-Bartholdy knew he had sold any art in Nazi Germany

Until 2005, no Mendelssohn-Bartholdy heir knew that Paul von Mendelssohn-Bartholdy
had sold any artworks in Nazi Germany.  In 2005, Mendelssohn-Bartholdy heir  Julius Schoeps,
through his attorneys, discovered that Mendelssohn-Bartholdy had sold *Boy Leading a Horse* in
Nazi Germany to Thannhauser on MoMA's Provenance Research Project (PRP) located at
www.moma.org, which is connected by hyperlink to the Nazi-Era Provenance Internet Portal
(hereinafter "NEPIP," located at www.nepip.org).  As discussed infra, NEPIP and related
museum websites were created as part of a massive undertaking by the State of New York and
the U.S. government -- from the late 1990's through today -- to make documents and
information available to Holocaust claimants so that they can identify, investigate, and make
claims to recover artworks that may have been lost as a result of Nazi persecution.  NEPIP
provides a searchable registry of objects in U.S. museum collections that changed hands in
Continental Europe during the Nazi era (1933-1945).  It was created by the American
Association of Museums (AAM) pursuant to an agreement with the Presidential Commission.[2]
New York's HCPO also was active in NEPIP's development.

But for the efforts of the State of New York and the U.S. government to make
information available to Holocaust victims and their heirs through NEPIP and related museum
websites such as MoMA's PRP, the Mendelssohn-Bartholdy heirs might never have discovered
-- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold *Boy
Leading a Horse* and other paintings under duress in Nazi Germany.

Once Schoeps was aware of Mendelssohn-Bartholdy's sale of the Painting, he acted
diligently throughout 2005-2007 to investigate, among other things, the relationship between
Mendelssohn-Bartholdy and Thannhauser, the art collection of Mendelssohn-Bartholdy,
additional sales Mendelssohn-Bartholdy made under duress, Nazi persecution of Mendelssohn-
Bartholdy, the location of the other Mendelssohn-Bartholdy heirs, and other matters which
enabled this demand.

---

[2] As noted, the Presidential Commission was created by the Commission Act (1998), discussed supra.

**B. The "Wall of Silence" which denied Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- access to information that would allow them to investigate and reclaim lost property**

Until recently, Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available. This historical deficiency has been widely recognized. For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**Wall of Silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

**C. The U.S. Congress, U.S. Department of State, and State of New York began intensive efforts in the late 1990's to tear down the "Wall of Silence," that is, to make information and documents available to Holocaust claimants so that they could develop and prosecute claims for the recovery of property lost during the Nazi era**

In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example:

1. In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations. The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945. The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

2. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S.

museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

3. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants. As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

4. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended. Upon meeting some initial resistance to acceptance of the AAMD guidelines, State Department representatives re-drafted the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

5. The Presidential Commission, created by the Commission Act of 1998, negotiated an agreement with the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. This agreement led to the creation of the Nazi-Era Provenance Internet Portal (NEPIP), www.nepip.org in September 2003, which was in part federally funded. NEPIP lists art that has a Nazi-Era provenance, that is, art that changed ownership in Europe between 1933-1945. NEPIP is connected by hyperlink to individual museum Websites where detailed provenance information can be accessed. The New York Holocaust Claims Processing Office (HCPO) actively participated in the AAM task force established to create NEPIP;

17 .

6. In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively — and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

7. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art — all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission — it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

**D. The efforts of the U.S. Government and State of New York to help victims of Nazi persecution and their heirs to recover confiscated artworks are on-going, and more relevant information continues to becomes available**

The U.S. Government and the State of New York began a process in the late 1990s that, among other things, has given Holocaust claimants increased access to documents and information worldwide. However, progress has been slow in some areas and the release of additional archives, documents and information is continuing.

For example, in 2006, the Claims Conference published a survey it conducted of U.S. museums' participation in NEPIP. The survey reports that NEPIP "lists approximately 18,000 items, or slightly higher than **12 percent** of the total number" of objects (over 140,000) that museums have determined are within the NEPIP criteria. Further, of "the museums that do clearly state that they are conducting provenance research, **52 percent have completed research on less than half of the relevant items** in their collection and a further 33 percent did not provide information on the extent to which they had completed the work." See "Nazi-Era Stolen Art and U.S. Museums: A Survey And Joint Project of the Claims Conference and the World Jewish Restitution Organization (WJRO)"(2006) (questionnaire sent on February 10, 2006 to 332 U.S. art museums to ascertain museums' progress in adhering to recognized principles concerning Nazi-era looted art).

November 1, 2007                                                    Byrne Goldenberg & Hamilton, PLLC

New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing. (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

  **E.  The Mendelssohn-Bartholdy's claim was made possible only by the concerted, public-policy driven initiatives of the U.S. Government and the State of New York -- beginning in the late 1990s -- to make relevant information and documents accessible to Holocaust claimants to enable them to develop and prosecute claims to recover property lost as a consequence of Nazi persecution**

As noted, this claim was made possible by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. In 2005, Schoeps, through his attorneys, discovered that Mendelssohn-Bartholdy sold *Boy Leading a Horse* to Thannhauser in Nazi Germany from the Museum of Modern Art (MoMA), Provenance Research Project (PRP), which is part of the NEPIP system, and is connected by hyperlink to NEPIP itself.

The PRP and the NEPIP system exist because of the efforts of the U.S. Congress and State of New York, among others. For example, in 1998, Congress passed the Commission Act which created the Presidential Commission. The Presidential Commission negotiated an agreement with the American Association of Museums (AAM) that committed member museums -- like MoMA -- to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. As a result of this agreement, the AAM created the NEPIP system. In addition, the NEPIP project received federal funding. Also, the State of New York played an important role in the development of the NEPIP system, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since this claim to recover the Painting is based on information discovered on the NEPIP system, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust claimants -- such as the Mendelssohn-Bartholdy heirs -- with access to documents and information to enable them to develop claims.

19

**F. The Mendelssohn-Bartholdy heirs, through their agents, have acted diligently throughout 2005-2007 to complete the investigation of Mendelssohn-Bartholdy's loss of art in Nazi Germany**

Once Schoeps became aware of Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he and other Mendelssohn-Bartholdy heirs have acted diligently in 2005-2007 to complete this investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, the circumstances of his sale of art under Nazi duress, and other matters which enabled us to make this demand in 2007. The Mendelssohn-Bartholdy heirs, through their agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

**VI. MOMA DISREGARDED THE PAINTING'S SUSPICIOUS NAZI-ERA PROVENANCE WHEN IT ACCEPTED THE PAINTING INTO ITS COLLECTION, AND CONTINUED TO IGNORE PROVENANCE PROBLEMS EVEN AS THEY BECAME MORE APPARENT. AS A RESULT, MOMA NEVER OBTAINED A COMMERCIALLY REASONABLE BELIEF THAT IT HAD ACQUIRED GOOD TITLE TO THE PAINTING, OR THAT THE TRUE OWNER WOULD NOT COME FORWARD TO CLAIM IT.**

MoMA failed in its obligation "to inquire about the validity of title before completing the transaction." U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004). Moreover, as additional facts became known over time which cast further doubt on the "validity of title," MoMA ignored them. The Museum's actions with regard to the acquisition and continued possession of the Painting without inquiring into its background is more egregious in light of the U.S. government's circular letters warning museums and others against acquiring Nazi-confiscated art, and New York courts' condemnation of the lax practices of the art world in art trading, as discussed below.

**A. Following the War, the U.S. Government repeatedly cautioned museums and the international art market about acquiring Nazi-confiscated art**

The formal policies of economic coercion and duress that Nazi Germany employed against its Jewish citizens during the years 1933-45, and its subsequent seizure and plunder of artworks in occupied countries, resulted in enormous displacement of art which the U.S. government and its Allies attempted to rectify after the War.

In 1946, the U.S. Department of State (State Department) issued a circular letter to U.S. museums, auction houses and dealers advising that the legal restrictions on the importation of artworks from Nazi-occupied countries had been lifted and urging precautions against acquiring contraband materials.

In 1951, the State Department issued a second circular letter to the U.S. art industry reiterating this warning. In light of the State Department warnings, the Museum clearly would have been aware of the dangers of acquiring Nazi-confiscated art in 1964 when Paley executed the documents donating the Painting to the Museum, and retained only a life estate for himself.

**B. For more than 35 years, New York courts have condemned how casually art is acquired on the international market, and have announced a policy to protect victims of art theft in order to safeguard the commercial integrity of the New York City art market**

Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned such individuals to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"; Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of... title ..it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art... and diminishes the integrity of the apathetic merchant."

In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

**C. The Museum disregarded the Painting's suspicious Nazi-era provenance when it accepted the painting into its collection**

**1. In August 1936, Thannhauser sold *Boy Leading a Horse* to William S. Paley in a manner that strongly suggested the Painting had been lost as a result of Nazi persecution.**

In August 1936, Thannhauser worked in Switzerland with Albert Skira - - a Swiss art dealer known for trafficking in Nazi looted art - - to sell *Boy Leading a Horse* to William S. Paley (Paley), the developer of the Columbia Broadcasting System (CBS). Paley was a sophisticated art collector, and later held positions as a trustee and president of MoMA. Paley was fully aware of events in Nazi Germany.

Byrne Goldenberg & Hamilton, PLLC

Switzerland was a known haven for traffickers in art lost by Nazi victims in forced sales in 1936. Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the marketplace lost by Jews due to Nazi persecution.

In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the Painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the Painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.

Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the Painting into the lobby for Paley. Id.

Paley liked the Painting. Paley asked Skira the price, and found that it was -- in Paley's words -- ***"quite modest."*** Paley immediately told Skira: "That's fine. I'll buy it." Paley described the Painting as "priceless." Id.

Paley asked Skira who owned *Boy Leading a Horse*, and ***Skira refused to tell him***. Skira stated: "That's the one thing I can't tell you. I'm sworn to secrecy." Id.

Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the Painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley was put on notice that there was a good possibility that he was purchasing confiscated art, and yet Paley proceeded with the sale.

### 2. Paley's knowledge of the suspicious provenance of the Painting may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990

Paley had an extremely close relationship with MoMA from shortly after he purchased the Painting in 1936 until his death. Paley was a Trustee of MoMA from 1937 until his death in 1990. In addition, Paley was President from 1968-1972; Chair from 1972-1985; and Chair Emeritus from 1985 until his death in 1990. Indeed, Paley stated that as of September 1968, he became, in effect, the CEO of MoMA: "After due consideration, I accepted the invitation to become president of the museum [MoMA]. I was elected to that office and became, in effect, its chief executive officer in September 1968." Id. at 391.

In light of Paley's close relationship and powerful positions within MoMA from 1937-1990, Paley's knowledge can be imputed to MoMA of the suspicious circumstances and "red flags"

regarding his purchase of the Painting which strongly suggested that a Jew lost the Painting in Nazi Germany due to Nazi persecution.

   **3. When Paley donated the Painting to MoMA in 1964, MoMA disregarded the provenance of the Painting which strongly suggested that it had been lost due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable expectation that it had good title to *Boy Leading a Horse***

In 1964, Paley executed documents donating *Boy Leading a Horse* to MoMA, while retaining a life interest. MoMA disregarded the provenance of the Painting which strongly suggested that it had been lost due to Nazi persecution in Germany, and accepted the Painting without performing provenance research.

MoMA's acceptance of the Painting knowing the suspicious provenance is more egregious because by 1964 the State Department had warned museums repeatedly that Nazi confiscated art was coming into the U.S. market and urged precautions against acquiring such materials. In addition, by 1964 Albert Skira -- who acted as Thannhauser's agent in the sale to Paley -- had been identified by the U.S. government as a trafficker in Nazi looted art.

In light of the foregoing, MoMA never had a commercially reasonable expectation in 1964 that it had acquired good title to the Painting or that the true owner would not come forward to claim it.[3]

   **4. MoMA continued to ignore the Nazi-era Provenance of the Painting from 1964 up to its acquisition of purported full title in 1990 after Paley's death**

In 1979, Paley wrote an autobiographical book entitled "*As It Happened, a Memoir by William S. Paley, Founder and Chairman, CBS,*" describing his purchase of *Boy Leading a Horse* from Skira in detail, as discussed supra. Paley also relates that he met Thannhauser at some unspecified date prior to December 26, 1976, the date of Thannhauser's death. At this meeting,

---

[3] It is firmly established under New York law that an acquirer of stolen property does not have clear title, even where a purchase was made in good faith. U S  v  Crawford Technical Services, 2004 WL 744670, *5 (S.D.N Y 2004); Solomon R. Guggenheim Found. v. Lubell, 77 N .Y.2d 311, 317 (1991) ("New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value."), Newton v. Porter, 69 N.Y. 133 (1877) ("The purchaser from a thief, however honest and bona fide the purchase may have been, cannot hold the stolen chattel against the true proprietor, but the latter may follow and reclaim it wherever or in whosoever hands it may be found."). A good faith purchaser simply cannot obtain title to stolen property because a thief has no title to give. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004);  Silsbury v. McCoon, 3 N.Y. 379, 383-84 (1850). It is therefore incumbent upon a good faith purchaser to inquire about the validity of title before completing the transaction. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004); A.F.T. Corp. v. Pathe Exch., 172 N.Y.S. 364, 365 (1 Dep't 1918) ("[A] purchaser of personal property is bound to satisfy himself as to the title of the vendor, and deals with stolen property at his peril....").

Thannhauser told Paley that he was the "owner" who sold *Boy Leading a Horse* to Paley. Thannhauser stated that he had "smuggled" the Painting out of Nazi Germany because he "needed that money so badly," and that he had observed the transaction between Skira and Paley by standing outside and looking through the window.

In 1990, Paley passed away, and MoMA published *"The William S. Paley Collection,"* by William Rubin and Matthew Armstrong, describing the collection Paley had left to MoMA. See William Rubin and Matthew Armstrong, *The William S. Paley Collection* (Museum of Modern Art, New York 1992). The preface described the suspicious circumstances surrounding Paley's purchase of the Painting:

> Nineteen thirty-six was a remarkable year [for Paley], marked by the acquisition of... by far the best-known work in the Paley Collection, Picasso's *Boy Leading a Horse*. Only later did Mr. Paley realize how lucky he was to have gotten a crack at [*Boy Leading a Horse*]. It had been smuggled to Switzerland out of Nazi Germany by the dealer Justin Thannhauser, and was being hurriedly and secretly offered for sale through Skira. There was no time to wait for a Geneva visit from Paley, who was skiing in Saint-Moritz. Skira trucked the large canvas to the Palace Hotel and carried it into the lobby. Paley bought it on the spot.

William Rubin and Matthew Armstrong, *The William S. Paley Collection*, Preface, p. x (Museum of Modern Art, New York 1992) (Emphasis added) (using Paley's *"As It Happened"* as a source).

In *The William S. Paley Collection*, Rubin and Armstrong also provide the provenance of the Painting, and identify Paul von Mendelssohn-Bartholdy as the owner, immediately followed by Justin K. Thannhauser. Accordingly, MoMA was fully informed by 1992 that a person from a famous Jewish family -- Mendelssohn-Bartholdy -- made the sale in Nazi Germany to Thannhauser before Thannhauser "smuggled" the Painting out of the country and "hurriedly and secretly" offered it for sale through a known trafficker in Nazi confiscated art [Skira] in a country known as a haven for looted art sales [Switzerland].

Thus, despite MoMA's increasing knowledge of prior owners -- including the Jewish Paul von Mendelssohn-Bartholdy as the owner immediately before Thannhauser in Nazi Germany -- and the "red flags" indicating that the Painting likely was lost due to Nazi persecution, MoMA conducted no further provenance research and accepted Paley's donation with "no questions asked."

November 1, 2007                                    Byrne Goldenberg & Hamilton, PLLC

> **5. The background and provenance for *Boy Leading a Horse* is a paradigm for a prototypical "forced sale." Therefore, MoMA's acceptance of the Painting without performing any "due diligence" investigation left it with no commercially reasonable expectation that it had good title**

In light of the provenance of the Painting which indicated a strong likelihood of loss due to Nazi persecution, it was incumbent upon MoMA as a reasonably prudent Museum to investigate further the provenance of the Painting both (a) in 1964 when Paley executed the documents donating the Painting to the Museum, and retained only a life estate for himself; and (b) in 1990, when Paley died and MoMA obtained purported full ownership of the Painting. However, MoMA failed to conduct any "due diligence" investigation on either occasion, completely disregarded the conspicuous Nazi-era provenance of the Painting, and accepted the Painting into its collection. Accordingly, MoMA has never had a commercially reasonable expectation that it had good title to *Boy Leading a Horse*, or that the true owner would not come forward to claim the Painting.

> **6. MoMA placed the Painting on NEPIP**

As noted, the Presidential Commission negotiated an agreement with the AAM to create NEPIP. MoMA belatedly placed the Painting on NEPIP and its PRP only after research was undertaken by MoMA to participate in NEPIP. After MoMA placed the Painting on NEPIP, the Mendelssohn-Bartholdy heirs discovered it, investigated the matter, and now make a timely demand for its return.

## VII. CONCLUSION AND DEMAND FOR RETURN OF THE PAINTING

In light of the foregoing, the Mendelssohn-Bartholdy heirs demand return of the Painting by November 12, 2007.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

25

# EXHIBIT 15

**The Museum of Modern Art**

Stephen W. Clark
Deputy General Counsel

November 5, 2007

BY FEDERAL EXPRESS

John J Byrne, Jr., Esq
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

Re:  *Boy Leading a Horse*

Dear Mr. Byrne·

Thank you for your letter dated November 1, 2007, demanding that the *Boy Leading a Horse* by Pablo Picasso be turned over to your clients, whom you state are all the heirs of Paul von Mendelssohn-Bartholdy, by November 12, 2007.  That letter also contains a presentation with respect to your clients' claim of ownership, which we will review with care  As you will recall, you requested and we gave you a considerable extension of the original date by which we expected you would make that presentation.

As I indicated in my letter of August 28, 2007, the decision of how to respond to your clients' claim will be made by our Board of Trustees.  This decision-making process cannot be accomplished by November 12 We hope to provide you with a response by December 14, 2007, and will let you know if this proves not to be possible.

Like our offer to review your written presentation, which I communicated to you in my letters dated July 16, 2007 and August 28, 2007, this letter representing that we intend to respond to your claim is made without waiver of any applicable privileges, and without prejudice to any of our defenses.

Sincerely,

Stephen W. Clark
Deputy General Counsel

# EXHIBIT 16

**Guggenheim** MUSEUM

1071 Fifth Avenue
New York NY 10128-0175
Telephone 212 423 4500
Telefax 212 423 4640

November 6. 2007

<u>BY EXPRESS MAIL</u>

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC  20036

Re:  *Le Moulin de la Galette*

Dear Mr. Byrne.

I am in receipt of your letter dated November 1, 2007, demanding that *Le Moulin de la Galette* by Pablo Picasso be turned over by November 12, 2007 to your clients, whom you state are all the heirs of Paul von Mendelssohn-Bartholdy.  That letter also contains a presentation with respect to your clients' claim of ownership, which we will review with care. As you will remember, you requested and we gave you a considerable extension of the original date by which we expected you would make that presentation.

As I indicated in my letters of May 29, 2007, July 13, 2007 and August 29, 2007, the decision of how to respond to your clients' claim will be made by our Board of Trustees. This decision-making process cannot be accomplished by November 12.  We hope to provide you with a response by December 14, 2007, and will let you know if this proves not to be possible.

Like our offer to review your written presentation, this letter representing that we intend to respond to your claim is made without waiver of any applicable privileges, and without prejudice to any of our defenses.

Sincerely,

Sarah G. Austrian

Sarah G. Austrian
General Counsel

# EXHIBIT 17

.

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P GOLDENBERG
ADMITTED DC, CA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMCAST.NET

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

November 12, 2007

**FIRST-CLASS MAIL AND FACSIMILE**

Sarah G. Austrian, Esq.
General Counsel
Guggenheim Museum
1071 Fifth Avenue
New York, New York 10128-0173

Re: Demand for return of Pablo Picasso's *Le Moulin de la Galette* (1900),
(Thannhauser Collection, 78.2514.34)

Dear Ms. Austrian:

Thank you for your letter of November 6, 2007. In your letter, you state that you cannot respond to our demand for the return of *Le Moulin de la Galette* by November 12, 2007, and state that you "hope" to provide us with a response by December 14, 2007. I will respond as to our position on this matter shortly.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

# EXHIBIT 18

# BYRNE GOLDENBERG & HAMILTON, PLLC

### Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J HAMILTON
ADMITTED DC, MD, VA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JOHN.J.BYRNE@COMCAST.NET

November 12, 2007

**FIRST-CLASS MAIL AND FACSIMILE**

Stephen W. Clark, Esq.
Deputy General Counsel
The Museum of Modern Art
11 West 53rd Street
New York, New York 10019-5497

Re: Demand for the Return of Pablo Picasso's *Boy Leading a Horse*

Dear Mr. Clark:

Thank you for your letter of November 5, 2007. In your letter, you state that you cannot respond to our demand for the return of *Boy Leading a Horse* by November 12, 2007, and state that you "hope" to provide us with a response by December 14, 2007. I will respond as to our position on this matter shortly.

Feel free to contact me if you have any questions.

Sincerely,

BYRNE GOLDENBERG & HAMILTON, PLLC

John J. Byrne, Jr.

# EXHIBIT 19

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial (212) 225-2850
E-Mail edavis@cgsh.com

ROGER W. THOMAS
MARK A. WALKER
LESLIE B. SAMUELS
ALLAN G. SPERLING
MAX GITTER
EVAN A. DAVIS
LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
A. RICHARD SUSKO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
ANDREA G. PODOLSKY
STEVEN M. LOEB
DANIEL S. STERNBERG
DONALD A. STERN
CRAIG B. BROD
SHELDON H. ALSTER
WANDA J. OLSON
MITCHELL A. LOWENTHAL
DEBORAH M. BUELL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR

CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
ANA DEMEL
RAYMOND B. CHECK
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
YVETTE P. TEOFAN
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
PAUL E. GLOTZER
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
DAVID I. GOTTLIEB

LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
DANA G. FLEISCHMAN
FRANCESCA LAVIN
SANG JIN HAN
WILLIAM L. MCRAE
JASON FACTOR
MARGARET E. STOWERS
LISA M. SCHWEITZER
KRISTOFER W. HESS
JUAN G. GIRALDEZ
DUANE MCLAUGHLIN
OHEON S. PEACE
RESIDENT PARTNERS

SANDRA M. ROCKS
ELLEN M. CREEDE
E. DOUGLAS SOHISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
GABRIEL J. MESA
DAVID H. HERRINGTON
MARK A. ADAMS
HEIDE H. ILGENFRITZ
DAVID S. BERG
KATHLEEN M. EMBERGER
NANCY I. RUSKIN
WALLACE L. LARSON, JR.
RESIDENT COUNSEL

December 7, 2007

BY FEDERAL EXPRESS AND E-MAIL

John J. Byrne, Jr., Esq.
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC 20036

Re: *Boy Leading a Horse and Le Moulin de la Galette*

Dear Mr. Byrne:

On behalf of The Museum of Modern Art ("MoMA") and The Solomon R. Guggenheim Foundation (the "Guggenheim") (collectively, the "Museums"), I write to respond to the letters you sent to each museum dated November 1, 2007, declaring that you represent the heirs of Paul von Mendelssohn-Bartholdy ("von Mendelssohn-Bartholdy"), setting forth your clients' claims of title to two paintings by Pablo Picasso, *Boy Leading a Horse*, which MoMA acquired as a gift from William S. Paley in 1964, and *Le Moulin de la Galette* (collectively, the "Paintings"), which the Guggenheim acquired as a gift from Justin K. Thannhauser ("Thannhauser") in 1963, and demanding that the Museums return, or agree to return, the Paintings to your clients within 11 days of the date of the letters.

In keeping with their ethical standards and obligation to honor legitimate claims, the Museums have scrupulously reviewed your clients' claim that the sale of the Paintings, which were once in von Mendelssohn-Bartholdy's collection, to Thannhauser in or around 1935 was made under "duress." The Museums have carefully researched and investigated the provenance of the Paintings, including the factual circumstances surrounding their sale, and have concluded that your clients' claims are without merit. Accordingly, the Museums hereby refuse your demand to return the Paintings to your clients.

John J. Byrne, Jr., Esq., p. 2

In response to your stated intention to "take whatever actions we deem appropriate to protect the rights of our clients," the Museums are filing a complaint today in the United States District Court for the Southern District of New York against your clients seeking an order from the Court declaring your clients' claims to be invalid.

I enclose herewith a courtesy copy of the complaint, and ask that you agree to accept service on your clients' behalf.

Sincerely,

Evan A. Davis

Enclosure

# EXHIBIT 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
------------------------------------
                                    )    Index No. 116768/06
                                    )
JULIUS H. SCHOEPS,                  )    THIRD AMENDED
                                    )    COMPLAINT
         Plaintiff,                 )
v.                                  )
                                    )
THE ANDREW LLOYD WEBBER ART FOUNDATION,)
AND ITS TRUSTEES:                   )
ANDREW LLOYD-WEBBER,                )
MADELIENE ASTRID LLOYD-WEBBER, and  )
DAVID JOHN MARCUS WARD,             )
                                    )
         Defendants.                )
                                    )
                                    )
------------------------------------
```

Plaintiff, by his attorneys, BYRNE GOLDENBERG & HAMILTON, PLLC and BRESSLER, AMERY & ROSS, P.C., for his Complaint against defendants herein alleges upon knowledge as to his own acts and upon information and belief as to the acts of others:

### INTRODUCTION

1. This action seeks the restitution of Pablo Picasso's painting *The Absinthe Drinker (Angel Fernandez de Soto)*, oil on canvas, 69.5 x 55 cms., signed and dated 1903 (the "Painting") to plaintiff Julius H. Schoeps, an heir of Paul von Mendelssohn-Bartholdy ("Plaintiff" or "Schoeps"). Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost the Painting in Nazi Germany in a duress sale as a proximate and intended consequence of Nazi persecution, and his heirs are the true owners of the Painting.

2. Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy at the time of

1

his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Marie Busch is Schoeps' grandmother. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. Mendelssohn-Bartholdy's estate was closed in 1935, and a Certificate of Inheritance was issued at that time.

3. The Painting was in the possession of Christie's auction house (Christie's) in New York City when this suit was filed on November 8, 2006, in anticipation of an auction sale that was canceled in light of Schoeps' claims. Upon information and belief, the Painting is now in the possession of either Christie's or defendant The Andrew Lloyd Webber Art Foundation or its trustees Andrew Lloyd Webber (Webber), Madeliene Astrid Lloyd Webber (Madeliene Webber) and David John Marcus Ward (Ward) (the Andrew Lloyd Webber Art Foundation and its trustees will be referred to collectively throughout this Complaint as the "Foundation").

## THE PARTIES

4. Plaintiff Julius H. Schoeps is an individual residing in Berlin, Germany. Schoeps represents 100% of the heirs of Paul von Mendelssohn-Bartholdy in this action. Schoeps himself is Mendelssohn-Bartholdy's great-nephew and an heir to 12.5% of the estate of Paul von Mendelssohn-Bartholdy. Mendelssohn-Bartholdy's sisters and widow, Elsa, are all deceased. All of their living heirs have assigned their claims to Schoeps.

2

5.    Defendant The Andrew Lloyd Webber Art Foundation is a
tax-exempt private foundation and charity under the laws of the
United Kingdom (U.K.), and is a resident of the U.K. The settlor
of The Andrew Lloyd Webber Art Foundation is Lord Andrew Lloyd-
Webber (Lloyd-Webber). The trustees of the Foundation are Lloyd-
Webber, Mr. David John Marcus Ward, and Lady Madeliene Astrid
Lloyd-Webber. The registered office of the Foundation is c/o
Speechly Bircham, 6 Andrew Street, London EC4A 3 LX. The
Foundation operates throughout England and Wales and transacts
business in New York.

6.    Defendant Andrew Lloyd-Webber is a trustee of the Andrew
Lloyd Webber Art Foundation, and is a resident of the United
Kingdom.

7.    Defendant Madeliene Astrid Lloyd-Webber is a trustee of
the Andrew Lloyd Webber Art Foundation, and is a resident of the
United Kingdom.

8.    Defendant David John Marcus Ward is a trustee of the
Andrew Lloyd Webber Art Foundation, and is a resident of the
United Kingdom.

## JURISDICTION

9.    This Court has personal jurisdiction over the Foundation
under CPLR §302(a) because it committed a tortious act within the
State of New York by converting the Painting in or around November
7, 2006, and transacted business within New York, and contracted
to supply goods or services in New York.

3

<u>FACTUAL ALLEGATIONS COMMON TO ALL</u>
<u>CAUSES OF ACTION</u>

**Summary and Overview: The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Sell the Painting Under Duress in Berlin in a Paradigmatic "Forced Sale"**

10.   Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795. When the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933, Mendelssohn & Co. had become one of the largest private banks in Germany.

11.   Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co.  Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke).  Mendelssohn-Bartholdy also was the Royal Consul General for Denmark, and held many other prestigious social and professional positions.

12.   In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas,

4

Tiepolo and others.

13.  Paul von Mendelssohn-Bartholdy never sold **any** art before the Nazis came to power in 1933.

14.  When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

15.  The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I. After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks. As a result, Jewish-owned banks lost the municipal bond business, which was an important source of revenue for private banks. Accordingly, the decline of privately owned "Jewish banks" began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed extinguishing -- summarily -- all "Jewish banks." Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co. -- and other privately owned Jewish banks -- to fear that the Nazis would terminate them at any moment.

16.  Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses

because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee working for a Jew; surrendered land he owned to the Nazi government under apparent Nazi pressure; and placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation. Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

17. In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser not only the Painting but four other Picasso artworks: *Boy Leading a Horse* (1906); *Le Moulin de la Galette* (1900); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy -- personally and without the assistance or knowledge of any other family member -- concluded the sale of these paintings to Thannhauser before he died in May 1935. During this same period, Mendelssohn-Bartholdy sold Vincent van Gogh's *Town Hall at Auvers on the 14th of July*, and van Gogh's legendary "*Still Life: Vase with Fifteen Sunflowers*" to the Paul Rosenberg Gallery in Paris. Mendelssohn-Bartholdy also sold van Gogh's *Trunk of the Old Yew Tree* to P. de Boer Art Gallery in Amsterdam during the Nazi era.

18.    As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- he began selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these sales were prototypical "forced" or "duress" sales resulting from Nazi persecution, and that his heirs are the true owners of the Painting under New York and U.S. law.

**Since Nazi Persecution Pried the Painting From Mendelssohn-Bartholdy, the Painting Has Resided in New York State for About 50 Years, and Has Been Sold Four Times -- and Exclusively -- in the New York City Art Market**

19.    Since Mendelssohn-Bartholdy sold the Painting to Thannhauser in Nazi Germany, *every* subsequent owner and seller has invoked the New York City art market, and the Painting has been in New York State at various times for an aggregate of about 50 years. In September 1936, Thannhauser sold the Painting to M. Knoedler & Co. (Knoedler) in New York City. The following month, October 1936, Knoedler sold the Painting to William H. Taylor (Taylor) of West Chester. In 1946, Taylor returned the Painting to Knoedler who sold it in New York in May 1946 to New York collectors Donald and Jean Stralem. After the Stralems passed away, the "Stralem Collection" sold the Painting at auction at Sotheby's New York in 1995 to the Foundation.  The Foundation

7

returned the Painting to New York for auction sale at Christie's New York that was scheduled for November 8, 2006, but which was canceled. In sum, every sale of the Painting for the past 70 years has occurred in the New York City art market, as sellers without exception have returned the Painting to New York to realize the unrivaled financial benefits of New York's world-renowned art market.

**When the Foundation Bought the Painting at Sotheby's Auction House in New York in 1995, It Contracted with Sotheby's that New York Law Would Govern Its Ownership Rights in the Painting and that It Would be Subject to the Jurisdiction of New York Federal Courts**

20.   Upon information and belief, the Foundation bought the Painting at a public auction at Sotheby's in New York on or about May 8, 1995.  Upon information and belief, the Foundation acquired the Painting in 1995 subject to a contract entitled "Conditions of Sale" that Sotheby's published in its Sales Catalogue for the May 8 auction.  (A copy of this form contract, published in the Sotheby's Sales Catalogue entitled "Impressionist and Modern Paintings and Sculpture from the Collection of Donald and Jean Stralem," is appended as Exhibit 1). Under this contract, buyers and Sotheby's agree that their "respective rights and obligations" under the contract shall be "governed by and construed and enforced in accordance with the laws of the State of New York", and that by bidding at auction the "purchaser shall be deemed to have consented to the exclusive jurisdiction of the state courts of, and federal courts sitting in, the State of New York." (Paragraph 11).

**The Foundation Represented and Warranted to Christie's that It**

**Would Provide Good and Marketable Title to the Painting Under New York and U.S. Law, and that This Warranty Existed for the Benefit of the Prospective Buyer**

21.    Upon  information  and  belief,  when  the  Foundation consigned the Painting to Christie's for sale to be held in New York on November 8, 2006, the Foundation executed an agreement similar to a standard consignment contract entitled "Christie's Consignment  Agreement  Between  Consignor  and  Christie's,  Inc. (Christie's)." (See the standard consignment contract, included in Ralph E. Lerner and Judith Bresler, 1 Art Law: The Guide for Collectors,  Investors,  Dealers,  and  Artists  (Practicing  Law Institute, New York 1999) at 327-333).

22.    Under this contract, the Consignor stipulates that the Agreement will be "governed by and construed in accordance with the laws of the State of New York", and consents to the "exclusive jurisdiction of the State of New York and the Federal courts of the United States of America located in the Southern District of New York." (Paragraph 10(b)).  Further, the consignor represents and  warrants to Christie's not only that it has the right and title to consign the artwork, but also that the artwork is, and will  remain,  "free  and  clear  of  all  liens,  claims,  and encumbrances of others or restrictions on Christie's right to offer and sell" it, and that "upon sale, good and marketable title and right to possession will pass to the buyer free and clear of all liens, claims, encumbrances and restrictions..."  Moreover, under this agreement the consignor further "agrees that such representations and warranties are for the benefit of Christie's and buyers of the (artwork), and that such representations and

warranties shall survive the completion" of the sale.

**Schoeps' Demand for the Return of the Painting and Defendant's Refusal Occurred in New York While the Painting Was in New York. Further, This Suit was Filed While the Painting Was in New York**

23.    On November 7, 2006, Schoeps, though his attorneys in New York, demanded the return of the Painting.    The Foundation, through its attorneys in New York, refused to return the Painting. At the time of the demand and refusal, the Painting was in New York.

24.    On November 8, 2006, Schoeps filed this suit for the return of the Painting while the Painting was in New York.

## BACKGROUND

### Ideological Foundations of Nazi Persecution of Jews

25.    In 1920 Adolf Hitler announced the program for the National Socialist German Workers Party (NSDAP) -- from which the abbreviation "Nazi" derived -- to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five Theses." Points 4 through 8 and 24 targeted Jews as a cause of Germany's misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and, if necessary, expel them from the country. Hitler later declared that this program was a "foundation which must remain unshakable." These points established the open agenda of the Nazi party against Jews in Germany, and foreshadowed the policies that it intended to pursue to eliminate them from the economic, political and social life of Germany. In his 1924 autobiography "Mein Kampf," Hitler labored to provide historical and philosophical foundations for his rabid anti-Semitism, and

characterized Jews as parasites that had undermined the economic, political, cultural and religious life of Germany.

**Nazi Persecution of Jews Became Official State Policy in 1933**

26.    The Nazi agenda to banish Jews from the economic life of Germany enjoyed widespread support among the German people when Hitler became Chancellor. The Nazi state policies to expel Jews economically and to deprive them of their property (sometimes referred to as "Aryanization") unfolded in two overlapping stages. The first occurred during the years 1933-1938 when -- precluded from an expanding list of jobs, professions, and economic activities -- Jews sold whatever property they had acquired often at discount prices merely to survive. The second stage commenced on November 12, 1938 with the formal decree to exclude Jews from the economic life of Germany and triggered the forfeiture to the Reich of all remaining Jewish-owned property.

27.    The Nazi campaign began almost immediately and was inexorable. After January 30, 1933 the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933 Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as

11

instructors and lecturers in universities and colleges. Jews were
later expelled from professions, trades and educational
institutions.

28.    In May 1934 the Nazi Government transformed the Reich
Flight Tax of 1931 -- which was originally enacted to prevent the
flight of capital abroad -- into a legal instrument for plundering
Jewish property. Avrahim Barkai, "From Boycott to Annihilation:
The Economic Struggle of German Jews 1933-43" (University of New
England) (1989) at 99. The Nazis expanded the scope of the tax by
reducing the asset value to which the tax applied from 200,000RM
to  50,000RM. The Nazis compounded the effects of the tax by
requiring  prospective emigrants -- even after paying the tax --
to deposit their money in blocked accounts for the purchase of
foreign currency.   The Reichsbank incrementally reduced the
exchange rate  for foreign currency that it paid to emigrants to
only 4 percent.

**During the Years 1933-1935 the Nazi Government Resolved to
Eventually Eradicate Private Jewish-Owned Banks -- Such as
Mendelssohn & Co.-- and Officially Monitored Their Decline**

29.    From the outset the Nazi government assaulted private
Jewish-owned banks.  The Nazis blamed Jewish-owned banks for
Germany's loss in World War I and for its economic depression. But
because the Nazis considered Jewish banks too important to the
German economy to expunge immediately, they intimidated,
persecuted, and tormented them judiciously, while awaiting the
opportune moment to terminate them altogether.

30.    The Nazis pressured private Jewish banks persistently,

and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady decline of the five largest Jewish-owned German banks. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

**Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Targeted Groups, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market**

31.    A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

32.    From 1933 on, many artworks that Jewish collectors liquidated in Germany as a proximate consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York. International art dealers and private collectors profited -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

**Nazi Persecution Devastated Paul von Mendelssohn-Bartholdy Personally, Professionally, and Financially and Forced Him to Sell the Painting**

33.   The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy. Nazi coercion and duress forced him to begin efforts to sell the Painting and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to disgorge.

34.   Before the Nazi's assumed power in Germany in 1933, Mendelssohn-Bartholdy enjoyed dynastic wealth as a scion of one of Germany's most illustrious and financially successful families. Mendelssohn-Bartholdy was a part owner and co-manager of Mendelssohn & Co. bank -- one of Germany's largest private banks. Over the years he had amassed one of Europe's singular private art collections, which included works from such masters as Van Gogh, Picasso, and Monet, among others. With his wife, Elsa, he enjoyed a lifestyle commensurate with his business success that included a palatial Berlin residence, Alsenstrasse, and a country estate, Boernicke.

35.   But from when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

(a) sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

(b) endured persistent, menacing threats from Nazi banking authorities, beginning in 1934, that Mendelssohn & Co. and

other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the banks' assets to the "Aryan" Deutsche Bank.)

(c) withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

(d) suffered a precipitous collapse of his personal net worth;

(e) declined to petition for an entitled reduction of his alimony obligations based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

(f) surrendered under pressure extensive land from his country estate (Boernicke) to the Nazi Kulturamt (Cultural Office);

(g) placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

(h) had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of

15

Mendelssohn-Bartholdy's Jewish background;

(i) lost prestigious and invaluable positions in business, commercial, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance institution;

(j) was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis; and

(j) finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

36.    In or around October 1934, Mendelssohn-Bartholdy consigned the Painting -- along with four other Picasso artworks -- to Berlin art dealer Justin Thannhauser. Thannhauser, through his gallery, acquired the Painting from Mendelssohn-Bartholdy some time before Mendelssohn-Bartholdy's death in May 1935.

37.    Thannhauser took advantage until approximately 1938 of the depressed prices of the Berlin art market. He sold to clients internationally, including New York and Switzerland, artworks that he had obtained at discounted prices from persecuted Jewish

collectors. Both during this period and after the War, Thannhauser partnered with art dealers such as Cesar Mange de Haucke and Albert Skira whom the U.S. State Department identified as trafficking in Nazi-looted art.

38.    The loss of the Painting marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune.    For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets were transferred to the "Aryan" Deutsche Bank.    Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed.    Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

**Following the War, the U.S. Consistently Pursued Policies to Invalidate the Coercive Transfers of Property -- Such as the Sale of the Painting -- that Occurred Under Nazi Authority and to Restitute Such Property to Rightful Owners**

39.    Even before the end of World War II, the U.S. government recognized that the Nazi regime employed coercion in occupied countries to wrongfully deprive individuals of valuable property. The U.S. initially attempted to impair the ability of Nazi Germany to profit from its economic and financial exploitation of occupied countries, and later developed principles for restituting property that the Nazis confiscated both from nations and individuals. By

17

the end of the War, U.S. policy makers had years of experience redressing Nazi abuses.

40.   From inception, the U.S. recognized that purported sales and other conveyances of property occurring under Nazi authority were presumptively invalid, and consistently voided such transfers to return property to persons who had lost it under duress.

41.   The U.S. government laid the cornerstone for post-War restitution policy in Europe on January 5, 1943 when the Allied Governments issued the "Inter-Allied Declaration Against Acts of Dispossession Committed in Territories under Enemy Occupation or Control", 8 Dep't St. Bull. 21 (1943), known also as the "Declaration of London" ("Declaration"). The Declaration recognized that the Nazi regime had employed a variety of means to dispossess persons in occupied countries of their property, and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealings with, property, rights and interests of any description whatsoever" in Nazi-occupied countries, regardless whether "such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The principles of the London Declaration became the foundation of post-War Allied restitution policy for property wrongfully taken as a result of Nazi persecution.

**Military Government Law No. 59 (MGL No. 59) -- the Centerpiece of Post-War U.S. Restitution Policy**

42.   U.S. policy for the restitution of artworks and other

property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." § 3.75(a)(1).

    43.    MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation." MGL No. 59 required persons in innocent possession of confiscated property to return it: "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

    44.    MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall

19

particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

45.    The U.S. actively promoted the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims. For example, in 1949, the U.S. National Security Council (NSC) drafted the "*Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)." President Truman was the chair of the NSC.  In its directive to the U.S. High Commissioner for Germany, the NSC punctuated that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either have identifiable property returned to them or be compensated therefore, . . .  To carry out this policy, you should seek agreement from your British and French colleagues to persuade the German Government to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70.  (Emphasis added).  Further, on March

15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their zone of occupation as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after MGL No. 59.

46. Due largely to U.S. efforts, MGL No. 59 became, in effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model for similar restitution legislation among both the Allied governments, many countries that the Nazi had controlled, and ultimately Germany itself. For example:

a. **The Berlin Restitution Law of 1949**.

MGL No. 59 was the controlling law for the U.S. "occupation zone" in Germany after 1947, but did not apply to Berlin. Berlin was divided into four "quadrants," and the U.S., Britain, France and the Soviet Union each controlled a quadrant. To address restitution issues within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is almost identical to Military Law. No. 59. The provisions regarding the "presumption of confiscation" and potential

rebuttal thereof are virtually identical.

b.   **Britain and France passed restitution laws in their**
**"zones of occupation" similar to MGL No. 59**.

Britain and France passed laws in their individual
German "zones of occupation" that were similar to MGL No. 59
and the Berlin Restitution Law.  (See British Military Law
59, and currently applicable provisions of French law
(article 1, paragraph 1 of order No. 45-770 dated April 21,
1945 and decree No-1344 dated September 30, 1949).

c.   **German restitution laws are patterned after MGL No. 59**.

    (1) After the Allies left the Federal Republic of
    Germany (West Germany), the West Germans enacted a
    restitution statute in or around 1957 that incorporated
    the restitution principles and presumptions of
    confiscation for Jewish sellers of property in Nazi
    Germany contained in MGL No. 59 and the Berlin
    Restitution Law of 1949.  (See
    "*Bundesrückerstattungsgesetz*" (BRüG),BGBl. 1957 I,
    734).

    (2)  In 1990, the Communist government of the
    Democratic Republic of Germany (East Germany) fell, and
    Germany was reunited.  The newly united Germany passed
    a restitution law, The Property Settlement Act of 1990,
    that applied to the former East Germany.  The Property
    Settlement Act specifically incorporated the
    presumption of confiscation provisions contained in the
    Berlin Restitution Law of 1949 -- which are, of course,

22

the same as MGL No. 59.

47.    The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance in other countries -- are applied today on a regular basis in Germany and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victims of Nazi persecution).

48.    The consistent policy of the U.S. government to nullify transfers of personal property occurring under Nazi authority is further evident in State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release). The Press Release repeated "this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated "that it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

49.    The Press Release refers to an April 13, 1949 letter from Jack B. Tate, the Acting Legal Adviser, U.S. State

Department, which identifies MGL No. 59 as exemplifying U.S.

policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law
> No. 59 which shows this Government's policy of
> undoing forced transfers and restituting
> identifiable property to persons wrongfully
> deprived of such property within the period from
> January 30, 1933 to May 8, 1945 for reasons of
> race, religion, nationality, ideology or political
> opposition to National Socialism. Article 1 (1).
> It should be noted that this policy applies
> generally despite the existence of purchasers in
> good faith. Article 1 (2).

**Following the War, the U.S. Government Repeatedly Cautioned the International Art Market About Nazi-Confiscated Art**

50. The formal policies of economic coercion and duress that

Nazi Germany employed against its Jewish citizens during the years

1933-45, and its subsequent seizure and plunder of artworks in

occupied countries, resulted in enormous displacement of art which

the U.S. government and its Allies attempted to rectify after the

War.

51. In 1946, the U.S. Department of State (State Department)

issued a circular letter to U.S. museums, auction houses and

dealers advising that the legal restrictions on the importation of

artworks from Nazi-occupied countries had been lifted and urging

precautions against acquiring contraband materials.

52. In 1951, the State Department issued a second circular

letter to the U.S. art industry reiterating this warning.

**The Executive Branch of the U.S. Government -- Through the U.S. Department of State -- Has Decreed that the Restitution to Rightful Owners of Property Confiscated During the Nazi Era is a National Policy Priority and is an Important Issue in U.S. Foreign Relations**

53. The U.S. Department of State has created a special

office to encourage and facilitate the return to rightful owners of property lost as a proximate consequence of Nazi persecution. This Office is entitled "The Office of the Special Envoy for Holocaust Issues" ("Office"), and is currently headed by Mr. Christian Kennedy. The mission of the Office is to develop and implement "U.S. policy with respect to the return of Holocaust-era assets to their rightful owners," and the Office relates that Holocaust restitution "is an important issue in our bilateral relations with countries of central and eastern Europe and the state of Israel." (See www.state.gov/p/eur/rt/hlcst.)

54.    Since the 1990's the Office has helped negotiate executive agreements with Austria, France, Germany and Switzerland concerning Holocaust-era claims for unpaid Holocaust-era insurance policies, slave labor, the illegal seizure of private and communal property and other personal injuries.    The Office specifically "(e)ncourages the restitution of artworks to rightful owners."

**Against the Backdrop of Executive Branch Holocaust Restitution Policy the U.S. Congress -- in 1998 -- Enacted Three Laws to Help Victims of Nazi Persecution Recover Artworks Wrongfully Taken as a Result of Nazi Policies**

55.    In 1998, the U.S. Congress enacted three statutes to help victims of Nazi persecution and their heirs locate and recover artworks and other property wrongfully confiscated during the years 1933-45. These are "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998), and the U.S. Holocaust Assets Commission Act of 1998 (Commission Act), Public Law No. 105-567.

25

These provisions declare U.S. policy - as a national moral priority - to return confiscated artworks and other property to victims of Nazi persecution and their heirs, and provide an integrated and complementary statutory scheme to assist them.

56. In summary:

(a) The Redress Act mandates that artworks and other assets lost by Holocaust victims be restituted to the "rightful owners" expeditiously. (Sec. 201(2)). The Redress Act is grounded in international law, including the Hague Convention of 1907 and the UNESCO Convention of 1970. In fact, on October 7, 1997 the Congressional sponsors of the Redress Act, James A. Leach, Chairman of the Committee on Banking and Financial Services, and Benjamin A. Gilman, Chairman, Committee on International Relations, wrote a letter to their colleagues urging support for the bill, and declaring that its purpose was to help complete the unfinished task of Holocaust art restitution and to confirm that international law requires the restitution of Nazi-confiscated artworks: "[o]ur bill underscores the fact that the restitution of these works of art to their rightful owners is required by international law and expresses the sense of Congress that governments should take appropriate action to achieve this objective." (A copy of this letter is appended as Exhibit 2.)

(b) The Disclosure Act complements the Redress Act by making available to victims of Nazi persecution and their heirs documents in the possession of the U.S. government concerning -- among other things - assets confiscated during the period 1933-45. Consonant with the expansive definition of "confiscation" adopted in MGL No.

59, the Disclosure Act makes available "Nazi war criminal records" concerning "assets taken from persecuted persons beginning on March 23, 1933, and ending on May 8, 1945," when "such transaction was completed without the assent of the owners of those assets or assigns or other legitimate representatives." Sec. 3(a)(2)(A),(B).

(c) The Commission Act established a Presidential Commission to investigate the fate of any Nazi-confiscated assets that may have come into the possession or under the auspices of the U.S. government. In December 2000, the Presidential Commission issued its formal report entitled "Plunder and Restitution: The U.S. and Holocaust Victims' Assets - Findings and Recommendations of the Presidential Advisory Commission on Holocaust Assets in the United States and Staff Report."

**Since 1997 New York State Has Proclaimed a Signal Public Policy to Help Victims of Nazi Persecution and Their Heirs -- Internationally -- To Recover Property That Was Wrongfully Taken During the Period January 1, 1933 until May 9, 1945**

57. On June 25, 1997 then New York Governor George E. Pataki created the Holocaust Claims Processing Office of the New York State Banking Department (HCPO). The purpose of the HCPO is to help victims of Nazi persecution recover: (1) assets deposited in European banks; (2) claims never paid by European insurers; and (3) lost, looted, or stolen art.

58. Governor Pataki repeatedly has underscored New York State policy to return to rightful owners artworks lost as a consequence of Nazi persecution. In Press Releases dated February 1, 2001, and July 12, 1999, respectively, Governor Pataki

proclaimed that "New York State is committed to helping as many claimants as possible recover assets or artwork that was stolen by the Nazis or lost during the Holocaust", and that "New York State will continue to use all the tools at its disposal to help survivors and their heirs recover what was stolen or looted from them during one of story's darkest times."

59.    The HCPO currently is helping approximately 133 claimants internationally to recover artworks that were wrongfully taken as a proximate consequence of Nazi persecution.   The HCPO specifically has recovered materials such as the Painting that were surrendered as a consequence of forced sales.  See e.g., HCPO Press Releases dated, respectively, June 17, 2003, November 17, 2001, February 1, 2001, and July 12, 1999, discussing the role of the HCPO in recovering artworks lost as a consequence of forced sales.

**For More Than 35 Years New York Courts Have Condemned How Casually Wealthy Purchasers - like the Foundation -- Buy Art on the International Market, and Have Announced a Policy to Protect Victims of Art Theft in Order to Safeguard the Commercial Integrity of the New York City Art Market**

60.   Since 1969 New York courts have rebuked the indifference with which purchasers buy artworks on the New York City art market, and have cautioned buyers and dealers to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969), dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to

"potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"; Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981), reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of... title...it is deemed poor practice to probe." The court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art... and diminishes the integrity of the apathetic merchant."

61.   In 1991, the New York Court of Appeals, in the landmark decision Solomon R. Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. Id. at 431.

**In Their Fervor to Maximize the Sales Price of the Painting, Both the Foundation and Christie's Disregarded the Painting's Suspicious Nazi-Era Provenance**

62.   In preparation for its originally planned November 8, 2006 auction of the Painting, Christie's published a provenance for the Painting that depicted an artwork with a strong likelihood of having been lost as a consequence of Nazi persecution. Christie's provenance relates that a **Jewish** collector in **Berlin, Germany** (Paul von Mendelssohn-Bartholdy) sold the Painting **by**

29

**August 31, 1935** (more than 2 1/2 years into Nazi rule). (A copy of this provenance is appended as Exhibit 3). The Christie's provenance relates as follows:

Paul von Mendelssohn-Batholdy [sic], Berlin.
Justin K. Thannhauser, Berlin/Lucerne (by August 31, 1935)
M. Knoedler & Co., Inc., New York (acquired from the above, 2 September 1936).
William H. Taylor, West Chester (acquired from the above in October 1936)
Private collection (acquired from the above; through Knoedler & Co., Inc., New York, in May 146).
Donald and Jean Stralem, New York: sale, Sotheby's, New York, 8 May 1995, lot 14.
Acquired at the above by the present owner.

63.    This Provenance is a paradigm for a prototypical "forced sale" because it flags a Jewish owner in Nazi Germany selling a painting "by August 31, 1935" to an art dealer operating out of Germany and Switzerland.   In 1936, the art dealer sold it into the New York market, where it was quickly re-sold to an American collector.    In light of this provenance, it was incumbent upon a reasonably prudent prospective seller to investigate further the possibility that the Painting was lost as a consequence of Nazi persecution.    Indeed, as discussed below, Christie's investigated Paul von Mendelssohn-Bartholdy extensively before the date of the planned   auction,   and   found   additional   information   that Mendelssohn-Bartholdy was a victim of Nazi persecution and had sold the Painting under duress.

64.    Notwithstanding the foregoing, the Foundation and Christie's decided to ignore the conspicuous Nazi-era provenance of the Painting, and the high probability that Mendelssohn-Bartholdy sold the Painting as a consequence of Nazi persecution.

65.    Neither the Foundation nor Christie's made any attempt

to contact Schoeps or any other heir of Paul von Mendelssohn-Bartholdy regarding the Painting before its planned November 8, 2006 auction.    This auction was canceled in light of Schoeps' action to recover the Painting.

### SCHOEPS DID NOT "UNREASONABLY DELAY" BRINGING THIS ACTION, AND THEREFORE DEFENDANT HAS NO PROPER LACHES DEFENSE TO SCHOEPS' CLAIMS

#### Introduction and Summary

66.    The defense of laches has been raised regularly by defendants in stolen art and Nazi-confiscated art cases in New York.    See, e.g., Bakalar v. Vavra, 2006 WL 2311113, *3 (S.D.N.Y. 2006), instructing that to establish a laches defense in a Holocaust art restitution action, the defendant must demonstrate: (1) the heirs knew of their claim; (2) they delayed in taking action without excuse; and (3) defendant suffered prejudice as a result.    See also Solomon R. Guggenheim Foundation v. Lubell, 77 N.Y.2d 311, 321, 567 N.Y.S.2d 623, 628 (1991), where the court ruled that the conduct of both the theft victim and the current possessor of the art will be relevant to any consideration of the equitable defense of laches.    In addition, and as discussed infra, the "unclean hands" of a defendant precludes the application of the laches defense. Uciechowski v. Ehrlich, 221 A.D.2d 866, 634 N.Y.S.2d 251 (App.Div. 3d Dept. 1995).    Further, laches involves "a fact-intensive inquiry into the conduct and background of both parties in order to determine the relative equities," and such issues "are often not amenable to resolution on a motion for summary judgment, let alone a motion to dismiss." U.S. v. Portrait of Wally, A Painting By Egon Schiele, 2002 WL

553532, *22 (S.D.N.Y. 2002) (citing <u>Solomon R. Guggenheim</u>

<u>Foundation</u> v. <u>Lubell</u>, 77 N.Y.2d at 321, 567 N.Y.S.2d at 628; and

<u>Solomon R. Guggenheim Foundation</u> v. <u>Lubell</u>, 153 A.D.2d 143, 151-

52, 550 N.Y.S.2d 618, 623 (1990).

    67.  Schoeps became aware in 2005 that his ancestor, Paul

von Mendelssohn-Bartholdy, sold a Pablo Picasso artwork to Berlin

and Lucerne art dealer Justin Thannhauser in Nazi Germany under

duress.  Schoeps, through his agents, discovered this sale on the

Nazi-Era Provenance Internet Portal (NEPIP) and a hyperlinked

museum website.  NEPIP and related museum websites were created

as part of a massive undertaking by the State of New York and the

U.S. government -- from the late 1990's through today -- to make

documents and information available to Holocaust claimants so

that they can identify, investigate, and make claims to recover

artworks that may have been lost as a result of Nazi persecution.

NEPIP provides a searchable registry of objects in U.S. museum

collections that changed hands in Continental Europe during the

Nazi era (1933-1945).  It was created by the American Association

of Museums (AAM) pursuant to an agreement with the Presidential

Commission created by the Commission Act (1998).  The HCPO also

was active in NEPIP's development.

    68.  Once Schoeps was made aware of the NEPIP entry, he

acted diligently throughout 2005-2007 to investigate, among other

things, the relationship between Mendelssohn-Bartholdy and

Thannhauser, the art collection of Mendelssohn-Bartholdy,

additional sales Mendelssohn-Bartholdy made under duress, Nazi

persecution of Mendelssohn-Bartholdy, and other matters which

enabled him to assert this claim in 2006.

69.  No heir of Mendelssohn-Bartholdy was aware -- or reasonably should have been aware -- of his forced sale of five Picasso artworks in Nazi Germany before the 2005 discovery on NEPIP, due to the persecution and extenuating circumstances Mendelssohn-Bartholdy faced in Nazi Germany.  In fact, but for the efforts of the State of New York and the U.S. government to make information available to Holocaust victims and their heirs, the Mendelssohn-Bartholdy heirs might never have discovered -- even in the exercise of extraordinary diligence -- that Mendelssohn-Bartholdy sold these paintings under duress in Nazi Germany.

**The "Wall of Silence" Preventing Holocaust Art Restitution**

70.  Until recently, Holocaust claimants -- such as Schoeps -- had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were not available.  This historical deficiency has been widely recognized.  For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**wall of silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of

33

Representatives (Eizenstat Testimony).

**The U.S. Congress, U.S. Department of State, and State of New York Began Intensive Efforts in the Late 1990's to Tear Down the "Wall of Silence," that is, To Make Information and Documents Available to Holocaust Claimants so that They Could Develop and Prosecute Claims for the Recovery of Property Lost During the Nazi Era**

71.    In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property.  For example:

a.    In 1998, as discussed in preceding sections, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations.  The Disclosure Act made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945.  The Redress Act provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. The Commission Act established a Presidential Commission to investigate and report on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

b.    In   1998,   at   Congressional   hearings,   U.S.

Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

c. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants. As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

d. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining

35

international acceptance of the AAMD guidelines.
Officials from 44 countries attended. Upon meeting
some initial resistance to acceptance
of the AAMD guidelines, State Department
representatives re-drafted the guidelines and
eventually succeeded in having all 44 countries
at the Washington Conference accept the re-
packaged AAMD principles, which became known as the
"Washington Principles"; the Washington Principles
led to increased worldwide publication of
information relating to art lost during World War
II, and the release of records to assist Holocaust
claimants to recover art;

e.    The Presidential Commission, created by the
Commission Act of 1998, negotiated an agreement with
the American Association of Museums (AAM) that
committed member museums to research extensively
artworks in their collections to identify those that
may have been confiscated as a proximate consequence
of Nazi persecution and to publish the provenance of
these artworks.  This agreement led to
the creation of the Nazi-Era Provenance Internet
Portal (NEPIP), www.nepip.org in September 2003,
which is in part federally funded.  NEPIP lists art
that has a Nazi-Era provenance, that is, art that
changed ownership in Europe between 1933-1945.
NEPIP is connected by hyperlink to individual museum

36

Websites where detailed provenance information can be accessed. The Holocaust Claims Processing Office (HCPO) actively participated in the AAM task force established to create NEPIP;

f. In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively -- and with significant success -- to persuade foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

g. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs Provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art -- all free of charge to the claimant. Further, the HCPO is a New York office

37

with a worldwide mission -- it will assist claimants

from anywhere in the world, and will pursue art

restitution regardless of where the art is now

located.

**The Efforts of the U.S. Government and State of New York to Help Victims of Nazi Persecution and their Heirs to Recover Confiscated Artworks are On-going, and More Relevant Information Continues to Becomes Available**

72.    The U.S. Government and the State of New York began a

process in the late 1990's that, among other things, has given

Holocaust claimants increased access to documents and information

worldwide. However, progress has been slow in some areas and the

release of additional archives, documents and information is

continuing.

73.    For example, in 2006, the Claims Conference published a

survey it conducted of U.S. museums' participation in NEPIP.  The

survey reports that NEPIP "lists approximately 18,000 items, or

slightly higher than **12 percent** of the total number" of objects

(over 140,000) that museums have determined are within the NEPIP

criteria.   Further, of "the museums that do clearly state that

they are conducting provenance research, **52 percent have completed**

**research on less than half of the relevant items** in their

collection and a further 33 percent did not provide information on

the extent to which they had completed the work."   See "Nazi-Era

Stolen Art and U.S. Museums: A Survey And Joint Project of the

Claims Conference and the World Jewish Restitution Organization

(WJRO)" (2006) (questionnaire sent on February 10, 2006 to 332 U.S.

art museums to ascertain museums' progress in adhering to

recognized principles concerning Nazi-era looted art).

74.    New York's HCPO has accepted 145 art claims (from 19 states and 9 countries) referencing approximately 8,000 items described in sufficient detail to permit additional research. The HCPO has secured the return of 14 works of art and closed 12 claims, but has 133 open claims that it is still pursuing. (See New York State Banking Department, Holocaust Claims Processing Report, Report to the Governor and the Legislature, January 15, 2007). As recently as October 2006, the HCPO announced the recovery of a work of art that had been lost as a result of a "forced sale" in Nazi Germany.

75.    The Department of State's Special Envoy for Holocaust Issues continues to work internationally for the release of Nazi-era documents and for the enactment and implementation of equitable private and communal property Holocaust restitution laws. In 2006, due in part to the efforts of the Department of State, Germany agreed to allow access to a vast Holocaust-era archive kept in the town of Bad Arolsen, Germany. The files, which make up one of the largest Holocaust archives in the world, reportedly are more than 15 miles long and hold up to 50 million documents.

**Schoeps' Action Was Made Possible Only by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990's -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

76.    Schoeps' claim in this case was made possible by information disclosed as a result of the intensive efforts of the

39

U.S. government and State of New York to assist Holocaust claimants. For example, in 2005, Schoeps first discovered that his Jewish ancestor, Paul von Mendelssohn-Bartholdy, sold a Picasso painting to art dealer Justin K. Thannhauser in Nazi Germany from information published on NEPIP and the hyperlinked Museum of Modern Art (MoMA), Provenance Research Project (PRP).

77. Based on the information discovered on NEPIP and MoMA's PRP in 2005, Schoeps, through his agents, investigated Mendelssohn-Bartholdy's relationship with Justin K. Thannhauser and his sale of Picasso artworks to Thannhauser. Ultimately, Schoeps discovered that Mendelssohn-Bartholdy had sold five Picasso artworks to Thannhauser under duress in Nazi Germany, including, of course, *The Absinthe Drinker (Angel Fernandez de Soto)*.

78. As noted, NEPIP and the museums' related websites were developed by the AAM as a result of the AAM's agreement with the Presidential Commission. The Presidential Commission was created by the Commission Act of 1998. In addition, the NEPIP project has received some federal funding. Also, the State of New York played an important role in the development of NEPIP, since the HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since Schoeps' claim to recover the Painting is based on information discovered on NEPIP and a related museum website, it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "wall of silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and

information to enable them to develop claims.

**No Mendelssohn-Bartholdy Heir Knew - or Reasonably Should Have Known -- of Mendelssohn-Bartholdy's Duress Sales of Art in Nazi Germany Until Relevant Information Was Published on NEPIP and MoMA's PRP**

79.    No   Mendelssohn-Bartholdy   heir   was   aware   that Mendelssohn-Bartholdy had sold Picasso artworks -- or any other paintings -- to Thannhauser in Nazi Germany until the information was discovered on NEPIP and MoMA's PRP.

80.   Mendelssohn-Bartholdy's widow, Elsa von Mendelssohn-Bartholdy (Elsa), was unaware of the fate of the five Picasso artworks Mendelssohn-Bartholdy sold under duress to Thannhauser. Mendelssohn-Bartholdy was approximately 23 years older that Elsa, and was very protective of her.  They had a very traditional marriage.  Mendelssohn-Bartholdy dealt exclusively with all issues relating to money or finance.  As Nazi persecution savaged his estate, Mendelssohn-Bartholdy attempted to shield Elsa from the extent of his losses. Based on their customary mode of interaction, Mendelssohn-Bartholdy would not have told Elsa about the sale of his paintings or the circumstances of the sales.  Nor did Mendelssohn-Bartholdy leave any records by which his estate could have made these determinations.  Moreover, Elsa never made any statements to anyone for the rest of her life that would indicate that she was aware of the sale of the Picasso artworks to Thannhauser.

81.   Paul von Mendelssohn-Bartholdy died of a heart attack on May 10, 1935.  His sudden death prevented him from giving his wife an accounting of his business affairs.   In fact, Elsa was shocked at   the   extent   of   Mendelssohn-Bartholdy's   financial   decline   when

41

she was forced to take over his affairs.

82. Mendelssohn-Bartholdy's sisters had no knowledge of the fate of the five Picasso artworks Mendelssohn-Bartholdy sold to Thannhauser. They did not live with Mendelssohn-Bartholdy. They were suffering under Nazi duress themselves, and at least one had left Nazi Germany at or around this time. Mendelssohn-Bartholdy placed the artworks on consignment on or before October 1934, and they were never returned to him. Moreover, Mendelssohn-Bartholdy's role as a protector of the family and its assets made him disinclined to reveal financial distress, so he would have had no incentive to advise his sisters of the circumstances of his sale of art.

83. Neither Elsa nor any of Mendelssohn-Bartholdy's sisters ever made any statement that would indicate any awareness of the fate of the five Picasso artworks Mendelssohn-Bartholdy sold to Thannhauser. As a result, none of the current Mendelssohn-Bartholdy heirs had any knowledge of the paintings Mendelssohn-Bartholdy sold to Thannhauser in Nazi Germany until relevant information was discovered on NEPIP and MoMA's PRP, nor could they reasonably be expected to have obtained such information.

**Schoeps, Through His Agents, Has Acted Diligently Throughout 2005-2007 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany**

84. Once Schoeps discovered Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on NEPIP and MoMA's PRP, he has acted diligently in 2005-2007 to complete his investigation and bring forward this claim. Schoeps, through his agents, performed archival research in the United States, Germany, Russia,

Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

**THE FOUNDATION IS NOT ENTITLED TO RAISE THE EQUITABLE DEFENSE OF LACHES BECAUSE IT COMES INTO COURT WITH "UNCLEAN HANDS" REGARDING THE DISPUTE OVER THE PAINTING**

**When the Foundation Acquired the Painting at Sotheby's in 1995, It Ignored the Repeated Admonitions of the Court of Appeals of New York to Take Precautions Against Acquiring Stolen Art, and Neglected to Investigate the Possibility -- which the Provenance of the Painting Suggested -- that Paul Mendelssohn-Bartholdy Lost the Painting as a Proximate Consequence of Nazi Persecution: Accordingly, the Foundation Never Has Entertained a Commercially Reasonable Expectation that It Acquired Good Title to the Painting or that the Rightful Owner Would Not Come Forward to Reclaim it at any Time**

85.  In 1991, the New York Court of Appeals in <u>Solomon R. Guggenheim Foundation</u> v. <u>Lubell</u>, 569 N.E.2d 426, 427 (N.Y. 1991) admonished that in "the New York City art market...illicit dealing in stolen merchandise is an industry all of its own," and advised prospective buyers to take appropriate precautions against acquiring contraband materials.

86.  Upon information and belief, the Foundation ignored these prescriptions when it bought the Painting at auction at Sotheby's in 1995.

87.  In preparation for its 1995 auction of the Painting, Sotheby's published a provenance (ownership history) of the Painting with a series of "red flags" that placed any commercially reasonable buyer on notice that the Painting may have been surrendered as a consequence of Nazi persecution.

88.  The provenance identified -- conspicuously -- as the first owner of the Painting an individual with a recognizably

43

Jewish name who lived in Germany: "Paul van (sic) Mendelssohn, Germany". The second owner that the provenance related enhanced suspicion that "Paul van (sic) Mendelssohn, Germany" may have sold the Painting under duress during the Nazi years. The provenance stated that the next owner of the Painting was Justin Thannhauser in "Lucerne". Thannhauser was a well-known art dealer, and Switzerland was a notorious venue for the sale of Nazi looted art as well as art sold under duress. Finally, the statement in the Sotheby's provenance that Thannhauser sold the Painting to M. Knoedler & Co, Inc. in New York in September 1936 identified a sale of the Painting during the Nazi period, and provided a historical context for the time frame that "Paul van (sic) Mendelssohn, Germany" may have lost the Painting.

89. So the Sotheby's provenance related information that required any commercially reasonable buyer to investigate further the possibility that "Paul van (sic) Mendelssohn" may have sold the Painting under duress in Nazi Germany. Upon information and belief, the Foundation, however, failed to take such precautions.

**In Tacit Recognition of the Provenance Problem Paul von Mendelssohn-Bartholdy Presented -- and in Preparation for the November 8 auction -- Christie's Performed an Internal Investigation Concerning Mendelssohn-Bartholdy and His Ownership and Sale of the Painting During the Nazi Era in Germany. Christie's Internal Investigation Revealed, Among Other Things: (1) that Mendelssohn-Bartholdy Was a Persecuted Jew in Nazi Germany; (2) that He Owned the Painting Well Into the Nazi Reign in Germany; (3) that Mendelssohn-Bartholdy May Have Sold the Painting Under Nazi Duress; and (4) that Schoeps Was an Heir of Mendelssohn-Bartholdy Who Could Be Easily Contacted. Nonetheless, the Foundation -- and Its Agent Christie's -- Failed to Contact Schoeps and Decided Instead to Proceed With the Sale**

90. In preparation for the planned November 8, 2006 auction

of the Painting, Christie's conducted an investigation of Paul von Mendelssohn-Bartholdy and his ownership and sale of the Painting in Nazi Germany. (See "Research Summary on Paul von Mendelssohn-Bartholdy (1875-1935) and Pablo Picasso's *Portrait of Angel Fernandez de Soto*," (Research Summary), a copy of which is attached as Exhibit 4.

91. The Research Summary confirms that:

a. Christie's knew that Paul von Mendelssohn-Bartholdy "was considered to be 'Jewish' by Nazi standards." (Research Summary at 7).

b. Christie's Research Summary reports that "[i]t has to be borne in mind that even someone with a prestigious background like [Paul von Mendelssohn-Bartholdy] would have suffered from the increasingly anti-Semitic climate in Germany." (Research Summary at 7).

c. Christie's knew that Mendelssohn-Bartholdy "was under scrutiny by the Nazi financial authorities in Berlin in the early 1930s." (Research Summary at 6).

d. Christie's knew that Mendelssohn-Bartholdy's transfers of funds to his sister in Sweden were stopped due to the "foreign currency situation." (Research Summary at 6).

g. Christie's knew that Paul von Mendelssohn-Bartholdy had taken out "a personal mortgage loan" on the Alsenstrasse property in the sum of RM 600,000.

(Research Summary at 6).

h.  The Research Summary states that "there seems to
be agreement in the literature that
[Paul von Mendelssohn-Bartholdy's] last will of
1935 is considered to be a 'Verfolgten-Testament
(=last will set up by someone persecuted by the
Nazis in order to protect their property. . . )."
(Research Summary at 7).

i.  Christie's knew that Mendelssohn-Bartholdy
owned the Painting in Berlin well into the Nazi
period.  (Research Summary at 3).

j.  Thannhauser -- who purchased the Painting from
Mendelssohn-Bartholdy in Nazi Germany -- had
books which identified the Painting as
"aus der Sammlung Paul von Mendelssohn-Bartholdy,
Berlin" (from the collection of Paul von
Mendelssohn-Bartholdy, Berlin).  (Research Summary
at 4).

k.  Christie's could not find a "conclusive answer" to
the following question:  "Did [Paul von
Mendelssohn-Bartholdy] sell the painting to Justin
Thannhauser before his death on 11 May 1935, or
was it sold by his widow, Elsa [von Mendelssohn-
Bartholdy]?"  (Research Summary at 5).

l.  Christie's also could not find a "conclusive
answer" to the following question:  "**If [Paul von
Mendelssohn-Bartholdy] was the seller, did he do so**

46

**out of financial difficulties and/or as a result of**

**racist/economic persecution by the Nazis?"**

    (Emphasis added).  (Research Summary at 5).

m. Christie's also could not answer the following

    question:  **"If [Paul von Mendelssohn-Bartholdy]**

    **sold the painting to Thannhauser, was it sold at**

    **fair market price and did he receive the proceeds**

    **from the sale**?"  (Emphasis added).  (Research

    Summary at 5).

n. Christie's was aware that Schoeps was Mendelssohn-

    Bartholdy's great-nephew, and that Mendelssohn-

    Bartholdy's heirs had sought restitution of assets "on

    the grounds of [Paul von Mendelssohn-Bartholdy] as well

    as his sisters' status as persecuted Jews under the

    Nazi regime."  (Research Summary at 10-11).

**Upon Information and Belief, Christie's Advised the Foundation of the Findings in its Research Summary on Paul von Mendelssohn-Bartholdy**

    92.  On July 27, 2006, Ambassador Stuart E. Eizenstat

testified before the U.S. House of Representatives, Subcommittee

on  Domestic  and  International  Monetary  Policy,  Trade,  and

Technology Committee on Financial Services (Subcommittee), on the

"Status  of  Art  Restitution  Worldwide."  (Eizenstat  Testimony).

Mr. Eizenstat is a member of the Advisory Board at Christie's.

(Eizenstat  Testimony,  p.  11).    Mr.  Eizenstat  assured  the

Subcommittee that when there is a "possible restitution problem"

Christie's notifies the consignor:  "[I]f there is a possible

restitution problem with an object consigned to Christie's . . .

47

[Christie's] "encourage[s] consignors to address issues when they arise." (Eizenstat Testimony at 12). Similarly, Timothy Hunter, Christie's London-based director of old masters paintings, was recently quoted as saying that when a "problematic war provenance" emerges, "[W]e tell the vendor we can't sell the picture nor would any other reputable auction house." (Emphasis added) (See November 17, 2006 article entitled "Plunder under the Hammer," by Corrie Perkin, appearing in www.theaustralian.news.com).

93.    Based upon the statements of Christie's representatives, Christie's customarily notifies consignors -- such as the Foundation -- whenever a provenance problem arises, especially when it deals with Holocaust-era art. Therefore, upon information and belief, Christie's notified the Foundation of the findings in its Research Summary, including: (a) that Mendelssohn-Bartholdy owned the Painting in Nazi Germany, and was persecuted by the Nazis due to his Jewish background; (b) that Mendelssohn-Bartholdy owned the Painting well into the Nazi period; (c) that -- according to its published provenance -- Christie's believed that Paul von Mendelssohn-Bartholdy sold the Painting to art dealer Justin K. Thannhauser in Nazi Germany (see provenance published in Research Summary, p. 1, and by Christie's in its Sales Catalogue prepared for the auction); and (d) that Christie's researchers could not determine if Mendelssohn-Bartholdy sold the Painting to art dealer Justin K. Thannhauser due to "financial difficulties and/or as a result of racist/economic persecution by the Nazis."

94.   Yet, notwithstanding the foregoing, the Foundation and Christie's proceeded with their plans to sell the Painting at auction on November 8, 2006 without notifying the Mendelssohn-Bartholdy heirs or their counsel, and while intentionally concealing from potential purchasers the provenance problems and cloud on title.

**Christie's Director of Restitution Has Emphasized that the Discrete Information to Which Holocaust Victims Often Have Exclusive Access Makes It Imperative To Speak With Them Directly In Order to Address Holocaust Claims Responsibly**

95.   Christie's failure to contact Schoeps is even more egregious in light of past statements made by Christie's "Director of Restitution," Monica Dugot, concerning the importance of speaking with Holocaust claimants during any investigation.  Dugot is the former Deputy Director of the New York Holocaust Claims Processing Office, Banking Department, State of New York. In investigating Holocaust claims, Dugot emphasizes the need to communicate directly with Holocaust claimants, and has instructed that it is "**vital**" to pay close attention to what claimants "have to say" since they "**hold _the most critical pieces_ of the puzzle.**" (See Monica S. Dugot, "The Holocaust Claims Processing Office: New York State's Approach to Resolving Holocaust-Era Art Claims." (Emphasis and italics added).  Dugot has stressed that often the resolution of Holocaust-era claims "**turns on the quality and degree of a claimant's documentation and information.**"  (Id.) (Emphasis added).

96.   Notwithstanding Dugot's acknowledgement of the

importance of communicating with claimants because they "hold the
most critical pieces of the puzzle," Christie's never contacted
Schoeps about the sale of the Painting.

97.    The motivation for the Foundation and Christie's
fraudulent concealment is obvious. As Timothy Hunter, Christie's
London-based director of old master paintings, said about
paintings with a problematic war provenance: "In effect, the
picture is worthless." (See November 17, 2006 article by Corrie
Perkin entitled "Plunder under the Hammer," which appeared in
www.theaustralian.news.com). In other words, the Foundation and
Christie's concealed from prospective buyers the "problematic war
provenance" of the Painting in the hopes of obtaining the highest
sales price possible and transferring title problems to the
purchaser.

**By Trying to Sell the Painting in New York Without Advising
Potential Buyers that: (1) the Painting May Have Been Lost as a
Consequence of Nazi Persecution; (2) that Mendelssohn-Bartholdy's
Heirs May Have a Conflicting Ownership Claim to the Painting; and
(3) that Schoeps Had Filed a Lawsuit in New York to Recover the
Painting, the Foundation and Its Agent Christie's Attempted to
Defraud Prospective Buyers and Violated Both U.S. and New York
State Statutes Proscribing Deceptive Trade Practices and False
Advertising**

98.    The Foundation and its agent Christie's -- through
extensive advertising and sales brochures which they disseminated
internationally -- attempted to cultivate an international market
for the Painting. All the while, however, they affirmatively
concealed from prospective buyers the conclusions of their
investigative report that Paul von Mendelssohn-Bartholdy may have
lost the Painting as a proximate consequence of Nazi persecution.
Later, Christie's attempted to conceal from prospective buyers

that Schoeps had filed a lawsuit in New York to recover it. These affirmative concealments constituted attempts to defraud prospective buyers, and upon information and belief violated, inter alia, 15 U.S.C. ' 45(a)(1)(1914) (proscribing unfair or deceptive acts or practices in or affecting commerce); N.Y.Gen.Bus. Law ' 349 (1970) (proscribing deceptive acts or practices in the conduct of any business, trade or commerce); N.Y.Gen.Bus.Law ' 350-a (1963) and New York Penal ' 190.20 (1965) (proscribing false advertising). By concealing this information, the Foundation and Christie's also breached the repeated assurances that Christie's representatives consistently have made to the U.S. Congress, the public, and to Holocaust victims and their heirs that Christie's takes conscientious precautions against selling any artwork that may have been lost as a consequence of Nazi persecution, and contacts persons with a potential interest in any such artwork in order to resolve any ambiguities.

### Counsel for Christie's Attempted to Continue the Fraud on the Public after Schoeps Filed Suit in Federal Court

99. Schoeps originally filed suit in federal court for the restitution of the Painting. (See Julius Schoeps v. Andrew Lloyd Webber Art Foundation, 06-CV-12934 [JSR]). Even after this suit was filed -- and Schoeps had set out his case for why Mendelssohn-Bartholdy lost the Painting in a forced sale as a proximate consequence of Nazi persecution -- counsel for Christie's nonetheless persisted with its attempt to conceal from potential buyers that there was a dispute as to ownership of the

Painting, and that the heirs of a victim of Nazi persecution had
filed a lawsuit to reclaim it.

   a. In a November 6, 2006 letter to Hon. Jed S. Rakoff,
      U.S. District Judge, counsel for Christie's
      requested that all papers be filed under seal
      because "[a]ny public disclosure of this dispute
      would damage [Christie's and the Foundation]
      irreparably."

   b. At the hearing on the motion for preliminary
      injunction, Judge Rakoff referred to this letter
      and a telephone conference with counsel on November
      6, 2004, and specifically stated that he felt that
      **Christie's counsel was asking the court to
      participate in a fraud on the future purchaser of the
      Painting:**

      > [W]hen Christie's counsel called my chambers yesterday
      > [November 6, 2006] to ask if they could put in papers,
      > which of course I was delighted to have them do, they
      > made no mention of any request for a sealing order.
      > But in a letter that accompanied the papers, there was
      > a request for sealing.
      >
      > I convened a telephone conference with counsel, and the
      > ground given for sealing by Christie's counsel was to
      > the effect that if word leaked out there was this
      > lawsuit, or these allegations, it would hurt the price
      > of the sale of the painting.
      >
      > I view that as an extraordinary argument,
      > extraordinarily bizarre argument. What it is in effect
      > saying is that the purchaser of the painting should not
      > be made aware of the potential cloud on title. He
      > should be defrauded with the connivance of the Court.
      > I therefore ordered that the papers, which should have
      > been filed electronically already, be filed then
      > electronically, which they were. So, it's wonderful to
      > have such good lawyering. (Emphasis added).

(See p. 4-5 of November 7, 2006 Transcript of proceedings in
Julius Schoeps v. Andrew Lloyd Webber Art Foundation, 06-CV-12934
(JSR).

    100.    Indeed, counsel for Christie's admitted at the
November 7 hearing that there would be a cloud on title if it
could be proved that there was a coercive sale and that
Mendelssohn-Bartholdy was not paid the fair market value.
(Transcript, p. 26).

**The Foundation and Christie's Acted With the Intent to Injure
Schoeps and -- in Violation of both U.S. and New York Law and
Public Policies to the Contrary -- to Negate His Property Rights
in the Painting and His Legitimate Attempt to Recover It**

    101.    In violation of emphatic U.S. and New York law and
public policy to the contrary, the Foundation and Christie's
acted with intent to injure Schoeps personally and to negate his
good faith attempts to recover the Painting as well as his
legitimate ownership rights in it.

    102.    The Foundation and Christie's intended to harm Schoeps
by selling the Painting without contacting him.  Moreover, they
targeted the Painting for sale in remote, distant markets with
the specific intent of precluding Schoeps from ever recovering
it.   Christie's exhibited the Painting in China, Taiwan and
Russia in the months before the planned November 8 auction. (See
"Composer's Picasso to be shown in Russia", The Art Newspaper,
September 7, 2006).  Moreover, **Andrew Lloyd Webber himself** flew
to Russia to generate interest among potential Russian
purchasers.

    103.    Upon information and belief, the Foundation and

Christie's knew that a sale of the Painting into Russia or China would effectively extinguish the ability of the Mendelssohn-Bartholdy heirs to recover it.

### COUNT ONE
**(Restitution Arising under the Laws and Public Policies of Both New York State and the U.S. Government to Return to Rightful Owners Artworks Lost as a Proximate Consequence of Nazi Persecution)**

104. Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

105. At all times relevant to this proceeding, the law has prohibited persons from being unjustly enriched by receiving and holding property that lawfully belongs to another, and which in good conscience they cannot retain. At all times relevant to this proceeding, the law has required persons in possession of such property to restore it to the rightful owner to prevent their unjust enrichment, and has afforded the equitable remedy of restitution to accomplish this objective.

106. At all times relevant to this proceeding, applicable New York State and U.S. law and public policy have informed how equitable remedies are applied. At all times relevant to this proceeding, the law and public policy of both New York State and the U.S. Government have conferred upon Schoeps legal ownership of the Painting, a right to its immediate possession, and a legal possessory interest in the Painting that is superior to that of the Foundation. As the supreme law of the land, federal law and public policy are incumbent upon the State of New York, and New York courts must acknowledge federal law and public policy as

fully as the law and public policy of New York State.

107.    Schoeps is the lawful and rightful owner of the Painting and the Foundation acquired the Painting, and unjustly, wrongfully and unlawfully retains it, in violation of his superior possessory rights, as well as the laws and public policies of both New York State and the U.S. Government to restore such artworks to their rightful owners.

108.    The law requires the Foundation to restore the Painting to Schoeps immediately to avoid its unjust enrichment.

**COUNT TWO**
**(Constructive Trust Arising under the Laws and Public Policies of Both New York State and the U.S. Government to Return to Rightful Owners Artworks Lost as a Consequence of Nazi Persecution)**

109.    Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

110.    At all times relevant to this proceeding, the law has prohibited persons from holding property which in good conscience they ought not to enjoy, and has imposed a constructive trust upon such property for the benefit of the person who is properly entitled to its possession. The law provides the equitable remedy of constructive trust in such instances and whenever necessary to satisfy the demands of good conscience and justice.

111.    At all times relevant to this proceeding, applicable New York State and U.S. law and public policy have informed how equitable remedies are applied. At all times relevant to this proceeding, the relevant law and public policy of both New York State and the U.S. Government have conferred upon Schoeps legal

55

ownership of the Painting, a right to its immediate possession, and a legal possessory interest that is superior to that of the Foundation. As the supreme law of the land, federal law and public policy are incumbent upon the State of New York, and New York courts must acknowledge federal law and public policy as fully as the law and public policy of New York State.

112.    The Painting was confiscated as a consequence of Nazi persecution within the ambit of both New York State as well as U.S. law and public policy to return such artworks to rightful owners, and Schoeps is the rightful owner of the Painting. The Foundation holds the Painting against equity, good conscience, justice, as well as the public policy of both New York State and the U.S. Government.

113.    The law imposes a constructive trust upon the Painting and makes the Foundation an involuntary trustee of the Painting for the benefit of Schoeps.

### COUNT THREE
### (Request for Declaratory Relief)

114.    Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

115.    At all times relevant to this proceeding, the law has permitted any court of the State of New York, upon the filing of an appropriate pleading, to declare the rights and other legal relations of any interested party seeking such declaration, regardless whether further relief is or could be sought.

116.    Schoeps is the lawful and rightful owner of the Painting, and the Foundation is in inequitable possession of it.

An actual controversy exists as to this right.

117.    Schoeps seeks a declaratory judgment and order declaring him to be the lawful and rightful owner of the Painting.

### COUNT FOUR
### (Replevin)

118. Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

119. The Painting is unique.  When the above-entitled action was commenced, and at all times relevant hereto, Schoeps was and still is the legal owner, and has had a superior possessory right to, and is entitled to the immediate possession of, the Painting.

120.    The value of the Painting exceeds $60 million.

121.    The Painting is currently in the possession of the Foundation or its agent, Christie's auction house.  The Foundation has wrongfully detained and still detains the Painting in violation of Schoeps' ownership rights and superior legal possessory interest.

122. The Foundation's detention of the Painting is wrongful for the reasons alleged herein.

123. Before the above-titled action was commenced -- and on or about November 7, 2006 -- Schoeps, through his attorneys, duly demanded that the Foundation return the Painting.  But the Foundation -- through its' attorney -- refused, and continues to refuse, Schoeps' demand.

124. The Foundations' wrongful detention of the Painting has caused Schoeps to sustain damages in the amount of $60,000,000.

### COUNT FIVE
### (Conversion)

57

125.   Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

126. At all times relevant hereto, the law has prohibited any person from wrongfully detaining property that belongs to another or in which another person has a superior legal possessory interest.  When the possessor of such property refuses the demand of a person with a superior possessory interest in such property to return it, the law makes the wrongful possessor of such property liable to the other for conversion.

127. At all times relevant to the proceeding, and for the reasons stated herein, Schoeps has been the rightful owner of the Painting and has had a legal possessory interest in the Painting that is superior to the Foundation's.

128. Before Schoeps commenced this action -- and on or about November 7, 2006 -- Schoeps, through his attorneys, demanded that the Foundation return the Painting.  The Foundation, through its attorney, refused Schoeps' request.

129. The Foundation has wrongfully detained the Painting in violation of Schoeps' ownership rights and superior legal possessory interest, and has wrongfully refused to return it.  The Foundations wrongful conversion of the Painting has caused Schoeps to sustain damages in the amount of $60,000,000.

## COUNT SIX
### (Unclean Hands)

130. Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

58

131. At all times relevant hereto, the equitable maxim of of "clean hands" has prescribed that "whoever comes into equity must come with clean hands" and that "whoever has done inequity shall not have equity." This maxim requires that any party seeking equitable relief or asserting an equitable defense must show that their own conduct with respect to the subject matter of the action has been equitable, fair, honest and lawful. Courts apply the maxim of clean hands to protect both public policy as well as their own integrity.

132. At all times relevant hereto, and within the meaning of this maxim, the hands of a litigant are rendered unclean by any conduct that is "condemned and pronounced wrongful by honest and fair minded" persons, or is dishonest, fraudulent, inequitable, unconscionable, unlawful, unfair or in bad faith. Courts deny equitable relief under this maxim whenever the right upon which the petitioner relies emanates from a wrong, a breach of duty, or a violation of law or strong public policy.

133. At all times relevant hereto, 15 U.S.C.' 45(a)(1) (1914) has proscribed "deceptive acts or practices in or affecting commerce," and any material representation, omission or practice that is likely to mislead consumers acting reasonably under the circumstances. At all times relevant hereto, N.Y. Gen.Bus. Law ' 349 (1984) similarly has proscribed "(d)eceptive acts or practices in the conduct of any business, trade or commerce." At all times relevant hereto, N.Y.Gen. Bus. Law ' 350-a (1963) and N.Y. Penal. Law ' 190.20 (1965) additionally have proscribed false advertising, and have considered advertising to be false when it

fails to reveal material facts concerning the particular good or commodity offered for sale.

134. At all times relevant hereto, the equitable doctrine of "clean hands" has been informed and animated both by public policy and the public interest. At all times relevant hereto, the Court of Appeals of New York repeatedly has cautioned that public policy is thwarted when prospective buyers in the New York City art market neglect to take affirmative, conscientious precautions against acquiring Holocaust-era or other stolen artworks.

135. At all times relevant hereto, the governments of both the U.S. and New York have decreed -- in clarion and emphatic terms -- that the public policy and public interest of both the U.S. and New York mandate the restitution to rightful owners of artworks wrongfully taken as a proximate consequence of Nazi persecution, and encourage Holocaust victims and their heirs to develop and bring such claims.

136. At all times relevant hereto, the laws, the public policy and the public interest of both the U.S. and New York have been subverted when persons: (a) fail to take affirmative precautions against acquiring Holocaust-era and other stolen artworks on the New York City art market, and ignore "red flag" warnings in the stated provenance of artworks offered for sale that identify them as potentially problematic; (b) seek to conceal from Holocaust victims and their heirs artworks that they lawfully are entitled to recover; (c) attempt to frustrate the efforts of Holocaust victims and their heirs to recover artworks to which they lawfully are entitled; (d) seek to cultivate -- in New York -

- an international market for the sale of Holocaust artworks; (e) intentionally seek to sell Holocaust artworks in remote and distant jurisdictions where Holocaust victims and their heirs will have no chance of recovering their property; (f) seek to conceal from prospective buyers and the public that Holocaust victims or their heirs have made a claim to recover a particular artwork offered for sale, and -- moreover -- that such claim is supported by substantial evidence that their own investigation has revealed; and (g) misrepresent -- as sellers of artworks -- to the U.S. Congress, Holocaust victims and their heirs, and the general public that they take affirmative and conscientious precautions against selling any artwork that may have been lost as a consequence of Nazi persecution, while concealing information that the artwork likely was lost as a consequence of Nazi persecution.

137. In violation of the clean hands maxim and the law and public policy both of the U.S and New York State that inform its meaning in this discrete context, and in harm to Schoeps, the Foundation, both in its individual capacity and through the activities of its agent Christie's:

a) disregarded the repeated advice of the New York Court of Appeals to take precautions against acquiring stolen art when the Foundation bought the Painting at Sotheby's in New York in 1995, and ignored the provenance of the Painting that Sotheby's published that identified Mendelssohn-Bartholdy as a former owner of the Painting in Germany;

b) attempted to sell the Painting without contacting Schoeps after Christie's own internal investigation had revealed that

Schoep's ancestor Mendelssohn-Bartholdy may have lost the Painting in a forced sale in Berlin, Germany as a result of Nazi persecution;

c) attempted to cultivate in New York an international market for the sale of a Holocaust-era artwork, while knowing that the Painting may well have been lost as a proximate consequence of Nazi persecution and rightfully belonged to Schoeps;

d) attempted to frustrate any legitimate opportunity Schoeps may have had to reclaim the Painting by declining to contact him before selling it, and by trying to sell the Painting in Russia or China where Schoeps could never recover it;

e) sought to conceal from the public and prospective buyers at auction that Schoeps had filed a lawsuit to reclaim the Painting; that the Painting likely was lost as a proximate consequence of Nazi persecution; and that Christie's own internal investigation had revealed substantial evidence to support Schoeps' claim and found no evidence to refute it; and

f) required Schoeps to file a lawsuit to protect his interest in the Painting.

138. For these reasons and for the other reasons set forth in the preceding averments of this Complaint, the "clean hands" maxim and the equitable doctrine of "Unclean Hands" preclude the Foundation from asserting any otherwise potentially available equitable defense to this action, including -- in particular -- the equitable defense of laches.

### PRAYER FOR RELIEF

Wherefore, Schoeps seeks:

a) an order declaring him to be the lawful and rightful owner of the Painting in accordance with applicable New York law, and U.S. law declaring the Foundation's possession of the Painting to be inequitable, and resulting in unjust enrichment to the Foundation;

b) an order requiring the Foundation to make restitution of the Painting to Schoeps in accordance with applicable New York and U.S. law;

c) an order imposing a constructive trust upon the Painting for the benefit of Schoeps in accordance with applicable New York and U.S. law, and requiring the Foundation to return the Painting to Schoeps;

d) an order adjudging that Schoeps is the owner and entitled to the immediate possession of the Painting, and that the Painting be delivered to Schoeps, and in case possession thereof cannot be given to Schoeps, that Schoeps have judgment against the Foundation for the sum of no less than $60 million with interest thereon;

e) an award of Schoeps' costs, expenses and interest, and;

f) such further and other relief as the Court may deem appropriate and just.

Dated:  New York, New York
        May 2, 2007

                BYRNE GOLDENBERG & HAMILTON, PLLC

By: _____
        John J. Byrne, Jr.
        1025 Connecticut Avenue, N.W.
        Suite 1012
        Washington, D.C. 20036
        (202) 857-9775

        BRESSLER, AMERY & ROSS, P.C.
        17 State Street
        New York, NY 10004
        (212) 425-9300

     Attorneys for Plaintiff Julius H. Schoeps