BYRNE GOLDENBERG & HAMILTON, PLLC
John J. Byrne, Jr. (JB: 6687)
Thomas J. Hamilton
Lloyd Goldenberg
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9799

BRESSLER AMERY & ROSS, P.C.
David H. Pikus
17 State Street
New York, New York 10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

Attorneys for Defendant Julius H. Schoeps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MUSEUM OF MODERN ART, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JULIUS H. SCHOEPS, <br><br> Defendant. | 07 Civ. 11074 (JSR) <br><br> **REPLY DECLARATION OF JOHN J. BYRNE, JR. IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR DECLARATORY RELIEF** |

JOHN J. BYRNE, JR., under penalty of perjury, declares:

1. I am a member of the firm of Byrne Goldenberg & Hamilton, PLLC, attorneys for

defendant Julius H. Schoeps (Dr. Schoeps) in this action. I am a member in good standing of the bar of the State of New York and the bar of the United States District Court for the Southern District of New York. I submit this Declaration in support of Dr. Schoeps' Motion to Dismiss the Complaint for Declaratory Relief. I hereby declare that all of the statements contained in this Declaration are made and based upon personal knowledge and belief, or upon having confirmed the authenticity of the exhibit annexed to this Declaration.

2. Dr. Schoeps has no intent to initiate any legal proceedings in his individual or personal capacity to recover either Pablo Picasso's *Boy Leading a Horse*, which is at the Museum of Modern Art (MoMA) or Picasso's *Le Moulin de la Galette*, which is at the Solomon R. Guggenheim Museum (Guggenheim). Indeed, Dr. Schoeps has held this position since November 19, 2007, when the case of Schoeps v. The Andrew Lloyd Webber Art Foundation, Slip Op. 52183(U), 2007 WL 4098215 (N.Y. Sup., November 17, 2007) (Schoeps v. Webber) was dismissed based on Dr. Schoeps' lack of standing in his personal capacity to litigate ownership rights to the artwork at issue in that case, Pablo Picasso's *Portrait of Angel Fernandez de Soto*. Dr. Schoeps does not intend to change his position unless: (a) his pending motion for leave to reargue in Schoeps v. Webber is granted and the decision is reversed; (b) the Schoeps v. Webber decision is reversed on appeal; or (c) this Court rules that Schoeps does have standing and the legal capacity to bring suit in his individual or personal capacity for the return of *Boy Leading a Horse* and *Le Moulin de la Galette* (Paintings).

3. Dr. Schoeps believes that, under the Schoeps v. Webber decision, the Surrogate's Court must appoint a personal representative for the estate of Paul von Mendelssohn-Bartholdy

2

(Mendelssohn-Bartholdy) before any action can be commenced to recover the Paintings. The Mendelssohn-Bartholdy heirs, through their attorneys, will seek to have the Surrogate's Court appoint such a personal representative for the Mendelssohn-Bartholdy estate.

4. Upon information and belief, both the Guggenheim and MoMA are members of the American Association of Museums (AAM). I attach as Exhibit 1 a copy of the AAM "Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era" which I retrieved from the website of the AAM (http://www.aam-us.org/museumresources/ethics/nazi-guidelines.cfm) on February 29, 2008. I submit the guidelines for several reasons. First, I want to explain the expectation of the Mendelssohn-Bartholdy heirs that some meaningful dialogue would occur between their representatives and the Museums before the Museums commenced legal action. Second, I want to place in the proper context the Museums' dismissive statements regarding settlement discussions at pages 14-15 of their "Memorandum of Law in Opposition to Defendant Julius H. Schoeps' Motion to Dismiss the Complaint for Declaratory Relief," that they never intended to commence a dialogue or settlement discussions with the heirs, and their filing of this lawsuit when they refused the heirs' demand for the return of the Paintings.

5. The AAM guidelines provide that "Museums should work to produce information that will help to clarify the status of objects with an uncertain Nazi-era provenance. **Where competing interests may arise, museums should strive to foster a climate of cooperation, reconciliation, and commonality of purpose**." (Guidelines, p. 3) (Emphasis and underlining added). Moreover, when a claim of ownership is made, "It is the position of AAM that **museums should address claims of ownership asserted in connection with objects in their**

3

involved." (Guideline, p. 6) (Emphasis and underlining added). The guidelines further provide that: "When appropriate and reasonably practical, **museums should seek methods other than litigation (such as mediation) to resolve claims that an object was unlawfully appropriated during the Nazi era without subsequent restitution**." (Guidelines, p. 6) (Emphasis and underlining added). .

I declare under penalty of perjury that the foregoing is true and correct.

February 29, 2008.

_____
John J. Byrne, Jr.

**Exhibit 1**

HOME | ABOUT AAM | ABOUT MUSEUMS | MUSEUM RESOURCES | GET INVOLVED | PUBLICATIONS | MEMBERSHIP | CONTACT US

> Museum Resources > Museum Ethics
Login or Sign Up.

contents

Accreditation

Collections Exchange

ICOM-US

Information Center

Museum Assessment Program

Special Projects and Initiatives

# Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era

*Approved, November 1999, Amended, April 2001, AAM Board of Directors*

## Introduction

From the time it came into power in 1933 through the end of World War II in 1945, the Nazi regime orchestrated a system of theft, confiscation, coercive transfer, looting, pillage, and destruction of objects of art and other cultural property in Europe on a massive and unprecedented scale. Millions of such objects were unlawfully and often forcibly taken from their rightful owners, who included private citizens, victims of the Holocaust, public and private museums and galleries, and religious, educational and other institutions.

In recent years, public awareness of the extent and significance of Nazi looting of cultural property has grown significantly. The American museum community, the American Association of Museums (AAM), and the U.S. National Committee of the International Council of Museums (AAM/ICOM) are committed to continually identifying and implementing the highest standard of legal and ethical practices. AAM recognizes that the atrocities of the Nazi era demand that it specifically address this topic in an effort to guide American museums as they strive to achieve excellence in ethical museum practice.

The AAM Board of Directors and the AAM/ICOM Board formed a joint working group in January 1999 to study issues of cultural property and to make recommendations to the boards for action. The report that resulted from the initial meeting of the Joint Working Group on Cultural Property included the recommendation that AAM and AAM/ICOM offer guidance to assist museums in addressing the problems of objects that were unlawfully appropriated during the Nazi era without subsequent restitution (i.e., return of the object or payment of compensation to the object's original owner or legal successor).

The efforts of the Working Group were greatly informed by the important work on the topic that had gone before. In particular, three documents served as a starting point for the AAM guidelines, and portions of them have been incorporated into this document. These include: *Report of the AAMD Task Force on the Spoliation of Art during the Nazi/World War II Era (1933-1945); ICOM Recommendations Concerning the Return of Works of Art Belonging to Jewish Owners;* and *Washington Conference Principles on Nazi-Appropriated Art* (released in connection with the Washington

Case 1:07-cv-11074-JSR Document 20 Filed 02/03/2008

Conference on Holocaust-Era Assets co-hosted by the U.S. Department of State and the United States Holocaust Memorial Museum).

The Presidential Advisory Commission on Holocaust Assets in the United States (PCHA) was created in June 1998 to study and report to the President on issues relating to Holocaust victims' assets in the United States. AAM and the Association of Art Museum Directors (AAMD) worked with the PCHA to establish a standard for disclosure of collections information to aid in the identification and discovery of unlawfully appropriated objects that may be in the custody of museums. In January 2001, the PCHA issued its final report, which incorporated the agreed standard for disclosure and recommended the creation of a searchable central registry of the information museums disclose in accordance with the new standard. AAM and AAMD agreed to support this recommendation, and these guidelines have been amended to reflect the agreed standard for disclosure of information.

Finally, AAM and AAM/ICOM acknowledge the tremendous efforts that were made by the Allied forces and governments following World War II to return objects to their countries of origin and to original owners. Much of the cultural property that was unlawfully appropriated was recovered and returned, or owners received compensation. AAM and AAM/ICOM take pride in the fact that members of the American museum community are widely recognized to have been instrumental in the success of the post-war restitution effort. Today, the responsibility of the museum community is to strive to identify any material for which restitution was never made.

## General Principles

AAM, AAM/ICOM, and the American museum community are committed to continually identifying and achieving the highest standard of legal and ethical collections stewardship practices. The AAM Code of Ethics for Museums states that the "stewardship of collections entails the highest public trust and carries with it the presumption of rightful ownership, permanence, care, documentation, accessibility, and responsible disposal."

When faced with the possibility that an object in a museum's custody might have been unlawfully appropriated as part of the abhorrent practices of the Nazi regime, the museum's responsibility to practice ethical stewardship is paramount. Museums should develop and implement policies and practices that address this issue in accordance with these guidelines.

These guidelines are intended to assist museums in addressing issues relating to objects that may have been unlawfully appropriated during the Nazi era (1933-1945) as a result of actions in furtherance of the Holocaust or that were taken by the Nazis or their collaborators. For the purposes of these guidelines, objects that were acquired through theft, confiscation, coercive transfer, or other methods of wrongful expropriation may be considered to have been unlawfully appropriated, depending on the specific circumstances.

In order to aid in the identification and discovery of unlawfully appropriated objects that may be in the custody of museums, the PCHA, AAMD, and AAM have agreed that museums should strive to: (1) identify all objects in their collections that were created before 1946 and acquired by the museum after 1932, that underwent a change of ownership between 1932 and 1946, and that were or might reasonably be thought to have been in continental Europe between those dates (hereafter, "covered objects"); (2) make currently available object and provenance (history of ownership) information on

those objects accessible; and (3) give priority to continuing provenance research as resources allow. AAM, AAMD, and PCHA also agreed that the initial focus of research should be European paintings and Judaica.

Because of the Internet's global accessibility, museums are encouraged to expand online access to collection information that could aid in the discovery of objects unlawfully appropriated during the Nazi era without subsequent restitution.

AAM and AAM/ICOM acknowledge that during World War II and the years following the end of the war, much of the information needed to establish provenance and prove ownership was dispersed or lost. In determining whether an object may have been unlawfully appropriated without restitution, reasonable consideration should be given to gaps or ambiguities in provenance in light of the passage of time and the circumstances of the Holocaust era. AAM and AAM/ICOM support efforts to make archives and other resources more accessible and to establish databases that help track and organize information.

AAM urges museums to handle questions of provenance on a case-by-case basis in light of the complexity of this problem. Museums should work to produce information that will help to clarify the status of objects with an uncertain Nazi-era provenance. Where competing interests may arise, museums should strive to foster a climate of cooperation, reconciliation, and commonality of purpose.

AAM affirms that museums act in the public interest when acquiring, exhibiting, and studying objects. These guidelines are intended to facilitate the desire and ability of museums to act ethically and lawfully as stewards of the objects in their care, and should not be interpreted to place an undue burden on the ability of museums to achieve their missions.

**Guidelines**

### 1. Acquisitions

It is the position of AAM that museums should take all reasonable steps to resolve the Nazi-era provenance status of objects before acquiring them for their collections whether by purchase, gift, bequest, or exchange.

a) Standard research on objects being considered for acquisition should include a request that the sellers, donors, or estate executors offering an object provide as much provenance information as they have available, with particular regard to the Nazi era.

b) Where the Nazi-era provenance is incomplete or uncertain for a proposed acquisition, the museum should consider what additional research would be prudent or necessary to resolve the Nazi-era provenance status of the object before acquiring it. Such research may involve consulting appropriate sources of information, including available records and outside databases that track information concerning unlawfully appropriated objects.

c) In the absence of evidence of unlawful appropriation without subsequent restitution, the museum may proceed with the acquisition. Currently available object and provenance information about any covered object should be made public as soon as practicable after the acquisition.

d) If credible evidence of unlawful appropriation without subsequent

restitution is discovered, the museum should notify the donor, seller, or estate executor of the nature of the evidence and should not proceed with acquisition of the object until taking further action to resolve these issues. Depending on the circumstances of the particular case, prudent or necessary actions may include consulting with qualified legal counsel and notifying other interested parties of the museum's findings.

e) AAM acknowledges that under certain circumstances acquisition of objects with uncertain provenance may reveal further information about the object and may facilitate the possible resolution of its status. In such circumstances, the museum may choose to proceed with the acquisition after determining that it would be lawful, appropriate, and prudent and provided that currently available object and provenance information is made public as soon as practicable after the acquisition.

f) Museums should document their research into the Nazi-era provenance of acquisitions.

g) Consistent with current practice in the museum field, museums should publish, display, or otherwise make accessible recent gifts, bequests, and purchases, thereby making all acquisitions available for further research, examination, and public review and accountability.

## 2. Loans

It is the position of AAM that in their role as temporary custodians of objects on loan, museums should be aware of their ethical responsibility to consider the status of material they borrow as well as the possibility of claims being brought against a loaned object in their custody.

a) Standard research on objects being considered for incoming loan should include a request that lenders provide as much provenance information as they have available, with particular regard to the Nazi era.

b) Where the Nazi-era provenance is incomplete or uncertain for a proposed loan, the museum should consider what additional research would be prudent or necessary to resolve the Nazi-era provenance status of the object before borrowing it.

c) In the absence of evidence of unlawful appropriation without subsequent restitution, the museum may proceed with the loan.

d) If credible evidence of unlawful appropriation without subsequent restitution is discovered, the museum should notify the lender of the nature of the evidence and should not proceed with the loan until taking further action to clarify these issues. Depending on the circumstances of the particular case, prudent or necessary actions may include consulting with qualified legal counsel and notifying other interested parties of the museum's findings.

e) AAM acknowledges that in certain circumstances public exhibition of objects with uncertain provenance may reveal further information about the object and may facilitate the resolution of its status. In such circumstances, the museum may choose to proceed with the loan after determining that it would be lawful and prudent and provided that the available provenance about the object is made public.

f) Museums should document their research into the Nazi-era

provenance of loans.

### 3. Existing Collections

It is the position of AAM that museums should make serious efforts to allocate time and funding to conduct research on covered objects in their collections whose provenance is incomplete or uncertain. Recognizing that resources available for the often lengthy and arduous process of provenance research are limited, museums should establish priorities, taking into consideration available resources and the nature of their collections.

*Research*

a) Museums should identify covered objects in their collections and make public currently available object and provenance information.

b) Museums should review the covered objects in their collections to identify those whose characteristics or provenance suggest that research be conducted to determine whether they may have been unlawfully appropriated during the Nazi era without subsequent restitution.

c) In undertaking provenance research, museums should search their own records thoroughly and, when necessary, contact established archives, databases, art dealers, auction houses, donors, scholars, and researchers who may be able to provide Nazi-era provenance information.

d) Museums should incorporate Nazi-era provenance research into their standard research on collections.

e) When seeking funds for applicable exhibition or public programs research, museums are encouraged to incorporate Nazi-era provenance research into their proposals. Depending on their particular circumstances, museums are also encouraged to pursue special funding to undertake Nazi-era provenance research.

f) Museums should document their research into the Nazi-era provenance of objects in their collections.

*Discovery of Evidence of Unlawfully Appropriated Objects*

g) If credible evidence of unlawful appropriation without subsequent restitution is discovered through research, the museum should take prudent and necessary steps to resolve the status of the object, in consultation with qualified legal counsel. Such steps should include making such information public and, if possible, notifying potential claimants.

h) In the event that conclusive evidence of unlawful appropriation without subsequent restitution is found but no valid claim of ownership is made, the museum should take prudent and necessary steps to address the situation, in consultation with qualified legal counsel. These steps may include retaining the object in the collection or otherwise disposing of it.

i) AAM acknowledges that retaining an unclaimed object that may have been unlawfully appropriated without subsequent restitution allows a museum to continue to care for, research, and exhibit the object for the benefit of the widest possible audience and provides the opportunity to inform the public about the object's history. If the

museum retains such an object in its collection, it should acknowledge the object's history on labels and publications.

### 4. Claims of Ownership

It is the position of AAM that museums should address claims of ownership asserted in connection with objects in their custody openly, seriously, responsively, and with respect for the dignity of all parties involved. Each claim should be considered on its own merits.

a) Museums should review promptly and thoroughly a claim that an object in its collection was unlawfully appropriated during the Nazi era without subsequent restitution.

b) In addition to conducting their own research, museums should request evidence of ownership from the claimant in order to assist in determining the provenance of the object.

c) If a museum determines that an object in its collection was unlawfully appropriated during the Nazi era without subsequent restitution, the museum should seek to resolve the matter with the claimant in an equitable, appropriate, and mutually agreeable manner.

d) If a museum receives a claim that a borrowed object in its custody was unlawfully appropriated without subsequent restitution, it should promptly notify the lender and should comply with its legal obligations as temporary custodian of the object in consultation with qualified legal counsel.

e) When appropriate and reasonably practical, museums should seek methods other than litigation (such as mediation) to resolve claims that an object was unlawfully appropriated during the Nazi era without subsequent restitution.

f) AAM acknowledges that in order to achieve an equitable and appropriate resolution of claims, museums may elect to waive certain available defenses.

### 5. Fiduciary Obligations

Museums affirm that they hold their collections in the public trust when undertaking the activities listed above. Their stewardship duties and their responsibilities to the public they serve require that any decision to acquire, borrow, or dispose of objects be taken only after the completion of appropriate steps and careful consideration.

a) Toward this end, museums should develop policies and practices to address the issues discussed in these guidelines.

b) Museums should be prepared to respond appropriately and promptly to public and media inquiries.

### Commitment of AAM

As part of its commitment to identifying and disseminating best practices, AAM will allocate resources:

a) to disseminate these guidelines widely and frequently along with references to other guidelines, principles, and statements that exist on the topic

b) to track the activity and purpose of the relevant databases and other resources and to compile bibliographies for dissemination to the United States museum community

c) to collect examples of best practices and policies on Nazi-era provenance research and claims resolution from the museum field, both in the United States and abroad, as guidelines for other museums

d) to make the above information available to the museum community through reports, conference sessions, and other appropriate mechanisms

e) to assist in the development of recommended procedures for object and provenance information disclosure

f) to provide electronic links from AAM's Web site to other resources for provenance research and investigate the feasibility of developing an Internet tool to allow researchers easier access to object and provenance information about covered objects in museum collections.

g) to encourage funding of Nazi-era provenance research.

*Copyright © November 1999, amended April 2001, American Association of Museums, 1575 Eye Street, N.W., Suite 400, Washington, DC 20005. All rights reserved.*

Copyright and Disclaimer Notice | Privacy Policy | Sitemap
1575 Eye Street NW Suite 400, Washington DC 20005 | (202) 289-1818