UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MUSEUM OF MODERN ART, and THE SOLOMON R. GUGGENHEIM FOUNDATION,<br><br>Plaintiffs,<br><br>-v-<br><br>JULIUS H. SCHOEPS,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

07 Civ. 11074 (JSR)

**JURY TRIAL DEMANDED**

## ANSWER AND COUNTERCLAIM

Now comes the defendant Julius H. Schoeps (Schoeps), by his attorneys, BYRNE GOLDENBERG & HAMILTON, PLLC, for his Answer to plaintiffs the Museum of Modern Art (MoMA) and the Solomon R. Guggenheim Foundation (Guggenheim), and herein answers the allegations of the Complaint for Declaratory Relief (Complaint) as follows:

1. Defendant admits that this action concerns two iconic paintings by Pablo Picasso, *Boy Leading a Horse* (1906) and *Le Moulin de la Galette* (1900) (together the "Paintings"). Defendant further admits that William S. Paley (Paley) was the son of a Ukrainian Jewish immigrant, an important collector of modern art, a successful businessman and President and then Chairman of MoMA. Defendant further admits that Justin K. Thannhauser (Thannhauser) was an art dealer in Berlin at one time. Defendant further admits that Paley purported to make a gift to MoMA of *Boy Leading a Horse*, but denies that proper title to that painting was ever transferred, since Paul von Mendelssohn-Bartholdy lost that painting in Nazi Germany as a direct result of Nazi persecution and that title therefore remained with him and his heirs. Defendant admits that Thannhauser

purported to make a gift to the Guggenheim of *Le Moulin de la Galette*, but denies that proper title to that painting was ever transferred, since Paul von Mendelssohn-Bartholdy lost that painting in Nazi Germany as a direct result of Nazi persecution and that title therefore remained with him and his heirs.

Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of whether Thannhauser was forced to flee Germany in 1937.

2. Defendant admits that the Paintings had at one time been part of the private collection of Paul Robert Ernst von Mendelssohn-Bartholdy (1875-1935) (Mendelssohn-Bartholdy), who was at one time a prominent and affluent German banker and art collector, patriarch of one branch of an extraordinarily distinguished German family of Jewish descent, and a manager of Mendelssohn & Co. bank, and owner of the ancestral estate outside of Berlin, known as Schloss Boernicke (Boernicke), but alleges that Boernicke was also known by other names. Defendant admits that Mendelssohn-Bartholdy died of a heart attack in Berlin in May 1935, and that he had no children.

Defendant denies the remaining allegations contained in paragraph 2 of the Complaint.

3. Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 of the Complaint that the Paintings were likely sent to Switzerland for sale or exhibition as early as March 1933.

Defendant admits that the Paintings were exhibited in Buenos Aires in October 1934. Defendant admits that some time between July 1934 and his death, Mendelssohn-Bartholdy began efforts to sell the Paintings due to Nazi persecution through Thannhauser, but defendant alleges that Thannhauser paid nothing -- or very little -- for the Paintings. Defendant further admits that in August 1936, Thannhauser and Skira purportedly sold *Boy Leading a Horse* to Paley in Switzerland, but is without knowledge or information sufficient to form a belief as to whether this

purported sale was through Siegfried Rosengart (Rosengart). Defendant admits that Thannhauser brought *Le Moulin de la Galette* to the United States when he emigrated in 1940 as part of his purported "personal collection."

4.    Defendant admits that his grandmother was one of Mendelssohn-Bartholdy's five siblings, but denies the remaining allegations contained in paragraph 4 of the Complaint.

5.    Defendant admits that the Museums denied the demand for the return of the Paintings on December 7, 2007.  Defendant denies that he alone made the demand for the return of the Paintings, and further denies that the sole issue raised is whether the sale of the Paintings to Galerie Thannhauser by August 1935 was a forced sale, and therefore denies the remaining allegations in paragraph 5.

6.    Schoeps' denies that this claim is "very similar" to the claim he brought against the Andrew Lloyd Webber Art Foundation.   Schoeps admits the remainder of the allegations in paragraph 6 of the Complaint, except that Schoeps also alleges as an alternative theory of recovery that Thannhauser never paid for the Paintings and stole them.

7.    Defendant denies each and every allegation contained in paragraph 7 of the Complaint.

8.    Defendant admits that MoMA and the Guggenheim are prepared to have all factual and legal issues surrounding Schoeps' claims to the Paintings resolved by this Court, but denies that the Museums are entitled to any of the declarations they seek.

9.    Defendant admits the allegations contained in paragraph 9 of the Complaint.

10.    Defendant admits the allegations contained in paragraph 10 of the Complaint.

11.    Defendant denies each and every allegation contained in paragraph 11 of the Complaint.

12.    Defendant admits that this Court has personal jurisdiction over him in this matter, but

denies that a basis is that he had earlier filed suit in New York to recover another painting.

13. Defendant admits that Plaintiffs are two prominent museums in New York City, and that they both are not-for-profit New York education corporations holding their assets (including the Paintings) for the public trust. Defendant denies that Plaintiffs are legally obligated to maintain and protect those assets for the benefit of the public when such Paintings are found to be lost due to Nazi persecution.

14. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Compliant.

15. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Compliant.

16. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Compliant.

17. Defendant admits that *Le Moulin de la Galette* is on the cover of the Guggenheim's 2001 catalogue for the Thannhauser Collection, and that the catalogue noted von Mendelssohn-Bartholdy's prior ownership. Defendant also admits that a 1978 catalogue includes a color reproduction of *Le Moulin de la Galette* and notes Mendelssohn-Bartholdy's prior ownership. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 17 of the Compliant.

18. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Compliant.

19. Defendant admits the allegations contained in paragraph 19 of the Compliant.

20. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Compliant.

21.   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Compliant.

22.   Defendant denies that Mendelssohn-Bartholdy exhibited his entire art collection at Alsenstrasse 3/3a and Schloss Boernicke, but admits the remaining allegations contained in paragraph 22 of the Complaint.

23.   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Compliant.

24.   Defendant admits that Mendelssohn-Bartholdy purchased *Le Moulin de la Galette* in or around 1910 from Thannhauser.  Defendant admits that Thannhauser owned Galerie Thannhauser, a renowned art gallery, founded in the early years of the twentieth century in Munich by Thannhauser's father, and that the Galerie expanded to include a branch in Berlin, which Thannhauser ran.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 24 of the Compliant.

25.   Defendant admits that Mendelssohn-Bartholdy sent works from his collection for exhibition and sale in Buenos Aires in October 1934.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 25 of the Compliant.

26.   Defendant denies each and every allegation contained in paragraph 26 of the Complaint.

27.   Defendant admits that Mendelssohn-Bartholdy married his second wife, Elsa, on or about September 22, 1927, and that at the time of her death in 1986 she resided in Ascona, Switzerland.  Defendant denies each and every remaining allegation contained in paragraph 27 of the Complaint.

28.  Defendant admits that Adolf Hitler became Chancellor of Germany in January 1933, but denies each and every remaining allegation contained in paragraph 28 of the Complaint.

29.  Defendant denies each and every allegation contained in paragraph 29 of the Complaint.

30.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 of the Compliant.

31.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Compliant.

32.  Defendant admits that in October 1934, the Paintings were included in a Picasso exhibit at Galeria Mueller in Buenos Aires, which was organized in collaboration with Thannhauser. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 32 of the Compliant.

33.  Defendant admits that by August 31, 1935, the five Picassos, including the Paintings, had been sold or transferred to Thannhauser, except that defendant asserts as an alternative theory of recovery that Thannhauser stole the Paintings by August 31, 1935 without making any payment for them.  Defendant further admits that the five Picassos were listed in a register entry of Galerie Thannhauser under numbers 1649 to 1653 with an indication that they came from the collection of von Mendelssohn-Bartholdy.  Defendant further admits that the actual specific date of the sale or theft, and the amount paid for the Paintings, if any, is unknown, except that Schoeps alleges that if Thannhauser made any payment for the Paintings it was not a fair purchase price.  Defendant denies the remainder of the allegations contained in paragraph 33 of the Complaint.

34.  Defendant admits that on the evening of May 10, 1935, Mendelssohn-Bartholdy died, and was survived by his second wife Elsa and his four sisters.  Defendant further admits that

Mendelssohn-Bartholdy's younger brother Alexander passed away in 1917. Defendant further admits that in February 1935, Mendelssohn-Bartholdy estimated that his assets were RM 1,700,000, but is without knowledge or information sufficient to form a belief as to the truth of the allegations as to how he arrived at this figure. Defendant further admits that Mendelssohn-Bartholdy lived at Gartenhaus Schloss and Schloss Boernicke at the time of his death. Defendant denies that Mendelssohn-Bartholdy lived at Alsenstrasse 3/3a at the time of his death, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 34 of the Complaint.

35.    Defendant denies each and every allegation contained in paragraph 35 of the Complaint.

36.    Defendant admits that Mendelssohn-Bartholdy's funeral was held five days after his death, on May 15, 1935. Defendant denies each and every remaining allegation contained in paragraph 36 of the Complaint.

37.    Defendant admits that a German court approved a Certificate of Inheritance in December 1935, and Mendelssohn-Bartholdy's estate was finally resolved in January 1939, when Elsa inherited RM 847,201.91. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 37 of the Complaint.

38.    Defendant denies that Elsa lived at Alsenstrasse 3/3a after Mendelssohn-Bartholdy's death. Defendant admits the remaining allegations contained in paragraph 38 of the Complaint.

39.    Defendant admits that Mendelssohn-Bartholdy continued as a director of Mendelssohn & Co. until his death in 1935. Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 39 of the Complaint.

7

40.   Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the Complaint.

41.   Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 41 of the Complaint.

42.   Defendant denies each and every allegation contained in paragraph 42 of the Complaint.

43.   Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 43 of the Complaint.

44.   Defendant alleges that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 44 of the Complaint.

45.   Defendant admits the allegations contained in paragraph 45 of the Complaint, because until 2005 no heir of Mendelssohn-Bartholdy knew, or reasonably should have known, of the loss of the Paintings in Nazi Germany due to Nazi persecution.

46.   Defendant admits the allegations contained in paragraph 46 of the Complaint.

47.   Defendant admits that his counsel was given access to some provenance files at the Museums, but denies that access was given to much provenance information included in the Museums' Complaint.

48.   Defendant admits the allegations contained in paragraph 48 of the Complaint.

49.   Defendant admits that his counsel was given access to some provenance files at the Museums, but denies that his counsel "requested" an extension of time to provide a written presentation to the Museums.

50.   Defendant admits that the letters were sent to the Museums on November 1, 2007 demanding the return of the Paintings to the heirs of Mendelssohn-Bartholdy, but denies the

remaining allegations contained in paragraph 50 of the Complaint.

51.  Schoeps denies that he made any independent claims to the Paintings on his own behalf.  Schoeps admits that the Mendelssohn-Bartholdy heirs made the claims to the Paintings as set forth in paragraph 51 of the Complaint.

52.  Schoeps denies each and every allegation contained in paragraph 52 of the Complaint.

53.  Schoeps admits the allegations contained in paragraph 53 of the Complaint.

54.  Schoeps denies each and every allegation contained in paragraph 54 of the Complaint.

55.  Schoeps denies each and every allegation contained in paragraph 55 of the Complaint.

56.  Schoeps denies each and every allegation contained in paragraph 56 of the Complaint.

57.  Schoeps admits the allegation contained in paragraph 57 of the Complaint, and also maintains an alternative theory that Thannhauser stole the Paintings.

58.  Schoeps denies each and every allegation contained in paragraph 58 of the Complaint, except Schoeps admits that no claims to the Paintings were made before 2005 because no heir knew until 2005 of Mendelssohn-Bartholdy's loss of the Paintings in Nazi Germany due to Nazi persecution.

59.  Schoeps denies each and every allegation contained in paragraph 59 of the Complaint, but admits that some relatives of Mendelssohn-Bartholdy did make some restitution claims.

60.  Schoeps admits that there is no evidence of any steps taken by him or any members of his family to recover the Paintings until 2005, when he discovered information on the Nazi-Era Provenance Internet Portal (NEPIP) and on MoMA's website that Mendelssohn-Bartholdy relinquished Pablo Picasso's *Boy Leading a Horse* to Thannhauser in Nazi Germany.  Schoeps denies the remaining allegations contained in paragraph 60 of the Complaint.

61.  Schoeps admits that in 1992 *Boy Leading a Horse* appeared on the cover of the

9

catalogue for the Paley Collection exhibition, and admits that Guggenheim publications identified Mendelssohn-Bartholdy as a prior owner of *Le Moulin de la Galette* as early as 1978. Schoeps is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 61 of the Complaint.

62. Schoeps denies that Plaintiffs' ability to defend against claims for restitution of the Paintings are impaired by the passage of time. Schoeps is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 62 of the Complaint.

63. Schoeps admits that a purported sale of *Boy Leading a Horse* to Paley occurred in Switzerland. Schoeps denies the remaining allegations contained in paragraph 63 of the Complaint.

64. Schoeps denies that the purported legal principles identified in paragraph 64 of the Complaint apply in this matter, and therefore Schoeps denies each and every allegation contained in paragraph 64 of the Complaint.

65. Schoeps denies that the purported legal principles identified in paragraph 65 apply in this matter, and therefore Schoeps denies each and every allegation contained in paragraph 65 of the Complaint.

66. Schoeps admits that, if a sale to Thannhauser occurred, it took place by August 31, 1935. However, Schoeps also maintains alternatively that Thannhauser stole the paintings without paying Mendelssohn-Bartholdy, his estate or Elsa.

67. Schoeps admits that Mendelssohn-Bartholdy had good title to the Paintings prior to his consignment of the Paintings to Thannhauser in 1934. Schoeps denies the remaining allegations contained in paragraph 67 of the Complaint.

68. Schoeps denies each and every allegation contained in paragraph 68 of the Complaint.

69.  Schoeps denies each and every allegation contained in paragraph 69 of the Complaint.

70.  Schoeps admits that Thannhauser's purported sale to Paley in 1936 of *Boy Leading a Horse* occurred in Switzerland.  Schoeps admits that Thannhauser -- many years later at some indeterminate time -- told Paley that he was the "owner" of *Boy Leading a Horse* at the time Paley purchased it.  Schoeps denies each and every remaining allegation contained in paragraph 70 of the Complaint.

71.  Schoeps denies each and every allegation contained in paragraph 71 of the Complaint.

72.  Schoeps admits that New York law will apply to determine the validity of Thannhauser's purported transfer of *Le Moulin de la Galette* to the Guggenheim, and of Paley's purported transfer of *Boy Leading a Horse* to MoMA.  Schoeps denies each and every remaining allegation contained in paragraph 72 of the Complaint.

73.  Schoeps denies each and every allegation contained in paragraph 73 of the Complaint.

74.  Schoeps admits the allegations contained in paragraph 74 of the Complaint.

75.  Schoeps repeats and re-alleges each of the allegations he made in paragraphs 1-74 as if the same were fully set forth herein.

76.  Schoeps denies each and every allegation contained in paragraph 76 of the Complaint.

77.  Schoeps denies each and every allegation contained in paragraph 77 of the Complaint.

78.  Schoeps denies each and every allegation contained in paragraph 78 of the Complaint.

79.  Schoeps denies each and every allegation contained in paragraph 79 of the Complaint.

80.  Schoeps denies each and every allegation contained in paragraph 80 of the Complaint.

81.  Schoeps denies each and every allegation contained in paragraph 81 of the Complaint.

82.  Schoeps denies each and every allegation contained in paragraphs 1 and 2 of Plaintiffs' Prayer for Relief.

## AFFIRMATIVE DEFENSES

83.  Schoeps hereby incorporates by references all of the factual allegations contained in his accompanying Counterclaim, as if the same were set forth in full herein, as the factual predicate and support for the following Affirmative Defenses:

### First Affirmative Defense -- The Museums Are Not the Owners of the Paintings

84.  Schoeps' great-uncle, Paul von Mendelssohn-Bartholdy, lost the Paintings in Nazi Germany as a direct result of Nazi persecution either: (a) in prototypical forced sales to Thannhauser; or, in the alternative, (b) because Thannhauser stole them after he was given possession of them on consignment to sell for Mendelssohn-Bartholdy.  In either case, Thannhauser never acquired good title to the Paintings.  As a result, Thannhauser could not transfer good title to a third party through sale or gift.  Accordingly, Thannhauser did not transfer good title to *Le Moulin de la Galette* to the Guggenheim when he purportedly "donated" it.  Similarly, Thannhauser did not transfer good title to *Boy Leading a Horse* to Paley when he "sold" it to him, and Paley consequently did not transfer good title subsequently to MoMA when he donated the painting.

85.  In light of the above, neither MoMA nor the Guggenheim ever obtained good title to the Paintings.  Therefore, the Museums are not entitled to a federal declaratory judgment that they are the rightful owners of the Paintings.  Indeed, the true owners of the Paintings are the heirs of Mendelssohn-Bartholdy, and the following Counterclaim sets forth their claim for restitution of the Paintings.

### Second Affirmative Defense -- Lack of Subject Matter Jurisdiction

86.  The Court lacks subject matter jurisdiction of this dispute because the Museums' claims do not present a justiciable "case" or "controversy" under Article III of the U.S. Constitution.

12

## Third Affirmative Defense -- Unclean Hands

87.   The "Unclean Hands" of Plaintiffs bar them from seeking the equitable relief of a Declaratory Judgment.  MoMA breached its fiduciary duties as a public, tax-exempt trustee to take reasonable and informed precautions against introducing Nazi-confiscated or other stolen artworks into its collection when it recklessly accepted *Boy Leading Horse* as a gift from William S. Paley. Guggenheim similarly breached its fiduciary duties as a public, tax-exempt trustee when it recklessly accepted *Le Moulin de la Galette* as a bequest from Justin Thannhauser.  Had either MoMA or Guggenheim reasonably investigated the provenance and background of either Painting they would have realized that Mendelssohn-Bartholdy lost both Paintings in Nazi Germany due to Nazi persecution, either in prototypical "forced" or duress sales within the historical meaning of U.S. and international public policy and convention or by theft.  Moreover, as additional evidence became available corroborating that Mendelssohn-Bartholdy lost the Paintings due to Nazi persecution, the Museums continued to ignore the growing evidence and maintained possession of the Paintings.

## Fourth Affirmative Defense -- Contributory Negligence

88.   The contributory negligence of the Museums in acquiring and maintaining possession of the Paintings precludes their claims in this proceeding.

## Fifth Affirmative Defense -- Constructive Notice

89.   At all times relevant hereto, Plaintiffs knew that Mendelssohn-Bartholdy was the owner of the Paintings in Nazi Germany, and that the Paintings were lost due to Nazi persecution. Plaintiffs' constructive notice as a matter of law of these facts precludes their claims in this proceeding.

## Sixth Affirmative Defense -- Assumption of Risk

13

90.   In accepting the Paintings without investigating their provenance or background, the Museums expressly assumed the risk that the Paintings were lost or stolen due to Nazi persecution.

### Seventh Affirmative Defense -- Illegality

91.   Because both Paintings were lost due to Nazi persecution  --  and the Museums acquired the Paintings in reckless violation of their affirmative fiduciary duties as tax-exempt, public trustees to take reasonable and informed precautions against acquiring Nazi-confiscated and other stolen artworks  --  the illegality of the Museums precludes their claim for declaratory relief.

### Eighth Affirmative Defense -- Fraudulent Concealment

92.   As an alternative theory, Schoeps alleges that Thannhauser embezzled and stole both Paintings from Mendelssohn-Bartholdy and his heirs when  --  after Mendelssohn-Bartholdy died in May 1935  --   Thannhauser realized that Mendelssohn-Bartholdy's family was unaware of consignment or what disposition Mendelssohn-Bartholdy may have made of the Paintings. Thannhauser then retained *Le Moulin de la Galette* for his own collection, and sold *Boy Leading a Horse* to William S. Paley under suspicious and secretive circumstances, refusing to identify Mendelssohn-Bartholdy as a past owner and concealing his own "ownership" claim.   The fraudulent concealment of Thannhauser may be imputed directly to both Museums as gratuitous, tax-exempt donees who acquired both Paintings in violation of their fiduciary duties as public trustees and with constructive knowledge.

### Ninth Affirmative Defense -- Estoppel

93.   The Museums' unclean hands, negligence, assumption of risk, breach of fiduciary duties as tax-exempt public trustees, illegality and fraudulent concealment equitably estop them from seeking the equitable relief of a declaratory judgment.

14

**Additional Affirmative Defenses**

94.  Schoeps hereby gives notice that he intends to rely upon such other and further defenses as may become available or apparent during the discovery proceedings in the action and hereby reserves the right amend his Answer and Counterclaim and to assert any such further defense or claim by appropriate motion.

WHEREFORE, Schoeps prays that judgment enter as follows:

1.  That all claims brought against him by Plaintiffs be dismissed.

2.  That Plaintiffs recover nothing in this action, and that judgment enter on behalf of Schoeps, together with attorney fees, costs and interest.

3.  That Schoeps be granted such further relief as this Court deems just.

**COUNTERCLAIM**

Now comes the counterclaimant Professor Julius H. Schoeps (Schoeps), in his personal capacity and  by his attorneys, BYRNE GOLDENBERG & HAMILTON, PLLC, for his Counterclaim against counterclaim-defendants the Museum of Modern Art (MoMA) and the Solomon R. Guggenheim Foundation (Guggenheim Foundation), and herein alleges upon knowledge as to his own acts and upon information and belief as to the acts of others:

**INTRODUCTION**

1.  Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost many artworks in Nazi Germany as a direct and intended consequence of Nazi persecution, through forced consignments and either duress sales or thefts.  Accordingly, no good title to these works was ever transferred to subsequent possessors, and Mendelssohn-Bartholdy's heirs, including Schoeps, are the true owners.

15

2. This Counterclaim seeks the restitution of two paintings that Mendelssohn-Bartholdy lost in Nazi Germany: (a) Pablo Picasso's painting *Boy Leading a Horse*, oil on canvas, approximately 220 x 130.6 cms., completed approximately 1906 (*Boy Leading a Horse*), currently located at MoMA; and (b) Pablo Picasso's *Le Moulin de la Galette*, oil on canvas, approximately 88.2 x 115.5 cms., completed approximately 1900 (*Le Moulin de la Galette*), currently located at the Solomon R. Guggenheim Museum (Guggenheim Museum), which is owned and operated by the Guggenheim Foundation. The Guggenheim Foundation and Guggenheim Museum may be referred to jointly as the "Guggenheim." *Boy Leading a Horse* and *Le Moulin de la Galette* may be referred to jointly as the "Paintings." MoMA and Guggenheim may be referred to jointly as the "Museums."

3. Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy (Elsa) at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Marie Busch was Schoeps' grandmother. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. In 1935, a Certificate of Inheritance was issued reflecting that his heirs were his widow and surviving sisters.

4. In violation of the affirmative fiduciary duties that the Museums owe the people of New York and the U.S. as charitable, tax-exempt entities and public trustees, the Museums acquired the Paintings in reckless disregard of the likelihood that they may have been lost as a direct and intended consequence of Nazi persecution either in prototypical forced sales or by theft. Accordingly, the Museums never entertained a reasonable, good faith, or legally valid expectation or reliance interest that they owned either Painting or that the true owners would not come forward at any time and seek to reclaim them.

## THE PARTIES

5.  Counterclaimant Professor Julius H. Schoeps is an individual residing in Berlin, Germany.  Professor Schoeps is the director of the Moses Mendelssohn Center for European-Jewish Studies at the University of Potsdam in Potsdam, Germany.  Schoeps is a tenured professor and is one of the founders of the University of Potsdam.  Schoeps is Paul von Mendelssohn-Bartholdy's great-nephew, and German court records establish that he is an heir to 12.5% of the estate of Paul von Mendelssohn-Bartholdy.  Schoeps brings this action in his personal capacity as an heir of Mendelssohn-Bartholdy.  In addition, Mendelssohn-Bartholdy's sisters and widow, Elsa, are all deceased.  All of the living heirs of Elsa and of Mendelssohn-Bartholdy's sisters (Kathe Wach, Enole von Schwerin, Charlotte Hallin, and Marie Busch) are aware of this litigation and currently do not wish to participate in it.

6.  Upon information and belief, counterclaim-defendant MoMA is and at all relevant times was a not-for-profit New York education corporation, organized and operated under the laws of the State of New York as an art museum open to the public, with its principal place of business located at 11 West 53rd Street, New York, New York 10019-5497.

7.  Upon information and belief, counterclaim defendant the Solomon R. Guggenheim Foundation is and at all relevant times was a not-for-profit New York education corporation, organized and operated under the laws of the State of New York.  The Solomon R. Guggenheim Foundation owns and operates the Guggenheim Museum, and has its principal place of business at 1071 Fifth Avenue, New York, New York 10128.

8.  The Museums are tax-exempt organizations under ' 501(c)(3) of the Internal Revenue Code (26 U.S.C. ' 501(c)(3).  As charitable, tax-exempt entities, the Museums operate as public trustees and owe the same fiduciary duties of loyalty and care to the public that the trustee of a

17

private trust owes the trust beneficiaries. These duties include taking affirmative precautions to ensure that the trust has valid legal ownership of any asset that the trust acquires, and that the trust acquires only such assets as are appropriate for the specific purposes and objectives of the trust. The Museums must operate both according to the law as well as clarion public policies of the U.S. and New York State. These policies include the return to rightful owners of artworks that were stolen or lost as a direct and intended consequence of Nazi persecution. As tax-exempt entities, the Museums are forbidden to operate in a manner that violates the law, such as by abdicating their fiduciary duties as public trustees to take affirmative precautions against acquiring stolen or Nazi-confiscated artworks for their publicly-supported collections. In addition, the Museums are prohibited from operating in a manner that violates public policy by encouraging or facilitating criminal activity, such as trafficking in stolen or Nazi-confiscated artworks or illicit cultural property.

## JURISDICTION & VENUE

9. This Court has jurisdiction over the subject matter of the claims set forth hereunder pursuant to federal diversity jurisdiction under Article III, Section 2 and Article I, Section 9 of the United States Constitution, and under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship. Schoeps is a resident and citizen of a foreign state, the Federal Republic of Germany, and the Museums reside in the State of New York.

10. This Court has personal jurisdiction over each of the Museums under the doctrines of general jurisdiction, based on their substantial and continuous contacts with New York, the forum state, and their offices located in this state, and, alternatively, based on specific personal jurisdiction

18

because the substance of this case relates to the Museums' business activities, that is, the wrongful continued possession of the Paintings in New York and within this judicial district, which activities constitute, at least in part, their actions, or failures to act, leading to the filing of this Counterclaim.

11.  The Court also has *in rem* jurisdiction to determine claims of ownership to property located within this State.

12.  Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because the Museums reside in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the properties that are the subject matter of this action -- the Paintings -- are situated in this judicial district.

## SUMMARY AND OVERVIEW

### The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Begin His Efforts to Sell His Artworks Under Duress in Berlin

13.  Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a famous German family of Jewish descent. The composer Felix Mendelssohn, and the Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which distinguished itself in the arts, business, finance and philosophy. Family members founded Mendelssohn & Co. bank in 1795.  Mendelssohn & Co. had become one of the largest private banks in Germany when the National Socialist German Worker's Party ("Nazis" or "Nazi party") came to power in January 1933.

14.  Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn & Co.  Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that maintained the premises, and spent summers at a sprawling country estate named Gutshaus Boernicke (Boernicke).  Mendelssohn-Bartholdy also was the Royal Consul General for Denmark,

and held many other prestigious social and professional positions.

15.   In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

16.   Paul von Mendelssohn-Bartholdy based his self-identity in material part upon his status as a preeminent collector of modern art.   Upon information and belief, Paul von Mendelssohn-Bartholdy never sold, or attempted to sell, **any** art before the Nazis came to power in 1933.

17.   When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

18.   The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I.   After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks.   As a result, these banks lost the municipal bond business, which was an important source of revenue for private banks.   Accordingly, the decline of Jewish-owned banks began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed summarily extinguishing all Jewish-owned banks.   Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co.  --  like other Jewish-owned banks  --  to fear that the Nazis would terminate them at any moment.

19.   Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee

20

working for a Jew; agreed to surrender land he owned to the Nazi government under apparent Nazi pressure; placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation; and, as a Jew, was designated an "alien" under Nazi citizenship laws (January 1934). Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

20.    In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Paintings along with three other Pablo Picasso artworks: *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903). Mendelssohn-Bartholdy made the consignments as a direct and intended consequence of the unremitting Nazi persecution set forth in the preceding paragraph. In addition, Mendelssohn-Bartholdy acted personally and without the assistance or knowledge of any other family member in his attempts to sell the artworks through Thannhauser.

21.    In or around October 1934, Thannhauser attempted to sell the five Picasso artworks owned by Mendelssohn-Bartholdy at an exhibition in Buenos Aires, Argentina. No sales were made.

22.    Following the failed attempt to sell Mendelssohn-Bartholdy's Picasso artworks in Buenos Aires, Thannhauser either (a) purchased them from Mendelssohn-Bartholdy for a price far below market value, or (b) stole the Paintings.

23.    As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power. Then -- precipitously -- and only after nearly two years of unrelenting and intensifying Nazi persecution, he began the process of selling many of the gems of his collection into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution. That Mendelssohn-Bartholdy, who derived immense personal fulfillment from his status as a prominent collector of modern art, let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially, professionally and socially -- confirms that these

21

transactions resulted from Nazi persecution, and that his heirs are the true owners of the Paintings under New York and U.S. law.

24.    After Paul von Mendelssohn-Bartholdy relinquished *Boy Leading a Horse* to Thannhauser in Nazi Germany, Thannhauser sold it to William S. Paley in 1936 in Switzerland in a manner, as discussed infra, that was overtly suspicious and that put Paley on clear notice of the likelihood that the *Boy Leading a Horse* had been lost due to Nazi persecution.  Paley was not a good faith purchaser.  Thannhauser had Albert Skira (a notorious trafficker in Nazi-looted art) make the sale to Paley in Switzerland (a country bordering Nazi Germany that was infamous for traffickers in Nazi-confiscated property) for an artificially low price after the infamous Nuremberg Laws were in effect in Germany.  When Paley asked Skira who the owner of *Boy Lead a Horse* was, Skira refused to tell him.

25.    Paley returned *Boy Leading a Horse* to New York after completing his purchase from Skira.  In or around 1964, Paley executed papers purportedly donating *Boy Leading a Horse* to MoMA, but retained a supposed life estate for himself.  Paley died in 1990, and MoMA then acquired purported full ownership of *Boy Leading a Horse*.  MoMA -- ignoring its fiduciary duties to the public as a tax-exempt charitable entity and public trustee to take affirmative precautions against introducing Nazi-confiscated, stolen, or other contraband artworks into publicly-supported collections -- accepted Paley's gift into its collection in reckless disregard of the provenance of the artwork that strongly suggested that Mendelssohn-Bartholdy lost it due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable, good faith, or legally defensible expectation or reliance interest that it had acquired good title to *Boy Leading a Horse* or that the true owners would not step forward to reclaim it.

26.    In or around 1940, Thannhauser emigrated to the United States.  He settled in New York, and arranged for *Le Moulin de la Galette* to be brought to New York.  *Le Moulin de la Galette* has remained in New York for most of the time since then.

27.    In or around 1976, Thannhauser passed away and left *Le Moulin de la Galette* as a bequest to the Guggenheim.  In or around 1978, the Guggenheim  --  in similar violation of its

22

fiduciary duties as a public trustee -- accepted Thannhauser's gift into its collection in reckless disregard of the provenance of *Le Moulin de la Galette* that strongly suggested that Mendelssohn-Bartholdy lost it due to Nazi persecution. Accordingly, the Guggenheim never had a commercially reasonable, good faith, or legally defensible expectation that it had acquired good title to *Le Moulin de la Galette* or that the true owner would not step forward to reclaim it.

> **The Mendelssohn-Bartholdy Heirs Demanded the Return of the Paintings on November 1, 2007, and the Museums refused to return The Paintings on December 7, 2007**

28.   On November 1, 2007, the Mendelssohn-Bartholdy heirs, through their attorneys, demanded the return of the Paintings. The Museums, through their attorneys, refused to return the Paintings on December 7, 2007.

## BACKGROUND: NAZI PERSECUTION OF THE JEWS

> **Nazi Persecution of Jews Became Official State Policy in 1933, and intensified up to the time of Paul von Mendelssohn-Bartholdy's death in May 1935**

29.   The Nazis' campaign to banish Jews from the economic life of Germany began in earnest immediately after Hitler became Chancellor in January 1933 and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

30.   In January 1934, citizenship laws divided the German population into four categories.

Jews were placed in category 4 as "aliens."

31.  In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99.  In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state.  The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax. When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax.  Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency.  The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.  The Reich's Flight Tax created compelling disincentives for Jews with assets -- like Mendelssohn-Bartholdy -- to emigrate and effectively anchored them in German to deal, as best they could, with the ever intensifying hostility and confiscatory policies of the Nazi government.

### During the years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

32.  From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish-owned banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

33.  The Nazis pressured private Jewish-owned banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady

decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

> **Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Jews, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market**

34.    A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

35.    The Nazi campaign against "Jewish bankers" was so virulent it extended to Jews who worked for privately owned banks that were not Jewish owned.  On April 9, 1933  --  just more than two months after Hitler took power  --  Georg Solmsen, a spokesman of the managing board of Deutsche Bank, wrote a letter to the chairman of the supervisory board of that bank describing his concerns as a Jewish banker.  Solmsen's feelings were no doubt shared by other Jewish bankers like Mendelssohn-Bartholdy about the aggressive Nazi campaign against them.   In particular, Solmsen anticipated the economic and moral extermination of the "Jewish race" in Germany, a "hopeless" situation, and his premonition that he too might eventually become a victim of the Nazi's "cleansing campaign":

> Dear Mr. Urbig,
>
> The **expulsion of Jews from the civil service**, now enshrined in law, prompts one to ask what further consequences for the private sector will flow from measures that even the educated section of the population has accepted almost as a matter of course.  **I fear we are only at the beginning of a development that is deliberately aimed, in accordance with a well-thought-out plan, at the economic and moral**

> **extermination of all members of the Jewish race living in Germany** . . .
> [T]he dead silence that greets the ignominy and shame irremediably
> inflicted on those who, albeit innocent, find the foundations of their honor
> and livelihood undermined from one day to the next  --  **all this points to
> a situation so hopeless** that it would be wrong not to look matters in the
> face without apply any makeup, as it were . . . I have the feeling that, at the
> same time as I seem to be regarded as someone whose work is valued as
> an asset and who is perhaps respected as embodying what is now a 70-
> year-old tradition, **I too would be dropped as soon as the call came
> from outside in a decisive manner that I should be included in the
> "cleansing campaign."**

(Emphasis added).

36.   From 1933 on, many artworks that Jewish collectors liquidated in Germany as a consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York.   International art dealers and private collectors profited   -- correspondingly  --  from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.


## NAZI PERSECUTION DEVASTATED PAUL VON MENDELSSOHN-BARTHOLDY PERSONALLY, PROFESSIONALLY, AND FINANCIALLY AND FORCED HIM TO SELL THE PAINTING

37.   The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy.  Nazi coercion and duress forced him to begin efforts to sell the Paintings and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

38.   From when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

    (a)    sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

    (b)    endured persistent, menacing threats from Nazi banking authorities, beginning in

1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the bank's assets to the "Aryan" Deutsche Bank.)

(c)     withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

(d)     suffered a precipitous collapse of his personal net worth;

(e)     declined to petition for an entitled reduction of his alimony obligations based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

(f)     agreed to surrender, under Nazi pressure, extensive land from his country estate (Boernicke) to the Nazi Kulturamt (Cultural Office);

(g)     placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

(h)     had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

(i)     lost prestigious and invaluable positions in business, professional, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance

institution;

(j)     was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

(k)     in January 1934, was categorized as an "alien" in Germany under Nazi citizenship laws;

(l)     as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

(m)     finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

39.   As a direct result of the unrelenting Nazi persecution set forth above, in or around October 1934 Mendelssohn-Bartholdy consigned the Paintings -- along with three other Picasso artworks -- to Berlin art dealer Justin K. Thannhauser. Thannhauser, through his gallery, either purchased the artworks from Mendelssohn-Bartholdy for a price significantly below fair market value some time before Mendelssohn-Bartholdy's death in May 1935 or, in the alternative, Thannhauser stole the artworks and never paid anything to Mendelssohn-Bartholdy, Mendelssohn-Bartholdy's estate, or Elsa.

40.   Thannhauser trafficked in stolen and Nazi-looted art during his career as a dealer. Both during and after World War II, Thannhauser partnered with art dealers such as Nazi Cesar Mange

28

de Hauke and Albert Skira, both of whom the U.S. State Department and others identified as traffickers in Nazi-looted art. (See, e.g., front page Boston Globe article, dated November 9, 1997, entitled "Murky Histories Cloud Some Local Art," describing Thannhauser's attempt to fraudulently sell a painting with de Hauke, copies of relevant pages are attached as Exhibit 1; see also September 18, 2001 letter from the Art Loss Register (ALR) to MoMA regarding *Boy Leading a Horse*, where the ALR states that the name Thannhauser in the provenance "generally does not mean good things," and Skira is described as a "red flag list name," a copy of which is attached hereto as Exhibit 2).

41.    Indeed, the historical record in this case creates a strong probability that Thannhauser stole the Paintings.  As discussed infra, neither Elsa nor any other member of the Mendelssohn-Bartholdy family was aware of Paul von Mendelssohn-Bartholdy's consignment of the five Picasso artworks to Thannhauser.  When Mendelssohn-Bartholdy died unexpectedly in May 1935 of a heart attack, he had no opportunity to give his family an accounting of his affairs or advise them of his consignment or Thannhauser's possession of the artworks.  Thannhauser, then, after a period of time when no one contacted him about the consignment or the artworks in his possession, believed he could steal the art without fear of detection.  His actions after Mendelssohn-Bartholdy's death substantiate this probability.  First, as described herein, Thannhauser's 1936 sale of *Boy Leading a Horse* to William S. Paley in Switzerland reads like a textbook example of a "fencing" operation for stolen merchandise and a conspiracy to traffic in stolen art.  (See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.  Thannhauser -- while peering through a window outside watching the sale go down -- used Swiss art dealer Albert Skira (who later developed a reputation as a notorious trafficker in Nazi-looted art) to make the sale to Paley in Switzerland, already widely known as a

venue for unloading Nazi-looted art. In addition, Skira seemed desperate to make the sale. He and Thannhauser were offering *Boy Leading a Horse* for an artificially low price, and Skira even refused to tell Paley who the owner was. (Id.) Yet, somehow the "modest" price for *Boy Leading a Horse* enabled Skira, Thannhauser -- and possibly another dealer, Rosengart -- to make enough of a profit that it was worth driving the entire length of Switzerland through the Alps to make sure the sale occurred. Within weeks of the sale to Paley in 1936, Thannhauser sold *Portrait of Angel Fernandez de Soto* to M. Knoedler & Co. in New York. Despite requests, Knoedler has been unwilling to provide any information Thannhauser gave them at the time of this sale. Moreover, any time Thannhauser was asked about the provenance of these five significant Picasso artworks he obtained from the well-known Mendelssohn-Bartholdy, Thannhauser was uncharacteristically vague and non-specific. For example, in 1964 when he sold *Madame Soler* to the Pinakothek der Moderne Museum in Munich, Thannhauser provided detailed information regarding the history of *Madame Soler*. However, when it came to past owners (provenance), Thannhauser merely inserted "Sammlung (collection) Paul von Mendelssohn-Bartholdy" without providing any dates -- the only entry on the page with no dates. (See document from Pinakothek der Moderne, given to the museum by Thannhauser in or around 1964, copies of which are attached as Exhibit 3). When Thannhauser donated *Le Moulin de la Galette* and *Head of a Woman* to the Guggenheim, he was equally vague. Thannhauser stated that he acquired *Le Moulin de la Galette* from Mendelssohn-Bartholdy "ca. [around] 1935." (See copy of Guggenheim records reflecting information provided by Thannhauser, a copy of which is attached as Exhibit 4 & 5). As to *Head of a Woman*, Thannhauser could only provide a range of dates "1935-1936" for his acquisition. (See copy of Guggenheim records reflection information Thannhauser provided to them about *Head of a Woman*, copies of which are attached as Exhibits 5 & 6).