42.    In addition, Thannhauser's records make clear that he dealt exclusively with Mendelssohn-Bartholdy regarding the five Picasso artworks.    There is no mention of Elsa anywhere.  Indeed, the Museums' claims that Mendelssohn-Bartholdy gifted all of his art collection to Elsa in 1927 at the time of their wedding is far-fetched.  There is no record of such a gift any time near the wedding.  Indeed, the only evidence of any Mendelssohn-Bartholdy transfer of art to Elsa is Mendelssohn-Bartholdy's February 1935 Contract for the Disposition of Property, which Schoeps will establish was a mere device to protect the Paintings from Nazi predation by creating a false impression that Elsa was the owner from 1927 forward.  Importantly, Thannhauser's own records make it obvious that the real and only owner of the Paintings was Mendelssohn-Bartholdy.

43.  In any event, whether by an actual forced sale at an artificially low price or a forced consignment followed by Thannhauser's theft, the loss of the Paintings marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune.  For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets and buildings were transferred to the "Aryan" Deutsche Bank.  Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed.  Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

## FOLLOWING THE WAR, THE U.S. CONSISTENTLY PURSUED POLICIES TO INVALIDATE THE COERCIVE TRANSFERS OF PROPERTY THAT OCCURRED UNDER NAZI AUTHORITY AND TO RESTITUTE SUCH PROPERTY TO RIGHTFUL OWNERS

### Military Government Law No. 59 (MGL No. 59) -- the Centerpiece of Post-War U.S. Restitution Policy

44.  U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government

31

Law Number 59 (MGL No. 59) was promulgated. 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism."  § 3.75(a)(1).  MGL No. 59 applied in the American "Occupation Zone" of Germany.

45.  MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation". See § 375(b) entitled "Article 3: presumption of confiscation."

46.  Nazi persecution of its Jewish citizens was so intense and all-encompassing that MGL. No. 59 prescribed that the presumption of confiscation could only be rebutted, in the "absence of other factors proving an act of confiscation," where it could be shown that: (a) the transferor was paid a fair purchase price; and (b) the transferor had the free right of disposal of the purchase price. In Germany today, museums typically acknowledge that no Jew had the "free right of disposal of the purchase price" in Nazi Germany, and therefore limit the inquiry as to whether a Jew made the sale within the Nazi period.

47.  MGL No. 59 required even persons in innocent possession of confiscated property to return it:  "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection or purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

48. MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the

32

claimant, or similar circumstances." § 382(a)(2).

> **The U.S. Actively and Successfully Promoted the Adoption of MGL No. 59's Restitution Principles As its "Official Policy" to the British and French for Application in Their Respective "Occupation Zones" and in Berlin. Ultimately, the Germans Themselves Incorporated the Restitution Principles of MGL No. 59 Into Their Substantive Law For Application in All of Germany**

49.  The U.S. actively promoted as its "official policy" the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims.  For example, in 1949, the U.S. National Security Council (NSC) drafted the *"Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)."  President Truman was the chair of the NSC.  In its directive to the U.S. High Commissioner for Germany, the NSC punctuated that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either ***have identifiable property returned to them*** or be compensated therefore, . . . ***To carry out this policy, you should seek agreement from your British and French colleagues to persuade the German Government*** to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70.  (Emphasis added).  Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their Occupation Zone as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their

heirs, or successors to the maximum extent possible and within the shortest period of time." (See

March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain). As

discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after

MGL No. 59.

50.  Due largely to U.S. efforts, the restitution principles of MGL No. 59 became, in

effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model

for similar restitution legislation among the Allied governments, many countries that the Nazi

had controlled, and ultimately Germany itself.  For example:

      a.  **The Berlin Restitution Law of 1949.**  MGL No. 59 was the controlling law

          for the U.S. Occupation Zone in Germany after 1947, but did not  apply to

          Berlin.  Berlin was divided into four "quadrants," and the U.S., Britain, France

          and the Soviet Union each controlled a quadrant.  To address restitution issues

          within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is

          almost identical to Military Law. No. 59.  The provisions regarding the

          "presumption of confiscation" and potential rebuttal thereof are virtually

          identical.

      b.  **Britain and France passed restitution laws in their "Occupation Zones"**

          **similar to MGL No. 59.**  Britain and France passed laws in their individual

          German Occupation Zones that were similar to MGL No. 59 and the Berlin

          Restitution Law.  (See British Military Law 59, and currently applicable

          provisions of French law (article 1, paragraph 1 of order No. 45-770, dated

          April 21, 1945 and decree No-1344 dated September 30, 1949).

      c.  **In the so-called "Treaty of Transition" of 1954,  the U.S. and the Allies**

**entered into a Treaty with West Germany making the Allies' restitution law part of German law**. In the so-called 1954 "Treaty of Transition," or Uberleitungsvertrag, the Germans agreed to make the Allies' restitution laws part of the laws of Germany.

d. **German restitution laws and principles are virtually the same as MGL No. 59.**

   (1) After the Allies left the Federal Republic of Germany (West Germany), and pursuant to the above-identified Treaty of Transition, the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59, the Berlin Restitution Law of 1949, and the British and French restitution laws. (See "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

   (2) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 -- which are, of course, virtually the same MGL No. 59.

51. The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance by other countries -- are applied today

35

on a regular basis in Germany, where it is part of German law, and throughout Europe. See, e.g., Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution); Report Of British Spoliation Advisory Panel In Respect Of A Painting Now In The Possession Of Glasgow City Council, The Right Honourable Sir David Hirst, *Ordered by the House of Commons to be printed 24 November 2004* (British Advisory Panel recommended that Jewish claimants be restituted for paintings lost in a forced sale in Nazi Germany, based on claimants position that "restitution principles adopted by the Allies after the war, epitomised in **British Military Law No 59**, which lays down that it shall be presumed in favour of a claimant that a transaction entered into between January 1933 and May 1945 which involves any transfer or relinquishment of property during a period of persecution by any person who was directly exposed to persecutory measures on racial grounds shall be presumed to constitute an act of confiscation"); Dutch Advisory Committee on the Assessment of Restitution Applications for Items of Cultural Value and the Second World War (2006 Report) (Dutch National Policy, adopted from Ekkart Committee, provides that all sales of works of art by Jewish private persons in Nazi Germany from 1933 onwards "be treated as forced sales, unless there is express evidence to the contrary").

> **Under New York choice of law rules, German restitution principles and law -- adopted from the U.S. MGL No. 59 and its progeny -- will apply to the transfer of the Paintings from Mendelssohn-Bartholdy to Thannhauser in Nazi Germany.**

52. New York choice of law principles provide that the law that characterizes the nature

of a dispossession is that of the place where the dispossession occurred. Kunstsamlungen zu Weimar v. Elicofon, 536 F.Supp. 829, 839-46 (E.D.N.Y. 1981), *aff'd* 678 F.2d 1150 (2d Cir. 1982); see also Angela Joy Davis, *Beyond Repatriation: A Proposal for the Equitable Restitution of Cultural Property*, 33 UCLA L. Rev. 642 (1985) (discussion of case where New York Attorney General argued for application of MGL No. 59 restitution principles to transfer in Nazi Germany, Abrams v. Sotheby Parke Bernet, Inc., No. 42255, slip op. (N.Y. Sup. Ct. Aug. 15, 1984), where case was settled before issue was resolved; author advocates application of these restitution principles in U.S. courts). In this case, of course, the German laws that apply in the analysis of the transfer of the Paintings from Mendelssohn-Bartholdy to Thannhauser are the German restitution laws that specifically apply to transactions in Nazi Germany. These German laws, of course, were adopted from MGL No. 59 and its progeny.

53. The restitution principles of MGL No. 59 and German law should also apply in this case as the "dominant policy" of the United States. In re Muller's Estate, 199 Misc. 745, 104 N.Y.S.2d 133 (Sur. Ct. Kings County 1951) (evaluating validity of legacy renunciations by German nationals in 1946, the court stated that it was required to give effect to Military Government Law No. 53, not only by choice of law principles, but because the military law was "an expression of the dominant policy of the United States" and the courts could not impede the full effectuation of the dominant federal policy expressed in the military law). Schoeps has set forth, supra, the efforts of the U.S. to advance the restitution principles of MGL No. 59 and its progeny. In addition, these efforts extended to actions brought in U.S. courts. For example, State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release), states that it is the policy of the Executive "with respect to claims asserted in the United States for

restitution" to relieve American courts "from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials." Further, tracking in part the language of MGL No. 59, the Press Release repeated "this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated that "it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

54. The Press Release reproduces in full an April 13, 1949 letter from Jack B. Tate (Tate Letter), the Acting Legal Advisor, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in this Court, that is, the United States District Court for the Southern District of New York. The Tate Letter was also sent to the presiding judge in the case, U.S. District Judge Sylvester J. Ryan, and the attorneys representing all the parties. In referring to the case pending in this Court, the Tate Letter instructs the Court and the parties that MGL No. 59 exemplifies U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit specifically relied on and followed the Press Release and Tate Letter, noting that they contained a "supervening expression of Executive Policy" to relieve American courts from any restraint upon the exercise of the their jurisdiction to pass upon the validity of the acts of Nazi officials).

55. Accordingly, under the restitution principles which are part of German law as well as the consistent and dominant policy of the United States, Mendelssohn-Bartholdy's duress consignment of the Paintings to Thannhauser as a direct result of Nazi persecution, and Thannhauser's later acquisition of the Paintings either by (a) payment to Mendelssohn-Bartholdy far below market value, or (b) theft, were Nazi confiscations, and Mendelssohn-Bartholdy's heirs are the true owners of the Paintings. In addition, under Schoeps alternative theory that Thannhauser stole the Paintings, under any U.S. or German law Thannhauser did not obtain good title to the Paintings, and under New York law Thannhauser could not transfer good title to any third party.

## THE MUSEUMS CANNOT RAISE A PROPER LACHES DEFENSE TO THE MENDELSSOHN-BARTHOLDY HEIRS' CLAIMS

56. The defense of laches has been raised regularly by defendants in stolen art and Nazi-confiscated art cases in New York. See, e.g., Bakalar v. Vavra, 2006 WL 2311113, *3 (S.D.N.Y. 2006), instructing that to establish a laches defense in a Holocaust art restitution action, the defendant must demonstrate: (1) the heirs knew of their claim; (2) they delayed in taking action without excuse; and (3) defendant suffered prejudice as a result. See also Solomon R. Guggenheim Foundation v. Lubell, 77 N.Y.2d 311, 321, 567 N.Y.S.2d 623, 628 (1991), where the court ruled that the conduct of both the theft victim and the current possessor of the art will be relevant to any consideration of the equitable defense of laches. Further, laches involves "a fact-intensive inquiry into the conduct and background of both parties in order to determine the relative equities," and such issues "are often not amenable to resolution on a motion for summary judgment, let alone a motion to dismiss." U.S. v. Portrait of Wally, A Painting By Egon Schiele, 2002 WL 553532, *22 (S.D.N.Y. 2002) (citing Solomon R. Guggenheim Foundation v. Lubell,

77 N.Y.2d at 321, 567 N.Y.S.2d at 628; and <u>Solomon R. Guggenheim Foundation v. Lubell</u>, 153 A.D.2d 143, 151-52, 550 N.Y.S.2d 618, 623 (1990). In addition, the "unclean hands" of a defendant precludes the application of the laches defense. <u>Uciechowski v. Ehrlich</u>, 221 A.D.2d 866, 634 N.Y.S.2d 251 (App.Div. 3d Dept. 1995). Finally, the application of the laches defense is precluded where imposing it would frustrate public policies. <u>See</u> <u>Manitou Sand & Gravel Co., Inc. v. Town of Ogden</u>, 2005 WL 2312450, *6 (N.Y. Sup. 2005).

57. The Museums cannot raise a valid laches defense because, among other reasons: (a) the Mendelssohn-Bartholdy heirs have not delayed unreasonably in asserting their claim because -- in the exercise of reasonable diligence -- they did not know until they completed their recent investigation that Mendelssohn-Bartholdy lost the Paintings as a direct and intended consequence of Nazi persecution; (b) the Museums have suffered no prejudice attributable to any putative delay of the Mendelssohn-Bartholdy heirs because both Museums have known from inception that they likely were acquiring artworks that were lost as a consequence of Nazi persecution in paradigmatic "forced sales" or that otherwise may have been stolen; (c) the Museums -- whose conduct is relevant in any laches analysis under New York law -- have "unclean hands" because they violated their fiduciary duties as public trustees to take reasonable and informed precautions against introducing stolen or "Nazi-confiscated" artworks into their collections, and knowingly accepted suspicious materials; (d) the strong New York and federal policies that favor the return to rightful owners of artworks lost during the Holocaust and that discourage tax-exempt museums from breaching their fiduciary duties as trustees and from recklessly trafficking in contraband artworks preclude the application of a laches defense in this case.

**The Mendelssohn-Bartholdy Heirs have not Unreasonably Delayed Making Their Demands, Since They Were Not Aware of Their Rights to the Paintings until The Efforts of the U.S. Government and State of New York Made Necessary Information Available to Them**

### Overview and Summary

58. Until 2005, no Mendelssohn-Bartholdy heir knew -- or reasonably should have been aware -- that Paul von Mendelssohn-Bartholdy had sold or otherwise lost the Paintings in Nazi Germany. As discussed infra, Mendelssohn-Bartholdy died suddenly in May 1935 and none of his heirs were aware of the status of the Paintings. Moreover, locating Nazi confiscated art was exceedingly difficult after World War II, since governments and the international art community were unwilling to make their records available for Holocaust survivors and their heirs to examine. Starting in the 1990s, the U.S. government and State of New York spearheaded a campaign to at last make information and documents in government archives and museums worldwide available to potential Holocaust claimants so they could finally investigate possible claims.

59. The efforts of the U.S. government and state of New York resulted, among other accomplishments, in the development of the Nazi-Era Provenance Internet Portal (NEPIP, located at www.nepip.org), which went online in or around September 2003 and provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). By providing a single point of contact to dozens of U.S. museum collections, NEPIP helps people seeking objects lost as a result of Nazi persecution. Once an item is located on NEPIP, a claimant may then go by hyperlink to individual museum websites where specific provenance information is found. The NEPIP website and the hyperlinked individual museum provenance websites may be referred to jointly as the "NEPIP System".

60. In 2005, Schoeps discovered on the NEPIP System that Mendelssohn-Bartholdy

41

transferred *Boy Leading a Horse* to Thannhauser in Nazi Germany. This launched an
investigation which revealed that Mendelssohn-Bartholdy lost many invaluable artworks before
his death in Nazi Germany as a direct result of Nazi persecution.

> **No Mendelssohn-Bartholdy Heir Knew -- or Reasonably Should Have
> Known -- of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany
> Until Relevant Information Was Discovered on the NEPIP System in
> 2005**

61.    No Mendelssohn-Bartholdy heir was aware that Mendelssohn-Bartholdy had lost
Picasso artworks -- or any other paintings -- to Thannhauser in Nazi Germany until the
information was discovered on the NEPIP System in 2005.

62.    Mendelssohn-Bartholdy's widow, Elsa von Mendelssohn-Bartholdy (Elsa), was
unaware of the fate of the five Picasso artworks Mendelssohn-Bartholdy relinquished under duress
to Thannhauser. Mendelssohn-Bartholdy had owned the five Picasso artworks for a long period
of time prior to marrying Elsa. Mendelssohn-Bartholdy was approximately 23 years older than
Elsa, and was very protective of her. They had a very traditional marriage. Mendelssohn-
Bartholdy dealt exclusively with all issues relating to money or finance. Moreover, as Nazi
persecution savaged his estate, Mendelssohn-Bartholdy attempted to shield Elsa from the extent
of his losses. Based on their customary mode of interaction, Mendelssohn-Bartholdy would not
have told Elsa about his attempts to sell the Paintings. Nor did Mendelssohn-Bartholdy leave any
records by which his estate could have made these determinations. Moreover, Elsa never made any
statements to anyone for the rest of her life that would indicate that she was aware of the loss of the
five Picasso artworks to Thannhauser.

63.    Paul von Mendelssohn-Bartholdy died of a heart attack on May 10, 1935. His sudden,
unexpected death prevented him from giving his wife an accounting of his business affairs. In fact,

Elsa was shocked at the extent of Mendelssohn-Bartholdy's financial decline when she was forced to take over his affairs.

64.  Mendelssohn-Bartholdy's sisters had no knowledge of the fate of the five Picasso artworks Mendelssohn-Bartholdy relinquished to Thannhauser.  They did not live with Mendelssohn-Bartholdy.  They were suffering under Nazi persecution themselves, and at least one had left Nazi Germany at or around this time.  Another was eventually sent to a concentration camp.  Mendelssohn-Bartholdy placed the artworks on consignment in or around October 1934. Moreover, Mendelssohn-Bartholdy's role as a protector of the family and its assets made him disinclined to reveal financial distress, so he would have had no incentive to advise his sisters of the circumstances of his sale of art.

65.  None of Mendelssohn-Bartholdy's sisters ever made any statement that would indicate any awareness of the fate of the five Picasso artworks Mendelssohn-Bartholdy lost to Thannhauser. As a result, none of the current Mendelssohn-Bartholdy heirs had any knowledge of the paintings Mendelssohn-Bartholdy consigned to Thannhauser in Nazi Germany until relevant information was discovered on the NEPIP System in 2005, nor could they reasonably be expected to have obtained such information.

### A "Wall of Silence" Has Denied Holocaust Claimants -- Such as the Mendelssohn-Bartholdy Heirs -- Access to Information that Would Allow Them to Investigate and Reclaim Lost Property

66.  Until recently, Holocaust claimants had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were inaccessible.  This historical deficiency has been widely recognized.  For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a **"Wall of Silence"** regarding information and documents necessary to discover and

develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat, former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

> **The U.S. Congress, U.S. Department of State, and State of New York Began Intensive Efforts in the Late 1990's to Tear Down the "Wall of Silence," that is, To Make Information and Documents Available to Holocaust Claimants so that They Could Develop and Prosecute Claims for the Recovery of Property Lost During the Nazi Era**

67. In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property. For example:

a. In 1998, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations. The "The Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998) made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945. "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998) provided five million dollars for archival research and translation of documents to assist Holocaust art restitution. "The U.S. Holocaust Assets Commission Act of 1998" (Commission Act), Public Law No. 105-567

44

established a Presidential Commission which, among other things, investigated and reported on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

b. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

c. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants. As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

d. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended. Upon meeting some initial resistance to

acceptance of the AAMD guidelines, State Department representatives re-drafted the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AAMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

e. The Presidential Commission, created by the Commission Act of 1998, negotiated an agreement with the AAMD and the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks. This agreement led to the creation of the NEPIP System. MoMA's Provenance Research Project (PRP) web pages are part of the NEPIP System, and the PRP is connected to NEPIP by hyperlink. Schoeps, through his agents, discovered on MoMA's PRP that Mendelssohn-Bartholdy had transferred *Boy Leading a Horse* to Thannhauser in Nazi Germany -- thereby making this action possible by starting the investigation into Picasso artworks Mendelssohn-Bartholdy lost in Nazi Germany due to Nazi persecution.

f. In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office). The Office has worked extensively -- and with significant success -- to persuade

46

foreign governments to open Nazi era archives and to make documents available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

g. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art -- all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission -- it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

**Schoeps' Action Was Made Possible <u>Only</u> by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990's -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

68. Schoeps' claim in this case was made possible ***only*** by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. In 2005, Schoeps first discovered that Mendelssohn-Bartholdy sold *Boy Leading a Horse* to Thannhauser in Nazi Germany from information published on MoMA's Provenance Research Project. PRP is part of the NEPIP System, and is connected to the NEPIP website by hyperlink. *Boy Leading a Horse* is also listed on NEPIP.

47

69.  The NEPIP System has received federal funding and arose as a direct result of the Presidential Commission created by the 1998 Commission Act.  Also, the State of New York played an important role in the development of the NEPIP system, since the New York HCPO actively participated in the AAM's task force that created NEPIP.  Accordingly, since Schoeps' claim to recover the Painting is based on crucial information originally discovered on MoMA's PRP -- an integral part of the NEPIP System -- it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "Wall of Silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and information to enable them to develop claims.

### Schoeps, Through His Agents, Has Acted Diligently Throughout 2005-2008 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany

70.  Once Schoeps discovered Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on MoMA's PRP, he has acted diligently in 2005-2008 to complete his investigation and bring forward this claim.  The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, his relationship with Thannhauser, the circumstances of his loss of art under Nazi duress, and other matters which have enabled him to make this claim. Schoeps, through his agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries.

### The Fundamental Policies of the United States and the State of New York to Make Information Available to Holocaust Claimants and to Restitute Holocaust Art Will be Frustrated if Schoeps Action is Barred on Laches Grounds.  Accordingly, the Equitable Defense of Laches Is Not Available to the Museums

71.  U.S. and New York policies to make information available to Holocaust claimants and

48

to restitute lost art are international, strong, manifest, and continuing.  As set forth supra, the efforts of the federal government and State of New York over the last ten years have been Herculean and the results have been commensurate with the effort:  (a) Holocaust claimants have unprecedented access to long-withheld archives and information worldwide  --  including U.S. museum information through the NEPIP System; and (b) art restitution to Holocaust victims and their heirs has risen dramatically in the U.S. and internationally.

72.    To permit the Museums to raise the defense of laches, on the other hand, would frustrate U.S. and New York policies to restitute art lost due to Nazi persecution.  Therefore the application of the equitable defense of laches is precluded.

73.    The Museums' raising of a laches defense would also frustrate New York policies protecting its world-renowned art market.

**The Museums' Disregarded "Red Flags" in the Provenance Which Strongly Indicated That the Painting had been Lost as a Result of Nazi Persecution**

74.    As discussed in detail below, the Museums acquired the Paintings in total disregard of the "red flags" in the history and provenance of the Paintings which suggested strongly that they were lost as a result of Nazi persecution.  The Museums did not fulfill their obligation "to inquire about the validity of title before completing the transaction."  U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004).  See discussion infra.  The Museums' failure to investigate the Nazi-era provenance of the Paintings is more egregious in light of repeated U.S. government warnings and admonitions to museums and others about Nazi-confiscated art coming into the U.S. art market, and the substantial press coverage of the issue since the 1940s.

**Following the War, the U.S. Government repeatedly cautioned museums and the international art market about acquiring Nazi-confiscated art**

75. Due to Nazi persecution of Jews throughout Europe, there was enormous displacement of art. Since the United States emerged from World War II as the richest country in the world, much of the art came into the U.S. market. As a result, the U.S. government took steps to alert the art world to be on guard for art lost due to Nazi persecution. For example, the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (also known as the "Roberts Commission" after its Chairman, Supreme Court Justice Owen J. Roberts), sent circulars in 1945 on the subject to "museums, art and antique dealers, and auction houses." This warning included the observation, "It is, of course, obvious, that no clear title can be passed on objects that have been looted from public or private collections abroad." (American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, Circular to Museums, Art and Antiques Dealers, and Auction Houses).

76. In 1951, the U.S. Department of State issued a second circular letter to the U.S. art industry reiterating this warning.

77. The U.S. Department of State tasked Ardelia Hall to alert members of the art world to these issues, and she was extraordinarily energetic in her work throughout the 1950s and 1960s.

**The Museums' disregard of the "red flags" in the provenance of the Paintings is even more egregious in light of the considerable coverage of the issue of Nazi looted art in the New York press from the end of World War II to the present**

78. There has always been considerable coverage of the issue of Nazi art looting in the press, especially in New York. Journalist Janet Flanner covered the topic in a celebrated 1947 article "Annals of Crime: The Beautiful Spoils," in *The New Yorker* 40 (22 February 1947), as well as in her 1957 book, *Men and Monuments* (New York: Harper and Row, 1957). Former OSS officer and member of the Art Looting Investigation Unit James Plaut wrote a piece, "Hitler's

Capital: Loot from the Master Race," that appeared in *The Atlantic* (October 1946), 75-80.

79.  Other key figures in the Allies' restitution effort also wrote memoirs, including James Rorimer, *Survival: The Salvage and Protection of Art in War* (New York: Abelard, 1950); and Thomas Carr Howe, *Salt Mines and Castles: The Discovery and Restitution of Looted European Art* (Indianapolis: Bobbs-Merril, 1946).

80.  That Rorimer later headed the Metropolitan Museum of Art in New York and that Howe became the director of the San Francisco Legion of Honor only increased the visibility of these books, which recounted both the Nazis' plundering operations, and also the challenges of restitution work.

81.  Many Americans who had served as Monuments Officers assumed leading positions in U.S. museums in the postwar period: this phenomenon has recently been documented by the scholarship of Robert Edsel. (See Robert Edsel's list of Monuments Officers who assumed positions    in    the    American    museum    establishment    can    be    found    at http://www.rescuingdavinci.com/HelpSolve/list_cultins.aspx).

82.  On November 16, 1964, Milton Estrow wrote in the *New York Times* an article entitled "Europe is Still Hunting Its Plundered Art."  Esterow made an important observation when he noted, "From Greece to California, hundreds of art scholars, museum directors, private galleries, and police organizations, including Interpol, the international police organization, are watching for the reappearance of works stolen from museums, churches, libraries, galleries and private collections."

83.  Indeed, from the late-1940s through the 1990s, when the issue emerged in a more public way, certain victims of Nazi persecution did pursue artworks looted from them and their families.  There was a steady stream of restitution cases throughout the postwar period that should

have served to put members of the art world on alert.

84.  In light of the State Department warnings, press coverage, and cases of families seeking restitution of art lost due to Nazi persecution, the Museums clearly would have been aware of the dangers of acquiring Nazi-confiscated art when the Paintings were donated.

85.  While there was widespread knowledge within the art world from the 1940s to 1990s of the issues surrounding Nazi looted art, there was also a willful disregard for the subject on the part of most art dealers and museum officials.

> **For more than 35 years, New York courts have condemned how casually art is acquired on the international market, and have announced a policy to protect victims of art theft in order to safeguard the commercial integrity of the New York City art market**

86.  Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned those in the art market to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969) (dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"); Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981) (reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of ... title ... it is deemed poor practice to probe;" the court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art ...").

87.  In 1991, the New York Court of Appeals, in the landmark decision Solomon R.

Guggenheim Foundation v. Lubell, 569 N.E.2d 426, 429 (1991), made clear that "New York long

has protected the right of the owner whose property has been stolen to recover that property, even if

it is in the possession of a good faith purchaser for value", and instructed that this principle is

specifically calculated to protect the commercial probity of New York's international art market. Id.

at 431.

### MoMA has "unclean hands" since it disregarded the suspicious Nazi-era provenance of *Boy Leading a Horse* when it accepted the painting into its collection.

88.    In 1964, William S. Paley donated *Boy Leading a Horse* to MoMA, but retained a life

estate in the painting.  In 1990, MoMA acquired purported full ownership of the painting upon the

death of Paley.  In 1964 and again in 1990, MoMA disregarded suspicious the Nazi-era provenance

of *Boy Leading a Horse* and accepted the painting into its collection.  As a result, MoMA has

unclean hands and is not entitled to assert a laches defense in this action.

#### In August 1936, Thannhauser sold *Boy Leading a Horse* to William S. Paley in a manner that strongly suggested that the Painting had been lost as a result of Nazi persecution

89.    In August 1936, Thannhauser worked in Switzerland with Albert Skira - - a Swiss art

dealer later known for trafficking in Nazi looted art - - to sell *Boy Leading a Horse* to William S.

Paley (Paley), the developer of the Columbia Broadcasting System (CBS).    Paley was a

sophisticated art collector, and later held positions as a trustee and president of MoMA.  Paley was

fully aware of events in Nazi Germany.

90.    By 1936, Switzerland was already a known haven for traffickers in art lost by Nazi

victims in forced sales.  Moreover, it was common knowledge that the infamous Nuremberg Laws,

enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the

marketplace lost by Jews due to Nazi persecution.

91. In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the Painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the Painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.

92. Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the Painting into the lobby for Paley. Id.

93. Paley liked the Painting. Paley asked Skira the price, and found that it was  --  in Paley's words -- *"quite modest."* Paley immediately told Skira: "That's fine. I'll buy it." Paley described the Painting as "priceless." Id.

94. Paley asked Skira who owned *Boy Leading a Horse*, and *Skira refused to tell him*. Skira stated: "That's the one thing I can't tell you. I'm sworn to secrecy." Id.

95. Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the Painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley was put on notice that there was a good possibility that he was purchasing confiscated art, and yet Paley proceeded with the sale.

**Paley's knowledge of the suspicious provenance of *Boy Leading a Horse* may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990**

54

96. Paley had an extremely close relationship with MoMA from shortly after he purchased the Painting in 1936 until his death. Paley was a Trustee of MoMA from 1937 until his death in 1990. In addition, Paley was President from 1968-1972; Chair from 1972-1985; and Chair Emeritus from 1985 until his death in 1990. Indeed, Paley stated that as of September 1968, he became, in effect, the CEO of MoMA: "After due consideration, I accepted the invitation to become president of the museum [MoMA]. I was elected to that office and became, in effect, its chief executive officer in September 1968." Id. at 391.

97. In light of Paley's close relationship and powerful positions within MoMA from 1937-1990, Paley's knowledge can be imputed to MoMA of the suspicious circumstances and "red flags" regarding his purchase of *Boy Leading a Horse* which strongly suggested that a Jew lost the Painting in Nazi Germany due to Nazi persecution.

### MoMA continued to ignore the Nazi-era Provenance of the Painting from 1964 up to its acquisition of purported full title in 1990 after Paley's death

98. In 1990, Paley passed away, and MoMA published "*The William S. Paley Collection*," by William Rubin and Matthew Armstrong, describing the collection Paley had left to MoMA. See William Rubin and Matthew Armstrong, *The William S. Paley Collection* (Museum of Modern Art, New York 1992). The preface described the suspicious and urgent circumstances under which Paley acquired *Boy Leading a Horse*:

> Nineteen thirty-six was a remarkable year [for Paley], marked by the acquisition of... by far the best-known work in the Paley Collection, Picasso's *Boy Leading a Horse*. Only later did Mr. Paley realize how lucky he was to have gotten a crack at [*Boy Leading a Horse*]. It had been smuggled to Switzerland out of Nazi Germany by the dealer Justin Thannhauser, and was being hurriedly and secretly offered for sale through [Albert] Skira. There was no time to wait for a Geneva visit from Paley, who was skiing in Saint-Moritz. Skira trucked the large canvas to the Palace Hotel and carried it into the lobby. Paley bought it on the spot.

William Rubin and Matthew Armstrong, *The William S. Paley Collection*, Preface, p. x

(Museum of Modern Art, New York 1992) (Emphasis added) (using Paley's *"As It Happened"* as

a source).

99. In *The William S. Paley Collection*, Rubin and Armstrong also provide the

provenance of the Painting, and identify Paul von Mendelssohn-Bartholdy as the owner,

immediately followed by Justin K. Thannhauser. Accordingly, MoMA was fully informed by

1992 that a person with a recognizably Jewish last name -- Mendelssohn -- made the sale in

Nazi Germany to Thannhauser before Thannhauser supposedly "smuggled" the Painting out of

the country and "hurriedly and secretly" offered it for sale through a known trafficker in Nazi

confiscated art [Skira] in a country known as a haven for looted art sales [Switzerland].

100. Thus, despite MoMA's increasing knowledge of prior owners -- including the

Jewish Paul von Mendelssohn-Bartholdy as the owner immediately before Thannhauser in Nazi

Germany -- and the "red flags" indicating that the Painting likely was lost due to Nazi

persecution, MoMA conducted no further provenance research and accepted Paley's donation

with "no questions asked."

101. By accepting Paley's gift of *Boy Leading a Horse* in disregard of its obvious

Holocaust provenance -- and in violation of its fiduciary duties as a public trustee to take informed

precautions against accepting Nazi-confiscated and stolen artworks into its collection -- and then

purposely ignoring additional evidence that Paul von Mendelssohn-Bartholdy lost the artwork due

to Nazi persecution, MoMA has "unclean hands" and cannot raise the equitable defense of laches.

**The Guggenheim has "unclean hands" since it disregarded the suspicious Nazi-era provenance of *Le Moulin de la Galette* when it accepted the painting into its collection.**

**In or around 1978, the Guggenheim Museum disregarded provenance information which strongly suggested that Paul von Mendelssohn-Bartholdy lost *Le Moulin de la Galette* due to Nazi persecution, and accepted the artwork**

**into its collection.  Accordingly, the Guggenheim never had a commercially reasonable expectation or good faith reliance interest that it had acquired good title to the *Le Moulin de la Galette***

102.    In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim.

103.    In or around 1972, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to it, including *Le Moulin de la Galette.*  This research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim, and was not intended to determine if any artworks had been stolen, looted or confiscated.  In fact, the book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was  entitled *The Guggenheim Museum: Justin K. Thannhauser Collection*, by Vivian Endicott Barnett.

104.  In or around 1972, Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information they had developed regarding the artworks he had bequeathed to the Guggenheim.  Thannhauser *himself* reviewed these documents, and  --  where appropriate  -- made corrections and additions in his own hand on the documents.

105.  In or around 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette.*  Thannhauser wrote on this document in his own hand that he had acquired *Le Moulin de la Galette* from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935." (See document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive, attached hereto as Exhibit 4).

106.  In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and

other artworks. During this interview, Rich used typed documents, with information and questions about the artworks Thannhauser was donating based, upon information and belief, on Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K. Thannhauser." This document appears clearly to be based in part on Thannhauser's 1972 notes.

107. In March 1975, Rich recorded that Thannhauser told him that the Painting was on consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and added:

"[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon R. Guggenheim Museum Archive, attached hereto as Exhibit 5).

108. Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich establish that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser claimed he acquired ownership of *Le Moulin de la Galette* from Mendelssohn-Bartholdy some time after the Buenos Aires exhibition and around 1935.

109. Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser Collection* (1978), stated that Thannhauser acquired of *Le Moulin de la Galette* from Mendelssohn-Bartholdy in or around 1935:

> "[P]urchased from Moderne Galerie [owned by Thannhauser family] by Paul von Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K. Thannhauser, c. 1935**."

110. By 1975, the Guggenheim was aware that:

a. Paul von Mendelssohn-Bartholdy was Jewish, based, among other reasons, upon the fact that "Mendelssohn" is a recognizably Jewish name;

b. Mendelssohn-Bartholdy was from Berlin in Nazi Germany (<u>see</u> document entitled "JKT Notes" regarding another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under duress to Thannhauser, and that Thannhauser bequeathed to the Museum, where Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, ***<u>Berlin</u>***" [emphasis added], a copy of which is attached as Exhibit 6);

c. Nazi persecution of Jews began immediately after the Nazis took power in 1933, and increased in intensity throughout 1933-1935;

d. Mendelssohn-Bartholdy was selling *Le Moulin de la Galette* and at least one other artwork during this period, that is, Pablo Picasso's *Head of A Woman* (<u>see</u> Exhibits 4-6);

e. In addition, minimal additional research would have revealed:

      (1) the Mendelssohn family suffered tremendous persecution during the Nazi era; and

      (2) the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo Picasso artworks on consignment in Buenos Aires in October 1934, further evidence that Mendelssohn-Bartholdy was selling his art under duress; and

f. U.S. State Department "circular letters" warned museums that Nazi confiscated artworks were entering the U.S. marketplace, and urged them to take precautions against acquiring such works. Moreover, stories regarding Nazi

looted art being in the U.S. art market were regularly in the New York press.

111.    The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale" or forced consignment and theft. Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of Picasso artworks in a time period close to when the Nazis passed the Nuremberg Laws of 1935. Therefore, the Guggenheim's acceptance of the Painting in or around 1978 without performing additional research into Mendelssohn-Bartholdy's transfer to Thannhauser left it with no commercially reasonable expectation or good faith reliance interest that it had good title or that the true owner would not come forward to claim the Painting.

### The Guggenheim has Ignored the Nazi-Era Provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on notice of Thannhauser's trafficking in Nazi-confiscated art

112.    On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson. (See Exhibit 1). The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family. In addition, the article notes that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity. The article states the following regarding Thannhauser's background:

> US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

113.    The front-page Boston Globe article placed the Guggenheim on further notice of Thannhauser's dealings in Nazi-era art, and the need to investigate the provenance of the