artworks in the so-called "Thannhauser Collection" at the Museum to ascertain whether they were Nazi-confiscated.

114.  As the Art Loss Register stated with regard to *Boy Leading a Horse*: "the name [Thannhauser in the provenance] generally does not mean good things." (See Exhibit 2).

115.  Despite the Guggenheim's increasing knowledge of Thannhauser, it performed no additional research regarding the possibility that Mendelssohn-Bartholdy lost the Painting due to Nazi persecution.

> **The Guggenheim did not placed *Le Moulin De La Galette* on the Nazi-Era Provenance Internet Portal (NEPIP) -- Even though it clearly comes within the scope of items which should be included -- until it was contacted by the Mendelssohn-Bartholdy heirs**

116.    The Guggenheim did not place *Le Moulin de la Galette* on NEPIP or its own website as having a Nazi era provenance until the Mendelssohn-Bartholdy heirs contacted the Guggenheim about the painting.  *Le Moulin de la Galette* clearly met the criteria for inclusion on NEPIP, that is, any objects that:

- were created before 1946 and acquired after 1932,

- underwent a change of ownership between 1932 and 1946, and

- were or might reasonably be thought to have been in Continental Europe between those dates

117.  By accepting Thannhauser's gift of of *Le Moulin de la Galette* in disregard of its obvious Holocaust provenance -- and in violation of its fiduciary duties as a public trustee to take informed precautions against accepting Nazi-confiscated and stolen artworks into its collection -- and then purposely ignoring additional evidence that Paul von Mendelssohn-Bartholdy lost the artwork due to Nazi persecution, the Guggenheim has "unclean hands" and cannot raise the

equitable defense of laches. In addition, the Guggenheim had placed some artworks on NEPIP, but had purposely withheld artworks from the Thannhauser Collection -- including *Le Moulin de la Galette*. This concealment of potentially Nazi-looted art is another example of the Guggenheim's "unclean hands" in this matter.

## COUNT ONE
### (Conversion)

118. Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

119. At all times relevant hereto, the law has prohibited any person from wrongfully detaining property that belongs to another or in which another person has a superior legal possessory interest. When the possessor of such property refuses the demand of a person with a superior possessory interest in such property to return it, the law makes the wrongful possessor of such property liable to the other for conversion.

120. At all times relevant to the proceeding, and for the reasons stated herein, Schoeps has been a rightful owner of the Paintings and has had a legal possessory interest in the Paintings that is superior to the Museums'.

121. Before Schoeps commenced this action -- and on or about November 1, 2007 -- the Mendelssohn-Bartholdy heirs, through their attorneys, demanded that the Museums return the Paintings. The Museums, through their attorneys, refused the demand on December 7, 2007.

122. The Museums have wrongfully detained the Paintings in violation of the Mendelssohn-Bartholdy heirs' ownership rights and superior legal possessory interest, and have wrongfully refused to return them. The Museums wrongful conversion of the Paintings has caused

damages in an amount of more that four hundred million (US) dollars ($400 million).

## COUNT TWO
### (Replevin)

123. Schoeps reasserts and realleges each and every preceding averment in this Complaint as if fully set forth herein.

124. The Paintings are unique. When the above-entitled action was commenced, and at all times relevant hereto, the Mendelssohn-Bartholdy heirs -- including Schoeps -- were and still are the legal owners, and have a superior possessory right to, and are entitled to the immediate possession of, the Paintings.

125. The value of the Paintings exceeds four hundred million (US) dollars ($400 million).

126. The Paintings are currently in the possession of the Museums. The Museums have wrongfully detained and still detain the Paintings in violation of Schoeps' and the Mendelssohn-Bartholdy heirs' ownership rights and superior legal possessory interest.

127. The Museums' detention of the Paintings is wrongful for the reasons alleged herein.

128. Before the above-titled action was commenced -- and on or about November 1, 2007 -- the Mendelssohn-Bartholdy heirs, through their attorneys, duly demanded that the Museums return the Paintings. But the Museums -- through their attorneys -- refused, and continue to refuse, the Mendelssohn-Bartholdy heirs' demand.

129. The Museums' wrongful detention of the Paintings has caused Schoeps and the other Mendelssohn-Bartholdy heirs to sustain damages in an amount of more that four hundred million (US) dollars ($400 million).

## COUNT THREE
### (Request for Declaratory Relief under Fed.R.Civ.P. 57 and 28 U.S.C. § 2201)

130. Schoeps reasserts and realleges each and every preceding averment in this Complaint

as if fully set forth herein.

131.   At all times relevant to this proceeding, the law has permitted any court of the United States, upon the filing of an appropriate pleading, to declare the rights and other legal relations of any interested party seeking such declaration, regardless whether further relief is or could be sought.

132.   The Mendelssohn-Bartholdy heirs, including Schoeps, are the lawful and rightful owners of the Paintings, and the Museums are in inequitable possession of it.   An actual controversy exists as to this right.

133.   Schoeps seeks a declaratory judgment and order declaring the Mendelssohn-Bartholdy heirs to be the lawful and rightful owner of the Paintings.

## **PRAYER FOR RELIEF**

Wherefore, Schoeps seeks:

a) an order adjudging that the Mendelssohn-Bartholdy heirs, including Schoeps, are the owners and entitled to the immediate possession of the Paintings, and that the Paintings be delivered to Schoeps, and in case possession thereof cannot be given to Schoeps, that Schoeps have judgment against the Museums for the sum of no less than four hundred million (US) dollars ($400 million) with interest thereon;

b) an order declaring the Mendelssohn-Bartholdy heirs, including Schoeps, to be the lawful and rightful owners of the Paintings in accordance with applicable U.S. and New York law, and declaring the Museums possession of the Paintings to be inequitable, and resulting in unjust enrichment to the Museums;

c) an order requiring the Museums to make restitution of the Paintings to the Mendelssohn-Bartholdy heirs, including Schoeps,  in accordance with applicable New York and U.S. law;

d) an order imposing a constructive trust upon the Paintings for the benefit of Schoeps in accordance with applicable New York and U.S. law, and requiring the Museums to return the

Paintings to Schoeps;

     e) an award of Schoeps' costs, expenses and interest, and;

     f) such further and other relief as the Court may deem appropriate and just.

**DEFENDANT-COUNTERCLAIMANT JULIUS H. SCHOEPS DEMANDS A TRIAL BY JURY ON ALL FACTS AND ISSUES.**

Dated:  New York, New York
       April 28, 2008

                    BYRNE GOLDENBERG & HAMILTON, PLLC

                    By:   *John Byrne /dgs*
                      John J. Byrne, Jr. (JB-6687)
                      1025 Connecticut Avenue, N.W.
                      Suite 1012
                      Washington, D.C. 20036

                      Telephone:  (202) 857-9775
                      Facsimile:  (202) 857-9799

                      BRESSLER AMERY & ROSS, P.C.
                      David H. Pikus (DP-7846)
                      Kenneth M. Moltner (KM 7778)
                      David Smitham (DS-7778)
                      17 State Street
                      New York, New York 10004

                      Telephone:(212) 425-9300
                      Facsimile:(212) 425-9337

                      Attorneys for Defendant and Counterclaimant
                      Julius H. Schoeps

# EXHIBIT 1




Nobody Walks Away
From This Sale.
We Pedal The Best. For Less. Click here!

NO FRAME BACK



The Boston Globe                                        boston.com

## Nation | World

**RELATED COVERAGE**

**April 17, 1998**
IItaly calls N.Y.
museum's prized
collection stolen

**April 4, 1998**
Italy suspects
smugglers got artifacts
to US collector

**March 5, 1998**
Austria confronts dark
past by combing art for
Nazi links

**February 13, 1998**
Museums' stance on
Nazi loot belies their
role in a key case

**Jan. 30, 1998**
Guatemala demands
MFA return of artifacts

**Jan. 16, 1998**
Harvard museum
acquisitions shock
scholars

**Jan. 13, 1998**
Guatemalans demand
return of artifacts

**Jan. 9, 1998**
New York DA bars
return of Austrian art

**Dec. 6, 1997**
Mali presses for
museum artifacts

**Dec. 5, 1997**
Guatemala moving to
reclaim art

**RELATED STORIES**
A network of profiteers
Art histories at The Fogg and The MFA

# Murky histories cloud some local art

**By Maureen Goggin and Walter V. Robinson, Globe Staff, 11/09/97**

French art dealer Cesar Mange de Hauke died in 1965. But he comes alive in declassified documents in the US National Archives: collaborating with the leader of the notorious Nazi effort to plunder artworks systematically from Jews, and driving a German staff car in occupied Paris.

Yet in 1949, just as the State Department was denying him an immigration visa because of his Nazi complicity, de Hauke sold a magnificent pastel by Edgar Degas to New York financier Maurice Wertheim, whose collection passed to the Fogg Art Museum at Harvard, his alma mater, after his death in 1950.

At the Fogg, correspondence on file shows that Wertheim was skeptical about de Hauke's right to sell Degas's "Singer with a Glove." But he bought it anyway. National Archives documents only add to those suspicions: State Department records, evidence that the art was owned by a French family whose collection was targeted by the Nazis in 1941, and information that before it fell into de Hauke's hands it belonged to a Swiss doctor who purchased at least one other looted painting.

At both the Fogg and the Museum of Fine Arts in Boston, records suggest that other European artworks acquired during and after World War II arrived with pedigrees that should have aroused curiosity, if not suspicion. Now, a half-century later, once-secret government documents have provoked a fresh accounting of what happened to the war's spoils, and have provided new evidence that some unsuspecting collectors donated artworks that may have been plundered from Jews and other European collections to major museums.

The Degas is unusual for the amount of documentation that suggests it might have passed illegally through Nazi hands and, ultimately, onto a second-floor wall in the Fogg's most celebrated gallery, the Wertheim Collection. But the two museums have other works with suspect

**Dec. 4, 1997**
Questionable collection

**Nov. 27, 1997**
Family says art will be
returned if it was stolen

**Nov. 25, 1997**
Sotheby's takes work
tied to Nazis off block

**Nov. 09, 1997**
Murky history
surrounds some local
art

**Aug. 01, 1997**
Artworks taken as
reparations pose US
dilemma

**July 25, 1997**
Art registry did not
inform Met of claim

**July 24, 1997**
Stolen-art claims shake
N.Y. museum

**July 6, 1997**
Sweden probes a dark
secret

**June 24, 1997**
Norway says its probe
downplays WWII guilt

**May 18, 1997**
Art buyer fights
Holocaust heirs

**May 9, 1997**
US tracked WWII
influx of imported art:
Government did little
to prevent sale of
works here, files
suggest

**May 5, 1997**
Portrait Nazis stole is
hotly disputed: Auction
buyer, Customs hope
it's Rembrandt;
specialist isn't so sure

**April 25, 1997**

characteristics: unexplained wartime ownership gaps, the involvement
of dealers who collaborated with Nazi art looters, and, often, a failure
by the collectors or museums to make inquiries before acquiring them.

For example, a wartime FBI report suggests that the Museum of Fine
Arts was nonchalant about the origin of its acquisitions during the war.
The MFA's curator of prints, Henry Preston Rossiter, admitted to FBI
agents in 1941 he knew that one dealer, Richard Zinser, whose works
he bought routinely had been imprisoned in Germany for smuggling.

Rossiter bought prints from Zinser, including valuable works by
Albrecht Durer, even though, the FBI report noted, Rossiter said Zinser
"never reveals where he obtains his works."

After the FBI's visit, the MFA ceased buying Zinser's works.

Even so, in an interview on Oct. 24, MFA director Malcolm Rogers
asserted the museum has always insisted that its curators carefully
check the history of any acquisition. As evidence of that longstanding
commitment, he cited the MFA's written "Collection Policy" that
contains that requirement.

Last Thursday, a museum spokeswoman, Dawn Griffin, acknowledged
that the MFA's Collection Policy had been approved by the museum's
trustees on Oct. 23, the day before the Globe interview. She said,
however, that it had been in preparation for more than a year. But it was
not until Oct. 23 that the museum began requiring all dealers to sign
bills of sale affirming their right to sell the artwork.

Griffin refused the Globe's request to release a copy of the full 12-page
written policy, saying it was an internal museum document.

An open market

Mark Masurovsky, one of the first historians to find evidence about
unscrupulous dealers in the National Archives, said disinterest by
museums in the origin of artworks "sent a clear signal during and after
the war that there was an open and unquestioning market for looted
artworks in the United States." With that encouragement, de Hauke and
other unscrupulous emigre dealers had a clear financial incentive to
prey on Jews, said Masurovsky, who is working for the Holocaust Art
Restitution Project, an effort spearheaded by the National Jewish
Museum to document and locate works looted from Jews.

Jonathan Petropoulos, a historian at Loyola College in Baltimore who
has written extensively about wartime plundering, said there is no
evidence that American collectors and museums knew they were
acquiring looted art. But the combination of seemingly legitimate
middlemen, the zeal that museums brought to building their collections
and their unwillingness to ask probing questions of dealers or donors

Case 1:07-cv-11074-JSR    Document 41    Filed 04/28/2008    Page 9 of 26

An ignominious legacy: Evidence grows of plundered art in US

**April 19, 1997**
School sues for return of German art

**April 1, 1997**
A dispute in miniatures: Sherborn man seeks to keep art Germany wants back

**March 17, 1997**
Anti-Semitism of WWII era still burdens Paris: In Marais, ambivalence recalls Vichy regime

**March 16, 1997**
The 'Lost' masterpieces: In France, an uneasy look inward

**LINKS**
**Artwork online**

The French National Museums have posted on the Internet an incomplete, but growing list of the 1,955 paintings and other art objects that were removed to Germany during World War II, returned to France after the war, but never returned to their original owners. Color pictures accompany many of the artworks.

Click here to access the site.

The listings are in French. To review the works, go to the bottom of the initial page and click on the box labeled Sommaire. Then click on the Consultation. Then enter the surname

had a predictable result.

"The evidence, and it is growing, suggests that there may be hundreds of paintings in American museums that were stolen from Jews or looted from other European collections," Petropoulos said. "If you count drawings and lithographs, the number of artworks that have problematic ownership histories is probably in the thousands."

At the MFA and the Fogg, Rogers and other officials are left defending acquisitions that, in many cases, were made before they were born. They note that many artworks have gaps in their ownership, simply, and most often innocently, because owners cherish their anonymity, and sometimes forget where they bought paintings. The archival evidence pointing to other motives has only become available in the last two decades. And as public institutions, their collections are published for any claimant who wishes to come forward.

Moreover, the museum officials noted, there is no conclusive evidence that any of the paintings that the Globe asked about were stolen. And with no claimants for the artworks, much of the documentation is circumstantial.

Art specialists interviewed by the Globe said the Fogg and MFA are hardly unique among museums for acquiring art without applying any of the customary standards of due diligence that are required by law when real estate and even used cars change hands. Nowadays, most museums follow a standard practice, requiring donors and art dealers to sign documents declaring they have clear title to the artwork.

But experts in art law say such documents are legally meaningless, and amount to nothing more than a fig leaf for what the law now requires: a full title search that can identify problem artworks and provide a real defense if a claim is made.

Questionable provenance

The Globe decided to examine a small portion of the thousands of European paintings at the MFA and Fogg - modern paintings acquired during or after the war - after reporting earlier this year about war-related claims being pressed against other museums.

The Metropolitan Museum of Art in New York and the Philadelphia Museum of Art are facing allegations that they acquired looted artworks after the war. In another case, curators at the Art Institute of Chicago helped a major benefactor, Daniel Searle, acquire a Degas monotype looted from a Dutch victim of the Holocaust.

Officials at both the Fogg and the MFA cooperated, opening their archives for inspection, and doing original - and, some critics say, long overdue - research to fill gaps in provenance, or ownership of some

of an artist and click on the box Executer. That will bring up a list of the painter's works. To see one of the works, and a brief description, click on the title of the painting.

**LATEST NEWS**
National
International
Washington, D.C.

**WORLD REPORTS**
Middle East
Far East
Latin America
Russia
Europe
Africa
Canada

**Table of Contents**



**Archives**



Search the Globe:

⦿ Today
○ Yesterday

**SEARCH**

**Sections**
PAGE ONE
NATION|WORLD
METRO|REGION
BUSINESS
SPORTS
LIVING|ARTS
EDITORIALS
COLUMNS

paintings. The results, in some instances, are embarrassing to the museums, especially the Fogg, where four paintings have questionable provenances.

At the Museum of Fine Arts, the issue is often how little it knows about some of its artworks. For example, the MFA bought a Monet painting from Brandeis University in 1974. Records at the MFA and Brandeis suggest that neither institution knew anything about the ownership of "Woodgatherers at the Edge of the Forest" during most of the century after Monet painted it in 1864. The painting was purchased in 1961 from New York dealer Alexander Ball by Harold Kaplan, who donated it to Brandeis in 1968.

Ball, according to National Archives records, had frequent dealings with Nazi art looters - and a business relationship with Hans Wendland, who funneled numerous stolen paintings into a wartime black market that included emigre dealers in New York.

At the MFA, some valuable paintings have no ownership history, except the name of the donors: The museum, for instance, knows nothing about the history of five paintings left to the museum in 1948 by one of its benefactors.

The museum has also been unable to identify who owned one of its Picassos, "Standing Figure," during the 37 years before the MFA bought the work from Swiss dealer Fritz Nathan in 1958. In a letter to the Globe suggesting that suspicions about the provenance of MFA paintings are unwarranted, George T. M. Shackelford, the curator of European paintings, said Nathan's gallery "for more than half a century was generally regarded as one of the most distinguished art galleries in Europe."

Yet Nathan was the wartime art adviser and purchasing agent for Emil G. Buhrle, a Swiss collector who knowingly bought many paintings that had been looted from Jews, according to extensive Allied interrogation reports in the National Archives. What's more, a 1921 auction catalog shows that the painting had been sold to a "Winberg."

Rogers, speaking from hindsight, said knowledge about Ball's wartime activities makes it "very unlikely" the MFA would have purchased the "Woodgathers at the Edge of the Forest" without conducting a thorough investigation. "Clearly," he said, "that would ring alarm bells."

But Rogers noted that much of the information surfaced only recently. "Inherent in the trading of any goods, as I'm sure you know since you must have bought second-hand goods yourself or from antique shops, is a matter of professional confidence," he said. As for most gaps, he added, "Human nature and memory are much more fragile than you think, and our knowledge is often incomplete.... Incompleteness is no grounds for suspicion."

Case 1:07-cv-11074-JSR  Document 41   Filed 04/28/2008   Page 11 of 26

CALENDAR
DISCUSSIONS
CLASSIFIEDS
LATEST NEWS
EXTRAnet
ARCHIVES

Still, he said, recent disclosures, some of them in the Globe, have led to a "new awareness [of a problem] that nobody guessed the size of, and we're all trying to cope with that."

Rogers, confronting questions about artworks acquired a half century ago, wondered why they were not raised in the 1950s and 1960s by the many Jews who, he said, were art dealers, collectors and art historians.

"But it is fascinating why in the years following the war ... more wasn't said, people weren't more enraged ... particularly since so many of the people in the art world were Jewish at that time. So many of the scholars were people who had fled. You know, most of the great giants in the art historical world were Jewish in that period ... The collectors were as well. Very strange," Rogers said.

Selling off paintings to survive

Unlike the much larger MFA, the Fogg has virtually no staff or money to undertake the sort of provenance research the Globe conducted: Its annual budget for out-of-town research is just $2,000.

The Fogg collections, built on the philanthropy of Harvard's most successful graduates, also contain their share of paintings with incomplete, and sometimes suspicious ownership records.

Across the room from the Degas in the Wertheim Collection is a haunting 1887 still life by Vincent van Gogh, "Three Pairs of Shoes," with its subliminal message about the misery of Europe's working poor. Wertheim bought it in late 1943 from the best-known of the emigre dealers, Georges Wildenstein. Wildenstein, like de Hauke, had a business relationship with Karl Haberstock, Hitler's principal art looter.

But where did Wildenstein obtain the van Gogh? According to the Fogg's records, it came from Marcel Kapferer, a French Jew. His granddaughter, Francine Legrand-Kapferer, said in a recent interview that Kapferer hid his family from the Nazis in Cannes during the war, selling off paintings one at a time to survive. Legrand-Kapferer said that her grandfather frequently reminded his family that but for those sales, they would have died.

All such sales under duress in Nazi-occupied Europe were declared invalid under a 1943 Allied declaration. If the van Gogh was among the works sold during the war - and Legrand-Kapferer said she did not know whether it was - then the artwork would enter a legal limbo.

Even more suspicious is a Monet, "La Mere Paul," listed at the Fogg as owned before the war by Paul Wittgenstein in Vienna and bought by the Wertheim Fund for the Fogg in 1955.

At the Globe's request, Austrian journalist Hubertus Czernin searched

Case 1:07-cv-11074-JSR  Document 41  Filed 04/28/2008  Page 12 of 26

out Nazi records in Austrian archives. They show that the Nazis confiscated a substantial art collection from a renowned Vienna concert pianist of the same name, Paul Wittgenstein, though the records are incomplete.

Wittgenstein's daughter, Joan Ripley of Charlottesville, Va., said her father, who was of Jewish ancestry, fled to New York in 1938 and as far as she knows never returned to Vienna, or recovered the bulk of his property after the war. Another relative, though, recalls a "a painting of an old woman, a Monet" that once hung in Wittgenstein's home.

The record shows that the Monet next surfaced in a gallery in Stuttgart, Germany, in 1954, where it was bought by Jacques Seligmann, another emigre dealer and associate of de Hauke who has been implicated in wartime art collaboration. Seligmann sold it to the Wertheim Fund.

The $38,500 Degas

But it is the Degas pastel that Wertheim bought the year before he died that has the most troubling history.

Maurice Wertheim was a tournament chess player, a founder of the New York Theatre Guild, for a time the owner of The Nation magazine, and the father of Barbara W. Tuchman, the Pulitzer Prize-winning historian. During the war, he was also chairman of the American Jewish Committee.

Wertheim was fearful that de Hauke did not have the right to sell the Degas, though the correspondence at the Fogg does not suggest why. To allay his fears, Wertheim had his lawyer call Justin Thannhauser, an associate of de Hauke, while de Hauke was en route to a meeting with Wertheim. Thannhauser told the lawyer that de Hauke did not own the pastel, but was selling it for a Dr. Heer of Zurich.

Yet when de Hauke arrived, he told Wertheim that his corporation owned the Degas, but refused to sign a statement saying he had authority to sell it. Wertheim nonetheless handed over a check for $38,500 for the artwork.

"Mr. Wertheim made the remark that he is aware of the fact that he took a chance with regard to the title of this picture, but that in view of the information obtained from Thannhauser, the risk involved is rather remote," the Wertheim lawyer, Hermann E. Simon, wrote at the time.

Three weeks later, Simon received a letter, apparently from de Hauke's lawyer, asserting that de Hauke bought the picture from Thannhauser - another apparent contradiction.

Ivan Gaskell, the Fogg's curator of paintings, sculpture and decorative arts, said that when he first saw the correspondence three or four years

Case 1:07-cv-11074-JSR Document 41 Filed 04/28/2008 Page 13 of 26

ago, he interpreted it to mean that both dealers had an interest in the work. "In and of itself, it did not suggest any suspicion," Gaskell said.

But the US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

The original listed owner of the pastelwas Camille Groult. Declassified US documents show that Haberstock, the Nazi art looter with ties to de Hauke, hired another art collaborator to "expertise" the Groult collection, a common step before a confiscation or forced sale. The Groults were apparently not Jewish, and efforts to determine what happened to their collection, or whether the Degas was part of it at the time, were unavailing.

The next owner in the chain was Dr. Fritz Heer, identified in National Archives documents as a Swiss collector who purchased at least one looted painting.

Several documents that historian Mazurovsky discovered in the National Archives contain intelligence information and post-war State Department correspondence that build a case against de Hauke for his ties to Haberstock and his role in art looting, even suggesting he may have been involved in obtaining paintings for Adolf Hitler, Hermann Goering and Heinrich Himmler. Two months before Wertheim bought the Degas, a handwritten note by a State Department official concluded de Hauke "knowingly handled looted art in his deals with the Germans" and that he should be denied a visa to remain in the United States.

Gaskell, the Fogg curator, said he is eager to track down more information about the paintings, especially the Degas. In light of the archival records, he said of the one artwork,"There are clearly red lights all along the way."

Previous coverage and related links are available on Globe Online at www.boston.com. The keyword is paintings.

This story ran on page A01 of the Boston Globe on 11/09/97.
© Copyright 1997 Globe Newspaper Company.




We Pedal The Best. For Less. Click here!

© Copyright 1998 Globe
Newspaper Company

The Boston Globe
EXTRANET
Extending our newspaper services

Return to the home page
of The Globe Online

Murky histories cloud some local art by Maureen Goggin and Walter V. Robinson <br><i... Page 8 of 8



to the web

# EXHIBIT 2

# THE ART LOSS REGISTER, INC.

20 East 46th Street, Suite 1402
New York, NY 10017

Telephone: 212-297-0941
Facsimile: 212-972-5091
Email: info@ALR.ny.com

September 18, 2001

Christel Hollevoet-Force
Research Assistant, Provenance
The Museum of Modern Art
11 West 53rd Street
New York, NY 10019

Invoice: MOMA210-5

Dear Ms. Hollevoet-Force:

Thank you for your search request.  We have completed the Art Loss Register database search on the following items:

**Artist:**       Pablo Picasso
**Title:**        *Boy Leading a Horse*
**Date:**         early 1906
**Medium:**       Oil on canvas
**Dimensions:**   7' 2 ¾" x 51 ½" (220.3 x 130.6 cm)
**Provenance:**   Ambroise Vollard, Paris; Gertrude and Leo Stein, Paris, by 1907 – before 1913; Paul von Mendelssohn-Bartholdy, Berlin; Justin Thannhauser, Munich; Siegfried Rosengart, Lucerne; Albert Skira, Geneva; William S. Paley, New York, 1936; The Museum of Modern Art, New York. Gift of William S. Paley, 1964.

Color image Provided.

ALR NOTE: Paul von Mendelssohn – Bartholdy, Berlin might have been related to Francesco Mendelssohn , whose collection underwent a forced sale.  The Thannhauser archives are in Geneva now, and the name generally does not mean good things.  Sigfried Rosengart records are now in Lucerne, Switerland.  It might be worth checking with them to get a date of sale, as Albert Skira is a red flag list name, althoug it might be alright as the painting went to New York so early on.

**REDACTED**



# THE ART LOSS REGISTER, INC.

REDACTED



**REDACTED**

As of September 18, 2001, these items have not been registered as stolen or missing on the Art Loss Register database. Nor are they listed in the published sources of WWII losses that are known to the Art Loss Register. As stated in the Terms and Conditions, the database does not include items that may have been illegally exported. Also, not every theft is necessarily reported to us.

Should you have any further questions or inquiries, please do not hesitate to contact us by telephone or fax. Thank you for using the Art Loss Register.

Sincerely,

Lucy Haverland

4

# EXHIBIT 3

<u>PABLO  PICASSO</u>                    <u>born 1881</u>

WOMAN    Oelgemaelde          100 x 70 cm          40 x 28 inches

Bildnis Madame Soler          Barcelona              1903

Ausgestellt Muenchen,  Galerie Thannhauser,
Erste Picasso Ausstellung                            1909

Armory Show in New York: "International Exhibition    1913
of Modern Art," Association of American Painters and
Scultors.  69th Infantery Regiment Armory, New York,
      # 148                        Febr.March    1913
Armory Show    Art Institute, Chicago, Ill. March/Apr.  1913
Armory Show    Copley Hall, Copley Society, Cat.#148
          Boston, Massachussetts        April/May   1913
Christian Zervos, "Pablo Picasso", Volume I,
Repr.P.90, No.200;angefuehrt rueckwaerts Plate 47,
No.200.

Galerie Thannhauser, Berlin, Ausstellung moderner    1930
deutscher und franzoesischer und spanischer Künstler,

Sammlung Paul von Mendelssohn Bartholdy, Berlin

Erste Picasso/Ausstellung in Süd Amerika:      Okt. 1934
Buenos Aires,  Katalog No. 1.

Jean Cassou, Picasso, Paris 1939 (franzoes.Ausg.)    1939
Jean Cassou, Picasso, London / New York, Hyperion
          Press                                  1940
          abgeb. gangseitig  S. 46

Museum of Modern Art, New York, "Twentieth Century   1943
          Portraits,"Exhibition by Monroe Wheeler
          Seite 141

Santa Barbara Museum of Art, California:            1953
          "Fiesta Exhibition," No. 4.

Marion Koogler McNay Art Institute,  Catal.# VII.   1961
San Antonio, Texas, Special Exhibition.
Reproduced.

"An American Tribute", Retrospective Picasso Show,
Benefit Exhibition for "Public Education Association"1962
Cat. # 19.     Reproduced.
                                                  1963

"The Armory Show in retrospect", Book by Edward H.Dwight, Director,
Museum of Art, Munson Williams Proctor Institute, Utica,
(Die Ausstellung war wiederholt in Utica, und danach in
derselben Armory in New York wie in 1913.) Das Bild ist
verzeichnet auf Seite 200, unter No.348;doch es war nicht
ausgestellt. Ist aber ganzseitig reproduziert, Seite 85.

Ein Bildnis gleicher Grösse stellt den Gatten der Madame
Soler dar und befindet sich im Eremitage Museum in Leningrad.
(Zervos, Picasso, Vol.I, P.90, Abb.199,Catal.S.45; No.199.)

Vergl.das grosse Bild der Familie Soler mit 4 Kindern,früher
Wallraf Richartz Museum,Köln;unter Hitler versteigert; in der
Schweiz;verkauft an Museum in Liège (Luettich).Zervos,I,203.

# EXHIBIT 4

*JF/note*
*Dec. 1970*

**The Solomon R. Guggenheim Museum Archive**
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

*152.65*

Museum Number 16

Pablo Picasso

Le Moulin de la Galette, Paris, 1900 (autumn).

Oil on canvas, 35½ x 46 (frm. stretcher rev.)

Signed b. r. "P. R. Picasso – "

Provenance: From the artist; Paul von Mendelssohn-Bartoldy (ca. 1910;
from Thannhauser Gallery, Berlin (ca. 1909); bought back by
Justin Thannhauser, ca. 1935.

Exhibitions:   Picasso, Forty Years of his Art, Museum of Modern Art,
New York, (1939), #5, p. 24 (ill.).
? Chicago, Art Institute     1939 or 1940?
Picasso: Fifty Years of his Art, Museum of Modern Art,
New York, 1946, p. 18 (ill.).

Picasso: 75th Anniversary Exhibition, Museum of Modern Art,
New York, 1957, p. 15 (ill.).

Picasso, Philadelphia Museum of Art, 1958, #4 (ill.).

Picasso, Arts Council of Great Britain, London Tate Gallery, 1960, #4, (ill. pl. 1b).

Literature:   Zervos, Christian, Pablo Picasso, I, # 4.

Cirici-Pellicer, Alexandre, Picasso Avant Picasso, trans. from
the Spanish edition of 1946 by Marguerite de Floris and
Ventura Gasol, Geneva, 1950, pp. 65-69.

Barr, Alfred H. Jr., Picasso: Fifty Years of his Art, New York,
1946, pp. 19-20.

Boeck, Wilhelm and Sabartès, Jaime, Picasso, New York, 1955, p. 117.

Asnar, Jose Camon, Picasso y el Cubismo, Madrid, 1956, #214 (ill.).

Penrose, Roland, Picasso: His Life and Work, New York, 1959,
pp. 63-64, ill. #8, pl. I.

Champris, Pierre de, Picasso, Ombre et Soleil, Paris, 1960, #3 (ill.),
p. 15.

Blunt, Anthony and Pool, Phoebe, Picasso, the Formative Years,
London, 1962, "First Visit to Paris 1900," pp. 12-14.

*Also elsewhere often reproduced*

*Helen F. Mackenzie   Understanding Picasso "Sponsored by the
Art Institute of Chicago" Illinois of Art Press 1940. Plate 1.*

# EXHIBIT 5

JKT                                                                    34

Provenances for The Solomon R. Guggenheim Museum Archive

The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

## The End of the Road

Private collection, Barcelona    *By 1957 JKT,*

✝ <u>Au Café</u>, <u>Woman and Child</u>, <u>Man with Pack</u>    *All in Zürich 1932*

All Santiago Laporta, Barcelona

## Le Moulin de la Galette

From the artist; Thannhauser Gallery, Munich (c. 1909);
Paul von Mendelssohn-Bartoldy (c. 1910-1935);
Justin K. Thannhauser    *B-aires*    *sent to B-aires in*

*consign. went;*    *1934,*

## The Fourteenth of July

*1936-37*

From whom was it purchased in Paris about 1937? ±  *3-6-57.*

*Picasso — Pierre Loeb? NY.*    *→ 1938-1*

## Woman Ironing    *Berlin. Strasbourg ~ Holland. another gallery to*

Did <s>you sell it</s> to Karl Adler about 1916 and
buy it back in <s>the</s> late 1930's?

Who owned it before?    *Kahn ??. 1 pg (didn't deal in*
Acc. Zervos, A. Vollard.    *Picasso then.*

## Head of a Woman (pastel)

When did it belong to Paul von Mendelssohn-Bartoldy,
Berlin?

*loan to Legrin.*    *1935-36*
*Consignment* It belonged to Justin K. Thannhauser at the time of
the 1934 Buenos Aires exhibition, didn't it? *no*

## ✗ Vase and Flowers (drawing)

Gallery in Paris

## Two Harlequins

*august 1939*
Who was Mlle. A. Nachmann? *South of ??*
*— middleman (??*
When and from whom did you acquire it? - *sent to Cuçar.*

# EXHIBIT 6

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

Pablo Picasso

HEAD OF A WOMAN (TÊTE DE FEMME), 1903 *or*, Paris (?).
*(and gouache?)*
Pastel on paper, 11 3/8 x 11 1/8 (JKT). 12 3/16 " 13 5/16 (*30 x 34*)

Signed t. r. "Picasso"

Provenance:   *Coll. Paul v. Mendelssohn-Bartholdy, Berlin*

Exhibitions:   *first Picasso Exhibition in South America,*
*Buenos Aires 1934, arranged by J. K. Thannhauser,*
*Thannhauser Galleries, Paris, 1937.*

*quest. on Cat*

Related Works:   Zervos I, #205 (Tête de Femme, Barcelona, 1903);
#254 (Fernande Olivier, 1906);
Zervos VI, #747 (portrait de Fernande, 1906).

Literature:   Zervos, Christian, Pablo Picasso, I (1957), #206.

Cirici-Pellicer, Alexandre, Picasso avant Picasso,
trans. from the 1946 Spanish edition by M. de Floris
and V. Gasol, Geneva, 1950, #175 (Tête de Femme,
1903, pastel), ill.