UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MUSEUM OF MODERN ART, and THE SOLOMON R. GUGGENHEIM FOUNDATION,<br><br>Plaintiffs,<br><br>-v-<br><br>JULIUS H. SCHOEPS,<br><br>Defendant.<br>──────────────────────────<br><br>JULIUS H. SCHOEPS, EDELGARD VON LAVERGNE-PEGUILHEN and FLORENCE KESSELSTATT,<br><br>Counterclaim-Plaintiffs,<br><br>-v-<br><br>THE MUSEUM OF MODERN ART, and THE SOLOMON R. GUGGENHEIM FOUNDATION,<br><br>Counterclaim-Defendants. | 07 Civ. 11074 (JSR)<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COUNTERCLAIM

Now comes the Counterclaim-Plaintiffs Professor Julius H. Schoeps ("Professor Schoeps" or "Schoeps"), Edelgard von Lavergne-Peguilhen ("Ms. Lavergne-Peguilhen" or "Lavergne-Peguilhen"), and Florence Kesselstatt ("Dr. Kesselstatt" or "Kesselstatt"), in their personal capacities and  by their attorneys, BYRNE GOLDENBERG & HAMILTON, PLLC, for their Counterclaim against Counterclaim-Defendants the Museum of Modern Art (MoMA) and the Solomon R. Guggenheim Foundation (Guggenheim Foundation), and herein allege upon

knowledge as to their own acts and upon information and belief as to the acts of others:

**INTRODUCTION**

1.  Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) was a wealthy Berlin banker of Jewish descent who lost many artworks in Nazi Germany as a direct and intended consequence of Nazi persecution, through forced consignments and either duress sales or thefts. Accordingly, no good title to these works was ever transferred to subsequent possessors, and Mendelssohn-Bartholdy's heirs and assigns are the true owners.

2.  This Counterclaim seeks the restitution of two paintings that Mendelssohn-Bartholdy lost in Nazi Germany: (a) Pablo Picasso's painting *Boy Leading a Horse*, oil on canvas, approximately 220 x 130.6 cms., completed approximately 1906 (*Boy Leading a Horse*), currently located at MoMA; and (b) Pablo Picasso's *Le Moulin de la Galette*, oil on canvas, approximately 88.2 x 115.5 cms., completed approximately 1900 (*Le Moulin de la Galette*), currently located at the Solomon R. Guggenheim Museum (Guggenheim Museum), which is owned and operated by the Guggenheim Foundation. The Guggenheim Foundation and Guggenheim Museum may be referred to jointly as the "Guggenheim." *Boy Leading a Horse* and *Le Moulin de la Galette* may be referred to jointly as the "Paintings." MoMA and Guggenheim may be referred to jointly as the "Museums."

3.  Mendelssohn-Bartholdy died in Nazi Germany in May 1935. He was married to Elsa von Mendelssohn-Bartholdy (Elsa) at the time of his death, and was also survived by four sisters: Kathe Wach; Enole von Schwerin; Charlotte Hallin; and Marie Busch. Marie Busch was Schoeps' grandmother. Mendelssohn-Bartholdy left all of his estate in varying interests to his widow, Elsa, and his sisters. In 1935, a Certificate of Inheritance was issued reflecting that his heirs were his widow (life estate) and surviving sisters (residual estate).

4. Counterclaim-Plaintiffs are proceeding on alternative theories of recovery and inheritance, which is necessary due to ambiguities regarding ownership of the Paintings which came about due to the Nazi persecution suffered by both Paul von Mendelssohn-Bartholdy and Elsa because of Mendelssohn-Bartholdy's Jewish background, as discussed immediately below.

5. Paul von Mendelssohn-Bartholdy had accumulated an impressive art collection at the time of his marriage to Elsa in 1927, including the Paintings and many other works by prominent artists. There is no evidence in or around 1927 that Mendelssohn-Bartholdy transferred any part of his art collection to Elsa at that time.

6. Mendelssohn-Bartholdy never sold any art before January 1933, when the Nazis came to power. Then, in 1934, after suffering more than a year of unrelenting Nazi persecution, Mendelssohn-Bartholdy began selling integral parts of his collection, including many of his most valuable paintings. For example, in or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale the Paintings and three other Picasso artworks with art dealer Thannhauser. Mendelssohn-Bartholdy alone dealt with Thannhauser regarding these artworks.

7. On February 8 1935, Mendelssohn-Bartholdy executed a "Contract for the Disposition of Property," which under German law is an alternative to a Will. In his Contract for the Disposition of Property, Mendelssohn-Bartholdy inserted a statement that he had given his "paintings" to Elsa as a wedding gift in 1927. Upon information and belief, Mendelssohn-Bartholdy inserted this provision in his Contract of Inheritance to protect his artworks from Nazi predation, and in fact Mendelssohn-Bartholdy never had given such a gift to his wife. In addition, even if this bequest created an *inter vivos* gift of Mendelssohn-Bartholdy's art collection to Elsa as of February 8, 1935, Mendelssohn-Bartholdy did not intend to transfer to Elsa art that he had already sold or that he had placed on consignment for sale in his name. Therefore, recoverable artwork that Mendelssohn-

Bartholdy lost in the Nazi period would have been "choses in action" that were part of Elsa's life

estate after Mendelssohn-Bartholdy's death in 1935, and then became part of Mendelssohn-

Bartholdy's residual estate inherited by Professor Schoeps and the other heirs of Mendelssohn-

Bartholdy's sisters at the time of Elsa's death in 1986.

8.   In the alternative, if Mendelssohn-Bartholdy's Contract for the Disposition of Property

created a transfer of the Paintings to Elsa as of 1927 or as of February 8, 1935 (the date of the

Contract), then the owners of the Paintings are Elsa's heirs, Ms. Lavergne-Peguilhen and Dr.

Kesselstatt.

9.   In any event, the heirs of Mendelssohn-Bartholdy's sisters as well as Elsa's heirs are

aware of their competing ownership claims to the Paintings, but have decided to jointly pursue

restitution of the Paintings.

10.   In violation of the affirmative fiduciary duties that the Museums owe the people of New

York and the U.S. as charitable, tax-exempt entities and public trustees, the Museums acquired the

Paintings in reckless disregard of the likelihood that they may have been lost as a direct and

intended consequence of Nazi persecution either in prototypical forced sales or by theft.

Accordingly, the Museums never entertained a reasonable, good faith, or legally valid expectation

or reliance interest that they owned either Painting or that the true owners would not come forward

at any time and seek to reclaim them.

## THE PARTIES

11.   Counterclaim-Plaintiff Professor Julius H. Schoeps is an individual residing in

Berlin, Germany.  Professor Schoeps is the director of the Moses Mendelssohn Center for

European-Jewish Studies at the University of Potsdam in Potsdam, Germany.  Schoeps is a

tenured professor and is one of the founders of the University of Potsdam.  Schoeps is Paul von

4

Mendelssohn-Bartholdy's great-nephew, and German court records establish that he is an heir to 12.5% of the estate of Paul von Mendelssohn-Bartholdy. Schoeps brings this action in his personal capacity as an heir of Mendelssohn-Bartholdy. In addition, Mendelssohn-Bartholdy's sisters and widow, Elsa, are all deceased. All of the living heirs of Mendelssohn-Bartholdy's sisters (Kathe Wach, Enole von Schwerin, Charlotte Hallin, and Marie Busch) are aware of this litigation and currently do not wish to participate in it.

12. Counterclaim-Plaintiffs Ms. Lavergne-Peguilhen and Dr. Kesselstatt are individuals residing in Munich, Germany. They are the sole heirs of Elsa von Mendelssohn-Bartholdy, who died in Switzerland in 1986. Dr. Kesselstatt is the adopted daughter of Elsa, and Ms. Lavergne-Peguilhen is Elsa's niece.

13. Upon information and belief, counterclaim-defendant MoMA is and at all relevant times was a not-for-profit New York education corporation, organized and operated under the laws of the State of New York as an art museum open to the public, with its principal place of business located at 11 West 53rd Street, New York, New York 10019-5497.

14. Upon information and belief, counterclaim defendant the Solomon R. Guggenheim Foundation is and at all relevant times was a not-for-profit New York education corporation, organized and operated under the laws of the State of New York. The Solomon R. Guggenheim Foundation owns and operates the Guggenheim Museum, and has its principal place of business at 1071 Fifth Avenue, New York, New York 10128.

15. The Museums are tax-exempt organizations under ' 501(c)(3) of the Internal Revenue Code (26 U.S.C. ' 501(c)(3). As charitable, tax-exempt entities, the Museums operate as public trustees and owe the same fiduciary duties of loyalty and care to the public that the trustee of a private trust owes the trust beneficiaries. These duties include taking affirmative precautions to

ensure that the trust has valid legal ownership of any asset that the trust acquires, and that the trust acquires only such assets as are appropriate for the specific purposes and objectives of the trust. The Museums must operate both according to the law as well as clarion public policies of the U.S. and New York State. These policies include the return to rightful owners of artworks that were stolen or lost as a direct and intended consequence of Nazi persecution. As tax-exempt entities, the Museums are forbidden to operate in a manner that violates the law, such as by abdicating their fiduciary duties as public trustees to take affirmative precautions against acquiring stolen or Nazi-confiscated artworks for their publicly-supported collections. In addition, the Museums are prohibited from operating in a manner that violates public policy by encouraging or facilitating criminal activity, such as trafficking in stolen or Nazi-confiscated artworks or illicit cultural property.

## JURISDICTION & VENUE

16. This Court has jurisdiction over the subject matter of the claims set forth hereunder pursuant to federal diversity jurisdiction under Article III, Section 2 and Article I, Section 9 of the United States Constitution, and under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship. Counterclaim-Plaintiffs Professor Schoeps, Ms. Lavergne-Peguilhen, and Dr. Kesselstatt are residents and citizens of a foreign state, the Federal Republic of Germany, and the Museums reside in the State of New York.

17. This Court has personal jurisdiction over each of the Museums under the doctrines of general jurisdiction, based on their substantial and continuous contacts with New York, the forum state, and their offices located in this state, and, alternatively, based on specific personal jurisdiction

because the substance of this case relates to the Museums' business activities, that is, the wrongful

continued possession of the Paintings in New York and within this judicial district, which activities

constitute, at least in part, their actions, or failures to act, leading to the filing of this Counterclaim.

18.    The Court also has *in rem* jurisdiction to determine claims of ownership to property

located within this State.

19.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because the

Museums reside in this judicial district, a substantial part of the events or omissions giving rise to

the claim occurred in this judicial district, and the properties that are the subject matter of this

action -- the Paintings -- are situated in this judicial district.

## SUMMARY AND OVERVIEW

### The Official Policies of Nazi Germany to Politically Persecute and Economically Devastate Germany's Jews Compelled Paul von Mendelssohn-Bartholdy to Begin His Efforts to Sell His Artworks Under Duress in Berlin

20.    Paul von Mendelssohn-Bartholdy was born on September 14, 1875 in Berlin to a

famous German family of Jewish descent. The composer Felix Mendelssohn, and the

Enlightenment philosopher, Moses Mendelssohn, were members of this illustrious family, which

distinguished itself in the arts, business, finance and philosophy. Family members founded

Mendelssohn & Co. bank in 1795.    Mendelssohn & Co. had become one of the largest private

banks in Germany when the National Socialist German Worker's Party ("Nazis" or "Nazi party")

came to power in January 1933.

21.    Paul von Mendelssohn-Bartholdy was part owner and co-manager of Mendelssohn &

Co.  Mendelssohn-Bartholdy's inheritance and success as a private banker afforded him a lifestyle

in Berlin befitting a man of dynastic wealth. Mendelssohn-Bartholdy lived in a downtown mansion

near the Reichstag Building at Alsenstrasse 3 & 3a (Alsenstrasse) with his wife and a large staff that

maintained the premises, and spent summers at a sprawling country estate named Gutshaus

Boernicke (Boernicke).  Mendelssohn-Bartholdy also was the Royal Consul General for Denmark,

and held many other prestigious social and professional positions.

22.   In addition, before the Nazi takeover of Germany, Mendelssohn-Bartholdy owned one of the great European private art collections, which included many paintings by Pablo Picasso and Vincent van Gogh, as well as works by Manet, Renoir, Monet, Degas, Tiepolo and others.

23.   Paul von Mendelssohn-Bartholdy based his self-identity in material part upon his status as a preeminent collector of modern art.   Upon information and belief, Paul von Mendelssohn-Bartholdy never sold, or attempted to sell, **any** art before the Nazis came to power in 1933.

24.   When Adolf Hitler became Chancellor of Germany on January 30, 1933, Mendelssohn-Bartholdy became an immediate target of persecution. As a wealthy private banker from a prominent Jewish family living in a mansion in downtown Berlin close to the Reichstag building, Mendelssohn-Bartholdy epitomized everything that the Nazis hated. And he suffered the full brunt of Nazi abuse and torment from January 1933 until his untimely death of a heart attack in May 1935.

25.   The Nazis resented private Jewish-owned banks like Mendelssohn & Co., which they blamed for Germany's economic misfortunes and loss of World War I.   After several months of Nazi rule, many cities and districts refused to do business with Jewish-owned banks.   As a result, these banks lost the municipal bond business, which was an important source of revenue for private banks.   Accordingly, the decline of Jewish-owned banks began almost immediately after the Nazi takeover. Starting in late 1933, the Nazis discussed summarily extinguishing all Jewish-owned banks.   Nazi intimidation, pressure, and rhetoric led Mendelssohn & Co.   --   like other Jewish-owned banks -- to fear that the Nazis would terminate them at any moment.

26.   Official Nazi policies wreaked havoc upon Paul von Mendelssohn-Bartholdy. In a period of less than two and one half years, Mendelssohn-Bartholdy: sustained significant banking losses because Mendelssohn & Co. was a Jewish-owned bank; suffered a precipitous decline in personal net worth; lost prestigious and invaluable positions in business, professional, and social organizations; fled his spacious downtown home for a garden house out of fear of the Nazis; had an "Aryan" employee quit under Nazi party pressure because the Nazis objected to the employee

8

working for a Jew; agreed to surrender land he owned to the Nazi government under apparent Nazi pressure; placed financial encumbrances (Grundschulden) on both his residences to protect them from Nazi expropriation; and, as a Jew, was designated an "alien" under Nazi citizenship laws (January 1934). Finally -- and consistent with his debilitated status and desolate future -- Mendelssohn-Bartholdy began selling into a depressed market many prized paintings from his extraordinary collection.

27.    In or around October 1934, Mendelssohn-Bartholdy placed on consignment for sale with Berlin art dealer Justin K. Thannhauser the Paintings along with three other Pablo Picasso artworks:  *The Absinthe Drinker (Angel Fernandez de Soto)*(1903); *Portrait of Mme. Soler* (1903); and *Head of a Woman* (1903).  Mendelssohn-Bartholdy made the consignments as a direct and intended consequence of the unremitting Nazi persecution set forth in the preceding paragraph.  In addition, Mendelssohn-Bartholdy acted personally and without the assistance or knowledge of any other family member in his attempts to sell the artworks through Thannhauser.

28.    In or around October 1934, Thannhauser attempted to sell the five Picasso artworks owned by Mendelssohn-Bartholdy at an exhibition in Buenos Aires, Argentina.  No sales were made.

29.    Following the failed attempt to sell Mendelssohn-Bartholdy's Picasso artworks in Buenos Aires, Thannhauser either (a) purchased them from Mendelssohn-Bartholdy for a price far below market value, or (b) stole the Paintings.

30.    As noted, Mendelssohn-Bartholdy never sold **any** works from his private collection until after the Nazis came to power.  Then -- precipitously -- and only after nearly two years of unrelenting and intensifying Nazi persecution, he began the process of selling integral components of his collection which included many of his gems into a depressed market that was ever more saturated with artworks from other Jewish collectors reeling from Nazi persecution.  That Mendelssohn-Bartholdy, who derived immense personal fulfillment from his status as a prominent collector of modern art, let go so many valuable paintings under these circumstances -- and only after discriminatory Nazi policies and relentless pressure had devastated him financially,

9

professionally and socially -- confirm that Nazi persecution alone induced these transactions, and that his heirs are the true owners of the Paintings under New York and U.S. law.

31.     After Paul von Mendelssohn-Bartholdy relinquished *Boy Leading a Horse* to Thannhauser in Nazi Germany, Thannhauser sold it to William S. Paley in 1936 in Switzerland in a manner, as discussed infra, that was overtly suspicious and that put Paley on clear notice of the likelihood that the *Boy Leading a Horse* had been lost due to Nazi persecution. Paley was not a good faith purchaser. Thannhauser had Albert Skira (a notorious trafficker in Nazi-looted art) make the sale to Paley in Switzerland (a country bordering Nazi Germany that was infamous for traffickers in Nazi-confiscated property) for an artificially low price after the infamous Nuremberg Laws were in effect in Germany. When Paley asked Skira who the owner of *Boy Lead a Horse* was, Skira refused to tell him.

32.   Paley returned *Boy Leading a Horse* to New York after completing his purchase from Skira. In or around 1964, Paley executed papers purportedly donating *Boy Leading a Horse* to MoMA, but retained a supposed life estate for himself. Paley died in 1990, and MoMA then acquired purported full ownership of *Boy Leading a Horse*. MoMA -- ignoring its fiduciary duties to the public as a tax-exempt charitable entity and public trustee to take affirmative precautions against introducing Nazi-confiscated, stolen, or other contraband artworks into publicly-supported collections -- accepted Paley's gift into its collection in reckless disregard of the provenance of the artwork that strongly suggested that Mendelssohn-Bartholdy lost it due to Nazi persecution. Accordingly, MoMA never had a commercially reasonable, good faith, or legally defensible expectation or reliance interest that it had acquired good title to *Boy Leading a Horse* or that the true owners would not step forward to reclaim it.

33.   In or around 1940, Thannhauser emigrated to the United States. He settled in New York, and arranged for *Le Moulin de la Galette* to be brought to New York. *Le Moulin de la Galette* has remained in New York for most of the time since then.

34.   In or around 1976, Thannhauser passed away and left *Le Moulin de la Galette* as a bequest to the Guggenheim. In or around 1978, the Guggenheim -- in similar violation of its

fiduciary duties as a public trustee -- accepted Thannhauser's gift into its collection in reckless disregard of the provenance of *Le Moulin de la Galette* that strongly suggested that Mendelssohn-Bartholdy lost it due to Nazi persecution. Accordingly, the Guggenheim never had a commercially reasonable, good faith, or legally defensible expectation that it had acquired good title to *Le Moulin de la Galette* or that the true owner would not step forward to reclaim it.

### The Heirs of Mendelssohn-Bartholdy's Sisters and the Heirs of Elsa Demanded the Return of the Paintings on November 1, 2007, and the Museums refused to return The Paintings on December 7, 2007

35. On November 1, 2007, the heirs of Mendelssohn-Bartholdy's sisters and the heirs of Elsa, through their attorneys, demanded the return of the Paintings. The Museums, through their attorneys, refused to return the Paintings on December 7, 2007.

## BACKGROUND: NAZI PERSECUTION OF THE JEWS

### Nazi Persecution of Jews Became Official State Policy in 1933, and intensified up to the time of Paul von Mendelssohn-Bartholdy's death in May 1935

36. The Nazis' campaign to banish Jews from the economic life of Germany began in earnest immediately after Hitler became Chancellor in January 1933 and was inexorable. In the first months after January 1933, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. On April 1, 1933 the Nazis orchestrated a boycott of Jewish businesses with demonstrations in the streets of Berlin. On April 7, 1933 Germany enacted the Law for the Restoration of the Professional Civil Service which expelled "non-Aryans" from their positions as instructors in all public educational institutions, as officials of public works, public banks, insurance companies, as employees of public or semi-public agencies, and from other civil service positions. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, and as instructors and lecturers in universities and colleges. Jews were later expelled from professions, trades and educational institutions.

37. In January 1934, citizenship laws divided the German population into four categories.

11

Jews were placed in category 4 as "aliens."

38.  In May 1934, the Nazi Government transformed the Reich Flight Tax of 1931 (Flight Tax) -- which was originally enacted to prevent the flight of capital abroad -- into a legal instrument for plundering Jewish property. Avrahim Barkai, "From Boycott to Annihilation: The Economic Struggle of German Jews 1933-43" (University of New England) (1989) at 99.  In essence, the Flight Tax forced emigrants to give 25% of their assets to the German state.  The Nazis expanded the scope of the tax by, among other things, reducing the asset value to which the tax applied from 200,000RM to 50,000RM, and making incomes of over 10,000RM subject to the tax.  When Nazi tax officials suspected that a person was planning to emigrate, they were authorized to demand that the person provide a security deposit equal to the foreseeable Flight Tax.  Further, the Nazis compounded the effects of the Flight Tax by, among other things, requiring prospective emigrants -- even after paying the tax -- to deposit their money in blocked accounts for the purchase of foreign currency.  The Nazi Reichsbank then used a confiscatory exchange rate to pay emigrants a fraction of the value of their money.  The Reich's Flight Tax created compelling disincentives for Jews with assets -- like Mendelssohn-Bartholdy -- to emigrate and effectively anchored them in German to deal, as best they could, with the ever intensifying hostility and confiscatory policies of the Nazi government.

### During the years 1933-1935, the Nazi Government Resolved to Eventually Eradicate Private Jewish-Owned Banks -- Such as Mendelssohn & Co. -- and Officially Monitored Their Decline

39.  From the outset, the Nazi government targeted private Jewish-owned banks. The Nazis blamed Jewish-owned banks for Germany's loss in World War I and for its economic depression. But because the Nazis considered Jewish-owned banks too important to the German economy to eradicate immediately, they intimidated, persecuted, and tormented them judiciously, while awaiting the opportune moment to terminate them altogether.

40.  The Nazis pressured private Jewish-owned banks persistently, and formally monitored their decline. The Nazi-owned and controlled Reichsbank maintained charts detailing the steady

decline of the five largest Jewish-owned German banks -- including Mendelssohn & Co. One such chart showed that the balance sheet totals of the five largest Jewish-owned banks fell 36.28 percent between 1932 and June 1935.

> **Increasingly Intensive Official Persecution After 1933 Created Ubiquitous Despair Among Jews, and Informed the Decisions of Many Jewish Private Collectors to Surrender Valuable Artworks into a Depressed Market**

41. A sense of hopelessness accompanied the loss of employment and increasing exclusion from German economic and national life, and framed the outlook and decision-making of targeted Nazi victims. As Holocaust historian Avraham Barkai observed, "a consciousness of imminent poverty, which seized hold of more and more previously prosperous individuals, is clearly evident from contemporary publications. And that consciousness says far more about the economic situation of German Jews at the time than any statistical tabulations."

42. The Nazi campaign against "Jewish bankers" was so virulent it extended to Jews who worked for privately owned banks that were not Jewish owned. On April 9, 1933 -- just more than two months after Hitler took power -- Georg Solmsen, a spokesman of the managing board of Deutsche Bank, wrote a letter to the chairman of the supervisory board of that bank describing his concerns as a Jewish banker. Solmsen's feelings were no doubt shared by other Jewish bankers like Mendelssohn-Bartholdy about the aggressive Nazi campaign against them. In particular, Solmsen anticipated the economic and moral extermination of the "Jewish race" in Germany, a "hopeless" situation, and his premonition that he too might eventually become a victim of the Nazi's "cleansing campaign":

> Dear Mr. Urbig,
>
> The **expulsion of Jews from the civil service**, now enshrined in law, prompts one to ask what further consequences for the private sector will flow from measures that even the educated section of the population has accepted almost as a matter of course. **I fear we are only at the beginning of a development that is deliberately aimed, in accordance with a well-thought-out plan, at the economic and moral**

> **extermination of all members of the Jewish race living in Germany** . . .
> [T]he dead silence that greets the ignominy and shame irremediably
> inflicted on those who, albeit innocent, find the foundations of their honor
> and livelihood undermined from one day to the next  --  **all this points to
> a situation so hopeless** that it would be wrong not to look matters in the
> face without apply any makeup, as it were . . . I have the feeling that, at the
> same time as I seem to be regarded as someone whose work is valued as
> an asset and who is perhaps respected as embodying what is now a 70-
> year-old tradition, **I too would be dropped as soon as the call came
> from outside in a decisive manner that I should be included in the
> "cleansing campaign."**

(Emphasis added).

43.    From 1933 on, many artworks that Jewish collectors liquidated in Germany as a consequence of Nazi-induced coercion and pressure swelled the art markets in Switzerland, London, and New York.    International art dealers and private collectors profited    -- correspondingly -- from the orchestrated financial ruin of Jewish collectors in Nazi Germany during these years.

## NAZI PERSECUTION DEVASTATED PAUL VON MENDELSSOHN-BARTHOLDY PERSONALLY, PROFESSIONALLY, AND FINANCIALLY AND FORCED HIM TO SELL THE PAINTING

44.    The official policies of Nazi Germany to politically persecute, economically marginalize, and socially ostracize its Jewish citizens eviscerated Mendelssohn-Bartholdy.  Nazi coercion and duress forced him to begin efforts to sell the Paintings and other works from his private collection into a depressed art market engulfed with artworks that countless other victims of Nazi persecution had been forced to relinquish.

45.    From when the Nazis assumed power in January 1933 until he died in May 1935, Mendelssohn-Bartholdy:

    (a)    sustained significant banking losses from the operation of Mendelssohn & Co., including the "Aryanization" of Akzeptbank, a successful private bank that Mendelssohn & Co. owned in part;

    (b)    endured persistent, menacing threats from Nazi banking authorities, beginning in

1934, that Mendelssohn & Co. and other private Jewish-owned banks would be terminated; in early 1934, a Mendelssohn & Co. representative took the extraordinary step of meeting with a government official, the Bank Commissar, and specifically asked if the Jewish-owned banks like Mendelssohn & Co. had any future in the German economy. (The fear of Mendelssohn & Co. was well-founded since, in 1938, the Nazi government "Aryanized" Mendelssohn & Co. and transferred full ownership of the bank's assets to the "Aryan" Deutsche Bank.)

(c)    withstood the intimidation of Nazi authorities, including the investigation of a Jewish manager of Mendelssohn & Co.;

(d)    suffered a precipitous collapse of his personal net worth;

(e)    declined to petition for an entitled reduction of his alimony obligations based upon changed financial circumstances because a public disclosure of his depreciated economic status would have eroded even further the competitive viability of Mendelssohn & Co.;

(f)    agreed to surrender, under Nazi pressure, extensive land from his country estate (Boernicke) to the Nazi Kulturamt (Cultural Office);

(g)    placed financial encumbrances (Grundschulden) upon both his residential properties, Alsenstrasse and Boernicke, in an attempt to protect them from Nazi confiscation;

(h)    had his "Aryan" chauffeur, whose family lived with Mendelssohn-Bartholdy at Alsenstrasse in the staff quarters, resign under direct Nazi Party pressure because of Mendelssohn-Bartholdy's Jewish background;

(i)    lost prestigious and invaluable positions in business, professional, and social organizations that constricted his professional opportunities and foretold a bleak economic future, including membership on the boards of directors of the Central Association of the German Bank and Bankers' Profession and of the "Reichsverischerungastalt fur Angestellte," a primary German annuity insurance

institution;

(j)    was compelled to flee his spacious Berlin residence (Alsenstrasse) near the Reichstag building in central Berlin -- the site of intensively vocal anti-Jewish protests -- for a modest "garden house" further way, out of fear of the Nazis;

(k)    in January 1934, was categorized as an "alien" in Germany under Nazi citizenship laws;

(l)    as a practical matter, Mendelssohn-Bartholdy could not leave Nazi Germany because of the onerous "Flight Tax," whose May 1934 amendments meant that Mendelssohn-Bartholdy would have lost a disproportionate amount of his remaining wealth and property -- including Mendelssohn & Co. -- if he decided to flee; and

(m)    finally, and consistent with his diminished station and bleak future -- and consonant with many other formerly prosperous Jewish collectors staggering from Nazi persecution -- Mendelssohn-Bartholdy began selling in a dismal market many prized paintings from his private collection.

46.   As a direct result of the unrelenting Nazi persecution set forth above, in or around October 1934 Mendelssohn-Bartholdy consigned the Paintings -- along with three other Picasso artworks -- to Berlin art dealer Justin K. Thannhauser. Thannhauser, through his gallery, either purchased the artworks from Mendelssohn-Bartholdy for a price significantly below fair market value some time before Mendelssohn-Bartholdy's death in May 1935 or, in the alternative, Thannhauser stole the artworks and never paid anything to Mendelssohn-Bartholdy, Mendelssohn-Bartholdy's estate, or Elsa.

47.   Thannhauser trafficked in stolen and Nazi-looted art during his career as a dealer. Both during and after World War II, Thannhauser partnered with art dealers such as Nazi Cesar Mange

de Hauke and Albert Skira, both of whom the U.S. State Department and others identified as traffickers in Nazi-looted art. (See, e.g., front page Boston Globe article, dated November 9, 1997, entitled "Murky Histories Cloud Some Local Art," describing Thannhauser's attempt to fraudulently sell a painting with de Hauke, copies of relevant pages are attached as Exhibit 1; see also September 18, 2001 letter from the Art Loss Register (ALR) to MoMA regarding *Boy Leading a Horse*, where the ALR states that the name Thannhauser in the provenance "generally does not mean good things," and Skira is described as a "red flag list name," a copy of which is attached hereto as Exhibit 2).

48.    Indeed, the historical record in this case creates a strong probability that Thannhauser stole the Paintings.  As discussed infra, neither Elsa nor any other member of the Mendelssohn-Bartholdy family was aware of Paul von Mendelssohn-Bartholdy's consignment of the five Picasso artworks to Thannhauser.  When Mendelssohn-Bartholdy died unexpectedly in May 1935 of a heart attack, he had no opportunity to give his family an accounting of his affairs or advise them of his consignment or Thannhauser's possession of the artworks.  Thannhauser, then, after a period of time when no one contacted him about the consignment or the artworks in his possession, believed he could steal the art without fear of detection.  His actions after Mendelssohn-Bartholdy's death substantiate this probability.  First, as described herein, Thannhauser's 1936 sale of *Boy Leading a Horse* to William S. Paley in Switzerland reads like a textbook example of a "fencing" operation for stolen merchandise and a conspiracy to traffic in stolen art.  (See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.  Thannhauser -- while peering through a window outside watching the sale go down -- used Swiss art dealer Albert Skira (who later developed a reputation as a notorious trafficker in Nazi-looted art) to make the sale to Paley in Switzerland, already widely known as a

17

venue for unloading Nazi-looted art. In addition, Skira seemed desperate to make the sale. He and

Thannhauser were offering *Boy Leading a Horse* for an artificially low price, and Skira even

refused to tell Paley who the owner was. (Id.) Yet, somehow the "modest" price for *Boy Leading a*

*Horse* enabled Skira, Thannhauser -- and possibly another dealer, Rosengart -- to make enough

of a profit that it was worth driving the entire length of Switzerland through the Alps to make sure

the sale occurred. Within weeks of the sale to Paley in 1936, Thannhauser sold *Portrait of Angel*

*Fernandez de Soto* to M. Knoedler & Co. in New York. Despite requests, Knoedler has been

unwilling to provide any information Thannhauser gave them at the time of this sale. Moreover,

any time Thannhauser was asked about the provenance of these five significant Picasso artworks he

obtained from the well-known Mendelssohn-Bartholdy, Thannhauser was uncharacteristically

vague and non-specific. For example, in 1964 when he sold *Madame Soler* to the Pinakothek der

Moderne Museum in Munich, Thannhauser provided detailed information regarding the history of

*Madame Soler*. However, when it came to past owners (provenance), Thannhauser merely inserted

"Sammlung (collection) Paul von Mendelssohn-Bartholdy" without providing any dates -- the

only entry on the page with no dates. (See document from Pinakothek der Moderne, given to the

museum by Thannhauser in or around 1964, copies of which are attached as Exhibit 3). When

Thannhauser donated *Le Moulin de la Galette* and *Head of a Woman* to the Guggenheim, he was

equally vague. Thannhauser stated that he acquired *Le Moulin de la Galette* from Mendelssohn-

Bartholdy "ca. [around] 1935." (See copy of Guggenheim records reflecting information provided

by Thannhauser, a copy of which is attached as Exhibit 4 & 5). As to *Head of a Woman*,

Thannhauser could only provide a range of dates "1935-1936" for his acquisition. (See copy of

Guggenheim records reflection information Thannhauser provided to them about *Head of a*

*Woman*, copies of which are attached as Exhibits 5 & 6).

18

49.    In addition, Thannhauser's records make clear that he dealt exclusively with Mendelssohn-Bartholdy regarding the five Picasso artworks that Mendelssohn-Bartholdy placed on consignment with him.  There is no mention of Elsa anywhere.  Indeed, the Museums' claims that Mendelssohn-Bartholdy gifted all of his art collection to Elsa in 1927 at the time of their wedding is far-fetched.  There is no record of such a gift any time near the wedding.  Indeed, the only evidence of any Mendelssohn-Bartholdy transfer of art to Elsa is Mendelssohn-Bartholdy's February 1935 Contract for the Disposition of Property, which was a device to protect the Paintings from Nazi predation by creating a false impression that Elsa was the owner from 1927 forward.

50.    In any event, whether by an actual forced sale at an artificially low price or a forced consignment followed by Thannhauser's theft, the loss of the Paintings marked a milestone well along the path of the Nazi government's premeditated annihilation of Mendelssohn-Bartholdy's property and private fortune.  For example, Mendelssohn & Co. was "Aryanized" in 1938 and all of its assets and buildings were transferred to the "Aryan" Deutsche Bank.  Thus, Mendelssohn & Co., founded in 1795 by family members and perhaps Germany's premier private bank at the time of the Nazi takeover, was destroyed.  Also, in 1938, Hitler and the Nazis forced Mendelssohn-Bartholdy's widow to sell the downtown mansion at Alsenstrasse for a modest price so that they could proceed with their plan to build "Germania," a proposed group of imperial buildings in downtown Berlin.

**FOLLOWING THE WAR, THE U.S. CONSISTENTLY PURSUED POLICIES TO INVALIDATE THE COERCIVE TRANSFERS OF PROPERTY THAT OCCURRED UNDER NAZI AUTHORITY AND TO RESTITUTE SUCH PROPERTY TO RIGHTFUL OWNERS**

**Military Government Law No. 59 (MGL No. 59) -- the Centerpiece of Post-War U.S. Restitution Policy**

51.  U.S. policy for the restitution of artworks and other property dislodged from victims of Nazi persecution during the years 1933-45 became crystallized in 1947 when Military Government Law Number 59 (MGL No. 59) was promulgated.  12 Fed. Reg. 7983 (November 29, 1947).  MGL

19

No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property...to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism."  § 3.75(a)(1).  MGL No. 59 applied in the American "Occupation Zone" of Germany.

52.  MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "acts of confiscation" which the statute defined broadly. § 376(a). MGL No. 59 established a presumption that any sale of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 was an "act of confiscation".  See § 375(b) entitled "Article 3: presumption of confiscation."

53.  Nazi persecution of its Jewish citizens was so intense and all-encompassing that MGL. No. 59 prescribed that the presumption of confiscation could only be rebutted, in the "absence of other factors proving an act of confiscation," where it could be shown that: (a) the transferor was paid a fair purchase price; and (b) the transferor had the free right of disposal of the purchase price. In Germany today, museums typically acknowledge that no Jew had the "free right of disposal of the purchase price" in Nazi Germany, and therefore limit the inquiry as to whether a Jew made the sale within the Nazi period.

54.  MGL No. 59 required even persons in innocent possession of confiscated property to return it:  "(p)roperty shall be restored to its former owner or to his successor in interest...even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. Provisions of law for the protection of purchasers in good faith, which would defeat restitution, shall be disregarded except where Law No. 59 provides otherwise."

55.  MGL No. 59 established a relaxed evidentiary burden that was specifically calculated to respond to the dislocation and destruction of both the Holocaust and World War II: "(t)his shall particularly apply where the producing of evidence has been rendered difficult or impossible through the loss of documents, the death or unavailability of witnesses, the residence abroad of the claimant, or similar circumstances." § 382(a)(2).

**The U.S. Actively and Successfully Promoted the Adoption of MGL No. 59's Restitution Principles As its "Official Policy" to the British and French for Application in Their Respective "Occupation Zones" and in Berlin. Ultimately, the Germans Themselves Incorporated the Restitution Principles of MGL No. 59 Into Their Substantive Law For Application in All of Germany**

56.  The U.S. actively promoted as its "official policy" the adoption of restitution laws with MGL No. 59's substantive rights for Nazi victims.  For example, in 1949, the U.S. National Security Council (NSC) drafted the *"Policies of the Government of the United States of America Relating to the National Security* (NSC Policy Report)."  President Truman was the chair of the NSC.  In its directive to the U.S. High Commissioner for Germany, the NSC punctuated that MGL No. 59 embodied the official policy of the U.S. to return property to victims of Nazi persecution, and that the High Commissioner should enlist the aid of the British and French to help persuade the German government to enact a restitution law modeled on MGL No. 59:

> With respect to internal restitution, ***it is the policy of your Government*** that persons and organizations deprived of their property as a result of [Nazi] racial, religious, or political discrimination should either ***have identifiable property returned to them*** or be compensated therefore, . . . ***To carry out this policy, you should seek agreement from your British and French colleagues to persuade the German Government*** to enact without delay a Uniform Internal Restitution Law, ***which should grant to claimants, to the greatest possible extent, all substantive rights now available to them under United States Military Government Law No. 59***.

NSC Policy Report, p. 70.  (Emphasis added).  Further, on March 15, 1949, the U.S. State Department wrote a letter to the British Ambassador requesting that the British pass a restitution law in their Occupation Zone as soon as possible, noting that "the United States has no reason to doubt that the British Government is basically in accord with [U.S. occupation policy]" that "property taken by the Nazis from their victims should be returned to the rightful owners, their heirs, or successors to the maximum extent possible and within the shortest period of time." (See

21

March 15, 1949 letter from the U.S. State Department to the Ambassador of Great Britain).  As

discussed below, the British enacted British Military Law 59 shortly thereafter, modeled after

MGL No. 59.

     57.  Due largely to U.S. efforts, the restitution principles of MGL No. 59 became, in

effect, a post-War "common law" for formerly Nazi-occupied Europe, and served as the model

for similar restitution legislation among the Allied governments, many countries that the Nazi

had controlled, and ultimately Germany itself.  For example:

    a.  **The Berlin Restitution Law of 1949.**  MGL No. 59 was the controlling law

for the U.S. Occupation Zone in Germany after 1947, but did not  apply to

Berlin.  Berlin was divided into four "quadrants," and the U.S., Britain, France

and the Soviet Union each controlled a quadrant.  To address restitution issues

within Berlin, the Allies passed the Berlin Restitution Law of 1949, which is

almost identical to Military Law. No. 59.  The provisions regarding the

"presumption of confiscation" and potential rebuttal thereof are virtually

identical.

    b.  **Britain and France passed restitution laws in their "Occupation Zones"**

**similar to MGL No. 59.**  Britain and France passed laws in their individual

German Occupation Zones that were similar to MGL No. 59 and the Berlin

Restitution Law.  (See British Military Law 59, and currently applicable

provisions of French law (article 1, paragraph 1 of order No. 45-770, dated

April 21, 1945 and decree No-1344 dated September 30, 1949).

    c.  **In the so-called "Treaty of Transition" of 1954,  the U.S. and the Allies**

**entered  into a Treaty with West Germany making the Allies' restitution**

**law part of German law**. In the so-called 1954 "Treaty of Transition," or Uberleitungsvertrag, the Germans agreed to make the Allies' restitution laws part of the laws of Germany.

d. **German restitution laws and principles are virtually the same as MGL No. 59.**

(1) After the Allies left the Federal Republic of Germany (West Germany), and pursuant to the above-identified Treaty of Transition, the West Germans enacted a restitution statute in or around 1957 that incorporated the restitution principles and presumptions of confiscation for Jewish sellers of property in Nazi Germany contained in MGL No. 59, the Berlin Restitution Law of 1949, and the British and French restitution laws. (<u>See</u> "*Bundesrückerstattungsgesetz*" (BRüG), BGBl. 1957 I, 734).

(2) In 1990, the Communist government of the Democratic Republic of Germany (East Germany) fell, and Germany was reunited. The newly united Germany passed a restitution law, The Property Settlement Act of 1990, that applied to the former East Germany. The Property Settlement Act specifically incorporated the presumption of confiscation provisions contained in the Berlin Restitution Law of 1949 -- which are, of course, virtually the same as MGL No. 59.

58. The restitution principles contained in U.S. MGL No. 59 -- which the U.S. government pioneered and then advocated for acceptance by other countries -- are applied today on a regular basis in Germany, where it is part of German law, and throughout Europe. <u>See</u>, <u>e.g.</u>,

Gentili di Gusieppe v. Musee Du Louvre, Court of Appeals of Paris 1st Division, Section A (1999) (French court applied currently applicable provision of French law similar to MGL no. 59 [article 1, paragraph 1 of order No. 45-770 dated April 21, 1945 and decree No. 1344 dated 30th September 1949], and required the Louvre museum to return five paintings to the heirs of a victim of Nazi persecution); Report Of British Spoliation Advisory Panel In Respect Of A Painting Now In The Possession Of Glasgow City Council, The Right Honourable Sir David Hirst, *Ordered by the House of Commons to be printed 24 November 2004* (British Advisory Panel recommended that Jewish claimants be restituted for paintings lost in a forced sale in Nazi Germany, based on claimants position that "restitution principles adopted by the Allies after the war, epitomised in **British Military Law No 59**, which lays down that it shall be presumed in favour of a claimant that a transaction entered into between January 1933 and May 1945 which involves any transfer or relinquishment of property during a period of persecution by any person who was directly exposed to persecutory measures on racial grounds shall be presumed to constitute an act of confiscation"); Dutch Advisory Committee on the Assessment of Restitution Applications for Items of Cultural Value and the Second World War (2006 Report) (Dutch National Policy, adopted from Ekkart Committee, provides that all sales of works of art by Jewish private persons in Nazi Germany from 1933 onwards "be treated as forced sales, unless there is express evidence to the contrary").

> **Under New York choice of law rules, German restitution principles and law -- adopted from the U.S. MGL No. 59 and its progeny -- will apply to the transfer of the Paintings from Mendelssohn-Bartholdy to Thannhauser in Nazi Germany.**

59. New York choice of law principles provide that the law that characterizes the nature of a dispossession is that of the place where the dispossession occurred. Kunstsamlungen zu

24

Weimar v. Elicofon, 536 F.Supp. 829, 839-46 (E.D.N.Y. 1981), *aff'd* 678 F.2d 1150 (2d Cir.

1982); see also Angela Joy Davis, *Beyond Repatriation: A Proposal for the Equitable Restitution*

*of Cultural Property*, 33 UCLA L. Rev. 642 (1985) (discussion of case where New York

Attorney General argued for application of MGL No. 59 restitution principles to transfer in Nazi

Germany, Abrams v. Sotheby Parke Bernet, Inc., No. 42255, slip op. (N.Y. Sup. Ct. Aug. 15,

1984), where case was settled before issue was resolved;  author advocates application of these

restitution principles in U.S. courts).   In this case, of course, the German laws that apply in the

analysis of the transfer of the Paintings from Mendelssohn-Bartholdy to Thannhauser are the

German restitution laws that specifically apply to transactions in Nazi Germany.   These German

laws, of course, were adopted from MGL No. 59 and its progeny.

      60.   The restitution principles of MGL No. 59 and German law should also apply in this

case as the "dominant policy" of the United States.   In re Muller's Estate, 199 Misc. 745, 104

N.Y.S.2d 133 (Sur. Ct. Kings County 1951) (evaluating validity of legacy renunciations by

German nationals in 1946, the court stated that it was required to give effect to Military

Government Law No. 53, not only by choice of law principles, but because the military law was

"an expression of the dominant policy of the United States" and the courts could not impede the

full effectuation of the dominant federal policy expressed in the military law).   Schoeps has set

forth, supra, the efforts of the U.S. to advance the restitution principles of MGL No. 59 and its

progeny.   In addition, these efforts extended to actions brought in U.S. courts.   For example,

State Department Press Release No. 296 of April 27, 1949 entitled "Jurisdiction of United States

Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers" (Press Release), states

that it is the policy of the Executive "with respect to claims asserted in the United States for

restitution" to relieve American courts "from any restraint upon the exercise of their jurisdiction to

pass upon the validity of the acts of Nazi officials." Further, tracking in part the language of MGL No. 59, the Press Release repeated "this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls," and stated that "it is this Government's policy to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property."

61. The Press Release reproduces in full an April 13, 1949 letter from Jack B. Tate (Tate Letter), the Acting Legal Advisor, U.S. State Department, to the attorneys for the plaintiff in Civil Action No. 31-555 in this Court, that is, the United States District Court for the Southern District of New York. The Tate Letter was also sent to the presiding judge in the case, U.S. District Judge Sylvester J. Ryan, and the attorneys representing all the parties. In referring to the case pending in this Court, the Tate Letter instructs the Court and the parties that MGL No. 59 exemplifies U.S. policy regarding the restitution of Nazi-confiscated property:

> Of special importance is Military Government Law No. 59 which shows this Government's policy of undoing forced transfers and restituting identifiable property to persons wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. Article 1 (1). It should be noted that this policy applies generally despite the existence of purchasers in good faith. Article 1 (2).

See Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 376 (2d Cir. 1954) (Second Circuit specifically relied on and followed the Press Release and Tate Letter, noting that they contained a "supervening expression of Executive Policy" to relieve American courts from any restraint upon the exercise of the their jurisdiction to pass upon the validity of the acts of Nazi officials).

62. Accordingly, under the restitution principles that are part of German law as well as

the consistent and dominant policy of the United States, Mendelssohn-Bartholdy's duress

consignment of the Paintings to Thannhauser as a direct result of Nazi persecution, and

Thannhauser's later acquisition of the Paintings either by (a) payment to Mendelssohn-Bartholdy

far below market value, or (b) theft, were Nazi confiscations, and Mendelssohn-Bartholdy's heirs

and assigns are the true owners of the Paintings. In addition, under Schoeps alternative theory

that Thannhauser stole the Paintings, under any U.S. or German law Thannhauser did not obtain

good title to the Paintings, and under New York law Thannhauser could not transfer good title to

any third party.

## THE MUSEUMS CANNOT RAISE A PROPER LACHES DEFENSE TO THE MENDELSSOHN-BARTHOLDY HEIRS' CLAIMS

63. The defense of laches has been raised regularly by defendants in stolen art and Nazi-

confiscated art cases in New York. See, e.g., Bakalar v. Vavra, 2006 WL 2311113, *3 (S.D.N.Y.

2006), instructing that to establish a laches defense in a Holocaust art restitution action, the

defendant must demonstrate: (1) the heirs knew of their claim; (2) they delayed in taking action

without excuse; and (3) defendant suffered prejudice as a result. See also Solomon R.

Guggenheim Foundation v. Lubell, 77 N.Y.2d 311, 321, 567 N.Y.S.2d 623, 628 (1991), where

the court ruled that the conduct of both the theft victim and the current possessor of the art will

be relevant to any consideration of the equitable defense of laches. Further, laches involves "a

fact-intensive inquiry into the conduct and background of both parties in order to determine the

relative equities," and such issues "are often not amenable to resolution on a motion for summary

judgment, let alone a motion to dismiss." U.S. v. Portrait of Wally, A Painting By Egon Schiele,

2002 WL 553532, *22 (S.D.N.Y. 2002) (citing Solomon R. Guggenheim Foundation v. Lubell,

77 N.Y.2d at 321, 567 N.Y.S.2d at 628; and Solomon R. Guggenheim Foundation v. Lubell, 153

A.D.2d 143, 151-52, 550 N.Y.S.2d 618, 623 (1990).  In addition, the "unclean hands" of a defendant precludes the application of the laches defense. Uciechowski v. Ehrlich, 221 A.D.2d 866, 634 N.Y.S.2d 251 (App.Div. 3d Dept. 1995).  Finally, the application of the laches defense is precluded where imposing it would frustrate public policies.  See Manitou Sand & Gravel Co., Inc. v. Town of Ogden, 2005 WL 2312450, *6 (N.Y. Sup. 2005).

   64.  The Museums cannot raise a valid laches defense because, among other reasons: (a) the Mendelssohn-Bartholdy heirs have not delayed unreasonably in asserting their claim because  --  in the exercise of reasonable diligence  --  they did not know until they completed their recent investigation that Mendelssohn-Bartholdy lost the Paintings as a direct and intended consequence of Nazi persecution; (b) the Museums have suffered no prejudice attributable to any putative delay of the Mendelssohn-Bartholdy heirs because both Museums have known from inception that they likely were acquiring artworks that were lost as a consequence of Nazi persecution in paradigmatic "forced sales" or that otherwise may have been stolen; (c) the Museums  --  whose conduct is relevant in any laches analysis under New York law -- have "unclean hands" because they violated their fiduciary duties as public trustees to take reasonable and informed precautions against introducing stolen or "Nazi-confiscated" artworks into their collections, and knowingly accepted suspicious materials; (d) the strong New York and federal policies that favor the return to rightful owners of artworks lost during the Holocaust and that discourage tax-exempt museums from breaching their fiduciary duties as trustees and from recklessly trafficking in contraband artworks preclude the application of a laches defense in this case.

**The Mendelssohn-Bartholdy Heirs have not Unreasonably Delayed Making Their Demands, Since They Were Not Aware of Their Rights to the Paintings until The Efforts of the U.S. Government and State of New York Made Necessary Information Available to Them**

**Overview and Summary**

65. Until 2005, no Mendelssohn-Bartholdy heir knew -- or reasonably should have been aware -- that Paul von Mendelssohn-Bartholdy had sold or otherwise lost the Paintings in Nazi Germany. As discussed infra, Mendelssohn-Bartholdy died suddenly in May 1935 and none of his heirs were aware of the status of the Paintings. Moreover, locating Nazi confiscated art was exceedingly difficult after World War II, since governments and the international art community were unwilling to make their records available for Holocaust survivors and their heirs to examine. Starting in the 1990s, the U.S. government and State of New York spearheaded a campaign to at last make information and documents in government archives and museums worldwide available to potential Holocaust claimants so they could finally investigate possible claims.

66. The efforts of the U.S. government and state of New York resulted, among other accomplishments, in the development of the Nazi-Era Provenance Internet Portal (NEPIP, located at www.nepip.org), which went online in or around September 2003 and provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945). By providing a single point of contact to dozens of U.S. museum collections, NEPIP helps people seeking objects lost as a result of Nazi persecution. Once an item is located on NEPIP, a claimant may then go by hyperlink to individual museum websites where specific provenance information is found. The NEPIP website and the hyperlinked individual museum provenance websites may be referred to jointly as the "NEPIP System".

67. In 2005, Schoeps discovered on the NEPIP System that Mendelssohn-Bartholdy transferred *Boy Leading a Horse* to Thannhauser in Nazi Germany. This launched an

investigation which revealed that Mendelssohn-Bartholdy lost many invaluable artworks before

his death in Nazi Germany as a direct result of Nazi persecution.

> **No Mendelssohn-Bartholdy Heir Knew -- or Reasonably Should Have Known -- of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany Until Relevant Information Was Discovered on the NEPIP System in 2005**

68.  No Mendelssohn-Bartholdy heir was aware that Mendelssohn-Bartholdy had lost

Picasso artworks -- or any other paintings -- to Thannhauser in Nazi Germany until the

information was discovered on the NEPIP System in 2005.

69.  Mendelssohn-Bartholdy's widow, Elsa von Mendelssohn-Bartholdy (Elsa), was

unaware of the fate of the five Picasso artworks Mendelssohn-Bartholdy relinquished under duress

to Thannhauser.  Mendelssohn-Bartholdy had owned the five Picasso artworks for a long period

of time prior to marrying Elsa.  Mendelssohn-Bartholdy was approximately 23 years older than

Elsa, and was very protective of her.  They had a very traditional marriage.  Mendelssohn-

Bartholdy dealt exclusively with all issues relating to money or finance.  Moreover, as Nazi

persecution savaged his estate, Mendelssohn-Bartholdy attempted to shield Elsa from the extent

of his losses. Based on their customary mode of interaction, Mendelssohn-Bartholdy would not

have told Elsa about his attempts to sell the Paintings.  Nor did Mendelssohn-Bartholdy leave any

records by which his estate could have made these determinations.  Moreover, Elsa never made any

statements to anyone for the rest of her life that would indicate that she was aware of the loss of the

five Picasso artworks to Thannhauser.

70.  Paul von Mendelssohn-Bartholdy died of a heart attack on May 10, 1935.  His sudden,

unexpected death prevented him from giving his wife an accounting of his business affairs.  In fact,

Elsa was shocked at the extent of Mendelssohn-Bartholdy's financial decline when she was forced

to take over his affairs.

71.    Mendelssohn-Bartholdy's sisters had no knowledge of the fate of the five Picasso artworks Mendelssohn-Bartholdy relinquished to Thannhauser.    They did not live with Mendelssohn-Bartholdy.  They were suffering under Nazi persecution themselves, and at least one had left Nazi Germany at or around this time.  Another was eventually sent to a concentration camp.  Mendelssohn-Bartholdy placed the artworks on consignment in or around October 1934. Moreover, Mendelssohn-Bartholdy's role as a protector of the family and its assets made him disinclined to reveal financial distress, so he would have had no incentive to advise his sisters of the circumstances of his sale of art.

72.    None of Mendelssohn-Bartholdy's sisters ever made any statement that would indicate any awareness of the fate of the five Picasso artworks Mendelssohn-Bartholdy lost to Thannhauser. As a result, none of the current Mendelssohn-Bartholdy heirs had any knowledge of the paintings Mendelssohn-Bartholdy consigned to Thannhauser in Nazi Germany until relevant information was discovered on the NEPIP System in 2005, nor could they reasonably be expected to have obtained such information.

### A "Wall of Silence" Has Denied Holocaust Claimants -- Such as the Mendelssohn-Bartholdy Heirs -- Access to Information that Would Allow Them to Investigate and Reclaim Lost Property

73.    Until recently, Holocaust claimants had great difficulty identifying and investigating artworks lost as a consequence of Nazi persecution because documents and information relating to such losses were inaccessible.  This historical deficiency has been widely recognized.  For example, on July 27, 2006, Ambassador Stuart E. Eizenstat testified before Congress that before the 1990's there was a "**Wall of Silence**" regarding information and documents necessary to discover and develop claims for Holocaust art recovery. (See July 27, 2006 testimony of Stuart E. Eizenstat,

31

former Special Representative of the President and Secretary of State for Holocaust-era Issues, on "The Status of Art Restitution Worldwide," before the Subcommittee on Domestic and International Monetary Policy, Trade, and Technology, Committee on Financial Services, U.S. House of Representatives (Eizenstat Testimony).

> **The U.S. Congress, U.S. Department of State, and State of New York Began Intensive Efforts in the Late 1990's to Tear Down the "Wall of Silence," that is, To Make Information and Documents Available to Holocaust Claimants so that They Could Develop and Prosecute Claims for the Recovery of Property Lost During the Nazi Era**

74. In the late 1990's, the U.S. Congress, U.S. Department of State, and the State of New York began intensive efforts to advance Holocaust art restitution and  -- as a crucial first step -- to give Holocaust victims and their heirs access to information and documents that were previously unavailable so they could develop claims to recover their property.  For example:

    a. In 1998, Congress passed three statutes providing Holocaust claimants with access for the first time to extensive information and documents in the possession of federal agencies and tax-exempt organizations.  The "The Nazi War Crimes Disclosure Act" (Disclosure Act), Public Law No. 105-567, 114 Stat. 2865 (1998) made available to victims of Nazi persecution records in the possession of the U.S. government concerning, among other things, assets confiscated during the period 1933-1945.  "The Holocaust Victims Redress Act" (Redress Act), Public Law No. 105-158, 112 Stat. 15 (1998) provided five million dollars for archival research and translation of documents to assist Holocaust art restitution.  "The U.S. Holocaust Assets Commission Act of 1998" (Commission Act), Public Law No. 105-567 established a Presidential Commission which, among other things, investigated

and reported on the fate of any Nazi-confiscated assets that came into the possession or under the auspices of the U.S. government.

b. In 1998, at Congressional hearings, U.S. Congressman James Leach pressured a representative of the Association of American Museum Directors (AAMD) to have that organization formulate guidelines for dealing with Nazi-confiscated art in U.S. museum collections. In response, the AAMD created guidelines in June 1998 calling for U.S. museums to perform provenance (ownership history) research and publish information relating to art that may have a Nazi-era provenance ("AAMD guidelines");

c. In 1998, the U.S. Department of State organized international meetings and conferences on Nazi-era art, met with foreign officials, and lobbied them intensely to facilitate Holocaust art recovery in their countries and accept the AAMD guidelines calling for provenance research and the publication of information helpful to Holocaust claimants. As a result, many European countries began publishing art provenance information, releasing documents and archival materials from the Nazi era, passing laws facilitating art restitution, and searching for Nazi victims and their heirs when looted art was located;

d. In 1998, the Department of State organized the Washington Conference on Holocaust Era Assets (Washington Conference), for the purpose, among other things, of promoting the release of Nazi-era information and archives worldwide, and of gaining international acceptance of the AAMD guidelines. Officials from 44 countries attended. Upon meeting some initial resistance to acceptance of the AAMD guidelines, State Department representatives re-drafted

the guidelines and eventually succeeded in having all 44 countries at the Washington Conference accept the re-packaged AAMD principles, which became known as the "Washington Principles"; the Washington Principles led to increased worldwide publication of information relating to art lost during World War II, and the release of records to assist Holocaust claimants to recover art;

e.  The Presidential Commission, created by the Commission Act of 1998, negotiated an agreement with the AAMD and the American Association of Museums (AAM) that committed member museums to research extensively artworks in their collections to identify those that may have been confiscated as a proximate consequence of Nazi persecution and to publish the provenance of these artworks.  This agreement led to the creation of the NEPIP System. MoMA's Provenance Research Project (PRP) web pages are part of the NEPIP System, and the PRP is connected to NEPIP by hyperlink.  Schoeps, through his agents, discovered on MoMA's PRP that Mendelssohn-Bartholdy had transferred *Boy Leading a Horse* to Thannhauser in Nazi Germany  --  thereby making this action possible by starting the investigation into Picasso artworks Mendelssohn-Bartholdy lost in Nazi Germany due to Nazi persecution.

f.  In the late 1990's, the U.S. Department of State established a special office to help return to rightful owners property lost as a consequence of Nazi persecution, called "The Office of the Special Envoy for Holocaust Issues" (Office).  The Office has worked extensively  --  and with significant success  --  to persuade foreign governments to open Nazi era archives and to make documents

34

available to help Holocaust victims and their heirs to develop claims for the recovery of confiscated property.

g. In 1997, Governor George Pataki created the Holocaust Claims Processing Office (HCPO) of the New York State Banking Department, to provide institutional assistance to individuals seeking to recover Holocaust-looted assets. The mission of the Office is, among other things, to recover lost or looted art. The HCPO investigates claims for Nazi victims, performs provenance research, finds and translates pertinent documents, and acts as an advocate for Holocaust claimants attempting to retrieve lost art -- all free of charge to the claimant. Further, the HCPO is a New York office with a worldwide mission -- it will assist claimants from anywhere in the world, and will pursue art restitution regardless of where the art is now located.

**This' Action Was Made Possible <u>Only</u> by the Concerted, Public-Policy Driven Initiatives of the U.S. Government and the State of New York -- Beginning in the Late 1990's -- to Make Relevant Information and Documents Accessible to Holocaust Claimants to Enable Them to Develop and Prosecute Claims to Recover Property Lost as a Consequence of Nazi Persecution**

75. This action was made possible *<u>only</u>* by information disclosed as a result of the intensive efforts of the U.S. government and State of New York to assist Holocaust claimants. In 2005, Professor Schoeps first discovered that Mendelssohn-Bartholdy sold *Boy Leading a Horse* to Thannhauser in Nazi Germany from information published on MoMA's Provenance Research Project. PRP is part of the NEPIP System, and is connected to the NEPIP website by hyperlink. *Boy Leading a Horse* is also listed on NEPIP.

76. The NEPIP System has received federal funding and arose as a direct result of the

35

Presidential Commission created by the 1998 Commission Act. Also, the State of New York played an important role in the development of the NEPIP system, since the New York HCPO actively participated in the AAM's task force that created NEPIP. Accordingly, since Schoeps' claim to recover the Painting is based on crucial information originally discovered on MoMA's PRP -- an integral part of the NEPIP System -- it is indisputable that this action was made possible by the efforts of the U.S. government and State of New York to tear down the "Wall of Silence" regarding Holocaust art, and to provide Holocaust victims and their heirs with access to documents and information to enable them to develop claims.

### Schoeps, Through His Agents, Has Acted Diligently Throughout 2005-2008 to Complete the Investigation of Mendelssohn-Bartholdy's Loss of Art in Nazi Germany

77.  Once Schoeps discovered Mendelssohn-Bartholdy's sale of paintings to Thannhauser in Nazi Germany on MoMA's PRP, he has acted diligently in 2005-2008 to complete his investigation and bring forward this claim. The investigation has determined, among other things, the full scope of Nazi persecution of Mendelssohn-Bartholdy, his art collection, his relationship with Thannhauser, the circumstances of his loss of art under Nazi duress, and other matters which have enabled him to make this claim. Schoeps, through his agents, performed archival research in the United States, Germany, Russia, Denmark, and other countries, interviewed witnesses, and retained investigators and attorneys in Germany, the United States and other countries. In addition, Schoeps and his agents worked to locate and contact all of the heirs of Mendelssohn-Bartholdy's sisters and Elsa's heirs -- who have a potential ownership interest in the disputed Paintings -- regarding this claim.

### The Fundamental Policies of the United States and the State of New York to Make Information Available to Holocaust Claimants and to Restitute Holocaust Art Will be Frustrated if Schoeps Action is Barred on Laches Grounds. Accordingly, the Equitable Defense of Laches Is Not Available to the Museums

78.  U.S. and New York policies to make information available to Holocaust claimants and to restitute lost art are international, strong, manifest, and continuing.  As set forth supra, the efforts of the federal government and State of New York over the last ten years have been Herculean and the results have been commensurate with the effort:  (a) Holocaust claimants have unprecedented access to long-withheld archives and information worldwide  --  including U.S. museum information through the NEPIP System; and (b) art restitution to Holocaust victims and their heirs has risen dramatically in the U.S. and internationally.

79.  To permit the Museums to raise the defense of laches, on the other hand, would frustrate U.S. and New York policies to restitute art lost due to Nazi persecution.  Therefore the application of the equitable defense of laches is precluded.

80.  The Museums' raising of a laches defense would also frustrate New York policies protecting its world-renowned art market.

**The Museums' Disregarded "Red Flags" in the Provenance Which Strongly Indicated That the Painting had been Lost as a Result of Nazi Persecution**

81.  As discussed in detail below, the Museums acquired the Paintings in total disregard of the "red flags" in the history and provenance of the Paintings which suggested strongly that they were lost as a result of Nazi persecution.  The Museums did not fulfill their obligation "to inquire about the validity of title before completing the transaction."  U.S. v. Crawford Technical Services, 2004 WL 744670, *5 (S.D.N.Y. 2004).  See discussion infra.  The Museums' failure to investigate the Nazi-era provenance of the Paintings is more egregious in light of repeated U.S. government warnings and admonitions to museums and others about Nazi-confiscated art coming into the U.S. art market, and the substantial press coverage of the issue since the 1940s.

**Following the War, the U.S. Government repeatedly cautioned museums and the international art market about acquiring Nazi-**

confiscated art

82.    Due to Nazi persecution of Jews throughout Europe, there was enormous displacement of art.  Since the United States emerged from World War II as the richest country in the world, much of the art came into the U.S. market.  As a result, the U.S. government took steps to alert the art world to be on guard for art lost due to Nazi persecution.   For example, the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (also known as the "Roberts Commission" after its Chairman, Supreme Court Justice Owen J. Roberts), sent circulars in 1945 on the subject to "museums, art and antique dealers, and auction houses." This warning included the observation, "It is, of course, obvious, that no clear title can be passed on objects that have been looted from public or private collections abroad."  (American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, Circular to Museums, Art and Antiques Dealers, and Auction Houses).

83.    In 1951, the U.S. Department of State issued a second circular letter to the U.S. art industry reiterating this warning.

84.    The U.S. Department of State tasked Ardelia Hall to alert members of the art world to these issues, and she was extraordinarily energetic in her work throughout the 1950s and 1960s.

**The Museums' disregard of the "red flags" in the provenance of the Paintings is even more egregious in light of the considerable coverage of the issue of Nazi looted art in the New York press from the end of World War II to the present**

85.    There has always been considerable coverage of the issue of Nazi art looting in the press, especially in New York.  Journalist Janet Flanner covered the topic in a celebrated 1947 article "Annals of Crime: The Beautiful Spoils," in *The New Yorker* 40 (22 February 1947), as well as in her 1957 book, *Men and Monuments* (New York: Harper and Row, 1957).  Former OSS

officer and member of the Art Looting Investigation Unit James Plaut wrote a piece, "Hitler's Capital: Loot from the Master Race," that appeared in *The Atlantic* (October 1946), 75-80.

86.   Other key figures in the Allies' restitution effort also wrote memoirs, including James Rorimer, *Survival: The Salvage and Protection of Art in War* (New York: Abelard, 1950); and Thomas Carr Howe, *Salt Mines and Castles: The Discovery and Restitution of Looted European Art* (Indianapolis: Bobbs-Merril, 1946).

87.   That Rorimer later headed the Metropolitan Museum of Art in New York and that Howe became the director of the San Francisco Legion of Honor only increased the visibility of these books, which recounted both the Nazis' plundering operations, and also the challenges of restitution work.

88.   Many Americans who had served as Monuments Officers assumed leading positions in U.S. museums in the postwar period: this phenomenon has recently been documented by the scholarship of Robert Edsel. (See Robert Edsel's list of Monuments Officers who assumed positions in the American museum establishment can be found at http://www.rescuingdavinci.com/HelpSolve/list_cultins.aspx).

89.   On November 16, 1964, Milton Estrow wrote in the *New York Times* an article entitled "Europe is Still Hunting Its Plundered Art." Esterow made an important observation when he noted, "From Greece to California, hundreds of art scholars, museum directors, private galleries, and police organizations, including Interpol, the international police organization, are watching for the reappearance of works stolen from museums, churches, libraries, galleries and private collections."

90.   Indeed, from the late-1940s through the 1990s, when the issue emerged in a more public way, certain victims of Nazi persecution did pursue artworks looted from them and their

families.  There was a steady stream of restitution cases throughout the postwar period that should have served to put members of the art world on alert.

91.  In light of the State Department warnings, press coverage, and cases of families seeking restitution of art lost due to Nazi persecution, the Museums clearly would have been aware of the dangers of acquiring Nazi-confiscated art when the Paintings were donated.

92.  While there was widespread knowledge within the art world from the 1940s to 1990s of the issues surrounding Nazi looted art, there was also a willful disregard for the subject on the part of most art dealers and museum officials.

> **For more than 35 years, New York courts have condemned how casually art is acquired on the international market, and have announced a policy to protect victims of art theft in order to safeguard the commercial integrity of the New York City art market**

93.  Since 1969, New York courts have rebuked the indifference with which those acquiring artworks in the New York City art market have acted, and have cautioned those in the art market to take precautions against trading in Nazi-confiscated and other stolen materials. See, e.g., Menzel v. List, 24 N.Y.2d 92, 298 N.Y.S.2d 979, 983 (1969) (dismissing the contention of art dealer that holding him accountable for the appreciated value of a Nazi-confiscated artwork that he sold some 14 years earlier would subject him to "potentially ruinous liability", and instructing that "this 'potential ruin' is not beyond the control of the seller since he can take steps to ascertain the status of title so as to satisfy himself that he himself is getting good title"); Porter v. Wertz, 416 N.Y.S.2d 254, 259 (N.Y. App. Div. 1979), aff'd 421 N.E.2d 500 (N.Y. 1981) (reproaching the "fantasy land of marketing in the fine arts" and observing that "in an industry whose transactions cry out for verification of ... title ... it is deemed poor practice to probe;" the court also said that "commercial indifference to ownership or the right to sell facilitates the traffic in stolen art ...").

40

94.   In 1991, the New York Court of Appeals, in the landmark decision <u>Solomon R.</u> <u>Guggenheim Foundation v. Lubell</u>, 569 N.E.2d 426, 429 (1991), made clear that "New York long has protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good faith purchaser for value", and instructed that this principle is specifically calculated to protect the commercial probity of New York's international art market. <u>Id</u>. at 431.

**MoMA has "unclean hands" since it disregarded the suspicious Nazi-era provenance of *Boy Leading a Horse* when it accepted the painting into its collection.**

95.   In 1964, William S. Paley donated *Boy Leading a Horse* to MoMA, but retained a life estate in the painting.  In 1990, MoMA acquired purported full ownership of the painting upon the death of Paley.  In 1964 and again in 1990, MoMA disregarded suspicious the Nazi-era provenance of *Boy Leading a Horse* and accepted the painting into its collection.  As a result, MoMA has unclean hands and is not entitled to assert a laches defense in this action.

> **In August 1936, Thannhauser sold *Boy Leading a Horse* to William S. Paley in a manner that strongly suggested that the Painting had been lost as a result of Nazi persecution**

96.   In August 1936, Thannhauser worked in Switzerland with Albert Skira - - a Swiss art dealer later known for trafficking in Nazi looted art - - to sell *Boy Leading a Horse* to William S. Paley (Paley), the developer of the Columbia Broadcasting System (CBS).  Paley was a sophisticated art collector, and later held positions as a trustee and president of MoMA.  Paley was fully aware of events in Nazi Germany.

97.   By 1936, Switzerland was already a known haven for traffickers in art lost by Nazi victims in forced sales.  Moreover, it was common knowledge that the infamous Nuremberg Laws, enacted in Germany by the Nazis in September 1935, had increased the number of artworks in the

marketplace lost by Jews due to Nazi persecution.

98. In August 1936, Skira phoned Paley, who was in St. Moritz, Switzerland, staying at the Palace Hotel. Skira told Paley: "I've got a great painting here [Geneva]. You must come right down and see it." Paley told Skira he was too tired, but Skira "insisted." When Paley still refused to travel to Geneva to look at the Painting, Skira drove the entire length of Switzerland through the Alps with *Boy Leading a Horse*, arriving in St. Moritz the next day in a truck to present the Painting to Paley. Skira used a truck because *Boy Leading a Horse* was too large to fit into a car. See William S. Paley, *As It Happened, A Memoir by William S. Paley, Founder and Chairman, CBS* (Garden City, New York: Doubleday, 1979), p. 107.

99. Skira pulled his truck up in front of the Palace Hotel where Paley was staying, and brought the Painting into the lobby for Paley. Id.

100. Paley liked the Painting. Paley asked Skira the price, and found that it was -- in Paley's words -- ***"quite modest."*** Paley immediately told Skira: "That's fine. I'll buy it." Paley described the Painting as "priceless." Id.

101. Paley asked Skira who owned *Boy Leading a Horse*, and ***Skira refused to tell him***. Skira stated: "That's the one thing I can't tell you. I'm sworn to secrecy." Id.

102. Paley proceeded with the sale even though Skira: (a) refused to identify the owner of the Painting; (b) was offering a "priceless" painting at a "quite modest" price; (c) was apparently desperate to conclude the sale immediately; and (d) was operating one year after passage of the Nuremberg Laws in a country bordering Nazi Germany that was a known haven for trafficking in Nazi looted art. Clearly, Paley was put on notice that there was a good possibility that he was purchasing confiscated art, and yet Paley proceeded with the sale.

**Paley's knowledge of the suspicious provenance of *Boy Leading a Horse* may be imputed to MoMA, since Paley was a Trustee of MoMA from 1937-1990**

42

103.  Paley had an extremely close relationship with MoMA from shortly after he purchased the Painting in 1936 until his death.  Paley was a Trustee of MoMA from 1937 until his death in 1990.  In addition, Paley was President from 1968-1972; Chair from 1972-1985; and Chair Emeritus from 1985 until his death in 1990.  Indeed, Paley stated that as of September 1968, he became, in effect, the CEO of MoMA:  "After due consideration, I accepted the invitation to become president of the museum [MoMA].  I was elected to that office and became, in effect, its chief executive officer in September 1968."  Id. at 391.

104.  In light of Paley's close relationship and powerful positions within MoMA from 1937-1990, Paley's knowledge can be imputed to MoMA of the suspicious circumstances and "red flags" regarding his purchase of *Boy Leading a Horse* which strongly suggested that a Jew lost the Painting in Nazi Germany due to Nazi persecution.

### MoMA continued to ignore the Nazi-era Provenance of the Painting from 1964 up to its acquisition of purported full title in 1990 after Paley's death

105.  In 1990, Paley passed away, and MoMA published "*The William S. Paley Collection*," by William Rubin and Matthew Armstrong, describing the collection Paley had left to MoMA.  See William Rubin and Matthew Armstrong, *The William S.  Paley Collection* (Museum of Modern Art, New York 1992).  The preface described the suspicious and urgent circumstances under which Paley acquired *Boy Leading a Horse*:

> Nineteen thirty-six was a remarkable year [for Paley], marked by the acquisition of... by far the best-known work in the Paley Collection, Picasso's *Boy Leading a Horse*.  Only later did Mr. Paley realize how lucky he was to have gotten a crack at [*Boy Leading a Horse*].  It had been smuggled to Switzerland out of Nazi Germany by the dealer Justin Thannhauser, and was being hurriedly and secretly offered for sale through [Albert] Skira.  There was no time to wait for a Geneva visit from Paley, who was skiing in Saint-Moritz.  Skira trucked the large canvas to the Palace Hotel and carried it into the lobby.  Paley bought it on the spot.

43

William Rubin and Matthew Armstrong, *The William S. Paley Collection*, Preface, p. x

(Museum of Modern Art, New York 1992) (Emphasis added) (using Paley's "*As It Happened*" as

a source).

106. In *The William S. Paley Collection*, Rubin and Armstrong also provide the

provenance of the Painting, and identify Paul von Mendelssohn-Bartholdy as the owner,

immediately followed by Justin K. Thannhauser. Accordingly, MoMA was fully informed by

1992 that a person with a recognizably Jewish last name -- Mendelssohn -- made the sale in

Nazi Germany to Thannhauser before Thannhauser supposedly "smuggled" the Painting out of

the country and "hurriedly and secretly" offered it for sale through a known trafficker in Nazi

confiscated art [Skira] in a country known as a haven for looted art sales [Switzerland].

107. Thus, despite MoMA's increasing knowledge of prior owners -- including the

Jewish Paul von Mendelssohn-Bartholdy as the owner immediately before Thannhauser in Nazi

Germany -- and the "red flags" indicating that the Painting likely was lost due to Nazi

persecution, MoMA conducted no further provenance research and accepted Paley's donation

with "no questions asked."

108. By accepting Paley's gift of *Boy Leading a Horse* in disregard of its obvious

Holocaust provenance -- and in violation of its fiduciary duties as a public trustee to take informed

precautions against accepting Nazi-confiscated and stolen artworks into its collection -- and then

purposely ignoring additional evidence that Paul von Mendelssohn-Bartholdy lost the artwork due

to Nazi persecution, MoMA has "unclean hands" and cannot raise the equitable defense of laches.

**The Guggenheim has "unclean hands" since it disregarded the suspicious Nazi-era**
**provenance of *Le Moulin de la Galette* when it accepted the painting into its collection.**

       **In or around 1978, the Guggenheim Museum disregarded provenance**
**information which strongly suggested that Paul von Mendelssohn-Bartholdy**
**lost *Le Moulin de la Galette* due to Nazi persecution, and accepted the artwork**

44

**into its collection.  Accordingly, the Guggenheim never had a commercially reasonable expectation or good faith reliance interest that it had acquired good title to the *Le Moulin de la Galette***

109.    In or around 1972, Justin K. Thannhauser bequeathed Pablo Picasso's *Le Moulin de la Galette* and other artworks to the Guggenheim.

110.    In or around 1972, the Guggenheim began investigating the provenance and history of artworks Thannhauser had bequeathed to it, including *Le Moulin de la Galette*.  This research was conducted in preparation for a book to be published regarding artworks that Thannhauser was donating to the Guggenheim, and was not intended to determine if any artworks had been stolen, looted or confiscated.  In fact, the book was eventually published in 1978 -- two years after Thannhauser's 1976 death -- and was  entitled *The Guggenheim Museum: Justin K. Thannhauser Collection*, by Vivian Endicott Barnett.

111.  In or around 1972, Guggenheim researchers gave typed documents to Thannhauser containing provenance and other information they had developed regarding the artworks he had bequeathed to the Guggenheim.  Thannhauser *himself* reviewed these documents, and  -- where appropriate -- made corrections and additions in his own hand on the documents.

112.  In or around 1972, Guggenheim researchers presented Thannhauser with a document that contained, among other things, the provenance research information they had developed relating to Pablo Picasso's *Le Moulin de la Galette*.  Thannhauser wrote on this document in his own hand that he had acquired *Le Moulin de la Galette* from Paul von Mendelssohn-Bartholdy in around 1935, or specifically "ca. 1935."  (See document entitled "JKT Notes, Dec. 1972," from the Solomon R. Guggenheim Museum Archive, attached hereto as Exhibit 4).

113.  In March 1975, Guggenheim researcher Daniel Catton Rich (Rich) interviewed Thannhauser with additional questions regarding the provenance of *Le Moulin de la Galette* and

45

other artworks. During this interview, Rich used typed documents, with information and

questions about the artworks Thannhauser was donating based, upon information and belief, on

Thannhauser's 1972 annotations. The document relating to *Le Moulin de la Galette* sets forth

Paul von Mendelssohn-Bartholdy's ownership as "c. 1910-1935," followed by "Justin K.

Thannhauser." This document appears clearly to be based in part on Thannhauser's 1972 notes.

114. In March 1975, Rich recorded that Thannhauser told him that the Painting was on

consignment in Buenos Aires in 1934. Rich, in his 1975 handwritten notes of his conversation

with Thannhauser, drew a line from Mendelssohn-Bartholdy's "1910-1935" ownership dates, and

added:

"[C]onsignment; sent to B-Aires in 1934."

(See document entitled "DCR Notes Mar. '75, JKT Provenances for Picasso," from the Solomon

R. Guggenheim Museum Archive, attached hereto as Exhibit 5).

115. Thus, Thannhauser's 1972 handwritten notes and his 1975 statements to Rich

establish that: (1) Mendelssohn-Bartholdy had placed *Le Moulin de la Galette* on consignment

with Thannhauser when it was exhibited in Buenos Aires in October 1934; and (2) Thannhauser

claimed he acquired ownership of *Le Moulin de la Galette* from Mendelssohn-Bartholdy some

time after the Buenos Aires exhibition and around 1935.

116. Vivian Endicott Barnett, in *The Guggenheim Museum: Justin K. Thannhauser*

*Collection* (1978), stated that Thannhauser acquired of *Le Moulin de la Galette* from

Mendelssohn-Bartholdy in or around 1935:

> "[P]urchased from Moderne Galerie [owned by Thannhauser family] by Paul von
> Mendelssohn-Bartholdy, Berlin, c. 1910; **repurchased from Bartholdy by J.K.**
> **Thannhauser, c. 1935**."

117. By 1975, the Guggenheim was aware that:

46

a. Paul von Mendelssohn-Bartholdy was Jewish, based, among other reasons, upon the fact that "Mendelssohn" is a recognizably Jewish name;

b. Mendelssohn-Bartholdy was from Berlin in Nazi Germany (see document entitled "JKT Notes" regarding another Pablo Picasso artwork, *Head of a Woman*, that Mendelssohn-Bartholdy sold under duress to Thannhauser, and that Thannhauser bequeathed to the Museum, where Thannhauser has written "coll. Paul v. Mendelssohn-Bartholdy, ***Berlin***" [emphasis added], a copy of which is attached as Exhibit 6);

c. Nazi persecution of Jews began immediately after the Nazis took power in 1933, and increased in intensity throughout 1933-1935;

d. Mendelssohn-Bartholdy was selling *Le Moulin de la Galette* and at least one other artwork during this period, that is, Pablo Picasso's *Head of A Woman* (see Exhibits 4-6);

e.    In addition, minimal additional research would have revealed:

(1)  the Mendelssohn family suffered tremendous persecution during the Nazi era; and

(2)  the remarkable fact that Mendelssohn-Bartholdy had *five* Pablo Picasso artworks on consignment in Buenos Aires in October 1934, further evidence that Mendelssohn-Bartholdy was selling his art under duress; and

f. U.S. State Department "circular letters" warned museums that Nazi confiscated artworks were entering the U.S. marketplace, and urged them to take precautions against acquiring such works.  Moreover, stories regarding Nazi

looted art being in the U.S. art market were regularly in the New York press.

118.   The background and provenance for *Le Moulin de la Galette* is a paradigm for a prototypical "forced sale" or forced consignment and theft.  Paul von Mendelssohn-Bartholdy was a Jew living in Berlin making multiple sales of Picasso artworks in a time period close to when the Nazis passed the Nuremberg Laws of 1935.   Therefore, the Guggenheim's acceptance of the Painting in or around 1978 without performing additional research into Mendelssohn-Bartholdy's transfer to Thannhauser left it with no commercially reasonable expectation or good faith reliance interest that it had good title or that the true owner would not come forward to claim the Painting.

**The Guggenheim has Ignored the Nazi-Era Provenance of *Le Moulin de la Galette* from 1972 up to the present time, despite being placed on notice of Thannhauser's trafficking in Nazi-confiscated art**

119.  On November 9, 1997, the Boston Globe published an article on its front page entitled, "*Murky Histories Cloud Some Local Art*," by Maureen Goggin and Walter V. Robinson.  (See Exhibit 1).  The article described Justin K. Thannhauser's participation in the fraudulent sale of an artwork that may have been looted by the Nazis from a Jewish family.  In addition, the article notes that Thannhauser's business partner in this sale was Cesar Mange de Hauke -- a notorious trafficker in Nazi looted art that the U.S. State Department later denied an immigration visa because of his Nazi complicity.   The article states the following regarding Thannhauser's background:

> US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of [Hans] Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

120.   The front-page Boston Globe article placed the Guggenheim on further notice of Thannhauser's dealings in Nazi-era art, and the need to investigate the provenance of the

artworks in the so-called "Thannhauser Collection" at the Museum to ascertain whether they were Nazi-confiscated.

121.   As the Art Loss Register stated with regard to *Boy Leading a Horse*: "the name [Thannhauser in the provenance] generally does not mean good things." (See Exhibit 2).

122.   Despite the Guggenheim's increasing knowledge of Thannhauser, it performed no additional research regarding the possibility that Mendelssohn-Bartholdy lost the Painting due to Nazi persecution.

> **The Guggenheim did not placed *Le Moulin De La Galette* on the Nazi-Era Provenance Internet Portal (NEPIP) — Even though it clearly comes within the scope of items which should be included — until it was contacted by the Mendelssohn-Bartholdy heirs**

123.   The Guggenheim did not place *Le Moulin de la Galette* on NEPIP or its own website as having a Nazi era provenance until the Mendelssohn-Bartholdy heirs contacted the Guggenheim about the painting. *Le Moulin de la Galette* clearly met the criteria for inclusion on NEPIP, that is, any objects that:

- were created before 1946 and acquired after 1932,

- underwent a change of ownership between 1932 and 1946, and

- were or might reasonably be thought to have been in Continental Europe between those dates

124.   By accepting Thannhauser's gift of of *Le Moulin de la Galette* in disregard of its obvious Holocaust provenance — and in violation of its fiduciary duties as a public trustee to take informed precautions against accepting Nazi-confiscated and stolen artworks into its collection — and then purposely ignoring additional evidence that Paul von Mendelssohn-Bartholdy lost the artwork due to Nazi persecution, the Guggenheim has "unclean hands" and cannot raise the

equitable defense of laches. In addition, the Guggenheim had placed some artworks on NEPIP, but had purposely withheld artworks from the Thannhauser Collection -- including *Le Moulin de la Galette*. This concealment of potentially Nazi-looted art is another example of the Guggenheim's "unclean hands" in this matter.

## COUNT ONE
### (Conversion)

125. Counterclaim-Plaintiffs reassert and reallege each and every preceding averment in this Complaint as if fully set forth herein.

126. At all times relevant hereto, the law has prohibited any person from wrongfully detaining property that belongs to another or in which another person has a superior legal possessory interest. When the possessor of such property refuses the demand of a person with a superior possessory interest in such property to return it, the law makes the wrongful possessor of such property liable to the other for conversion.

127. At all times relevant to the proceeding, and for the reasons stated herein, Schoeps has been a rightful owner of the Paintings and has had a legal possessory interest in the Paintings that is superior to the Museums'. In the alternative, at all times relevant to the proceeding, and for the reasons stated herein, Ms. Lavergne-Peguilhen and Dr. Kesselstatt have been the rightful owners of the Paintings and have had a legal possessory interest in the Paintings that is superior to the Museums'.

128. Before this action was commenced -- and on or about November 1, 2007 -- the heirs of Paul von Mendelssohn-Bartholdy and Elsa, through their attorneys, demanded that the Museums return the Paintings. The Museums, through their attorneys, refused the demand on December 7,

50

2007.

129.   The Museums have wrongfully detained the Paintings in violation of the heirs'
ownership rights and superior legal possessory interest, and have wrongfully refused to return them.
The Museums wrongful conversion of the Paintings has caused damages in an amount of more that
four hundred million (US) dollars ($400 million).

## COUNT TWO
### (Replevin)

130.   The Counterclaim-Plaintiffs reassert and reallege each and every preceding averment
in this Complaint as if fully set forth herein.

131.   The Paintings are unique.  When the above-entitled action was commenced, and at
all times relevant hereto, the heirs of Paul von Mendelssohn-Bartholdy -- including Schoeps --
were and still are the legal owners, and have a superior possessory right to, and are entitled to the
immediate possession of, the Paintings. In the alternative, when the above-entitled action was
commenced, and at all times relevant hereto, Ms. Lavergne-Peguilhen and Dr. Kesselstatt were
and still are the legal owners, and have a superior possessory right to, and are entitled to the
immediate possession of, the Paintings.

132.   The value of the Paintings exceeds four hundred million (US) dollars ($400 million).

133.   The Paintings are currently in the possession of the Museums.  The Museums have
wrongfully detained and still detain the Paintings in violation of the Counterclaim-Plaintiffs'
ownership rights and superior legal possessory interest.

134.   The Museums' detention of the Paintings is wrongful for the reasons alleged herein.

135.   Before this action was commenced  --  and on or about November 1, 2007  --  the
heirs of Paul von Mendelssohn-Bartholdy and Elsa, through their attorneys, demanded that the

Museums return the Paintings.    The Museums, through their attorneys, refused the demand on

December 7, 2007, and continue to refuse this demand.

136.   The Museums' wrongful detention of the Paintings has caused the Counterclaim-

Plaintiffs and the other Mendelsohn-Bartholdy heirs to sustain damages in an amount of more

that four hundred million (US) dollars ($400 million).

**COUNT THREE**
**(Request for Declaratory Relief under Fed.R.Civ.P. 57 and 28 U.S.C. § 2201)**

137.   Counterclaim-Plaintiffs reassert and reallege each and every preceding averment in

this Complaint as if fully set forth herein.

138.   At all times relevant to this proceeding, the law has permitted any court of the United

States, upon the filing of an appropriate pleading, to declare the rights and other legal relations of

any interested party seeking such declaration, regardless whether further relief is or could be sought.

139.   The heirs of Paul von Mendelssohn-Bartholdy's sisters, including Schoeps, are the

lawful and rightful owners of the Paintings, and the Museums are in inequitable possession of them.

In the alternative, Ms. Lavergne-Peguilhen and Dr. Kesselstatt are the lawful and rightful owners of

the Paintings, and the Museums are in inequitable possession of them.    An actual controversy

exists as to this right.

140.   The Counterclaim-Plaintiffs seek a declaratory judgment and order declaring that the

rightful owners of the Paintings are either the heirs of Mendelssohn-Bartholdy's sisters or the heirs

of Elsa.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, the Counterclaim-Plaintiffs seek:

a) an order adjudging that the heirs of Mendelssohn-Bartholdy's sisters, including

Professor Schoeps, are the owners and entitled to the immediate possession of the Paintings, and

that the Paintings be delivered to Schoeps, and in case possession thereof cannot be given to

52

Schoeps, that Schoeps have judgment against the Museums for the sum of no less than four hundred million (US) dollars ($400 million) with interest thereon; or, in the alternative, the Counterclaim-Plaintiffs seek an order adjudging that Ms. Lavergne-Peguilhen and Dr. Kesselstatt are the owners and entitled to the immediate possession of the Paintings, and that the Paintings be delivered to them, and in case possession thereof cannot be given to them, that they have judgment against the Museums for the sum of no less than four hundred million (US) dollars ($400 million) with interest thereon;

b) an order declaring the heirs of Mendelssohn-Bartholdy's sisters, including Schoeps, to be the lawful and rightful owners of the Paintings in accordance with applicable U.S. and New York law, and declaring the Museums possession of the Paintings to be inequitable, and resulting in unjust enrichment to the Museums; or, in the alternative, an order declaring that Ms. Lavergne-Peguilhen and Dr. Kesselstatt are the lawful and rightful owners of the Paintings in accordance with applicable U.S. and New York law, and declaring the Museums' possession of the Paintings to be inequitable, and resulting in unjust enrichment to the Museums;

c) an order requiring the Museums to make restitution of the Paintings to the heirs of Mendelssohn-Bartholdy's sisters, including Schoeps, in accordance with applicable New York and U.S. law; or, in the alternative, an order requiring the Museums to make restitution of the Paintings to the Ms. Lavergne-Peguilhen and Dr. Kesselstatt, in accordance with applicable New York and U.S. law;

d) an order imposing a constructive trust upon the Paintings for the benefit of Schoeps in accordance with applicable New York and U.S. law, and requiring the Museums to return the Paintings to Schoeps; in the alternative, an order imposing a constructive trust upon the Paintings for the benefit of Ms. Lavergne-Peguilhen and Dr. Kesselstatt in accordance with applicable New

53

York and U.S. law, and requiring the Museums to return the Paintings to them.

     e) an award of the Counterclaim-Plaintiffs' costs, expenses and interest, and;

     f) such further and other relief as the Court may deem appropriate and just.

**COUNTERCLAIM PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL FACTS AND ISSUES.**

Dated:  New York, New York
       June 2, 2008

                  BYRNE GOLDENBERG & HAMILTON, PLLC


              By:_____
                  John J. Byrne, Jr. (JB-6687)
                  1025 Connecticut Avenue, N.W.
                  Suite 1012
                  Washington, D.C. 20036

                  Telephone:  (202) 857-9775
                  Facsimile:  (202) 857-9799

                  BRESSLER AMERY & ROSS, P.C.
                  David H. Pikus (DP-7846)
                  Kenneth M. Moltner (KM 7778)
                  David Smitham (DS-7778)
                  17 State Street
                  New York, New York 10004

                  Telephone:(212) 425-9300
                  Facsimile:(212) 425-9337

                  Attorneys for Defendant and Counterclaimant
                  Julius H. Schoeps

York and U.S. law, and requiring the Museums to return the Paintings to them.

      e) an award of the Counterclaim-Plaintiffs' costs, expenses and interest, and;

      f) such further and other relief as the Court may deem appropriate and just.

**COUNTERCLAIM PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL FACTS AND ISSUES.**

Dated:  New York, New York
         June 2, 2008

                BYRNE GOLDENBERG & HAMILTON, PLLC

            By: _____/S/_____
               John J. Byrne, Jr. (JB-6687)
               1025 Connecticut Avenue, N.W.
               Suite 1012
               Washington, D.C. 20036

               Telephone:  (202) 857-9775
               Facsimile:  (202) 857-9799

               BRESSLER AMERY & ROSS, P.C.
               David H. Pikus (DP-7846)
               Kenneth M. Moltner (KM 7778)
               David Smitham (DS-7778)
               17 State Street
               New York, New York 10004

               Telephone:(212) 425-9300
               Facsimile:(212) 425-9337

               Attorneys for Defendant and Counterclaimant
               Julius H. Schoeps

# EXHIBIT 1





We Pedal The Best. For Less. Click here!

NO FRAME BACK

The Boston Globe                                                    boston.com

## Nation | World



RELATED COVERAGE

**RELATED STORIES**
A network of profiteers
Art histories at The Fogg and The MFA

**April 17, 1998**
Iltaly calls N.Y.
museum's prized
collection stolen

**April 4, 1998**
Italy suspects
smugglers got artifacts
to US collector

**March 5, 1998**
Austria confronts dark
past by combing art for
Nazi links

**February 13, 1998**
Museums' stance on
Nazi loot belies their
role in a key case

**Jan. 30, 1998**
Guatemala demands
MFA return of artifacts

**Jan. 16, 1998**
Harvard museum
acquisitions shock
scholars

**Jan. 13, 1998**
Guatemalans demand
return of artifacts

**Jan. 9, 1998**
New York DA bars
return of Austrian art

**Dec. 6, 1997**
Mali presses for
museum artifacts

**Dec. 5, 1997**
Guatemala moving to
reclaim art

# Murky histories cloud some local art

**By Maureen Goggin and Walter V. Robinson, Globe Staff, 11/09/97**

**F**rench art dealer Cesar Mange de Hauke died in 1965. But he comes alive in declassified documents in the US National Archives: collaborating with the leader of the notorious Nazi effort to plunder artworks systematically from Jews, and driving a German staff car in occupied Paris.

Yet in 1949, just as the State Department was denying him an immigration visa because of his Nazi complicity, de Hauke sold a magnificent pastel by Edgar Degas to New York financier Maurice Wertheim, whose collection passed to the Fogg Art Museum at Harvard, his alma mater, after his death in 1950.

At the Fogg, correspondence on file shows that Wertheim was skeptical about de Hauke's right to sell Degas's "Singer with a Glove." But he bought it anyway. National Archives documents only add to those suspicions: State Department records, evidence that the art was owned by a French family whose collection was targeted by the Nazis in 1941, and information that before it fell into de Hauke's hands it belonged to a Swiss doctor who purchased at least one other looted painting.

At both the Fogg and the Museum of Fine Arts in Boston, records suggest that other European artworks acquired during and after World War II arrived with pedigrees that should have aroused curiosity, if not suspicion. Now, a half-century later, once-secret government documents have provoked a fresh accounting of what happened to the war's spoils, and have provided new evidence that some unsuspecting collectors donated artworks that may have been plundered from Jews and other European collections to major museums.

The Degas is unusual for the amount of documentation that suggests it might have passed illegally through Nazi hands and, ultimately, onto a second-floor wall in the Fogg's most celebrated gallery, the Wertheim Collection. But the two museums have other works with suspect

**Dec. 4, 1997**
Questionable collection

**Nov. 27, 1997**
Family says art will be
returned if it was stolen

**Nov. 25, 1997**
Sotheby's takes work
tied to Nazis off block

**Nov. 09, 1997**
Murky history
surrounds some local
art

**Aug. 01, 1997**
Artworks taken as
reparations pose US
dilemma

**July 25, 1997**
Art registry did not
inform Met of claim

**July 24, 1997**
Stolen-art claims shake
N.Y. museum

**July 6, 1997**
Sweden probes a dark
secret

**June 24, 1997**
Norway says its probe
downplays WWII guilt

**May 18, 1997**
Art buyer fights
Holocaust heirs

**May 9, 1997**
US tracked WWII
influx of imported art:
Government did little
to prevent sale of
works here, files
suggest

**May 5, 1997**
Portrait Nazis stole is
hotly disputed: Auction
buyer, Customs hope
it's Rembrandt;
specialist isn't so sure

**April 25, 1997**

characteristics: unexplained wartime ownership gaps, the involvement
of dealers who collaborated with Nazi art looters, and, often, a failure
by the collectors or museums to make inquiries before acquiring them.

For example, a wartime FBI report suggests that the Museum of Fine
Arts was nonchalant about the origin of its acquisitions during the war.
The MFA's curator of prints, Henry Preston Rossiter, admitted to FBI
agents in 1941 he knew that one dealer, Richard Zinser, whose works
he bought routinely had been imprisoned in Germany for smuggling.

Rossiter bought prints from Zinser, including valuable works by
Albrecht Durer, even though, the FBI report noted, Rossiter said Zinser
"never reveals where he obtains his works."

After the FBI's visit, the MFA ceased buying Zinser's works.

Even so, in an interview on Oct. 24, MFA director Malcolm Rogers
asserted the museum has always insisted that its curators carefully
check the history of any acquisition. As evidence of that longstanding
commitment, he cited the MFA's written "Collection Policy" that
contains that requirement.

Last Thursday, a museum spokeswoman, Dawn Griffin, acknowledged
that the MFA's Collection Policy had been approved by the museum's
trustees on Oct. 23, the day before the Globe interview. She said,
however, that it had been in preparation for more than a year. But it was
not until Oct. 23 that the museum began requiring all dealers to sign
bills of sale affirming their right to sell the artwork.

Griffin refused the Globe's request to release a copy of the full 12-page
written policy, saying it was an internal museum document.

An open market

Mark Masurovsky, one of the first historians to find evidence about
unscrupulous dealers in the National Archives, said disinterest by
museums in the origin of artworks "sent a clear signal during and after
the war that there was an open and unquestioning market for looted
artworks in the United States." With that encouragement, de Hauke and
other unscrupulous emigre dealers had a clear financial incentive to
prey on Jews, said Masurovsky, who is working for the Holocaust Art
Restitution Project, an effort spearheaded by the National Jewish
Museum to document and locate works looted from Jews.

Jonathan Petropoulos, a historian at Loyola College in Baltimore who
has written extensively about wartime plundering, said there is no
evidence that American collectors and museums knew they were
acquiring looted art. But the combination of seemingly legitimate
middlemen, the zeal that museums brought to building their collections
and their unwillingness to ask probing questions of dealers or donors

An ignominious legacy: Evidence grows of plundered art in US

**April 19, 1997**
School sues for return of German art

**April 1, 1997**
A dispute in miniatures: Sherborn man seeks to keep art Germany wants back

**March 17, 1997**
Anti-Semitism of WWII era still burdens Paris: In Marais, ambivalence recalls Vichy regime

**March 16, 1997**
The 'Lost' masterpieces: In France, an uneasy look inward

**LINKS**

**Artwork online**

The French National Museums have posted on the Internet an incomplete, but growing list of the 1,955 paintings and other art objects that were removed to Germany during World War II, returned to France after the war, but never returned to their original owners. Color pictures accompany many of the artworks.

Click here to access the site.

The listings are in French. To review the works, go to the bottom of the initial page and click on the box labeled Sommaire. Then click on the Consultation. Then enter the surname

had a predictable result.

"The evidence, and it is growing, suggests that there may be hundreds of paintings in American museums that were stolen from Jews or looted from other European collections," Petropoulos said. "If you count drawings and lithographs, the number of artworks that have problematic ownership histories is probably in the thousands."

At the MFA and the Fogg, Rogers and other officials are left defending acquisitions that, in many cases, were made before they were born. They note that many artworks have gaps in their ownership, simply, and most often innocently, because owners cherish their anonymity, and sometimes forget where they bought paintings. The archival evidence pointing to other motives has only become available in the last two decades. And as public institutions, their collections are published for any claimant who wishes to come forward.

Moreover, the museum officials noted, there is no conclusive evidence that any of the paintings that the Globe asked about were stolen. And with no claimants for the artworks, much of the documentation is circumstantial.

Art specialists interviewed by the Globe said the Fogg and MFA are hardly unique among museums for acquiring art without applying any of the customary standards of due diligence that are required by law when real estate and even used cars change hands. Nowadays, most museums follow a standard practice, requiring donors and art dealers to sign documents declaring they have clear title to the artwork.

But experts in art law say such documents are legally meaningless, and amount to nothing more than a fig leaf for what the law now requires: a full title search that can identify problem artworks and provide a real defense if a claim is made.

Questionable provenance

The Globe decided to examine a small portion of the thousands of European paintings at the MFA and Fogg - modern paintings acquired during or after the war - after reporting earlier this year about war-related claims being pressed against other museums.

The Metropolitan Museum of Art in New York and the Philadelphia Museum of Art are facing allegations that they acquired looted artworks after the war. In another case, curators at the Art Institute of Chicago helped a major benefactor, Daniel Searle, acquire a Degas monotype looted from a Dutch victim of the Holocaust.

Officials at both the Fogg and the MFA cooperated, opening their archives for inspection, and doing original - and, some critics say, long overdue - research to fill gaps in provenance, or ownership of some

of an artist and click on
the box Executer. That
will bring up a list of
the painter's works. To
see one of the works,
and a brief description,
click on the title of the
painting.

**LATEST NEWS**
National
International
Washington, D.C.

**WORLD REPORTS**
Middle East
Far East
Latin America
Russia
Europe
Africa
Canada

**Table of Contents**

**Archives**

Search the Globe:

◉ Today
○ Yesterday

**SEARCH**





**Sections**
PAGE ONE
NATION&WORLD
METRO/REGION
BUSINESS
SPORTS
LIVING/ARTS
EDITORIALS
COLUMNS

paintings. The results, in some instances, are embarrassing to the
museums, especially the Fogg, where four paintings have questionable
provenances.

At the Museum of Fine Arts, the issue is often how little it knows about
some of its artworks. For example, the MFA bought a Monet painting
from Brandeis University in 1974. Records at the MFA and Brandeis
suggest that neither institution knew anything about the ownership of
"Woodgatherers at the Edge of the Forest" during most of the century
after Monet painted it in 1864. The painting was purchased in 1961
from New York dealer Alexander Ball by Harold Kaplan, who donated
it to Brandeis in 1968.

Ball, according to National Archives records, had frequent dealings
with Nazi art looters - and a business relationship with Hans Wendland,
who funneled numerous stolen paintings into a wartime black market
that included emigre dealers in New York.

At the MFA, some valuable paintings have no ownership history,
except the name of the donors: The museum, for instance, knows
nothing about the history of five paintings left to the museum in 1948
by one of its benefactors.

The museum has also been unable to identify who owned one of its
Picassos, "Standing Figure," during the 37 years before the MFA
bought the work from Swiss dealer Fritz Nathan in 1958. In a letter to
the Globe suggesting that suspicions about the provenance of MFA
paintings are unwarranted, George T. M. Shackelford, the curator of
European paintings, said Nathan's gallery "for more than half a century
was generally regarded as one of the most distinguished art galleries in
Europe."

Yet Nathan was the wartime art adviser and purchasing agent for Emil
G. Buhrle, a Swiss collector who knowingly bought many paintings
that had been looted from Jews, according to extensive Allied
interrogation reports in the National Archives. What's more, a 1921
auction catalog shows that the painting had been sold to a "Winberg."

Rogers, speaking from hindsight, said knowledge about Ball's wartime
activities makes it "very unlikely" the MFA would have purchased the
"Woodgathers at the Edge of the Forest" without conducting a thorough
investigation. "Clearly," he said, "that would ring alarm bells."

But Rogers noted that much of the information surfaced only recently.
"Inherent in the trading of any goods, as I'm sure you know since you
must have bought second-hand goods yourself or from antique shops, is
a matter of professional confidence," he said. As for most gaps, he
added, "Human nature and memory are much more fragile than you
think, and our knowledge is often incomplete.... Incompleteness is no
grounds for suspicion."

CALENDAR
DISCUSSIONS
CLASSIFIEDS
LATEST NEWS
EXTRANET
ARCHIVES

Still, he said, recent disclosures, some of them in the Globe, have led to a "new awareness [of a problem] that nobody guessed the size of, and we're all trying to cope with that."

Rogers, confronting questions about artworks acquired a half century ago, wondered why they were not raised in the 1950s and 1960s by the many Jews who, he said, were art dealers, collectors and art historians.

"But it is fascinating why in the years following the war ... more wasn't said, people weren't more enraged ... particularly since so many of the people in the art world were Jewish at that time. So many of the scholars were people who had fled. You know, most of the great giants in the art historical world were Jewish in that period ... The collectors were as well. Very strange," Rogers said.

Selling off paintings to survive

Unlike the much larger MFA, the Fogg has virtually no staff or money to undertake the sort of provenance research the Globe conducted: Its annual budget for out-of-town research is just $2,000.

The Fogg collections, built on the philanthropy of Harvard's most successful graduates, also contain their share of paintings with incomplete, and sometimes suspicious ownership records.

Across the room from the Degas in the Wertheim Collection is a haunting 1887 still life by Vincent van Gogh, "Three Pairs of Shoes," with its subliminal message about the misery of Europe's working poor. Wertheim bought it in late 1943 from the best-known of the emigre dealers, Georges Wildenstein. Wildenstein, like de Hauke, had a business relationship with Karl Haberstock, Hitler's principal art looter.

But where did Wildenstein obtain the van Gogh? According to the Fogg's records, it came from Marcel Kapferer, a French Jew. His granddaughter, Francine Legrand-Kapferer, said in a recent interview that Kapferer hid his family from the Nazis in Cannes during the war, selling off paintings one at a time to survive. Legrand-Kapferer said that her grandfather frequently reminded his family that but for those sales, they would have died.

All such sales under duress in Nazi-occupied Europe were declared invalid under a 1943 Allied declaration. If the van Gogh was among the works sold during the war - and Legrand-Kapferer said she did not know whether it was - then the artwork would enter a legal limbo.

Even more suspicious is a Monet, "La Mere Paul," listed at the Fogg as owned before the war by Paul Wittgenstein in Vienna and bought by the Wertheim Fund for the Fogg in 1955.

At the Globe's request, Austrian journalist Hubertus Czernin searched

out Nazi records in Austrian archives. They show that the Nazis confiscated a substantial art collection from a renowned Vienna concert pianist of the same name, Paul Wittgenstein, though the records are incomplete.

Wittgenstein's daughter, Joan Ripley of Charlottesville, Va., said her father, who was of Jewish ancestry, fled to New York in 1938 and as far as she knows never returned to Vienna, or recovered the bulk of his property after the war. Another relative, though, recalls a "a painting of an old woman, a Monet" that once hung in Wittgenstein's home.

The record shows that the Monet next surfaced in a gallery in Stuttgart, Germany, in 1954, where it was bought by Jacques Seligmann, another emigre dealer and associate of de Hauke who has been implicated in wartime art collaboration. Seligmann sold it to the Wertheim Fund.

The $38,500 Degas

But it is the Degas pastel that Wertheim bought the year before he died that has the most troubling history.

Maurice Wertheim was a tournament chess player, a founder of the New York Theatre Guild, for a time the owner of The Nation magazine, and the father of Barbara W. Tuchman, the Pulitzer Prize-winning historian. During the war, he was also chairman of the American Jewish Committee.

Wertheim was fearful that de Hauke did not have the right to sell the Degas, though the correspondence at the Fogg does not suggest why. To allay his fears, Wertheim had his lawyer call Justin Thannhauser, an associate of de Hauke, while de Hauke was en route to a meeting with Wertheim. Thannhauser told the lawyer that de Hauke did not own the pastel, but was selling it for a Dr. Heer of Zurich.

Yet when de Hauke arrived, he told Wertheim that his corporation owned the Degas, but refused to sign a statement saying he had authority to sell it. Wertheim nonetheless handed over a check for $38,500 for the artwork.

"Mr. Wertheim made the remark that he is aware of the fact that he took a chance with regard to the title of this picture, but that in view of the information obtained from Thannhauser, the risk involved is rather remote," the Wertheim lawyer, Hermann E. Simon, wrote at the time.

Three weeks later, Simon received a letter, apparently from de Hauke's lawyer, asserting that de Hauke bought the picture from Thannhauser - another apparent contradiction.

Ivan Gaskell, the Fogg's curator of paintings, sculpture and decorative arts, said that when he first saw the correspondence three or four years

ago, he interpreted it to mean that both dealers had an interest in the work. "In and of itself, it did not suggest any suspicion," Gaskell said.

But the US archival records, coupled with Swiss government records, suggest that both Thannhauser and de Hauke had much to hide. Thannhauser was a business associate of Wendland, the German dealer and art looter who funneled so many artworks into the black market, and may have stored paintings for Wendland during the war.

The original listed owner of the pastel was Camille Groult. Declassified US documents show that Haberstock, the Nazi art looter with ties to de Hauke, hired another art collaborator to "expertise" the Groult collection, a common step before a confiscation or forced sale. The Groults were apparently not Jewish, and efforts to determine what happened to their collection, or whether the Degas was part of it at the time, were unavailing.

The next owner in the chain was Dr. Fritz Heer, identified in National Archives documents as a Swiss collector who purchased at least one looted painting.

Several documents that historian Mazurovsky discovered in the National Archives contain intelligence information and post-war State Department correspondence that build a case against de Hauke for his ties to Haberstock and his role in art looting, even suggesting he may have been involved in obtaining paintings for Adolf Hitler, Hermann Goering and Heinrich Himmler. Two months before Wertheim bought the Degas, a handwritten note by a State Department official concluded de Hauke "knowingly handled looted art in his deals with the Germans" and that he should be denied a visa to remain in the United States.

Gaskell, the Fogg curator, said he is eager to track down more information about the paintings, especially the Degas. In light of the archival records, he said of the one artwork, "There are clearly red lights all along the way."

Previous coverage and related links are available on Globe Online at www.boston.com. The keyword is paintings.

This story ran on page A01 of the Boston Globe on 11/09/97.
© Copyright 1997 Globe Newspaper Company.





We Pedal The Best. For Less. Click here!



© Copyright 1998 Globe
Newspaper Company

Extending our newspaper services

Return to the home page
of The Globe Online



to the web

# EXHIBIT 2



# THE ART LOSS REGISTER, INC.

20 East 46th Street, Suite 1402
New York, NY 10017

Telephone: 212-297-0941
Facsimile: 212-972-5091
Email: info@ALR.ny.com

September 18, 2001

Christel Hollevoet-Force
Research Assistant, Provenance
The Museum of Modern Art
11 West 53rd Street
New York, NY 10019

Invoice: MOMA210-5

Dear Ms. Hollevoet-Force:

Thank you for your search request. We have completed the Art Loss Register database search on the following items:

**Artist:**      Pablo Picasso
**Title:**       *Boy Leading a Horse*
**Date:**        early 1906
**Medium:**      Oil on canvas
**Dimensions:**  7' 2 ¾" x 51 ½" (220.3 x 130.6 cm)
**Provenance:**  Ambroise Vollard, Paris; Gertrude and Leo Stein, Paris, by 1907 –
before 1913; Paul von Mendelssohn-Bartholdy, Berlin; Justin Thannhauser, Munich;
Siegfried Rosengart, Lucerne; Albert Skira, Geneva; William S. Paley, New York, 1936;
The Museum of Modern Art, New York. Gift of William S. Paley, 1964.

Color image Provided.

ALR NOTE: Paul von Mendelssohn – Bartholdy, Berlin might have been related to
Francesco Mendelssohn , whose collection underwent a forced sale. The Thannhauser
archives are in Geneva now, and the name generally does not mean good things. Sigfried
Rosengart records are now in Lucerne, Switzerland. It might be worth checking with
them to get a date of sale, as Albert Skira is a red flag list name, althoug it might be
alright as the painting went to New York so early on.

**REDACTED**



THE ART LOSS ■ REGISTER, INC.

REDACTED



# THE ART LOSS█REGISTER, INC.

**REDACTED**

s of September 18, 2001, these items have not been registered as stolen or missing on the Art Loss egister database.  Nor are they listed in the published sources of WWII losses that are known to the Art oss Register. As stated in the Terms and Conditions, the database does not include items that may have een illegally exported.  Also, not every theft is necessarily reported to us.

hould you have any further questions or inquiries, please do not hesitate to contact us by telephone or x.  Thank you for using the Art Loss Register.

incerely

ucy Haverland

4

# EXHIBIT 3

<u>PABLO  PICASSO</u>                    <u>born 1881</u>

WOMAN     Oelgemaelde          100 x 70 cm          40 x 28 inches

Bildnis Madame Soler          Barcelona          1903

Ausgestellt Muenchen,  Galerie Thannhauser,
Erste Picasso Ausstellung                                   1909

Armory Show in New York: "International Exhibition    1913
of Modern Art," Association of American Painters and
Scu]ptors. 69th Infantery Regiment Armory, New York,
          # 148                          Febr.March     1913
Armory Show    Art Institute, Chicago, Ill. March/Apr.  1913
Armory Show    Copley Hall, Copley Society, Cat.#148
               Boston, Massachussetts          April/May  1913
Christian Zervos, "Pablo Picasso", Volume I,
Repr.P.90, No.200;angefuehrt rueckwaerts Plate 4T,
No.200.

Galerie Thannhauser, Berlin, Ausstellung moderner    1930
deutscher und franzoesischer und spanischer Künstler,

Sammlung Paul von Mendelssohn Bartholdy, Berlin

Erste Picasso/Ausstellung in Süd Amerika:        Okt.  1934
Buenos Aires,  Katalog No. 1.

Jean Cassou, Picasso, Paris 1939 (franzoes.Ausg.)   1939
Jean Cassou, Picasso, London / New York, Hyperion
          Press                                      1940
          abgeb. gangseitig  S. 46

Museum of Modern Art, New York, "Twentieth Century   1943
          Portraits,"Exhibition by Monroe Wheeler
          Seite 141

Santa Barbara Museum of Art, California:             1953
          "Fiesta Exhibition," No. 4.

Marion Koogler McNay Art Institute,  Catal.# VII.    1961
San Antonio, Texas, Special Exhibition.
Reproduced.

"An American Tribute", Retrospective Picasso Show,
Benefit Exhibition for "Public Education Association",1962
Cat. # 19.       Reproduced.
                                                     1963

"The Armory Show in retrospect", Book by Edward H.Dwight, Director,
Museum of Art, Munson Williams Proctor Institute, Utica,
(Die Ausstellung war wiederholt in Utica, und danach in
derselben Armory in New York wie in 1913.) Das Bild ist;
verzeichnet auf Seite 200, unter No.348;doch es war nicht
ausgestellt. Ist aber ganzseitig reproduziert, Seite 85.

Ein Bildnis gleicher Grösse stellt; den Gatten der Madame
Soler dar und befindet sich im Eremitage Museum in Leningrad.
(Zervos, Picasso, Vol.I, P.90, Abb.199,Catal.S.45; No.199.)

Vergl.das grosse Bild der Familie Soler mit 4 Kindern,früher
Wallraf Richartz Museum,Köln;unter Hitler versteigert; in der
Schweiz;verkauft an Museum in Liège (Luettich) Zervos I.203

# EXHIBIT 4

*JK Thorder*
*Dec. 1970*

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

*15.2.105*

Museum Number 16

Pablo Picasso

Le Moulin de la Galette, Paris, 1900 *(autumn)*

Oil on canvas, 35½ x 46 (frm. stretcher rev.)

Signed b. r. "P. R. Picasso – "

Provenance: From the artist; Paul von Mendelssch Bartoldy (ca. 1910; *from* Thannhauser Gallery, Berlin (ca. 1909); bought back by Justin Thannhauser *ca. 1935.*

Exhibitions: Picasso, Forty Years of his Art, Museum of Modern Art, New York, (1939), #5, p. 24 (ill.).
*Chicago, Art Institute  1939 a 1940".*
Picasso: Fifty Years of his Art, Museum of Modern Art, New York, 1946, p. 18 (ill.).

Picasso: 75th Anniversary Exhibition, Museum of Modern Art, New York, 1957, p. 15 (ill.).

Picasso, Philadelphia Museum of Art, 1958, #4 (ill.).

Picasso, Arts Council of Great Britain, *London Tate Gallery* 1960, #4, (ill. pl. 1b).

Literature: Zervos, Christian, Pablo Picasso, I, # 4.

Cirici-Pellicer, Alexandre, Picasso Avant Picasso, trans. from the Spanish edition of 1946 by Marguerite de Floris and Ventura Gasol, Geneva, 1950, pp. 65-69.

Barr, Alfred H. Jr., Picasso: Fifty Years of his Art, New York, 1946, pp. 19-20.

Boeck, Wilhelm and Sabartès, Jaime, Picasso, New York, 1955, p. 147.

Asnar, Jose Camon, Picasso y el Cubismo, Madrid, 1956, #214 (ill.).

Penrose, Roland, Picasso: His Life and Work, New York, 1959, pp. 63-64, ill. #8, pl. I.

Champris, Pierre de, Picasso, Ombre et Soleil, Paris, 1960, #3 (ill.), p. 15.

Blunt, Anthony and Pool, Phoebe, Picasso, the Formative Years, London, 1962, "First Visit to Paris 1900," pp. 12-14.

*Also elsewhere often reproduced*

*Helen F. Mackenzie  Understanding*  *Picasso  "censored by the
Art Institute of Chicago" Volume of their Press 1940. Plate 1.*

# EXHIBIT 5

JKT

*DCE NSIG  Mar 15*   **34**

Provenances for ~~PICASSO~~ The Solomon R. Guggenheim Museum Archive

The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

## The End of the Road

Private collection, Barcelona  *By 1957 JKT*

## Au Café, Woman and Child, Man with Pack

All Santiago Laporta, Barcelona   *All in Zürich 1932*

## Le Moulin de la Galette

From the artist; Thannhauser Gallery, Munich (c. 1909);
Paul von Mendelssohn-Bartoldy (c. 1910-1935);
Justin K. Thannhauser   *B-aires*   *sent to B-aires in 1934*   *consign need*

## The Fourteenth of July

From whom was it purchased in Paris about 1937?   *1936-37*  *36-37*
*Picaso, — Pierre Loeb & NY.*   *-7 1938-(*

## Woman Ironing

*Berlin, Strasbourg — Holland another gallery to*
~~Did you sell it to Karl Adler about 1916 and
buy it back in the late 1930s?~~

Who owned it before?   *Kahn 100, 1 ptg (didn't deal in Picaso)*   Acc. Zervos, A. Vollard.

## Head of a Woman   (pastel)

When did it belong to Paul von Mendelssohn-Bartoldy,
Berlin?

*Consignment*   *loan To Legrain.*   It belonged to Justin K. Thannhauser at the time of
*1935-36*
the 1934 Buenos Aires exhibition, didn't it? *no*

## Vase and Flowers   (drawing)

Gallery in Paris

## Two Harlequins

Who was Mlle. A. Nachmann? *Sonoten after*   *August 1939*
When and from whom did you acquire it? *— middleman Cur*  *— Sent to — Cigare.*

# EXHIBIT 6

*JKT A01 CS*

The Solomon R. Guggenheim Museum Archive
The material reproduced in this copy may be
protected by copyright.
This copy is for personal use only; do not reproduce.

Pablo Picasso

HEAD OF A WOMAN (TÊTE DE FEMME), 1903 *[?]*, Paris (?).
*(and gouache)*
*inscription:* Pastel on paper, 11 3/8 x 11 1/8 (JKT). *12 3/16 ~ 10 7/16 (Zervos) Maurice*

Signed t. r. "Picasso"

Provenance:   *Coll. Paul v. Mendelssohn-Bartholdy, Berlin*

*(question Cat)*

Exhibitions:   *First Picasso Exhibition in South America, at th. Buenos Aires 1934, arranged by J. K. Thannhauser, Thannhauser Galleries, Paris, 1937.*

Related Works:   Zervos I, #205 (Tête de Femme, Barcelona, 1903);
#254 (Fernande Olivier, 1906);
Zervos VI, #747 (portrait de Fernande, 1906).

Literature:   Zervos, Christian, Pablo Picasso, I (1957), #206.

Cirici-Pellicer, Alexandre, Picasso avant Picasso,
trans. from the 1946 Spanish edition by M. de Floris
and V. Gasol, Geneva, 1950, #175 (Tête de Femme,
1903, pastel), ill.